**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　　Plaintiff-Applicant,<br><br>　　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　　Defendant. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>Substantively Consolidated |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD.,<br><br>　　　　　　　Defendants. | Adv. Pro. No. 10-4932 (BRL)<br><br>Case No. 1:11-cv-00913 (CM) (MHD) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Estate of*
*Bernard L. Madoff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 5

    A.    Madoff's Ponzi Scheme Is Discovered and the SIPA Liquidation Is Removed to Judge Lifland's Court ............................................................ 5

    B.    The Trustee's Rule 2004 Discovery Has Revealed Only the "Tip of the Iceberg" ...................................................................................................... 5

    C.    The Trustee's Complaint Against JPMC .................................................. 6

    D.    JPMC's Misstated Facts ........................................................................... 8

ARGUMENT ........................................................................................................... 9

I.    DEFENDANTS' MOTION IS PREMATURE .............................................. 9

II.    THE STANDARD FOR MANDATORY WITHDRAWAL IS NOT MET ...................... 9

    A.    Section 157(d) Is to Be Narrowly Construed ........................................ 10

    B.    The "Substantial and Material Consideration" Bar Is High ................... 10

    C.    Section 157(d) Pertains to the Significant Interpretation of Non-Bankruptcy Federal Statutes, Not Federal Common Law ................... 12

III.    NOTHING ABOUT THE TRUSTEE'S STANDING TO ASSERT CLAIMS IN THIS CASE MANDATES WITHDRAWAL OF THE REFERENCE ........................ 13

    A.    SIPA Is Not a Federal Securities Statute Outside the Expertise of the Bankruptcy Court ................................................................................ 13

    B.    Established Second Circuit Law Holds that a Trustee Has Standing to Assert Common Law Claims as Bailee, Assignee, and Enforcer of SIPC's Subrogation Rights ............................................................................. 16

        1.    Assignment ................................................................................ 17

        2.    Bailment .................................................................................... 17

        3.    Subrogation ............................................................................... 18

        4.    There Is No "Split" in Authority as to the Trustee's Standing ............... 18

IV.    DEFENDANTS' ANTICIPATED SLUSA DEFENSE BORDERS ON FRIVOLOUS AND ITS APPLICATION DOES NOT REQUIRE "SUBSTANTIAL AND MATERIAL" INTERPRETATION OF A FEDERAL STATUTE ............................................................................................... 20

V.    THE TRUSTEE HAS NOT BROUGHT ANY CLAIMS AGAINST JPMC FOR VIOLATIONS OF FEDERAL BANKING LAWS AND REGULATIONS ................. 23

    A.    Aiding and Abetting Fraud and Breach of Fiduciary Duty Are New York State Law Claims ................................................................................ 24

i

**TABLE OF CONTENTS**
(continued)

**Page**

B. Conversion Is a New York State Law Claim ........................................ 25

C. Unjust Enrichment Is a New York State Law Claim ........................... 25

D. Fraud on the Regulator Is a New York State Law Claim .................... 25

E. Allegations Involving a Federal Statute Do Not Mandate Withdrawal ............. 27

F. The Bankruptcy Court Is Competent to Resolve Questions of Preemption ........ 28

VI. THE STANDARD FOR PERMISSIVE WITHDRAWAL OF THE REFERENCE IS NOT MET HERE EITHER ........................................................ 30

A. The Core/Non-Core Distinction Is Not Dispositive ............................. 30

B. Judicial Efficiency Favors Bankruptcy Court Adjudication ................. 33

  1. JPMC's Reliance on *In re Herald* Is Unpersuasive ................. 37

C. The Jury Trial Issue Is Premature and Weighs In Favor of Denying Withdrawal ................................................................................... 39

CONCLUSION ................................................................................................ 40

## TABLE OF AUTHORITIES

**Page**

**Cases**

*A-Z Assoc. v. 931 Investors (In re Lion Capital Grp.)*,
  63 B.R. 199 (S.D.N.Y. 1985)................................................................................... 31

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
  Adv. Pro. No. 03-04942 (REG), 2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007)......... 22

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*,
  293 B.R. 337 (Bankr. S.D.N.Y. 2003)..................................................................... 22

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  No. 03 MDL 1529(LMM), 2006 WL 337667 (S.D.N.Y. Feb. 10, 2006).......................... 12, 39

*In re Adler Coleman Clearing Corp.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996)..................................................................... 13

*Am. Tel. & Tel. Co. v. Chateaugay Corp.*,
  88 B.R. 581 (S.D.N.Y. 1988).................................................................................. 11

*Appleton v. First Nat'l Bank of Ohio*,
  62 F.3d 791 (6th Cir. 1995) ............................................................................. 18, 19

*Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*,
  529 F.3d 432 (2d Cir. 2008) ............................................................................ 16, 17

*Bear Stearns Sec. Corp. v. Gredd*,
  No. 01 Civ. 4379 NRB, 2001 WL 840187 (S.D.N.Y. July 25, 2001) .......................... 11

*Boyle v. United Tech. Corp.*,
  487 U.S. 500 (1988)........................................................................................... 27

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)....................................................................................... 26, 27

*Cal. v. Enron Corp. (In re Enron Corp.)*,
  No. 05 Civ. 4079 (GBD), 2005 WL 1185804 (S.D.N.Y. May 18, 2005)........................ 29

*Chanayil v. Gulati*,
  169 F.3d 168 (2d Cir. 1999) ............................................................................... 26

*Chemtura Corp. v. United States*,
  No. 10 Civ. 503 (RMB), 2010 WL 1379752 (S.D.N.Y. Mar. 26, 2010)....................... 12

# TABLE OF AUTHORITIES

**Page**

*Cipollone v. Ligget Grp., Inc.*,
   505 U.S. 504 (1992)...........................................................................................29

*City of New York v. Exxon Corp.*,
   932 F.2d 1020 (2d Cir. 1991) ...........................................................................10

*Cohen v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Cnty. Seat Stores, Inc.)*,
   No. 01 Civ. 2966 (JGK), 2002 WL 141875 (S.D.N.Y. Jan. 31, 2002)...................37

*In re Cont'l Air Lines, Inc.*,
   60 B.R. 459 (Bankr. S.D. Tex. 1985) ............................................................12, 26

*Coyne Elec. Contractors, Inc. v. United States (In re Coyne Elec. Contractors, Inc.)*,
   244 B.R. 245 (Bankr. S.D.N.Y. 2000) ..............................................................29

*In re Dana Corp.*,
   379 B.R. 449 (S.D.N.Y. 2007).............................................................................11

*In re Enron Corp.*,
   318 B.R. 273 (S.D.N.Y. 2004)..............................................................................39

*In re Enron Corp.*,
   328 B.R. 75 (Bankr. S.D.N.Y. 2005)....................................................................29

*Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*,
   388 B.R. 131 (S.D.N.Y. 2008).................................................................11, 22, 27

*Enron Corp. v. JP Morgan Sec., Inc. (In re Enron Corp.)*,
   No. M-47 (GBD), 2008 WL 281972 (S.D.N.Y. Jan. 25, 2008) ...............................9

*In re Enron Power Mktg., Inc.*,
   2003 WL 68036 ...........................................................................31, 33, 37, 39

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*,
   No. 04 Civ. 8177(RCC), 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ...............11

*Exch. Nat'l Bank of Chicago v. Wyatt*,
   517 F.2d 453 (2d Cir. 1975) ...............................................................................15

*In re Fairfield Sentry Ltd.*,
   10 Civ. 7340, 2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010)............................*passim*

*In re Fairfield Sentry Ltd.*,
   Case No. 10-13164 (BRL) (Bankr. S.D.N.Y. filed July 22, 2010)........................35

# TABLE OF AUTHORITIES

**Page**

*Fornshell v. Firstmerit Bank, N.A.*,
No. 1:10 CV 2040, 2010 WL 4835771 (N.D. Ohio Nov. 23, 2010) ....................................... 28

*In re Gaston & Snow*,
173 B.R. 302 (S.D.N.Y. 1994)................................................................. 39

*In re Herald, Primeo and Thema Funds Sec. Litig.*, No. 09 Civ. 0289 (RMB)
(S.D.N.Y. filed Jan. 1, 2009) (Amend. Compl. filed Feb. 10, 2009).......................... 37, 38, 39

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992)................................................................................ 19

*In re Horizon Air, Inc.*,
156 B.R. 369 (N.D.N.Y. 1993)................................................................. 12

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*,
185 B.R. 680 (S.D.N.Y. 1995)............................................................. 10, 11

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*
*(In re Ionosphere Clubs, Inc.)*, 103 B.R. 416 (S.D.N.Y. 1989)................................. 12

*Jagow v. Top Hill, LLC (In re Townhomes at Hill Top, LLC)*,
No. 08-cv-00514, 2008 WL 2078109 (D. Colo. May 14, 2008) ............................ 29

*Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.)*,
182 B.R. 379 (S.D.N.Y. 1995)......................................................... 10, 11, 31

*Keller v. Blinder (In re Blinder, Robinson & Co.)*,
162 B.R. 555 (D. Colo. 1994)................................................................ 15

*Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*,
136 B.R. 59 (S.D.N.Y. 1992)............................................................. 30, 39

*LaSala v. UBS, AG*,
510 F. Supp. 2d 213 (S.D.N.Y. 2007) ...................................................... 21

*Lee v. Marsh & McLennan Cos., Inc.*, No. 06 Civ. 6523(SWK),
2007 WL 704033 (S.D.N.Y. Mar. 7, 2007) .............................................. 20, 21

*In re Mann*,
134 B.R. 710 (Bankr. E.D.N.Y. 1991).................................................... 29

*Minihane v. Weissman (In re Empire Blue Cross & Blue Shield Customer Litig.)*,
622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994) ................................................ 25, 26

# TABLE OF AUTHORITIES

**Page**

*Mishkin v. Ageloff,*
   220 B.R. 784 (S.D.N.Y. 1998)................................................................ 12, 19, 30, 33

*Mishkin v. Peat, Marwick, Mitchell & Co.,*
   744 F. Supp. 531 (S.D.N.Y. 1990) ..................................................................... 19

*Murphy v. Cnty. of Chemung,*
   410 B.R. 145 (W.D.N.Y. 2009) ......................................................................... 11

*O'Connell v. Terranova (In re Adelphi Inst., Inc.),*
   112 B.R. 534 (S.D.N.Y. 1990)................................................................... 10, 11, 39

*Old Carco LLC v. Kroger (In re Old Carco LLC),*
   442 B.R. 196 (S.D.N.Y. 2010)........................................................................ 29, 30

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
   4 F.3d 1095 (2d Cir. 1993) ........................................................................... 30, 31

*Orr v. Ameriquest Mortg. Co. (In re Hollis),*
   Adv. Pro. No. 07-2615, 2009 WL 3030125 (Bankr. D.N.J. Sept. 17, 2009).......................... 29

*Pension Benefit Guar. Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines),*
   138 B.R. 442 (D. Del. 1992)....................................................................... 12, 26, 28

*Picard v. Fairfield Sentry Ltd.,* Case No. 08-01789 (BRL), Adv. Pro. No. 09-01239
   (Bankr. S.D.N.Y. filed May 18, 2009) (Am. Compl. filed July 20, 2010).............................. 34

*Picard v. HSBC Bank PLC,* Case No. 08-01789 (BRL), Adv. Pro. No. 09-1364
   (Bankr. S.D.N.Y. filed July 15, 2009) (Am. Compl. filed Dec. 5, 2010)......................... 35, 36

