UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff-Applicant,

-against-

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.

_____x

In re:

BERNARD L. MADOFF,

                Debtor.

_____x

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                Plaintiff,

-against-

JPMORGAN CHASE & CO., JPMORGAN CHASE
BANK, N.A., J.P. MORGAN SECURITIES LLC, and
J.P. MORGAN SECURITIES LTD.,

                Defendants.

_____x

11 Civ. 0913 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/23/11

1

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION
TO WITHDRAW THE REFERENCE FROM THE BANKRUPTCY COURT.

McMahon, J.

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and

J.P. Morgan Securities Ltd. (collectively, "JPMorgan") have moved for an order under 28 U.S.C.

§ 157(d) withdrawing the reference of this action to the bankruptcy court.  Irving H. Picard

("Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff

Investment Securities LLC ("BMIS") and the estate of Bernard L. Madoff, opposes JPMorgan's

motion.  For the reasons discussed, JPMorgan's motion is granted and the reference of this action

to the bankruptcy court is withdrawn.

## I.  BACKGROUND

This action arises from the now-infamous Ponzi scheme orchestrated by Bernard L.

Madoff.  JPMorgan was BMIS's primary banker for over twenty years and, in essence, the

Trustee's action alleges that JPMorgan turned a "blind eye" to evidence of Madoff's fraud and

was complicit in that fraud.  (Compl. ¶¶ 1-2.)  The Trustee seeks to recover approximately $5.4

billion in damages suffered by BMIS's customers and approximately $500 million in fees and

profits collected by JPMorgan.  (Id. ¶¶ 277-78, 443, 458, 482.)

A.  Madoff's Ponzi scheme and the SIPA liquidation

On December 11, 2008, Madoff was charged with operating a multi-billion-dollar

securities fraud scheme in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.  (Id.

¶ 48; see also United States v. Madoff, Case No. 09-CR-213.)  On the same day, the Securities

and Exchange Commission ("SEC") also filed a civil complaint in this Court against Madoff and

BMIS, alleging that Madoff had engaged in fraud through one of BMIS's business units—the

investment advisory unit.  (Compl. ¶ 48.)

On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application in this Court seeking to commence a liquidation proceeding for BMIS under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78eee(a)(4)(B). (Id. ¶ 49.) This Court granted SIPC's application, and an order was entered removing the case to the Bankruptcy Court for the Southern District of New York and appointing Picard as the Trustee for the liquidation proceeding of BMIS. (Id. ¶ 50.) The SIPA liquidation of BMIS is being administered in the bankruptcy court by the Honorable Burton R. Lifland. (See SIPC v. Bernard L. Madoff Inv. Sec. LLC, Case No. 08-01789.)

B. JPMorgan's involvement with Madoff

Since 1986, BMIS maintained bank accounts at JPMorgan or its predecessor banks. (Compl. ¶ 178.) BMIS deposited customer investments into a so-called "703 Account" at JPMorgan and transferred money out of that account as part of the scheme. (Id. ¶¶ 2, 173, 178.) JPMorgan also made loans to BMIS and received fees for providing its commercial banking services to BMIS. In 2005 and 2006, JPMorgan made two secured loans totaling $145 million to BMIS and collected $3.48 million in interest before the loans were repaid. (Id. ¶¶ 256-66.) The Trustee also alleges that during the six-year period prior to BMIS's bankruptcy, JPMorgan received $597,000 in fee payments from BMIS. (Id. ¶¶ 292-347, Ex. A.)

The Trustee also alleges that in 2006, J.P. Morgan Securities Ltd. invested approximately $338 million in four Madoff "feeder funds." According to the Trustee, JPMorgan redeemed most of its BMIS-related investments, approximately $276 million, before Madoff's arrest on December 11, 2008. (Id. ¶ 169.) On that day, JPMorgan had only $35 million in "risk exposure" to BMIS funds. (Id.)