*Picard v. Kohn,* Case No. 08-01789 (BRL), Adv. Pro. No. 10-05411
   (Bankr. S.D.N.Y. filed Dec. 10, 2010) ............................................................... 35

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),*
   440 B.R. 243 (Bankr. S.D.N.Y. 2010)................................................................... 16

*Picard v. Taylor (In re Park S. Sec., LLC),*
   326 B.R. 505 (Bankr. S.D.N.Y. 2005)................................................................ 16, 17, 18, 19

*Picard v. Tremont Grp. Holdings, Inc.,* Case No. 08-01789 (BRL),
   Adv. Pro. No. 10-05310 (BRL) (Bankr. S.D.N.Y. filed Dec. 7, 2010) .................................... 36

*In re Recoton Corp.,*
   No. 04 Civ. 2466 (DIC), 2004 WL 1497570 (S.D.N.Y. July 1, 2004)......................... 10, 22, 23

# TABLE OF AUTHORITIES

**Page**

*Redington v. Touche Ross & Co.,*
  592 F.2d 617 (2d Cir. 1978) ........................................................................ *passim*

*RGH Liquidating Trust v. Deloitte & Touche,*
  71 A.D.3d 198, 891 N.Y.S.2d 324 (N.Y. App. Div. 2009) .................................... 22

*Sec. Exch. Comm'n v. Bernard L. Madoff Inv. Sec. LLC,*
  No. 08-10791 (S.D.N.Y. Dec. 15, 2008) ............................................................ 14

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP,*
  222 F.3d 63 (2d Cir. 2000) ................................................................. 18, 19, 20

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP,*
  49 F. Supp. 2d 644 (S.D.N.Y. 1999) ............................................................ 19, 20

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
  *(In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).......... 3, 14, 16

*Sec. Investor Prot. Corp. v. Cheshier & Fuller, L.L.P. (In re Sunpoint Sec., Inc.),*
  262 B.R. 384 (Bankr. E.D. Tex. 2001) ............................................................ 15

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,*
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ............................................................ 25

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),*
  922 F.2d 984 (2d Cir. 1990) ................................................................. 10, 24, 26

*Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.),*
  387 B.R. 365 (Bankr. E.D.N.Y. 2008).......................................................... 24, 25

*Smith v. Arthur Andersen, LLP,*
  421 F.3d 989 (9th Cir. 2005) ..................................................................... 21

*In re Texaco Inc.,*
  84 B.R. 911 (S.D.N.Y. 1988).............................................................. 9, 22, 27

*Times Circle E., Inc. v. Edward Isaacs & Co. (In re Times Circle E., Inc.),*
  No. 94 B 455593 (TLB), 1995 WL 489551 (S.D.N.Y. Aug. 15, 1995) .................................. 37

*Touche Ross & Co. v. Redington,*
  442 U.S. 560 (1979)........................................................................... 16, 19

*Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.),*
  136 B.R. 1008 (D. Colo. 1998)................................................................... 15

# TABLE OF AUTHORITIES

**Page**

*Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*,
    4 F.3d 1556 (10th Cir. 1993) ........................................................................ 15

*United States v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    63 B.R. 600 (S.D.N.Y 1986) .......................................................................... 10

*In re the VWE Group, Inc.*,
    359 B.R. 441 (S.D.N.Y. 2007) (McMahon, J.) ............................................. 32

*Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.)*,
    94 B.R. 293 (S.D.N.Y. 1988) ............................................................ 30, 31, 32

*In re White Motor Corp.*,
    42 B.R. 693 (N.D. Ohio 1984) ...................................................................... 27

**Statutes**

11 U.S.C. § 101 ...................................................................................................... 3

11 U.S.C. § 362(a) ................................................................................................ 14

11 U.S.C. § 541(a)(7) ........................................................................................... 17

11 U.S.C. § 542 ..................................................................................................... 16

11 U.S.C. § 546(e) ................................................................................................ 11

15 U.S.C. § 77p(b) ............................................................................................... 21

15 U.S.C. § 77p(f)(2)(A) ...................................................................................... 21

15 U.S.C. § 78aaa .................................................................................................. 1

15 U.S.C. § 78bb(f)(5)(D) .................................................................................... 21

15 U.S.C. § 78eee(a)(4)(B) .................................................................................... 5

15 U.S.C. § 78eee(b)(4) ..................................................................................... 5, 14

15 U.S.C. § 78fff(b) ................................................................................. 13, 14, 15

15 U.S.C. § 78fff-2(c)(3) ...................................................................................... 16

15 U.S.C. § 78fff-3(a) ........................................................................................... 18

15 U.S.C. § 78lll(4) ............................................................................................... 17

## TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 157 .................................................................................................. 30

28 U.S.C. § 157(b)(1) ........................................................................................ 31

28 U.S.C. § 157(b)(3) ........................................................................................ 32

28 U.S.C. § 157(c) ............................................................................................. 33

28 U.S.C. § 157(c)(1) ........................................................................................ 31

28 U.S.C. § 157(d) .......................................................................................... *passim*

**Other**

H.R. Rep. No. 91-1788 (1970) (Conf. Rep.) ..................................................... 14

S. Rep. No. 105-182, 1998 WL 226714 (May 4, 1998) ................................... 21

**Rules**

Fed. R. Civ. P. 17 .............................................................................................. 18

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the estate of Bernard L. Madoff, by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to the motion by JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMC" or "Defendants") to withdraw the reference ("Motion") of this action from the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").

## PRELIMINARY STATEMENT

JPMC seeks refuge in this Court to escape the scrutiny of the Bankruptcy Court overseeing the vast and complex proceedings surrounding the BLMIS Ponzi scheme. In so doing, it no doubt hopes to distance itself both from the thousands of victims of that scheme and from other alleged wrongdoers—all of whom are before the Bankruptcy Court. Yet there is no escaping the fact that JPMC was at the very center of Madoff's Ponzi scheme. It was the debtors' primary banker for over two decades and touched virtually every cent that flowed through the Ponzi scheme—nearly every cent at issue in the bankruptcy. As BLMIS's banker, it had every opportunity to see the fraud, yet turned a blind eye to billions of dollars worth of suspicious transactions. JPMC also conducted due diligence on BLMIS and Madoff in order to structure products on BLMIS feeder funds. It reached out to numerous feeder funds in its due diligence efforts—feeder funds with claims before the Bankruptcy Court and who are being sued in the Bankruptcy Court. Its diligence revealed the high likelihood of fraud, yet JPMC again decided to turn a blind eye. The issue of JPMC's misconduct belongs before the Bankruptcy Court as the court most versed in the nuances of the Ponzi scheme and the roles of other, related wrongdoers in that scheme.

JPMC uses its central role in the Ponzi scheme to contend, with some degree of indignation, that it has a right to be before this Court given the serious nature of the allegations. Although the allegations are indeed serious, the test for withdrawal of the reference is neither the gravity of the allegations nor the indignation of the defendant.  As much as JPMC is emphatic in its *right* to a jury trial, significantly, JPMC has not asked for a jury trial.  And unless and until it makes that request, the fact that it is entitled to a jury trial is no reason to withdraw the reference from the Bankruptcy Court.

Indeed, JPMC's entire Motion is premature, premised on nothing more than arguments it *anticipates* making, but has not made.  Previewing its motion to dismiss, JPMC attempts to characterize its defenses in such a way as to manufacture issues which would require withdrawal of the reference.  However, mandatory withdrawal of the reference is only called for in the limited circumstance in which the court needs to engage in a "substantial and material" analysis of a non-bankruptcy federal statute through "significant interpretation" of that statute.  As a practical matter, "significant interpretation" has been viewed in this Circuit to apply in circumstances in which a non-bankruptcy federal statute conflicts or potentially conflicts with a bankruptcy statute, or in situations in which there are complex issues of first impression involving a non-bankruptcy federal statute.  Although mandatory adjudication by this Court is not limited to these circumstances, any other "significant interpretation" must rise to this high level of consideration to require this Court to withdraw the reference.  JPMC cannot satisfy this stringent standard.

*First*, JPMC contends that the issue of whether the Trustee has standing to bring common law claims is unsettled and thus mandates withdrawal of the reference.  To the contrary, the law is clear that the Trustee has standing as an assignee under the United States Bankruptcy Code, 11

U.S.C. §§ 101, *et seq.* ("Bankruptcy Code"), as a bailee under SIPA, and as an enforcer of the

Securities Investor Protection Corporation's ("SIPC") subrogation rights, to bring his common

law claims.  That JPMC does not agree with the law, and may seek to overturn it, is not a basis to

withdraw the reference.  The meritless nature of JPMC's argument is best demonstrated by its

reliance on SIPA as the "non-bankruptcy statute" requiring "substantial and material"

consideration by the Bankruptcy Court.  Not only is SIPA derived from the Bankruptcy Code, it

incorporates portions of that statute.  Accordingly, bankruptcy courts, including this Bankruptcy

Court, have regularly applied and interpreted SIPA.  *See, e.g.*, *Sec. Investor Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr.

S.D.N.Y. 2010).

  *Second*, JPMC contends that its anticipated defense that the Securities Litigation Uniform

Standards Act of 1998 ("SLUSA") preempts the Trustee's common law causes of action requires

mandatory withdrawal of the reference.  However, JPMC's argument on SLUSA preemption

borders on frivolous, as it flies in the face of well-settled caselaw that establishes that SLUSA is

inapplicable to bankruptcy trustees who represent creditors of an estate, as the Trustee does here.

  *Third*, JPMC essentially argues that its "Teflon bank defense"—that JPMC owed no duty

to anyone, not to the victims of the Ponzi scheme, not to regulators, and not to the public—

absolves it of any liability even though it was aware of indicia of fraud and turned a blind eye to

them.  The Trustee's challenge to JPMC's Teflon bank defense, it argues, treads new ground

which will require significant interpretation of non-bankruptcy federal law, triggering

withdrawal of the reference.  JPMC's argument is misplaced.  There is nothing about the Teflon

bank defense that involves the "substantial and material" consideration of non-bankruptcy

federal statutes, as required for mandatory withdrawal of the reference.  The aiding and abetting,

conversion, unjust enrichment, and fraud on the regulator claims are all state common law causes of action.  As much as JPMC contends that federal banking law "pervades" the Complaint, that banking law merely provides backdrop to show why JPMC was on inquiry notice of the fraud— because it had monitoring systems in place pursuant to federal banking law.  JPMC cannot demonstrate why the Trustee's *state* law claims would mandate withdrawal of the reference.  And to the extent JPMC argues that the issue of federal preemption somehow dictates withdrawal of the reference, bankruptcy courts routinely decide preemption issues.

Not only is there no basis for mandatory withdrawal of the reference, there is no reason for the Court otherwise to withdraw the reference "for cause" under the permissive standard of 28 U.S.C. § 157(d).  To the contrary, judicial efficiency, the paramount consideration for permissive withdrawal of reference, would best be served by allowing the Bankruptcy Court to adjudicate this case.  Chief Judge Preska has held that similar Madoff-related litigation should remain in Judge Lifland's Court in order to "promote, significantly, judicial economy because that court is generally familiar with . . . the complex Madoff factual context."  *In re Fairfield Sentry Ltd.*, 10 Civ. 7340, 2010 WL 4910119, at *3 (S.D.N.Y. Nov. 22, 2010).