3

C.   The Trustee's lawsuit against JPMorgan

On December 2, 2010, Irving H. Picard, as Trustee for the liquidation of BMIS, commenced this action against JPMorgan in the United States Bankruptcy Court for the Southern District of New York.  The complaint asserts twenty-one causes of action against JPMorgan. The first sixteen causes of action are "clawback" claims that seek to recover payments made by BMIS to JPMorgan before the fraud was revealed.  (Compl. ¶¶ 292-429 (Counts I-XVI).)  These claims seek to recover $145 million in loan repayments, $3.48 million in interest payments on the loan, $597,000 in banking fees, and $276 million in redemptions made by JPMorgan from Madoff feeder funds—for a total of $425 million.  The Trustee alleges that this money is "customer property" as defined by SIPA, 15 U.S.C. §78lll(4).  (Id. ¶17.)  The remaining five causes of action allege non-bankruptcy claims based on theories of aiding and abetting fraud (Count Seventeen), aiding and abetting breach of fiduciary duty (Count Eighteen), conversion (Count Nineteen), unjust enrichment (Count Twenty) and fraud on the regulator (Count Twenty-One).  Based on these claims, the Trustee seeks to recover an additional $5.4 billion in damages.

The Trustee's complaint alleges that JPMorgan was "at the center of [Madoff's] fraud, and thoroughly complicit in it."  (Id. ¶ 1.)  According to the Trustee, JPMorgan stood idly by as billions of dollars flowed between BMIS's "703 Account" and various investors, feeder funds and banks, and JPMorgan suppressed warnings triggered by the large transactions occurring in the 703 Account.  (Id. ¶ 2.)  Specifically, the Trustee provides numerous examples of "red flags" that JPMorgan, as BMIS's long-time banker, allegedly ignored: (1) JPMorgan could not identify, and Madoff would not provide any information, about BMIS's purported over-the-counter options counterparties (id. ¶¶ 5, 101-02, 134, 146); (2) Madoff would not provide details with regards to his split strike conversion strategy (id. ¶¶ 5, 9, 84, 133, 140, 146); (3) transactions

4

taking place in the 703 Account did not coincide with a legitimate enterprise, and could only be

explained by fraud (id. ¶¶ 224-37, 434); and (4) highly suspicious activity was occurring in the

703 Account, such as large repetitive transactions, up and down spikes in the value and volume

of transactions, frequent transactions with offshore entities, regular use of hand-written checks

for millions of dollars, and suspicious activity between the 703 Account and clients of

JPMorgan's private bank (id. ¶¶ 224-37, 251-73, 434).

JPMorgan filed a motion on February 9, 2011, seeking to withdraw the reference of the

Trustee's action to the bankruptcy court. The Trustee filed its opposition on March 30, 2011.

The Court heard oral argument on May 4, 2011. At the May 4 oral argument, the Court

announced its decision to grant JPMorgan's motion and withdraw the reference from the

bankruptcy court. The reasons for the Court's ruling are explained below.

## II. DISCUSSION

A. The standard for withdrawal of the reference

JPMorgan moves this Court under 28 U.S.C. § 157(d) for withdrawal of the reference

from the bankruptcy court. Section 157(d) provides for withdrawal of the reference in two

instances:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any party,
> for cause shown. The district court shall, on timely motion of a party, so
> withdraw a proceeding if the court determines that resolution of the proceeding
> requires consideration of both title 11 and other laws of the United States
> regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d). The first sentence in Section 157(d) provides for "permissive" withdrawal,

or withdrawal for cause, while the second sentence provides for "mandatory" withdrawal.

1. Mandatory withdrawal

The mandatory withdrawal provision of Section 157(d) has been construed "narrowly" to apply only in cases "where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." In re Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990); see also Bear, Stearns Secs. Corp. v. Gredd, 2001 WL 840187, at *2 (S.D.N.Y. July 25, 2001). Consideration is "substantial and material" when the case requires the bankruptcy judge to make a "significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991); In re Dana Corp., 379 B.R. 449, 453 (S.D.N.Y. 2007). Section 157(d) is meant to "assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside the Bankruptcy Code." Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (quoting Eastern Airlines, Inc. v. Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.), 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990)).