Virtually no defendant affected as many victims as JPMC.  Virtually no defendant dealt with as many other defendants as JPMC.  Virtually no defendant could be more central to the bankruptcy proceedings than JPMC.  The Bankruptcy Court is the court most knowledgeable about the Ponzi scheme, its victims, and the related defendants.  The Trustee respectfully requests that the reference not be withdrawn and that the case remain in the Bankruptcy Court.

## BACKGROUND

### A.   Madoff's Ponzi Scheme Is Discovered and the SIPA Liquidation Is Removed to Judge Lifland's Court

On December 11, 2008, Madoff's Ponzi scheme came to light when he was arrested by the Federal Bureau of Investigations for violations of criminal securities laws.  (Compl. ¶¶ 47–48.)  Investors had lost nearly $17.1 billion in principal.  (*Id.* ¶ 47.)  Shortly after Madoff's arrest, SIPC filed an application in this Court pursuant to SIPA § 78eee(a)(4)(B) alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, as a result, its customers needed the protection afforded by SIPA.  (*Id.* ¶ 49.)

On the same day, Judge Louis Stanton of this Court granted SIPC's application and entered an order pursuant to SIPA § 78eee(b)(4) which, *inter alia*, removed the case to the Bankruptcy Court.  (*Id.* ¶ 50.)  The case was assigned to the Honorable Burton R. Lifland.  Judge Lifland has been administering the main underlying SIPA proceeding, No. 08-01789 ("SIPA Proceeding") for over two years, and is well-acquainted with the intricate facts surrounding this massive fraud.  There are currently over 1,000 adversary proceedings related to the SIPA Proceeding including numerous actions against BLMIS feeder funds that dealt with JPMC.

### B.   The Trustee's Rule 2004 Discovery Has Revealed Only the "Tip of the Iceberg"

The Trustee never engaged in "substantial discovery from JPMorgan under Rule 2004" as JPMC baldly contends.  (Def. Br. 6.)  The Trustee believes he has only seen the proverbial "tip of the iceberg" of JPMC's involvement in the fraud at this early stage in the litigation.

The Trustee served JPMC with a subpoena ("Subpoena") under Rule 2004 of the Federal Rules of Bankruptcy Procedure on November 30, 2009.  (Affidavit of Deborah H. Renner, sworn

to on March 29, 2011 ("Renner Aff.") ¶ 3.)  The Trustee's efforts were met with what could only be viewed as dilatory tactics.

It was only in March 2010, when the Trustee received JPMC's objections to the Subpoena, that the Trustee learned JPMC had unilaterally decided to revise the Trustee's definition of "JPMC" to include only 11 employees and confine the search for responsive documents to those 11 employees.  (*Id.* ¶ 4, Ex. 1 ¶ A.1, & Ex. 2 ¶ 12.)  JPMC's decision was indefensible at best, and cost the Trustee precious time in his investigation, with a December 11, 2010 filing deadline looming.  The production was not "completed" until September 2010, and the Trustee had a limited opportunity to follow up on the deficiencies or to issue a new subpoena related to new areas.  (*See id.* ¶ 7.)  One important area in which information was missing dealt with JPMC's representations to its regulators.  (*Id.* ¶ 6 and Exs. 1 and 2, Requests and Responses 12 and 66.)

### C.     The Trustee's Complaint Against JPMC

The Trustee's Complaint alleges that JPMC was at the very center of Madoff's fraud and complicit in it.  (Compl. ¶ 1.)  JPMC watched billions of dollars flow between BLMIS's main account at JPMC (the "703 Account") and various investors, feeders funds, and banks—many of whom have been named as defendants in lawsuits filed by the Trustee.  (*Id.* ¶ 2.)  JPMC suppressed any warnings that the large transactions occurring in the 703 Account triggered, as the drive for fees and profits was Defendants' first and foremost concern.  (*Id.*)  JPMC also performed extensive due diligence on Madoff, BLMIS, and BLMIS feeder funds, and ignored indicia of fraud over and over again.  (*Id.* ¶¶ 83–171.)  The Trustee now seeks to recover nearly a billion dollars in fees and profits, as well as at least $5.4 billion in damages.  (*Id.* ¶¶ 2, 277–78.)

As BLMIS's long-time banker, JPMC was provided with rare insight into BLMIS's operations.  And beginning in 2006, JPMC's due diligence on BLMIS and its feeder funds

revealed additional red flags that Madoff's operation was a fraud.  At various points between

1990 and 2008, JPMC knew, for example, that:

- BLMIS's returns were consistently too good to be true—even in down markets (*id.* ¶¶ 5, 9, 84, 146, 163);

- Madoff would not allow transparency into his split strike conversion strategy (Compl. ¶¶ 5, 9, 84, 133, 140, 146);

- JPMC could not identify Madoff's purported over-the-counter options counterparties, and Madoff would not provide any information about the same (*id.* ¶¶ 5, 101–02, 134, 146);

- BLMIS's auditor was a small, unknown firm (*id.* ¶¶ 5, 140, 163);

- BLMIS served as its own prime broker, custodian, and investment adviser (*id.* ¶¶ 5, 163);

- BLMIS feeder funds were unable to effectively conduct due diligence on or monitor BLMIS, and their fear of Madoff prevented them from asking any serious questions (*id.* ¶ 140);

- Public speculation existed as to whether Madoff operated a Ponzi scheme or was engaging in some other illegal activity, such as front-running (*id.* ¶¶ 5, 111–14);

- Transactions taking place in the 703 Account did not coincide with a legitimate enterprise, and could only be explained by fraud (Compl. ¶¶ 224–37, 434);

- There appeared to be a check-kiting scheme between BLMIS and Norman Levy (*id.* ¶¶ 230–31, 434);

- Highly suspicious activity was occurring in the 703 Account including large repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and suspicious activity between the 703 Account and clients of the Private Bank, including Norman Levy (*id.* ¶¶ 224–37, 251–73, 434); and

- Financial and Operational Combined Uniform Single Reports BLMIS provided to JPMC provided glaring inaccuracies (*id.* ¶¶ 193–216, 435).

Despite these warning signs, JPMC looked the other way for years.  (*Id.* ¶ 6.)  Yet, just

prior to Madoff's arrest, JPMC removed nearly all of its assets from the BLMIS feeder funds.

(*Id.* ¶¶ 143–53.)  At or around the same time, JPMC filed a Suspicious Activity Report ("SAR")

with the British authorities targeting BLMIS and stating, *inter alia*, that BLMIS's returns were

"so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true—meaning that it probably is."  (Compl. ¶¶ 9, 146.) As alleged, JPMC made no such report to United States authorities, and did not restrict BLMIS's bank accounts even after the filing of the British SAR.  (*Id.* ¶ 10.)

### D.   JPMC's Misstated Facts

JPMC misstates facts contained in the Trustee's Complaint, and even adds its own factual allegations in its memorandum of law.  For example, it repeatedly characterizes the Trustee's action as seeking damages based on JPMC's violations of federal banking law.  (Def. Br. 1–2, 4, 7–9, 11, 23.)  But the fraud on the regulator claim, as pled, is not based upon violations of federal laws.  That claim is a New York common law cause of action based on misrepresentations and omissions to regulators.  The allegations that JPMC was required by federal law to establish policies and procedures to detect money laundering and the like, and to report suspicious activity, are to explain the types of policies and procedures JPMC was required by these regulations to implement, and to show how those policies and procedures should have detected fraudulent activity in Madoff's accounts at JPMC.  (*See, e.g.,* Compl. ¶¶ 172–250.)

In addition, when characterizing its 2008 hedge fund exposure review, JPMC states that the review "resulted in significant redemptions from hedge funds unrelated to Madoff."  (Def. Br. 5.)  Similarly, JPMC states that that hedge fund exposure review also resulted in the $276 million redemption of its original investment in BLMIS feeder funds "which was a small fraction of the total redemptions resulting from the bank's review."  (*Id.* at 5–6.)  But the Trustee's Complaint contains no facts related to JPMC's redemptions from other feeder funds, and no facts relating to what fraction of redemptions the $276 million represented.

## ARGUMENT

### THE REFERENCE SHOULD NOT BE WITHDRAWN

**I.     DEFENDANTS' MOTION IS PREMATURE**

JPMC's Motion is based on nothing but defenses it purportedly *plans* to raise.  There has been no motion to dismiss filed in the Bankruptcy Court.  JPMC has not answered the Trustee's Complaint.  At this stage of the litigation, whether this action implicates issues requiring withdrawal of the reference is purely speculative.  Courts are reluctant to withdraw the reference under such circumstances.  *See, e.g.*, *In re Fairfield Sentry,* 2010 WL 4910119, at *3 (denying motion to withdrawal as premature:  "[d]istrict courts 'are generally unreceptive to motions to withdraw references where the underlying action is in its preliminary stages'") (internal citations omitted); *Enron Corp. v. JP Morgan Sec., Inc. (In re Enron Corp.)*, No. M-47 (GBD), 2008 WL 281972, at *6 (S.D.N.Y. Jan. 25, 2008); *In re Texaco Inc.*, 84 B.R. 911, 921 (S.D.N.Y. 1988).  Accordingly, a decision to withdraw the reference is premature.

**II.    THE STANDARD FOR MANDATORY WITHDRAWAL IS NOT MET**

Although JPMC contends that this Court has no choice but to withdraw the reference pursuant to § 157(d), mandatory withdrawal is only available in very limited circumstances that are not present here.  Section 157(d)  provides, in relevant part, that "a district court shall withdraw the reference if it determines that the resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  As set forth below, this section is narrowly construed and cases applying this section establish a high threshold for mandatory withdrawal—a threshold that cannot be met here.

## A.       Section 157(d) Is to Be Narrowly Construed

Courts in the Second Circuit consistently hold that § 157(d) must be "construed narrowly."  *See, e.g.*, *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990); *Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995).  A broader reading of the statute "would eviscerate much of the work of the bankruptcy courts."  *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 683 (S.D.N.Y. 1995); *O'Connell v. Terranova (In re Adelphi Inst., Inc.)*, 112 B.R. 534, 536 (S.D.N.Y. 1990).  The provision was not meant to serve as an "escape hatch" for cases that should be resolved by a bankruptcy court.  *In re Houbigant, Inc.*, 185 B.R. at 684 (quoting *United States v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 63 B.R. 600, 603 (S.D.N.Y 1986)).

## B.       The "Substantial and Material Consideration" Bar Is High

Mandatory withdrawal is appropriate only when resolution of the proceeding demands "substantial and material" consideration of non-bankruptcy federal statutes, which in turn requires that a court engage in significant interpretation of a non-bankruptcy federal statute and not just simple application.  *See, e.g.*, *In re Ionosphere*, 922 F.2d at 995; *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal is appropriate when "a bankruptcy court judge [will be required] to engage in significant interpretation, as opposed to simple application" of non-bankruptcy federal statutes).