"Where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met." Chemtura Corp. v. U.S., 2010 WL 1379752, at *1 (S.D.N.Y. Mar. 26, 2010) (quoting In re Manhattan Inv. Fund Ltd., 343 B.R. 63, 67 (S.D.N.Y.2006) (citations omitted)). Nonetheless, in determining whether withdrawal of the reference is mandatory, this Court need not evaluate the merits of the parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve consideration of federal non-bankruptcy law. Gredd, 2001 WL 840187, at *4; Chemtura, 2010 WL 1379752, at *2.

6

B.  JPMorgan has satisfied the standard for mandatory withdrawal of the reference under
    Section 157(d).

In support of its motion to withdraw the reference, JPMorgan argues that the Trustee's

complaint raises issues of first impression under federal securities law—namely, whether the

Trustee has standing to assert his common-law claims on behalf of BMIS customers and whether

the Trustee's common-law claims are preempted by the Securities Litigation Uniform Standards

Act of 1998 ("SLUSA"). At oral argument, the Trustee conceded that permissive withdrawal of

the reference was appropriate in light of Judge Rakoff's decision in Picard v. HSBC Bank PLC,

2011 WL 1544494 (S.D.N.Y. Apr. 25, 2011). (See 5/4/11 H'rg Tr. 15:18-22.) Further, the

SLUSA preemption and SIPA standing questions raised by the Trustee's complaint will require

the bankruptcy court to engage in significant consideration of federal non-bankruptcy law.

Therefore, the requirement for mandatory withdrawal of the reference under Section 157(d) is

also satisfied.

1.  Whether SLUSA preempts the Trustee's common-law claims will require the bankruptcy
    court to engage in significant interpretation of federal non-bankruptcy law.

Withdrawal of the reference is mandated because the Trustee's action will require the

bankruptcy court to interpret a federal statute outside of Title 11—namely, SLUSA.

SLUSA was enacted in order to prevent securities plaintiffs from using the class-action

vehicle to prosecute state-law securities claims in state courts to avoid the pleading requirements

of the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. §§ 77z-1, 78u-4.

In pertinent part, SLUSA provides that:

> No covered class action based upon the statutory or common law of any State or
> subdivision thereof may be maintained in any State or Federal court by any
> private party alleging-

7

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative device in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

If a state-law class action falls under either category, SLUSA preempts the action and confers upon the federal court exclusive jurisdiction. See 15 U.S.C. § 78bb(f)(2). "SLUSA was intended to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims." Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 123 (2d Cir. 2003).

Four conditions must be satisfied to trigger SLUSA's removal and preemption provisions: (1) the underling suit must be a "covered class action;" (2) the action must be based on state or local law; (3) the action must concern a "covered security;" and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative device or contrivance "in connection with the purchase or sale" of that security. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81-82 (2006).

At issue here is the term "covered class action," which SLUSA defines, in relevant part, as: "any single lawsuit in which . . . damages are sought on behalf of more than 50 persons or prospective class members . . . ." 15 U.S.C. § 78bb(f)(5)(B)(i). The statute provides that, for purposes of this definition, "a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action." 15 U.S.C. § 78bb(f)(5)(D).

8

JPMorgan argues that withdrawal of the reference is necessary because whether the Trustee's suit is a "covered class action" under SLUSA will require substantial and material interpretation of non-bankruptcy federal law. Conversely, the Trustee argues that his action is not a "covered class action" because the Trustee is an "entity" under Section 78bb(f)(5)(D) and therefore treated as one person.

The Trustee misses the point: the issue is whether seeking damages "on behalf of more than 50 persons or prospective class members" triggers SLUSA preemption, even if the claims are brought by a single entity—in this case, a SIPA trustee.