Although the analysis is fact-specific, as a practical matter, cases in the Second Circuit that involve the "substantial and material consideration" of federal statutes typically deal either with (a) an actual or potential conflict between the Bankruptcy Code and other federal statutes or (b) an issue of first impression involving a non-bankruptcy federal statute.  *See, e.g.*, *In re Recoton Corp.*, No. 04 Civ. 2466(DIC), 2004 WL 1497570, at *3 (S.D.N.Y. July 1, 2004)

(mandatory withdrawal appropriate when "substantial and material potential conflicts exist" between non-bankruptcy federal law and the Bankruptcy Code); *In re Keene*, 182 B.R. at 382 (finding same); *In re Adelphi Inst., Inc.*, 112 B.R. at 537 (in most cases where withdrawal was appropriate "the proceedings presented and required resolution of 'substantial and material conflicts' between non-title 11 federal law and the Bankruptcy Code"); *In re Houbigant*, 185 B.R. at 684 (same); *Murphy v. Cnty. of Chemung*, 410 B.R. 145, 148 (W.D.N.Y. 2009) (no mandatory withdrawal "until and unless the movant can demonstrate" a conflict between the Bankruptcy Code and other federal statutes or an issue of first impression).

Indeed, the cases JPMC cites as examples in support of mandatory withdrawal are premised largely on actual or potential conflicts between other federal statutes and the Bankruptcy Code, or involve issues of first impression requiring the substantial and material consideration of a non-bankruptcy federal statute. (Def. Br. 9–11); *Bear Stearns Sec. Corp. v. Gredd,* No. 01 Civ. 4379 NRB, 2001 WL 840187, at *3–4 (S.D.N.Y. July 25, 2001) (holding that § 546(e) of the Bankruptcy Code potentially conflicts with securities law at issue); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177(RCC), 2004 WL 2711101, at *4 (S.D.N.Y. Nov. 23, 2004) (granting withdrawal motion premised on jurisdictional conflict between Bankruptcy Code and Federal Power Act); *In re Dana Corp.*, 379 B.R. 449, 459 (S.D.N.Y. 2007) (withdrawing the reference where "CERCLA and the Bankruptcy Code arguably conflict"); *Am. Tel. & Tel. Co. v. Chateaugay Corp.*, 88 B.R. 581, 587–88 (S.D.N.Y. 1988) (withdrawing the reference based on conflict between CERCLA and the Bankruptcy Code); *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 388 B.R. 131, 140 (S.D.N.Y. 2008) (denying withdrawal of the reference on timeliness grounds, but also noting potential conflict and issue of first impression involving the securities laws and recovery of fraudulent

transfers); *Mishkin v. Ageloff*, 220 B.R. 784, 796 (S.D.N.Y. 1998) (involving issue of first impression regarding application of Private Securities Litigation Reform Act's ("PSLRA") automatic stay provision to bankruptcy trustee); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig*, No. 03 MDL 1529(LMM), 2006 WL 337667, at *3 (S.D.N.Y. Feb. 10, 2006) (holding that RICO and Bank Holding Company Act claims present issues of first impression which require significant interpretation); *Chemtura Corp. v. United States*, No. 10 Civ. 503 (RMB), 2010 WL 1379752, at *2 (S.D.N.Y. Mar. 26, 2010) (issue of first impression).

Other complex circumstances may dictate a mandatory withdrawal of a reference. *See In re Horizon Air, Inc.*, 156 B.R. 369, 373–74 (N.D.N.Y. 1993). Nevertheless, as the caselaw demonstrates, at a minimum, the bar for a mandatory withdrawal of the reference is high, consistent with the narrow construction of § 157(d).

### C.   Section 157(d) Pertains to the Significant Interpretation of Non-Bankruptcy Federal Statutes, Not Federal Common Law

In an effort to expand the boundaries of § 157(d), JPMC baldly concludes that mandatory withdrawal can be based on the need for "significant interpretation" of federal common law. (Def. Br. 14). However, the caselaw is clear that the phrase "other laws of the United States" in § 157(d) refers to federal *statutes* specifically, and does not mean other types of federal law, including federal common law. *See, e.g., Pension Benefit Guar. Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 138 B.R. 442, 446 (D. Del. 1992); *In re Cont'l Air Lines, Inc.*, 60 B.R. 459, 465 (Bankr. S.D. Tex. 1985); *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc. (In re Ionosphere Clubs, Inc.)*, 103 B.R. 416, 420 (S.D.N.Y. 1989) (denying a motion for mandatory withdrawal because, *inter alia*, "[t]he First Amendment issues raised by the injunctive relief do not specifically implicate a federal statute").

As shown below, JPMC can point to no potential or actual conflict between the Bankruptcy Code and other federal statutes or any issue of first impression involving a federal statute.  Nor does it otherwise show that any significant interpretation of a non-bankruptcy federal statute is required.  There is no basis for mandatory withdrawal of the reference.

## III.   NOTHING ABOUT THE TRUSTEE'S STANDING TO ASSERT CLAIMS IN THIS CASE MANDATES WITHDRAWAL OF THE REFERENCE

JPMC contends that its anticipated motion to dismiss will challenge the Trustee's standing to bring common law causes of action.  (Def. Br. 19.)  It argues that whether the Trustee can assert those claims as bailee, assignee, or as enforcer of SIPC's subrogation rights remains unsettled in this Circuit, and that resolution of these issues will require a substantial and material interpretation of federal securities law, which would be an inquiry too novel and complex for the Bankruptcy Court to handle.  (*See id.* at 18–19.)  The Trustee's bases for standing arise under SIPA, the Bankruptcy Code, and state common laws, and no other federal statutes, making mandatory withdrawal under § 157(d) inappropriate.  Far from unsettled, the law is clear that a SIPA trustee has standing to assert claims as enforcer of SIPC's subrogation rights, assignee, and bailee of customer property.  Resolution of these issues is entirely within the expertise of the Bankruptcy Court.  Accordingly, there is no reason to require that the reference be withdrawn because of JPMC's anticipated arguments on standing.

### A.   SIPA Is Not a Federal Securities Statute Outside the Expertise of the Bankruptcy Court

JPMC argues that the SIPA statute is a "federal securities law" that must be significantly interpreted, requiring withdrawal of the reference.  (*Id.* at 17.)  But SIPA is not only part of the federal securities laws, it is part of the bankruptcy laws.  A "SIPA liquidation is essentially a bankruptcy liquidation tailored to achieve the special purposes of SIPA."  *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 269 (Bankr. S.D.N.Y. 1996) (citing SIPA § 78fff(b)).  As such, it

is a hybrid proceeding under titles 11 and 15 of the United States Code, *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 135–36, in which SIPA is applied in tandem with the Bankruptcy Code.

SIPA and the Bankruptcy Code are each incorporated into the other.  *E.g.*, *compare* SIPA § 78fff(b) *with* § 362(a) of the Bankruptcy Code.  Upon entry of a protective decree, SIPA cases are expressly removed to the bankruptcy court under § 78eee(b)(4), as was the case here.  *See* Order, *Sec. Exch. Comm'n v. Bernard L. Madoff Inv. Sec. LLC,* No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (Stanton, J.) (Dkt. No. 4).  Given that this case was removed to the Bankruptcy Court under SIPA, not the Bankruptcy Code, it is only by admitting the interrelationship between the Code and SIPA that JPMC can argue that mandatory withdrawal of the reference under § 157(d) is applicable to a SIPA proceeding.  (*See* Def. Br. 19 n.5.)

SIPA § 78fff(b) confers upon the Trustee the authority to conduct BLMIS's liquidation proceedings in the Bankruptcy Court "in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of Title 11."  Because SIPA is derived from § 60e of the Chandler Act, the Bankruptcy Act of 1989, many of its provisions are identical.  *See, e.g.*, H.R. Rep. No. 91-1788, at 13 (1970) (Conf. Rep.) (recognizing that the definitions of "customers," "cash customer," and "net equity," among other special provisions of SIPA, are derived from the former § 60e).  Moreover, SIPA is directly incorporated into numerous sections of the Bankruptcy Code, including one of its most critical features—the automatic stay provision of § 362(a).  *Compare* SIPA § 78fff(b) *with* § 362(a) of the Bankruptcy Code.

Accordingly, as SIPA is not a non-bankruptcy statute, the mandatory withdrawal provisions of § 157(d) do not come into play.  Indeed, SIPA's provisions reflect Congress's

intent that bankruptcy courts have jurisdiction over SIPA proceedings.  *See Sec. Investor Prot. Corp. v. Cheshier & Fuller, L.L.P. (In re Sunpoint Sec., Inc.)*, 262 B.R. 384, 393–94 (Bankr. E.D. Tex. 2001) (citing *Keller v. Blinder (In re Blinder, Robinson & Co.)*, 162 B.R. 555, 559 (D. Colo. 1994) ("[78fff(b)] indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, identical to a traditional bankruptcy case under title 11.")).  It would be nonsensical, given that Congress directs bankruptcy courts to hear SIPA proceedings in the first instance, to read § 157(d) as imposing mandatory withdrawal whenever SIPA has to be interpreted.  As the district court in *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)* stated, "It would be truly anomalistic . . . for Congress to adopt § 78fff(b) while simultaneously refusing to confer jurisdiction on the bankruptcy courts over SIPA proceedings." 4 F.3d 1556, 1565 (10th Cir. 1993).

Further, the Second Circuit has expressed a strong preference for adjudication of SIPA proceedings by bankruptcy courts.  For example, in *Exchange. Nat'l Bank of Chicago v. Wyatt*, the Second Circuit confirmed that the power of district courts to refer SIPA proceedings to bankruptcy courts is "not only consistent with the purposes of SIPA but *essential*."  517 F.2d 453, 457 (2d Cir. 1975) (internal quotation marks omitted and emphasis added); *see also Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 136 B.R. 1008, 1016 (D. Colo. 1998) (recognizing that the Second Circuit's settled position is that bankruptcy courts, not district courts, "are the tribunals best equipped to preside over SIPA liquidations and are authorized to do so").  Contrary to JPMC's claims, the *Wyatt* Court reasoned that in handling SIPA cases, "bankruptcy judges have developed special expertness and administrative skills . . . which Congress did not intend to dump on already overburdened district courts without needed clerical and other facilities."  517 F.2d at 457–58.

Judge Lifland has issued numerous decisions applying the nuances of SIPA.  *See, e.g.*, *In re Bernard Madoff Inv. Sec. LLC*, 424 B.R. 122 (determining how to define net equity under SIPA for purposes of distributing customer property in the Madoff proceeding and its accompanying SIPA liquidation); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 271–73 (Bankr. S.D.N.Y. 2010) (determining whether SIPA § 78fff-2(c)(3) "makes property that was transferred prepetition to a third party 'property of the debtor' for purposes of turnover under Section 542 of the Code").  There is no basis to suggest that the Bankruptcy Court lacks the competence to resolve issues involving SIPA.

**B.**     **Established Second Circuit Law Holds that a Trustee Has Standing to Assert Common Law Claims as Bailee, Assignee, and Enforcer of SIPC's Subrogation Rights**

Even if SIPA were deemed to be only a federal securities law or outside the Bankruptcy Court's area of expertise (which it should not be), there would still be no basis for mandatory withdrawal of the reference.

JPMC argues that courts are "split on the question of whether a SIPA trustee has standing to sue on behalf of customers."  (Def. Br. 18.)  To the contrary, Second Circuit law is clear that a trustee has standing to assert common law claims against third parties as a bailee under the SIPA statute, as an assignee under the Bankruptcy Code, and as an enforcer of SIPC's subrogation rights.  *See Redington v. Touche Ross & Co.*, 592 F.2d 617, 624 (2d Cir. 1978), *rev'd on other grounds*, *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) (trustee has standing as bailee and SIPC has standing as subrogee to assert creditors' claims against third parties); *Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 459, 469 (2d Cir. 2008) (trustee has standing as assignee in similar context); *Picard v. Taylor (In re Park S. Sec., LLC)*,

16

326 B.R. 505, 516–17 (Bankr. S.D.N.Y. 2005) (trustee can assert SIPC's subrogation rights where SIPC has expressly conferred those rights).