Whether SLUSA applies when "the original owners of the claim" number more than 50—regardless of whether the claims are asserted by one entity—is an open question in this Circuit. None of the cases cited by the Trustee furthers his argument. In <u>Smith v. Arthur Andersen LLP</u>, 421 F.3d 989, 1003 (9th Cir. 2005), for instance, the claims were asserted by a bankruptcy trustee on behalf of the bankrupt estate (and not, as is the case here, on behalf of customers of the estate). In <u>LaSala v. UBS, AG</u>, 510 F. Supp. 2d 213, 237 (S.D.N.Y. 2007), the Court concluded that the claims asserted by the trustee (asserted on behalf of a trust that was assigned the claims of former shareholders of the bankrupt entity) were preempted by SLUSA. In reaching its conclusion, the Court explained that "SLUSA's definition of a covered class action does not concern itself with the nature of the claim being advanced but rather with the nature of the persons or entities on whose behalf damages are being sought . . . . Here, since damages are indisputably being sought on behalf of beneficiaries of the Trust numbering more than 50 persons, the Trust is a covered class action unless the entity exception applies." <u>Id.</u> at 236.

9

The Trustee also cites In re Recoton Corp., 2004 WL 1497570 (S.D.N.Y. July 1, 2004), to support his argument that withdrawal of the reference is unnecessary because straightforward application of SLUSA is within the bankruptcy court's competency. In that case, a committee of unsecured creditors sought discovery from former officers and directors of the bankrupt corporation under Bankruptcy Rule 2004. Id. at *1. The former officers and directors argued that allowing discovery under Rule 2004 was in conflict with Section 78u-4 of SLUSA, which allows a court to "stay discovery proceedings in any private action in State court." 15 U.S.C. § 78u-4(b)(3)(D). The bankruptcy court concluded that the committee's discovery motion was not governed by or in conflict with federal securities law, because a stay of discovery under SLUSA applies only to actions in state court, "and the instant Chapter 11 cases are decidedly not pending in State court." In re Recoton, 307 B.R. 751, 757-58 (Bankr. S.D.N.Y. 2004). There is no ambiguity in the express terms of Section 78u-4 or in its application to the bankruptcy proceeding in In re Recoton. By its express terms, SLUSA provides for a stay of discovery in an action pending in state court and there was no pending state-court action in In re Recoton. Thus, application of SLUSA in that case was straightforward. By contrast, whether SLUSA preempts the Trustee's action—because even if the claims are asserted by one entity they are for damages sought by thousands of BMIS customers—is a novel question.

Further, although the Trustee argues that JPMorgan's preemption argument is frivolous, at least one court has concluded that a claim belonging to 50 or more persons could be preempted under SLUSA even if a single entity asserts the claim in an action. In LaSala v. Bordier et Cie, 519 F.3d 121 (3d Cir. 2008), the Third Circuit distinguished between claims belonging to the debtor and claims belonging to the purchasers of the debtor's stock. As to claims owned by the purchasers and assigned to a state-law trust created for purposes of pursuing

10

those claims, the court explained that such claims "likely are brought to recover damages 'on behalf of more than 50 persons' so they would seek to take the form of a covered class action." Id. at 137-38 (citing 15 U.S.C. § 78bb(f)(5)(B)(i)(I) (internal citations omitted)). The Third Circuit explained that "the phrase 'on behalf of 50 or more persons' seems to refer to someone bringing a claim on behalf of 50 or more injured persons. In other words, the phrase refers to the assignors of a claim, not to the assignee . . . ." Id. at 134.

Accordingly, because the Trustee's common-law claims are on behalf of BMIS customers, and not the BMIS estate, determining whether the Trustee's action is preempted by SLUSA requires substantial interpretation of federal non-bankruptcy law. Withdrawal of the reference is therefore mandated under Section 157(d).

2. Whether the Trustee has standing to assert his common-law claims will require the bankruptcy court to engage in significant interpretation of federal non-bankruptcy law.

It is well-established that Title 11 generally does not confer standing on a bankruptcy trustee to bring claims on behalf of the bankrupt estate's creditors. See Caplin v. Marine Midland Grace Trust Co. of New York, 406 U.S. 416, 428-34 (1972). A SIPA trustee may only exercise the powers of a bankruptcy trustee with the addition of those powers set forth in SIPA. See 15 U.S.C. § 78fff-1(a). The Trustee therefore asserts three grounds for standing to bring his common-law claims in Counts Seventeen through Twenty-One: bailee of customer property, subrogee of SPIC's subrogation rights, and assignee of customers' claims.