### 1.    Assignment

JPMC argues that "an ordinary bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." (Def. Br. 18.) (internal citations omitted).  This statement is contradicted by both the Bankruptcy Code and Second Circuit law.  The Bankruptcy Code was amended in 1978 to allow an "ordinary bankruptcy trustee" to bring *assigned* claims against third parties.  Section 541(a)(7) provides that the bankruptcy estate includes "[a]ny interest in property that the estate acquires after commencement of the case."  In 2008, the Second Circuit held that an "ordinary bankruptcy trustee" has standing to sue third parties based on assignments from creditors.  *In re CBI Holding*, 529 F.3d at 459, 469 (bankruptcy trustee has standing to sue based on unconditional assignments).  Thus, there is no question that an ordinary bankruptcy trustee has standing to sue as an assignee, as does the Trustee here.

### 2.    Bailment

Failing to cite *CBI Holding*, JPMC targets the Second Circuit's decision in *Redington*, which held, *inter alia*, that a SIPC trustee has standing to sue third parties as a bailee of "customer property."[1]  (*See* Def. Br. 18.)  In *Redington*, the SIPA trustee and SIPC brought an action against a third-party accounting firm asserting securities claims and state law claims.  592 F.2d at 619–20.  The Second Circuit held:

> To the extent that customers have claims that have not been satisfied either by [the debtor] in liquidation . . . or by SIPC, they retain rights of action against [the

---

[1] "Customer property" is defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."  SIPA § 78lll(4).

third-party accounting firm].  We hold that the Trustee, as bailee, is an appropriate real party in interest to maintain this action on their behalf.

*Id*. at 625.  *Redington*'s holding is consistent with Fed. R. Civ. P. 17, which expressly permits a bailee to sue in his or her own name without joining the bailor in the action.  Thus, to the extent that customer claims have not been fully reimbursed by SIPC or satisfied by the liquidation, a SIPA trustee, as a real party in interest, has standing to maintain an action as bailee on behalf of customers.  *In re Park S.*, 326 B.R. at  516–17.

### 3.    Subrogation

SIPC's subrogation rights derive from both SIPA and common law.  *See* 15 U.S.C. § 78fff-3(a); *Redington*, 592 F.2d at 624.  All of the relevant caselaw recognizes SIPC's right to seek subrogation against the estate for amounts advanced for customer claims.  *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 69 (2d Cir. 2000); *Redington,* 592 F.2d at 624; *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 799–800 (6th Cir. 1995); *In re Park S.*, 326 B.R. at 515.  SIPC also has a right of subrogation against third parties on behalf of customers whose claims it has paid.  *Redington*, 592 F.2d at 624; *Appleton*, 62 F.3d at 799).  Furthermore, SIPC's subrogation rights are not limited to the statutory subrogation provided for in SIPA § 78fff-3(a).  Rather, Congress amended SIPA in 1978 to clarify that SIPC's rights against the estate are "in addition to all other rights it may have at law or in equity."  15 U.S.C. § 78fff-3(a).  Because SIPC may confer its subrogation rights on the Trustee, *see In re Park S.*, 326 B.R. at 516–17, and has done so in this case, there is little doubt that the Trustee has standing as subrogee of all of SIPC's rights.

### 4.    There Is No "Split" in Authority as to the Trustee's Standing

Attempting to create a split where there is none, JPMC points to a lone district court decision in which the court departed from the precedent of this Circuit in holding that SIPC did

not have an equitable common law right of subrogation to bring claims against third parties: *Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F. Supp. 531, 555–58 (S.D.N.Y. 1990); (Def. Br. 18–19.)  A district court holding that flies in the face of a Second Circuit decision cannot credibly be said to render the state of the law "unsettled" as JPMC contends.  (*Id.* at 18); *see Appleton*, 62 F.3d at 799–800.  Thus, notwithstanding *Mishkin*, the Second Circuit's decision in *Redington* remains the binding law of this Circuit that makes clear SIPC's ability to assert claims against third parties to enforce its subrogation rights.  *Redington*, 592 F.2d at 624.

Recognizing that the law is against it, JPMC attempts to cast doubt on *Redington* by pointing to two Supreme Court decisions.  (Def. Br. 18–19, citing *Touche Ross,* 442 U.S. 560; *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)).  As JPMC must admit, however, neither case reversed *Redington*.  *Touche Ross* determined only that § 17(a) of the Securities Exchange Act of 1934 did not create a private right of action under SIPA.  442 U.S. at 571. *Holmes* recognized that "[t]here is support for the proposition that SIPC can assert state-law subrogation rights against third parties."  503 U.S. at 271 n.17.  It did not overturn SIPC's subrogation rights.  *Id.* at 271–72.  Moreover, the Second Circuit in *BDO Seidman*, 222 F.3d at 69, did not disturb *Redington*'s holding with respect to subrogation, as JPMC admits.  (Def. Br. 19.)  And, under *Park South*, decided after *Mishkin*, SIPC may confer its subrogation rights on the Trustee, granting the Trustee standing to sue third parties on behalf of SIPC.  326 B.R. at 517.

Nor is there any question that a SIPA trustee can recover against third parties as a bailee of customer property.  Significantly, the district court in *BDO Seidman* found the Trustee to have standing to assert claims on behalf of the debtor's customers under *Redington*.  *Sec. Investor*

*Prot. Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 654 (S.D.N.Y. 1999).  On appeal, the

Second Circuit noted that under *Redington*,

> a trustee in a broker-dealer liquidation proceeding has the power to bring suit against "any wrongdoer whom [the customers] could sue themselves." . . . In so holding, we reasoned that an SIPA trustee acts as a bailee of the customers' property, and, in an effort to "marshal[] and return[] that property, may sue any third party responsible for the customers" losses.

*BDO Seidman*, 222 F.3d at 71 (quoting *Redington*, 592 F.2d at 625).  Thus, *Redington* continues

to be the guidepost for courts within the Second Circuit considering a SIPA trustee's standing as

an enforcer of SIPC's subrogation rights or bailee.

Accordingly, there is no reason to require that the reference be withdrawn because of

JPMC's anticipated arguments on standing.

## IV.   DEFENDANTS' ANTICIPATED SLUSA DEFENSE BORDERS ON FRIVOLOUS AND ITS APPLICATION DOES NOT REQUIRE "SUBSTANTIAL AND MATERIAL" INTERPRETATION OF A FEDERAL STATUTE

JPMC attempts to manufacture an issue it hopes will lead to withdrawal of the reference

by contending that the Trustee's common law claims may be preempted by SLUSA.  (Def. Br.

22.)  This argument borders on frivolous.  SLUSA does not apply to the Trustee's claims, which

is a conclusion the Bankruptcy Court will be able to reach through a simple application of the

statute.

Congress enacted SLUSA in 1998 to prevent litigants from circumventing the strict

pleadings standards of the PSLRA by bringing state law securities claims as class actions.  *Lee v.*

*Marsh & McLennan Cos., Inc.*, No. 06 Civ. 6523(SWK), 2007 WL 704033, at *2 (S.D.N.Y.

Mar. 7, 2007).  SLUSA requires the dismissal of: (i) a "covered class action"; (ii) based on state

law alleging; (iii) "an untrue statement or omission of a material fact in connection with the

purchase or sale of a covered security" or that "the defendant used or employed any manipulative

or deceptive device or contrivance in connection with the purchase or sale of a covered security."

15 U.S.C. § 77p(b); *see Lee*, 2007 WL 704033, at *2.  "Covered class actions" include lawsuits

in which common issues predominate and "damages are sought on behalf of more than 50

persons."  15 U.S.C. § 77p(f)(2)(A).

JPMC suggests that the Trustee's claims are preempted by SLUSA because the Trustee is

bringing claims on behalf of "thousands of BLMIS customers."  (Def. Br. 21–22.)  JPMC's

argument ignores the plain language of the statute and the cases that have interpreted it, which

hold that bankruptcy trustees are counted as a *single entity* for purposes of SLUSA.  In

determining whether damages are sought on behalf of more than 50 persons, certain entities are

"treated as one person or prospective class member . . . if the entity is not established for the

purpose of participating in the action."  15 U.S.C. § 78bb(f)(5)(D).  The determination turns on

the purpose for which the entity was created.  *Smith v. Arthur Andersen, LLP*, 421 F.3d 989,

1007 (9th Cir. 2005); *Lee*, 2007 WL 704033, at *4.  As long as the "primary purpose" of the

entity is not to pursue litigation, that entity is treated as a single person under SLUSA.  *Smith*,

421 F.3d at 1008; *Lee*, 2007 WL 704033, at *4; *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 237

(S.D.N.Y. 2007).  It follows that "a typical Chapter 11 trust established to represent a bankrupt

estate for all purposes, including the litigation of outstanding causes of action, is entitled to entity

treatment."  *Lee*, 2007 WL 704033, at *4.

The manner in which federal courts have defined an "entity" under SLUSA comports

with the legislative history of SLUSA, in which the Senate Report states that "a trustee in

bankruptcy, a guardian, a receiver, and other persons or entities duly authorized by law . . . to

seek damages on behalf of another person or entity would not be covered by this provision."  S.

Rep. No. 105-182, 1998 WL 226714 at *7 (May 4, 1998); *see also Smith*, 421 F.3d at 1007–08

(explaining that preclusion of a trustee's claims pursuant to SLUSA "could potentially deprive

many bankruptcy trustees of the ability to pursue state-law securities fraud claims on behalf of an estate. Nothing in SLUSA suggests that Congress intended to work such a radical change in the bankruptcy laws").

JPMC thus relies on a New York State court decision, *RGH Liquidating Trust v. Deloitte & Touche*, 71 A.D.3d 198, 891 N.Y.S.2d 324 (N.Y. App. Div. 2009). Such reliance is misplaced because the *RGH* action was not brought by a trustee in the context of a bankruptcy case. Instead, the action was asserted by a trust, which the court held was created for the purpose of bringing bondholders' claims, in an attempt to circumvent SLUSA. *Id.* at 210, 212. Even if its position had any merit, JPMC has not explained how resolution of this position would involve a "substantial and material" interpretation of SLUSA. JPMC's conclusory speculation that "[w]hatever the Trustee argues, there is no doubt that this case will require significant interpretation of SLUSA in a highly unusual, if not novel, context" (Def. Br. 22), is not sufficient to warrant withdrawal. *See In re Enron Corp.*, 388 B.R. at 141; *In re Texaco Inc.*, 84 B.R. at 921.

Significantly, when defendants have raised SLUSA in bankruptcy proceedings, bankruptcy courts have applied its provisions without issue. *See, e.g., Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, Adv. Pro. No. 03-04942 (REG), 2007 WL 2403553, at *2–4 (Bankr. S.D.N.Y. Aug. 17, 2007); *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 293 B.R. 337, 339–60 (Bankr. S.D.N.Y. 2003).