Relying on Redington v. Touche Ross & Co., 592 F.2d 617 (2d Cir. 1978), the Trustee argues that he has standing to assert his common-law claims. As Judge Rakoff explained in HSBC Bank, the Supreme Court's decisions in Touche Ross & Co. v. Redington, 442 U.S. 560 (1979), and Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), cast doubt on

11

<u>Redington</u>'s continued viability and on the Trustee's basis for standing, either as a bailee of customer property or as a subrogee of SPIC's subrogation rights. <u>Picard v. HSBC Bank PLC</u>, 2011 WL 1544494, at **3-4 (S.D.N.Y. Apr. 25, 2011). A bankruptcy court is not the forum for deciding whether a decision of the Supreme Court effectively overruled a Second Circuit decision.

Moreover, because it is not clear that a SIPA trustee may sue parties other than the liquidated estate as an assignee of the estate's customers, determining if the Trustee has standing as an assignee of BMIS customers will require the bankruptcy court to engage in substantial interpretation of SIPA.

In <u>Mishkin v. Peat, Marwick, Mitchell & Co.</u>, 744 F. Supp. 531, 554 (S.D.N.Y. 1990), for instance, the Court concluded that SIPA only permits assignments of customers' net-equity claims—meaning claims against the failed broker-dealer—and not claims against third parties. Similarly, in <u>Securities Investor Protection Corp. v. BDO Seidman, LLP</u>, 49 F. Supp. 2d 644 (S.D.N.Y. 1999), the Court, discussing Section 78fff-1(a) of SIPA, expressed doubts as to whether a SIPA trustee could rely on that section to obtain assignment of customer claims:

> I cannot agree that Section 78fff-2(b), which deals generally with payments to customers in a liquidation proceeding, should be construed so broadly as to permit standing. That section states that payments made "pursuant to this subsection may be conditioned upon the trustee requiring the claimants to execute . . . supporting affidavits, releases and assignments." When read in the entire context of Section 78fff, it is clear that those assignments relate to payments for net equity claims. And, as stated above, that does not extend the Trustee's authority to bring suit beyond the brokerage firm-customer relationship to include claims against a third party.

<u>Id.</u> at 654 n.7 (internal citations omitted). Moreover, bankruptcy courts in this district that have addressed whether a SIPA trustee has standing as assignee have concluded that "the assignments authorized by section 78fff–2(b) of SIPA do not extend to all claims of customers against third

parties but, rather, only to a customer's net equity claim." In re Park S. Sec., LLC, 326 B.R. 505, 515 (Bankr. S.D.N.Y. 2005); accord Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co., Inc.), 280 B.R. 794, 803 (Bankr. S.D.N.Y. 2002).

In an attempt to sidestep these cases, the Trustee argues that he has standing as assignee to assert customer claims against third parties under the Bankruptcy Code (and not SIPA). Specifically, the Trustee relies on Section 541(a)(7) of the Bankruptcy Code, which states that the bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). The Trustee also relies on the Second Circuit's decision in Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co.), 529 F.3d 432, 459 (2d Cir. 2008). While In re CBI Holding held that a bankruptcy trustee has standing to assert claims assigned to him by creditors pursuant to Section 541(a)(7), that case did not involve a SIPA proceeding or a SIPA trustee.

Further, the Trustee's argument that SIPA is effectively a bankruptcy statute and, therefore, interpretation of SIPA does not satisfy the mandatory withdrawal requirement of Section 157(d), is not persuasive. At oral argument, the Trustee argued that interpretation of SIPA "is well within the bankruptcy court's expertise" and therefore does not merit mandatory withdrawal, as Judge Rakoff concluded in HSBC Bank. (See 5/4/11 H'rg T. 16: 2-16.) But while a SIPA liquidation proceeding may be maintained in the bankruptcy court, and SIPA incorporates provisions of the Bankruptcy Code, SIPA expressly provides that it is part of the securities laws and is codified in Title 15, not Title 11. See 15 U.S.C. § 78bbb ("Except as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 . . . apply as if [SIPA] constituted an amendment to, and was included as a section of, such Act"). Section 157(d) requires mandatory withdrawal if a proceeding "requires consideration of both

13

title 11 and other laws of the United States . . . ." See 28 U.S.C. § 157(d). Thus, an issue that

requires significant interpretation of SIPA undoubtedly requires consideration of laws other than

Title 11. Regardless of a bankruptcy court's familiarity with a statute outside of Title 11, the

requirements for mandatory withdrawal are satisfied if the proceeding requires consideration of a

law outside of Title 11. Accord HSBC Bank, 2011 WL 1544494, at *2.