The only case to determine whether SLUSA's application required withdrawal of the reference to the district court held that withdrawal was inappropriate. *In re Recoton Corp.*, 2004 WL 1497570, at *5. In *In re Recoton Corp.*, certain of the debtor's directors and officers argued that the reference should be withdrawn because of a conflict between the automatic stay

provision of the securities law and the Bankruptcy Code's Rule 2004 discovery. *Id.* at *2. In denying the motion, the district court found that, although the bankruptcy court had considered the provisions of the PSLRA and SLUSA in resolving the dispute, the "[statutes'] inapplicability to Rule 2004 was sufficiently clear and unambiguous that [the bankruptcy judge] was not required to and he did not resort to any 'significant interpretation' of federal non-bankruptcy statutes in doing so." *Id.* at *3. For this reason, the district court denied the motion to withdraw the reference. *Id.* at *5.

JPMC has not demonstrated that a SLUSA preemption argument will require the Bankruptcy Court to engage in anything other than a basic application of the statute. Thus, withdrawal of the reference is not warranted.

## V.   THE TRUSTEE HAS NOT BROUGHT ANY CLAIMS AGAINST JPMC FOR VIOLATIONS OF FEDERAL BANKING LAWS AND REGULATIONS

The Trustee alleges aiding and abetting claims against JPMC, as well as fraud, conversion, and unjust enrichment in Counts Seventeen through Twenty-One of the Complaint. (Compl. ¶¶ 430–82.) JPMC attempts to invoke the standard for mandatory withdrawal by mischaracterizing these claims, which are grounded in state common law, as claims for violations of federal banking laws and regulations. (*See* Def. Br. 11–14.) In reality, none of the Trustee's claims arises out of JPMC's violations of federal statutes, much less would require a court to engage in a complex interpretation of those statutes.

The Complaint describes the statutory and regulatory framework in which JPMC operates as a financial institution. (*See* Compl. ¶¶ 182–89, 238.) The purpose of these allegations is to explain the types of policies and procedures JPMC was required by these regulations to implement, and how those policies and procedures should have detected fraudulent activity in Madoff's accounts at JPMC. (*See id.* ¶¶ 190–93, 217–50.) These allegations do not, however,

form the basis for the Trustee's common law claims; they serve only to provide context for

understanding the type of fraud detection policies that were in place at JPMC, and which should

have uncovered Madoff's fraud.

As JPMC ultimately acknowledges, "[t]here is no question that the Trustee's action is

based on state law." (Def. Br. 20.)  As further explained below, any violations by JPMC of

federal banking laws are not necessary elements of the Trustee's common law claims.  Because

resolving these state law claims will not "require[] consideration," much less "substantial and

material consideration" of non-bankruptcy federal statutes, mandatory withdrawal is not

warranted on this basis.  28 U.S.C. § 157(d); *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995.

### A.       Aiding and Abetting Fraud and Breach of Fiduciary Duty Are New York State Law Claims

In support of the Trustee's aiding and abetting claims in Counts Seventeen and Eighteen,

the Trustee alleges JPMC had knowledge of BLMIS's fraud and breach of fiduciary duty through

JPMC's knowledge of numerous "red flags," including for example, irregular activity in the 703

Account, such as suspicious transactions with other JPMC customers; BLMIS's false statements

in its regulatory filings; and that BLMIS's returns were "too good to be true."  (*See, e.g.*, Compl.

¶¶ 434–40, 449–55.)  JPMC provided substantial assistance to BLMIS and Madoff by, *inter alia*,

investing hundreds of millions of dollars with BLMIS feeder funds, with knowledge of a

potential fraud or Ponzi scheme at BLMIS; choosing not to execute internal policies and

procedures designed to detect fraud and money laundering; and providing banking services to

Madoff and a number of BLMIS customers.  (*See, e.g.*, *id.* ¶¶ 441, 456.)  These allegations state

claims for aiding and abetting under New York law.  *See Silverman v. H.I.L. Assocs. Ltd. (In re*

*Allou Distribs., Inc.)*, 387 B.R. 365, 406–10 (Bankr. E.D.N.Y. 2008) (analyzing the elements of

aiding and abetting fraud and breach of fiduciary duty under New York law in deciding a motion to dismiss).

### B. Conversion Is a New York State Law Claim

In Count Nineteen, the Trustee claims JPMC converted funds in which BLMIS customers had a possessory interest.  (Compl. ¶¶ 460–65.)  JPMC exercised dominion and control over those funds, in a manner inconsistent with BLMIS customers' rights, when it continued to allow Madoff to use its services and BLMIS customers' money to fund the Ponzi scheme.  (*Id.* ¶¶ 463–65.)  These allegations state a claim for conversion under New York law and do not involve violations of federal statutes.  *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 327–28 (Bankr. S.D.N.Y. 1999) (analyzing a conversion claim under New York state law).

### C. Unjust Enrichment Is a New York State Law Claim

Count Twenty alleges that JPMC was unjustly enriched at the expense of BLMIS customers.  (Compl. ¶¶ 467–72.)  JPMC received over half a billion dollars from BLMIS that rightfully belongs to BLMIS customers.  (*Id.*)  These allegations do not involve federal statutory violations and are sufficient to state a claim for unjust enrichment.  *See In re Allou Distribs., Inc.*, 387 B.R. at 412–13 (analyzing a New York common law unjust enrichment claim).

### D. Fraud on the Regulator Is a New York State Law Claim

In Count Twenty-One, the Trustee alleges that JPMC committed fraud on regulators and that its misrepresentations or omissions caused harm to BLMIS customers.  (Compl. ¶¶ 474–81.)  These allegations state a claim for fraud on the regulator under New York law.  *See Minihane v. Weissman (In re Empire Blue Cross & Blue Shield Customer Litig.)*, 622 N.Y.S.2d 843, 845–49 (N.Y. Sup. Ct. 1994) (analyzing whether fraud on the New York State Department of Insurance

was barred by the filed rate doctrine); *see generally Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (stating the elements of a fraud claim under New York state law).

Trying to shoehorn themselves into the § 157(d) caselaw, JPMC argues, without support, that the court will have to address the "matter of first impression" of whether a fraud on the regulator claim exists under *federal* common law.  (Def. Br. 16.)  Such an analysis will not be necessary because the United States Supreme Court and the New York Supreme Court have already acknowledged that a fraud on the regulator claim derives from *state* common law.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001); *Minihane*, 622 N.Y.S.2d  at 846.  In *Buckman*, cited by JPMC, the United States Supreme Court addressed a "state law fraud-on-the-FDA claim[]" in the context of a motion to dismiss.  531 U.S. at 348.  The New York Supreme Court in *Minihane* addressed plaintiff's claim for "common law fraud," in state court, based on defendants' filing of false reports with the New York State Department of Insurance.  622 N.Y.S. 2d at 845–46.  Even if JPMC argues that the law governing the claim is not well-developed, that argument would not support withdrawal of the reference.  Fraud on the regulator is a state common law claim and, thus, cannot serve as the basis for mandatory withdrawal.  *See* 28 U.S.C. § 157(d); *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995.  Even if the Trustee's claim arose under federal common law, mandatory withdrawal would not be appropriate because mandatory withdrawal only applies in situations where courts are required to engage in substantial and material interpretation of federal *statutes*.  *See, e.g.*, *In re Cont'l Airlines*, 138 B.R. at 446; *In re Cont'l Air Lines, Inc.*, 60 B.R. at 465.

Neither of the cases JPMC cites for the proposition that a fraud on the regulator claim derives from federal common law supports this argument.  (Def. Br. 15.)  *Buckman* explicitly acknowledges that the fraud on the regulator claim at issue in that case was a "state law" claim.

*See* 531 U.S. at 348.  The other case JPMC cites, *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988), stands for the unremarkable proposition that federal law sometimes preempts state law. Neither case even suggests that there exists a federal common law cause of action for fraud on the regulator.

Importantly, the Trustee has not yet received significant discovery from JPMC regarding its submissions to federal regulators.  (Renner Aff. ¶ 6 and Exs. 1 and 2, Requests and Responses 12 and 66.)  Unless and until it becomes clear that resolution of substantial and material conflicts between other federal statutes and bankruptcy law will be necessary to resolve these claims, mandatory withdrawal is not warranted.  *See, e.g., In re Enron Corp.*, 388 B.R. at 141 (denying motion to withdraw the reference and stating that "[m]ere speculation that the bankruptcy court may have to determine, at some future time, a securities law issue is an insufficient basis for withdrawing the reference"); *In re Texaco Inc.*, 84 B.R. at 921 (denying motion to withdraw the reference based on speculation about federal issues that "may or may not arise").  Withdrawing the reference from the Bankruptcy Court in such circumstances would encourage forum shopping.  *See In re Texaco Inc.*, 84 B.R. at 921.

### E.    Allegations Involving a Federal Statute Do Not Mandate Withdrawal

Although the Complaint does contain allegations regarding JPMC's failure to comply with laws and regulations governing financial institutions, as well as its own internal rules, these allegations exist to provide context and to show why JPMC was on inquiry notice of the fraud. None of these allegations is essential to the court's determination of whether JPMC aided and abetted the Ponzi scheme, converted customer funds, was unjustly enriched, or made misrepresentations to regulators.  Where federal statutes are not necessary for the resolution of claims, as is the case here, mandatory withdrawal is not warranted.  *See In re White Motor Corp.*, 42 B.R. 693, 703 (N.D. Ohio 1984) (holding that a consideration of a federal statute must be

"necessary for the *resolution* of a case or proceeding" to require withdrawal of the reference); *In re Cont'l Airlines*, 138 B.R. at 445 (mandatory withdrawal is not appropriate where the movant "failed to show that it is necessary for the Court to address the [federal law] questions raised in order to resolve the case") (emphasis in original).

Another court faced a nearly identical issue in determining whether an aiding and abetting fraud claim conferred jurisdiction on a federal court. *See Fornshell v. Firstmerit Bank, N.A.*, No. 1:10 CV 2040, 2010 WL 4835771, at *1 (N.D. Ohio Nov. 23, 2010). The court needed to determine whether adjudicating the plaintiff's claim, which was premised in part on allegations that the defendant violated the Bank Secrecy Act, would require the court to construe federal law. *Id.* at *1. In finding that a federal court did not have jurisdiction, the court explained:

> [P]laintiff identifies banking activity that he intends to rely on in order to establish that defendant knew of the fraud committed by the [Ponzi scheme perpetrator]. To succeed with his claim, plaintiff need not establish that this activity also violates the BSA. Rather, a trier of fact might conclude that the activity establishes knowledge of the fraud irrespective of whether the conduct also amounts to a violation of the BSA. Because the BSA may not be implicated in the analysis, the Court finds that there is no federal issue that is "actually disputed."

*Id.* at *2. Not only was there no substantial or material interpretation necessary to resolve plaintiff's aiding and abetting claim, but a federal issue was not even in dispute. The Trustee's allegations similarly do not implicate or depend upon any federal statute and, thus, remain firmly within the jurisdiction of the Bankruptcy Court.

## F. The Bankruptcy Court Is Competent to Resolve Questions of Preemption

JPMC next argues that even if the claim is based on state law, the case must be resolved by this Court because JPMC will likely argue the claim is preempted by federal law. But the Bankruptcy Court is fully competent to adjudicate questions of preemption. The legal standard

that applies to a question of preemption is well established and will not require the court to

engage in novel interpretation of a federal statute.  *See Cipollone v. Ligget Grp., Inc.*, 505 U.S.