C. JPMorgan's motion to withdraw the reference is timely.

The Trustee argues that JPMorgan's motion to withdraw the reference is premature

because it is based on defenses JPMorgan *intends* to raise and therefore the question of whether

this action implicates issues that require withdrawal of the reference is speculative.

Section 157 does not specify a time by when a party must file a motion to withdraw the

reference; rather, the statute requires only that the motion be "timely." 28 U.S.C. § 157(d).

Courts in this Circuit have interpreted timeliness under Section 157 to mean "as soon as possible

after the moving party has notice of the grounds for withdrawing the reference." In re FMI

Forwarding Co., 2005 WL 147298, at *5 (S.D.N.Y. Jan. 24, 2005); M. Fabrikant & Sons, Inc. v.

Long's Jewelers Ltd., 2008 WL 2596322, at *2 (S.D.N.Y. June 26, 2008); Shugrue v. Chem.

Bank, Inc. (In re Ionosphere Clubs, Inc.), 1995 WL 479480, at *3 (S.D.N.Y. Aug. 11, 1995).

Typically, the timeliness issue arises because a court is asked to determine whether the

party moving for withdrawal of the reference has waited too long to file the motion. See e.g.,

Interconnect Tel. Serv., Inc. v. Farren, 59 B.R. 397, 402 (S.D.N.Y. 1986) (withdrawing the

reference even though the motion was made one year after the proceeding had commenced,

discovery had been taken, and the parties had engaged in motion practice); Burger King Corp. v.

B-K of Kansas, Inc., 64 B.R. 728, 730-31 (D. Kan. 1986) (motion to withdraw the reference was

timely even though it was filed 10 months after the proceeding had commenced in the

14

bankruptcy court and after discovery had been taken); see also In re Ionosphere Clubs, Inc., 1995 WL 479480, at *3 (S.D.N.Y. Aug. 11, 1995) (collecting cases). Here, timeliness is not a ground for denying JPMorgan's motion to withdraw the reference. JPMorgan filed its motion approximately two months after the Trustee filed its complaint in the bankruptcy court and it is the Trustee's complaint which gave JPMorgan notice of the grounds for withdrawal of the reference.

Further, unlike the situation in Enron Corp. v. JP Morgan Sec., Inc. (In re Enron Corp.), 2008 WL 281972, at *6 (S.D.N.Y. Jan. 25, 2008), cited by the Trustee, JPMorgan's motion to withdraw the reference is not "premised upon an issue that the bankruptcy court may never be required to consider." If the Trustee's action remains in the bankruptcy court, that court will have to determine whether the Trustee has standing to assert the claims against JPMorgan on behalf of BMIS customers and whether the Trustee's state-law claims are preempted by SLUSA—both questions that will require the bankruptcy court to engage in significant interpretation of federal non-bankruptcy law.

The determination of timeliness must be made on a case-by-case, fact-specific basis. See In re Chateaugay, 104 B.R. 622, 623-24 (S.D.N.Y. 1989). Here, judicial economy favors concluding that JPMorgan's motion is timely because the questions of standing and preemption can be determined before resources are expended litigating this action in the bankruptcy court. Moreover, the grounds for withdrawal of the reference are apparent from the face of the complaint. It is therefore a waste of judicial resources to require JPMorgan to answer the complaint or file a motion to dismiss in the bankruptcy court before allowing it to move for withdrawal of the reference.

Accordingly, JPMorgan's motion to withdraw the reference is timely.

15

## III.CONCLUSION

For the reasons discussed, the Court grants Defendants' motion to withdraw the reference from the bankruptcy court.

Dated:  May 23, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

16