504, 516 (1992); *In re Enron Corp.*, 328 B.R. 75, 79–80 (Bankr. S.D.N.Y. 2005).  Moreover,

bankruptcy courts have repeatedly applied the preemption analysis set forth in *Cipollone*,

including in cases where the federal statutes at issue were banking laws and regulations.  *See,*

*e.g.*, *Coyne Elec. Contractors, Inc. v. United States (In re Coyne Elec. Contractors, Inc.)*, 244

B.R. 245, 246–53 (Bankr. S.D.N.Y. 2000) (holding that a claim pursuant to the New York Lien

Law was not preempted by ERISA); *In re Mann*, 134 B.R. 710, 712–15 (Bankr. E.D.N.Y. 1991)

(holding that ERISA did not preempt the New York exemption statute); *Orr v. Ameriquest*

*Mortg. Co. (In re Hollis)*, Adv. Pro. No. 07-2615, 2009 WL 3030125, at *9–11 (Bankr. D.N.J.

Sept. 17, 2009) (holding that the National Banking Act and regulations promulgated by the

Office of the Comptroller of the Currency did not preempt common law fraud claims).

     For this reason, district courts regularly reject requests to withdraw the reference based

on the possibility that one party might argue preemption.  *See, e.g.*, *Cal. v. Enron Corp. (In re*

*Enron Corp.)*, No. 05 Civ. 4079 (GBD), 2005 WL 1185804, at *2 (S.D.N.Y. May 18, 2005);

*Jagow v. Top Hill, LLC (In re Townhomes at Hill Top, LLC)*, No. 08-cv-00514, 2008 WL

2078109, at *3 (D. Colo. May 14, 2008).  The Trustee's common law claims against JPMC are

based in state law and the Bankruptcy Court is competent to resolve any issues that are necessary

to resolve those claims.  The only case JPMC cites for the proposition that district courts rather

than bankruptcy courts must resolve preemption claims is *Old Carco LLC v. Kroger (In re Old*

*Carco LLC)*, 442 B.R. 196, 201–02 (S.D.N.Y. 2010).  However, the court in *In re Old Carco*

granted a motion to withdraw the reference based on the moving party's argument that the

complaint contained no core issues, which simply is not the case here, as the Trustee has brought

numerous bankruptcy causes of action.  *See id.,* (Compl. ¶¶ 277–429.)  Withdrawal of the reference is not mandated.

## VI.  THE STANDARD FOR PERMISSIVE WITHDRAWAL OF THE REFERENCE IS NOT MET HERE EITHER

Just as with mandatory withdrawal of the reference, permissive withdrawal—or withdrawal for cause—is similarly inappropriate in this case.  A "district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).  Although § 157 does not define the term "cause," this Court has considered numerous factors, including "whether the claim or proceeding is core or non-core, whether it is legal or equitable, considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law."  *In re Orion*, 4 F.3d at 1101; *see also Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*, 136 B.R. 59, 61 (S.D.N.Y. 1992); *Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.)*, 94 B.R. 293, 296 (S.D.N.Y. 1988).  However, one factor—judicial efficiency—is of paramount importance in determining whether permissive withdrawal is appropriate under § 157(d), and that factor weighs strongly in favor of leaving this case in Judge Lifland's Court.  *See Ageloff*, 220 B.R. at 800.

### A.  The Core/Non-Core Distinction Is Not Dispositive

JPMC contends that the Trustee's common law claims are "classic non-core claims" and therefore permissive withdrawal is warranted.  (Def. Br. 24–25.)  However, whether the Trustee's common law claims are core or non-core is not dispositive in the permissive withdrawal analysis.  All of the Trustee's claims, arising under both bankruptcy and common law, are factually intertwined.  Thus, without deciding whether the common law claims are core

or non-core, the Bankruptcy Court has the power to hear all of the claims in the first instance. *See* 28 U.S.C. §§ 157(b)(1), (c)(1).  JPMC's contention that the presence of potentially non-core claims requires permissive withdrawal of the reference is therefore unpersuasive.

Section 157(b)(1) grants federal bankruptcy courts the power to hear, determine, and enter appropriate orders and judgments in all core proceedings.  Federal bankruptcy courts may also hear non-core claims that are "related to" core bankruptcy proceedings, subject to *de novo* review by a district court.  28 U.S.C. § 157(c)(1).  Allowing bankruptcy courts to hear such non-core claims in the first instance promotes judicial economy, the underlying goal of § 157.  *See In re Enron Power Mktg., Inc*., 2003 WL 68036, at *7.  Accordingly, the mere existence of potentially non-core claims does not require a district judge to withdraw the reference.  *See*, *e.g*., *In re Wedtech*, 94 B.R. at 295 (explaining that the existence of non-core claims in a proceeding does not "end the inquiry and automatically require withdrawal . . . this Court must consider various discretionary factors"); *In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *2 (denying a motion to withdraw the reference without deciding the issue of core versus non-core, "which is not singularly dispositive"); *In re Enron Power Mktg., Inc.,* 2003 WL 68036*,* at *3 (the core versus non-core determination "is not determinative with respect to whether or not reference to the Bankruptcy Court must be withdrawn"); *In re Keene*, 182 B.R. at 383 (whether the proceeding is core "is a mere factor and 'a finding that a matter is core or non-core does not automatically determine jurisdiction for the action'") (quoting *In re Orion*, 4 F.3d at 1101). If § 157 were interpreted to require withdrawal any time that *de novo* review was available, "such an interpretation would lead to automatic withdrawal of any case in which a non-core claim was in any way involved.  Such a result was not intended by Congress."  *See A-Z Assoc. v. 931 Investors (In re Lion Capital Grp.)*, 63 B.R. 199, 206 (S.D.N.Y. 1985).

To the extent that this Court determines that any of the Trustee's common law claims are non-core, the relevant inquiry is whether the common law claims are related to the core claims. *See In re Wedtech Corp.*, 94 B.R. at 295–97; *see also In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *3. The existence of non-core claims does not alone warrant withdrawal of the reference where the non-core claims are "factually intertwined" with the core claims. *See In re Wedtech Corp.*, 94 B.R. at 295–97. Where core and non-core claims are "factually intertwined," a bankruptcy court retains jurisdiction to hear the non-core claims in the first instance, much like a magistrate judge is entitled to issue a report and recommendation subject to review by the presiding judge.[2] *See id.* at 296–97. Allowing bankruptcy judges to retain jurisdiction in such cases can "promote judicial economy and swift resolution," the overarching policy of permissive withdrawal. *Id.* at 297.

In the instant case, 16 of the Trustee's 21 claims seek recovery of fraudulent and preferential transfers received by JPMC. (Compl. ¶¶ 292–429.) It is undisputed that these claims fall within the ambit of core proceedings. (Def. Br. 26.) The five remaining common law causes of action are all related to these bankruptcy claims. The common law claims are in large part based upon the same factual allegations underlying the Trustee's claims for fraudulent and preferential transfers, namely that JPMC served as primary banker to BLMIS and was thoroughly complicit in Madoff's fraud. (*See generally* Compl.)

---

[2] Section 157 states that "[t]he bankruptcy judge shall determine . . . whether a proceeding is a core proceeding under this subsection." 28 U.S.C. § 157(b)(3). Although this Court may make such a ruling itself, *In re the VWE Group, Inc.*, 359 B.R. 441, 447–48 (S.D.N.Y. 2007) (McMahon, J.), a bankruptcy court *must* make its own determination. *See In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *2 ("While this Court may make the core/non-core determination absent a ruling from the bankruptcy court, . . . the statute requires the bankruptcy court to do so before it may proceed . . . .").

As JPMC states in its brief, the facts supporting the Trustee's common law claims will also serve to rebut JPMC's good faith defense to the Trustee's fraudulent transfer claims.  (Def. Br. 8.)  These factually intertwined allegations are sufficient for a finding that the common law claims at issue are related to the core claims and, therefore, the core versus non-core distinction becomes one without a difference.  The Bankruptcy Court has the ability to hear all of the Trustee's claims under § 157(c) whether they are deemed core or non-core.  *See In re Enron Power Mktg., Inc.*, 2003 WL 68036, at *10 (the core versus non-core distinction is a distinction without a difference because the proceeding 'is clearly a matter which is 'otherwise related' to the bankruptcy proceeding").  Accordingly, judicial economy is best served by allowing the Bankruptcy Court to hear all of the Trustee's factually intertwined claims, regardless of whether the common law claims are found to be core or non-core.

### B.      Judicial Efficiency Favors Bankruptcy Court Adjudication

Judicial efficiency is one of the most important factors for a court to consider in determining whether permissive withdrawal is appropriate under § 157(d).  *Ageloff*, 220 B.R. at 800.  JPMC's argument that judicial efficiency considerations favor withdrawal of the reference is completely unpersuasive.  Judge Lifland currently has 1,071 Madoff-related adversary proceedings before him, including 29 BLMIS feeder fund actions.  Of those BLMIS feeder fund actions, JPMC conducted due diligence on seven of those funds, and received fraudulent transfers from three of the funds.  JPMC was at the very center of this massive fraud, and was complicit in it.  (Compl. ¶ 1.)  Billions of dollars of customer money flowed through BLMIS's 703 Account at JPMC, but not a single dollar was used to buy or sell securities, as Madoff claimed.  (*Id.* ¶ 2.)  JPMC watched the money flow between the 703 Account and the thousands of entities and individuals against whom the Trustee has filed lawsuits.  (*See id.*)

The Trustee's case against JPMC is closely related to the Trustee's case against Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma").  JPMC invested in Fairfield Sentry and Fairfield Sigma to hedge its structured products exposure to BLMIS feeder funds and redeemed its interest in both funds a month prior to Madoff's arrest. (*Id.* ¶ 76.)  Both funds were run by the Fairfield Greenwich Group ("FGG").  (*Id.*)  Fairfield Sentry was one of BLMIS's largest feeder funds, and Fairfield Sigma fed 100% of its funds into Fairfield Sentry.  (*Id.*)  The Trustee is seeking to recover fraudulent subsequent transfers JPMC indirectly received from BLMIS when they redeemed their interests in Fairfield Sentry and Fairfield Sigma in November 2008.  (Compl. ¶¶ 279–90, 348–429, & Exs. B, D, E.)

JPMC began its due diligence on FGG in early 2006, which continued into 2008 when a JPMC team met with FGG's Head of Risk Management.  (*Id.* ¶¶ 84–85, 132–38.)  As a result of conversations with FGG, JPMC discovered: FGG funds were making money during times of market distress without sound explanation (*id.* ¶ 84); FGG knew very little about Madoff's operations and was extremely reluctant to push Madoff for answers to due diligence questions (*id.* ¶ 133); and FGG did not know who the counterparties were to the option transactions BLMIS was purportedly entering into on their behalf (*id.* ¶ 134).

The Trustee has filed a complaint against FGG funds and personnel, including Fairfield Sentry and Fairfield Sigma, in the Bankruptcy Court to recover avoidable transfers, and has alleged common law claims against FGG entities and personnel related to their willingness to "turn a blind eye" to Madoff's fraud.  *Picard v. Fairfield Sentry Ltd.*, Case No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. filed May 18, 2009) (Am. Compl. filed July 20, 2010) (Dkt. No. 23).  Judge Lifland is not only well-acquainted with the Trustee's case against FGG, but is also presiding over Fairfield Sentry's Chapter 15 proceeding, and hundreds of cases related

to that proceeding.  *See, e.g.*, *In re Fairfield Sentry Ltd.*, Case No. 10-13164 (BRL) (Bankr. S.D.N.Y. filed July 22, 2010) (Chapter 15 liquidation proceeding).

JPMC also purchased an interest in Herald Fund s.p.c. ("Herald") as part of its hedging strategy and redeemed that interest prior to Madoff's arrest.  (Compl. ¶ 77.)   Herald was a BLMIS feeder fund managed by Herald Asset Management, but day-to-day management was delegated to Bank Medici.  (*Id.*)  Bank Medici's founder and majority shareholder was Sonja Kohn, a longtime friend of Madoff who also played a key role in the fraud.  (*Id.*)  The Trustee is seeking to recover fraudulent subsequent transfers JPMC received indirectly from BLMIS when they redeemed their interest in Herald. (*Id.* ¶¶ 279–90, 348–429, & Exs. C, E.)

JPMC began its due diligence on Herald in 2007, and traveled to Vienna during the Summer of 2008 to meet with Kohn.  (*Id.* ¶¶ 101, 123–26.)  JPMC's due diligence revealed that Madoff was not willing to disclose the names of any counterparties with whom he traded, and Kohn, the only person at Bank Medici who had a meaningful relationship with Madoff and BLMIS, was unable to provide answers to JPMC's due diligence questions.  (*Id*. ¶¶ 101, 125–26.)  Lawsuits related to Herald, Herald Asset Management, Bank Medici, and Kohn are also currently pending in front of Judge Lifland.  *See Picard v. HSBC Bank PLC*, Case No. 08-01789 (BRL), Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y. filed July 15, 2009) (Am. Compl. filed Dec. 5, 2010) (hereinafter referred to as "*Picard v. HSBC Bank*"); *Picard v. Kohn*, Case No. 08-01789 (BRL), Adv. Pro. No. 10-05411 (Bankr. S.D.N.Y. filed Dec. 10, 2010).

In addition to Fairfield Sentry, Fairfield Sigma, and Herald, JPMC invested in Lagoon Trust Limited ("Lagoon"), another fund that fed money into BLMIS.  (Compl. ¶ 78.)  JPMC's Equity Exotics also made a proposal to structure hundreds of millions of dollars worth of products around Rye Select Broad Market Portfolio Limited and Rye Select Broad Market Fund

("Rye Funds") and Thema International Fund plc ("Thema"), but the proposal was ultimately not approved.  (*Id.* ¶ 79–80).  While preparing this proposal, JPMC conducted due diligence on these BLMIS feeder funds as well, which confirmed prior suspicions raised during due diligence on Fairfield Sentry, Fairfield Sigma, and Herald, and unveiled additional red flags. (*Id.* ¶¶ 84–87, 99, 127–29.)  Lawsuits are also pending in the Bankruptcy Court against Lagoon, the Rye Funds, Thema, and their managers.  *See Picard v. HSBC Bank*; *Picard v. Tremont Grp. Holdings, Inc.*, Case No. 08-01789 (BRL), Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. filed Dec. 7, 2010).

Thus, the Trustee's adversary proceeding against JPMC substantially overlaps with a number of other adversary proceedings commenced by the Trustee and other parties currently pending before Judge Lifland.  Accordingly, Judge Lifland is well-positioned to parse through the complicated web of interrelationships between JPMC and the other BLMIS feeder funds and bank defendants because of his already formidable understanding of BLMIS's bankruptcy case and its underlying facts.  The Trustee's case against JPMC serves as an important piece of the puzzle in understanding how Madoff's Ponzi scheme remained undetected for so long, and therefore should remain in Judge Lifland's Court.

Chief Judge Preska already has held that Madoff-related litigation should remain in Judge Lifland's Court to promote efficient use of judicial resources.  *In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *2–4.  In *In re Fairfield Sentry Ltd.*, Fairfield Sentry and two related funds commenced a number of substantively identical proceedings against parties that had redeemed shares of their funds prior to Madoff's exposure.  *Id.* at *1.  The defendants sought to withdraw the reference from the Bankruptcy Court pursuant to § 157(d), but Judge Preska denied their motion, holding that it was premature and judicial efficiency would be served by keeping the case in front of Judge Lifland:

> And in this case, allowing the bankruptcy court to [preside over the case] would promote, significantly, judicial economy because that court is generally familiar with the Plaintiffs' lawsuits and the complex Madoff factual context. . . . Bankruptcy Judge Lifland presided over the Chapter 15 proceedings [of Fairfield Sentry Ltd.] in this case, which involved substantial filings and resulted in a ten-page order. . . . Judge Lifland is also presiding over the BLMIS liquidation proceedings. . . . Having these intimately related cases consolidated before one judge who is familiar with the background of these actions therefore will be more efficient and promote the uniform application of the bankruptcy laws.

*Id.* at *2–3 (internal citations omitted).

Other judges in this district have reached a similar conclusion—where the bankruptcy judge is familiar with the complex factual background of a case, that case should remain in the bankruptcy judge's court to promote judicial efficiency.  *See, e.g., In re Enron Power Mktg. Inc.*, 2003 WL 68036, at *10 ("Clearly, then, because Judge Gonzalez is dealing with a number of cases involving analogous claims and issues, the most efficient use of judicial resources would be to keep this case before Judge Gonzalez in the Bankruptcy Court, at least for pre-trial discovery purposes."); *Times Circle E., Inc. v. Edward Isaacs & Co. (In re Times Circle E., Inc.)*, No. 94 B 455593 (TLB), 1995 WL 489551, at *3 (S.D.N.Y. Aug. 15, 1995) (holding that reference should not be withdrawn where case was at the preliminary stages, "significant discovery" was likely, and the bankruptcy court was familiar with the issues facing the estate); *Cohen v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Cnty. Seat Stores, Inc.)*, No. 01 Civ. 2966 (JGK), 2002 WL 141875, at *6 (S.D.N.Y. Jan. 31, 2002)  (denying withdrawal of the reference as inefficient where the bankruptcy court had been involved with a dispute ever since the Trustee brought the action).

### 1.    JPMC's Reliance on *In re Herald* Is Unpersuasive

While the Trustee's action against JPMC is closely related to multiple proceedings in front of Judge Lifland, JPMC can point to only one purportedly related case in front of Judge Richard Berman, *In re Herald*.  (Def. Br. 29) (citing *In re Herald, Primeo and Thema Funds Sec.*

*Litig.*, No. 09 Civ. 0289 (RMB) (S.D.N.Y.).)  Tellingly, JPMC's motion to withdraw the reference was not assigned to Judge Berman as "related."

*In re Herald* is a consolidation of three complaints, only one of which names JPMC.  The allegations related to JPMC in *In re Herald* are incidental to the much broader, 190-page complaint against multiple persons, feeder funds, auditors, advisors, and financial institutions, all of which—including JPMC—are being sued solely in relation to the Thema fund.  Amended Class Action Complaint ¶¶ 17–61 (hereinafter "Thema Complaint"), *In re Herald*, No. 09 Civ. 0289 (RMB) (S.D.N.Y. filed Jan. 1, 2009) (Am. Compl. filed Feb. 10, 2009) (Dkt. No. 76). (Dec. of Emil Kleinhaus, dated Feb. 8, 2011, Ex. 2.)  Although JPMC notes that "both actions seek to recover from JPMorgan on theirs of unjust enrichment . . . and aiding and abetting breach of fiduciary duty," the facts underlying these theories of recovery differ.  (Def. Br. 30.)  The Trustee's Complaint alleges that JPMC was unjustly enriched by receiving "fees and profits from its [BLMIS-related] banking activity and investments" at the expense of BLMIS customers, while the Thema Complaint alleges that JPMC was unjustly enriched by "the receipt or retention of salaries, bonuses and other monies" at the expense of Thema shareholders.  (*Compare* Compl. ¶¶ 466–72 *with* Thema Compl. ¶¶ 585–89.)  And while the Trustee's Complaint alleges that JPMC aided and abetted BLMIS in breaching its fiduciary duty to customers, the Thema Complaint alleges that JPMC aided and abetted certain *other* named defendants—not BLMIS— in breaching their fiduciary duties to Thema shareholders.  (*Compare* Compl. ¶¶ 444–58 *with* Thema Compl. ¶¶ 590–93.)  Plaintiffs' counsel in *In re Herald* may *want* the benefit of copying the Trustee's allegations and access to his discovery for a more expansive, competing complaint, but such opportunism is not "cause" for withdrawal of the reference.

Finally, the allegations JPMC relies on in *In re Herald* are dwarfed by the overlapping

facts contained in the Trustee's complaints against JPMC, Fairfield Sentry, Fairfield Sigma, and

Herald, as discussed above, further weakening JPMC's argument that judicial efficiency

considerations support withdrawal of the reference.  JPMC's reliance on *In re Adelphia*

*Communications Corporation Securities and Derivative Litigation* is unpersuasive.  2006 WL

337667.  In that case, contrary to the facts here, nearly all of the defendants were also defendants

in a case pending before the district court.  *Id.* at *4.

### C.  The Jury Trial Issue Is Premature and Weighs In Favor of Denying Withdrawal

JPMC further argues in favor of withdrawal premised on its inchoate right to demand a

jury trial.  (Def. Br. 27–29.)  Yet, JPMC has not demanded a jury trial and, indeed, may never do

so.  As this Court stated in *In re Kenai Corporation*:

> A rule that would require a district court to withdraw a reference simply because a
> party is entitled to a jury trial, regardless of how far along toward trial a case may
> be, runs counter to the policy favoring judicial economy that underlies the
> statutory scheme governing the relationship between the district courts and
> bankruptcy courts.

136 B.R. at 61 (*citing In re Adelphi Inst., Inc.*, 112 B.R. at 538); *see also In re Gaston & Snow*,

173 B.R. 302, 307 (S.D.N.Y. 1994) (relying on *Kenai* in finding a withdrawal motion to be

premature); *In re Enron Corp.*, 318 B.R. 273, 275 (S.D.N.Y. 2004) ("Even if the Bankruptcy

Court determines that the proceeding is non-core, and thus this Court concludes that [the

defendant] is entitled to a jury trial on its claims, the Court would still not withdraw the reference

of the case to the Bankruptcy Court until the case is trial-ready."); *In re Enron Power Mktg., Inc.*,

2003 WL 68036, at *6 ("A district court is not compelled to withdraw a reference 'simply

because a party is entitled to a jury trial.'") (*quoting In re Kenai Corp.*, 136 B.R. at 61)).

None of the cases cited by JPMC stands for the proposition that a right to jury trial is cause to withdraw the reference at this early stage in the proceedings.  Given that JPMC has not requested a jury trial, and may never do so, the jury trial issue is not a basis for permissive withdrawal.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that this action remain with the Bankruptcy Court.

Dated: New York, New York
      March 30, 2011

Of Counsel:

Jessie M. Gabriel
Email:  jgabriel@bakerlaw.com
Jennifer A. Vessells
Email:  jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email:  lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email:  ldandrea@bakerlaw.com

Capitol Square, Suite 2100
65 East State Street
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

Thomas D. Warren
Email:  twarren@bakerlaw.com

PNC Center
1900 East 9th Street, Suite 3200
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

Respectfully submitted,

/s/Deborah H. Renner
Baker & Hostetler LLP
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Deborah H. Renner
Email:  drenner@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Estate of Bernard L. Madoff*