## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

        Plaintiff,

        v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, and J.P. MORGAN
SECURITIES LTD.,

        Defendants.

11 Civ. 913 (CM)

## OPENING BRIEF IN SUPPORT OF JPMORGAN'S MOTION
## TO DISMISS THE TRUSTEE'S COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., J.P. Morgan Securities*
*LLC and J.P. Morgan Securities Ltd.*

Dated:  June 3, 2011

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ......................................................................................................6

    A.    JPMorgan's contacts with Madoff .............................................................6

    B.    The Trustee's lawsuit against JPMorgan ...................................................7

ARGUMENT ..........................................................................................................9

POINT I     THE TRUSTEE LACKS STANDING TO BRING COMMON
          LAW CLAIMS AGAINST JPMORGAN. ......................................................9

    A.    Under *Caplin* and *Wagoner*, the Trustee lacks standing to bring
          common law claims against JPMorgan............................................................9

    B.    SIPA does not grant the Trustee standing to bring common law
          claims on behalf of BMIS's customers. ..................................................11

    C.    The Trustee lacks standing to sue JPMorgan as a bailee. .....................12

          1.    *Redington* is not good law........................................................13

          2.    *Wagoner* and *Hirsch* control over *Redington*. ...........................15

          3.    A thief cannot be a bailee........................................................16

    D.    The Trustee lacks standing to sue JPMorgan as a subrogee. .................17

    E.    The Trustee lacks standing to sue JPMorgan as an assignee................20

POINT II    THE TRUSTEE'S COMMON LAW CLAIMS ARE
          PRECLUDED BY SLUSA.........................................................................22

    A.    SLUSA must be interpreted broadly to foreclose securities class
          actions based on state law. .....................................................................22

    B.    SLUSA preempts the Trustee's claims on behalf of
          Madoff's customers. ..............................................................................24

          1.    This action is based on state law...............................................24

          2.    This action alleges misrepresentations or omissions in connection
              with the purchase or sale of securities. ...................................24

          3.    This is a covered class action....................................................25

POINT III THE COMPLAINT FAILS TO STATE CLAIMS FOR AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY. ........................29

 A. The Trustee must plead the elements of aiding and abetting liability with particularity. ...................................................................30

 B. The burden of pleading actual knowledge is a heavy one. ....................32

 C. The Trustee has failed to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud. ..............................................35

  1. The Trustee's allegations with respect to the 703 Account do not show actual knowledge. ..................................................36

  2. The Trustee's allegations concerning JPMorgan's structured products due diligence do not show actual knowledge. ............38

 D. The Trustee has failed to allege facts showing that JPMorgan substantially assisted Madoff's fraud. .....................................................43

 E. The Trustee has failed to plead that JPMorgan's conduct was the proximate cause of the alleged injury. ....................................................45

 F. The Trustee has failed to plead individual fraud claims. .......................46

POINT IV THE COMPLAINT FAILS TO STATE CLAIMS FOR CONVERSION AND UNJUST ENRICHMENT. ................................48

 A. The Complaint fails to state a claim for conversion. ..............................48

 B. The Complaint fails to state a claim for unjust enrichment. ..................50

POINT V THE TRUSTEE HAS NO VALID CLAIM FOR "FRAUD ON THE REGULATOR." ..................................................................................51

POINT VI THE TRUSTEE'S CLAIMS TO AVOID PAYMENTS FROM BMIS TO JPMORGAN SHOULD BE DISMISSED. ...........................56

 A. As acts of setoff or repayments of secured debts, the alleged transfers from BMIS to JPMorgan are not avoidable. ...........................56

  1. The Trustee cannot avoid the loan repayments. .........................56

  2. The Trustee cannot avoid the fee payments. ...............................61

 B. The Trustee's fraudulent transfer claims are barred by the Second Circuit's decision in *Sharp International*. ..........................................62

CONCLUSION ..................................................................................................................66

# TABLE OF AUTHORITIES

**Page**

## Cases

*Albion Alliance Mezzanine Fund* v. *State Street Bank & Trust*,
    8 Misc. 3d 264 (N.Y. Sup. Ct. N.Y. Co. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003).......... 38

*AmSouth Bank* v. *Dale*,
    386 F.3d 763 (6th Cir. 2004) ...................................................................... 54 n.10

*Andrew Velez Constr., Inc.* v. *Consol. Edison Co. of N.Y., Inc.*
    *(In re Andrew Velez Constr., Inc.)*,
    373 B.R. 262 (Bankr. S.D.N.Y. 2007) ......................................................... 65 n.16

*Anwar* v. *Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)............................................................ 40 n.8

*Ascot Fund Ltd.* v. *UBS PaineWebber, Inc.*,
    No. 600341/03 (Sup. Ct. N.Y. Co. Dec. 17, 2004),
    *aff'd*, 28 A.D.3d 313 (1st Dep't 2006) ................................................................ 33

*Ashcroft* v. *Iqbal*,
    129 S. Ct. 1937 (2009)...................................................................................... 30

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd*,
    493 F.3d 87 (2d Cir. 2007)................................................................................. 30

*Bankruptcy Services, Inc.* v. *Ernst & Young (In re CBI Holding Co.)*,
    529 F.3d 432 (2d Cir. 2008)...................................................................... 21, 22 n.5

*Bear, Stearns Securities Corp.* v. *Gredd*,
    275 B.R. 190 (S.D.N.Y. 2002)........................................................................60-61

*Belford* v. *Union Trust. Co. (In re Wild Bills, Inc.)*,
    206 B.R. 8 (Bankr. D. Conn. 1997) .................................................................... 59

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007).......................................................................................... 30

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
    403 F.3d 474 (7th Cir. 2005) ................................................................... 54 n.10

*Berman* v. *Morgan Keegan & Co.*,
    2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011) ................................... 31, 32, 34, 45

*Bloor* v. *Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir. 1985)................................................................................. 45

*Boston Trading Group, Inc.* v. *Burnazos*,
    835 F.2d 1504 (1st Cir. 1987)........................................................................ 63, 64

*Brecht* v. *Abrahamson*,
    944 F.2d 1363 (7th Cir. 1991) ............................................................................ 14

*Breeden* v. *Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.)*,
   268 B.R. 704 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) ....................................... 16

*Buckman Co.* v. *Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001) ................................................................................. 52, 53, 54, 55

*Cape Ann Investors, LLC* v. *Lepone*,
   296 F. Supp. 2d 4 (D. Mass. 2003) ................................................................................. 28

*Caplin* v. *Marine Midland Grace Trust Co. of N.Y.*,
   406 U.S. 416 (1972) ................................................................................. 2, 9, 11, 12

*Carmona* v. *Spanish Broadcasting System*,
   2009 WL 890054 (S.D.N.Y. Mar. 30, 2009) ......................................................................... 50

*Carran* v. *Morgan*,
   2007 WL 3520480 (S.D. Fla. Nov. 14, 2007) ................................................................. 54 n.10

*Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal*
   *Services Fund and Annuity Fund* v. *Lollo*,
   148 F.3d 194 (2d Cir. 1998) ......................................................................................... 55

*Chemical Bank* v. *Ettinger*,
   196 A.D.2d 711 (1st Dep't 1993) .................................................................................... 58

*Chemtex, LLC* v. *St. Anthony Enter.*,
   490 F. Supp. 2d 536 (S.D.N.Y. 2007) ............................................................................... 32

*Citadel Mgmt.* v. *Telesis Trust*,
   123 F. Supp. 133 (S.D.N.Y. 2000) ................................................................................. 49

*City of New York* v. *Cyco.Net, Inc.*,
   383 F. Supp. 2d 526 (S.D.N.Y. 2005) ............................................................................... 55

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R.*,
   70 N.Y.2d 382 (1987) ............................................................................................. 50-51

*Clarkson Co.* v. *Shaheen*,
   533 F. Supp. 905 (S.D.N.Y. 1982) ................................................................................. 58

*Colavito* v. *N.Y. Organ Donor Network*,
   8 N.Y.3d 43 (2006) ............................................................................................... 48

*Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*,
   2005 WL 1490097 (S.D.N.Y. June 23, 2005) ....................................................................... 50

*Daly* v. *Deptula (In re Carrozzella & Richardson)*,
   286 B.R. 480 (D. Conn. 2002) ..................................................................................... 66

*Edwards & Hanly* v. *Wells Fargo Secs. Clearance Corp.*,
   602 F.2d 478 (2d Cir. 1979) ....................................................................................... 46

*Fenton* v. *Ives*,
   222 A.D.2d 776 (3d Dep't 1995) .................................................................................... 58

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................................................... 35 n.6

*Giddens* v. *D.H. Blair & Co., Inc. (In re A.R. Baron & Co., Inc.)*,
280 B.R. 794 (Bankr. S.D.N.Y. 2002) ..................................................................... 21

*HBE Leasing Corp.* v. *Frank*,
48 F.3d 623 (2d Cir. 1995) ..................................................................................... 63

*Henry* v. *Lehman Commercial Paper Inc. (In re First Alliance Mortg. Co.)*,
471 F.3d 977 (9th Cir. 2006) .................................................................................. 60

*Hirsch* v. *Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995) ....................................................................... 10, 15, 16

*Holmes* v. *SIPC*,
503 U.S. 258 (1992) ......................................................................................... 18, 19 n.4

*Holyoke Nursing Home, Inc.* v. *Health Care Fin. Admin. (In re Holyoke Nursing Home)*,
273 B.R. 305 (Bankr. D. Mass. 2002) ................................................................ 58-59

*In re Agape Litig.*,
681 F. Supp. 2d 352 (E.D.N.Y. 2010) ................................................................ 43-44

*In re Agape Litig.*,
2011 WL 1136173 (E.D.N.Y. Mar. 29, 2011) .............................................. passim

*In re All-Type Printing, Inc.*,
274 B.R. 316 (Bankr. D. Conn. 2002),
*aff'd*, 80 F. App'x 700 (2d Cir. 2003) ................................................................... 64

*In re Am. Remanufacturers, Inc.*,
2008 WL 2909871 (Bankr. D. Del. July 25, 2008) ............................................... 58

*In re Amaranth Natural Gas Commodities Litig.*,
612 F. Supp. 2d 376 (S.D.N.Y. 2009) .................................................................. 44

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) .................................................................. 26

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010) ............................................................. 25, 46

*In re Bennett Funding Grp.*,
146 F.3d 136 (2d Cir. 1998) .............................................................................. 57-58

*In re CBGB Holdings, LLC*,
439 B.R. 551 (Bankr. S.D.N.Y. 2010) ............................................................. 62 n.14

*In re ICN/Viratek Sec. Litig.*,
1996 WL 164732 (S.D.N.Y. Apr. 9, 1996) ........................................................... 47

*In re J.P. Jeanneret Assocs., Inc.*,
2011 WL 335594 (S.D.N.Y. Jan. 31, 2011) .......................................................... 25

*In re National Century Financial Enterprises, Inc.*,
2011 WL 1397813 (S.D. Ohio Apr. 12, 2011) ...................................................... 60

*In re Oppenheimer Funds Fees Litig.*,
419 F. Supp. 2d 593 (S.D.N.Y. 2006) .................................................................. 25

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010) ........................................................................... 40

*In re Unified Commercial Capital*,
    2002 WL 32500567 (W.D.N.Y. June 21, 2002) .......................................................... 66

*Jana Master Fund* v. *JPMorgan Chase & Co.*,
    2008 WL 746540 (Sup. Ct. N.Y. Co. Mar. 12, 2008) ................................................ 47

*Jet Star Enters., Ltd.* v. *Soros*,
    2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006) ............................................................... 50

*Jordan (Bermuda) Inv.* v. *Hunter Green Inv.*,
    566 F. Supp. 2d 295 (S.D.N.Y. 2008) ................................................................... 30, 45

*Kagan* v. *K-Tel Entm't, Inc.*,
    172 A.D.2d 375 (1st Dep't 1991) ................................................................................ 51

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ....................................................................................... 45

*Kaufman* v. *Cohen*,
    307 A.D.2d 113 (1st Dep't 2003) ..................................................................... 30, 32, 44

*Kingdom 5-KR-41* v. *Star Cruises PLC*,
    2004 WL 444554 (S.D.N.Y. Mar. 10, 2004) .............................................................. 24

*Kirschner* v. *Grant Thornton LLP*,
    2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010) ............... 10

*Kirschner* v. *KPMG, LLP*,
    15 N.Y.3d 446 (2010) ................................................................................................. 10

*Kolbeck* v. *LIT America*,
    939 F. Supp. 240 (S.D.N.Y. 1996) ................................................................ 31, 32, 44-45

*LaBarbera* v. *Clestra Hauserman, Inc.*,
    369 F.3d 224 (2d Cir. 2004) ................................................................................. 14 n.2

*Lama Holding Co.* v. *Smith Barney, Inc.*,
    88 N.Y.2d 413 (1996) ................................................................................................. 55

*Lander* v. *Hartford Life & Ann. Ins.*,
    251 F.3d 101 (2d Cir. 2001) ....................................................................................... 23

*LaSala* v. *Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008) .............................................................................. 26, 27, 28

*Lawson* v. *Ford Motor Co. (In re Roblin Indus., Inc.)*,
    78 F.3d 30 (2d Cir. 1996) ........................................................................................... 63

*Lee* v. *Bankers Trust Co.*,
    166 F.3d 540 (2d Cir. 1999) ....................................................................................... 42

*Lerner* v. *Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ................................................................................. 30, 31

*Levinson* v. *PSCC Servs.*,
    2009 WL 5184363 (D. Conn. Dec. 23, 2009) .......................................................... 25

*Leykin* v. *AT&T Corp.*,
    216 F. App'x 14 (2d Cir. 2007) .............................................................................. 25

*Lippe* v. *Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)...................... 59

*Mandarin Trading Ltd.* v. *Wildenstein*,
    16 N.Y.3d 173 (2011) .............................................................................................. 50

*Martin* v. *Briggs*,
    235 A.D.2d 192 (1st Dep't 1997) ........................................................................... 17

*Melamed* v. *Lake County Nat'l Bank*,
    727 F.2d 1399 (6th Cir. 1984) ................................................................................ 60

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*,
    547 U.S. 71 (2006)..................................................................................... 22-23, 24

*Miller* v. *Forge Mench P'ship Ltd.*,
    2005 WL 267551 (S.D.N.Y. Feb. 2, 2005)............................................................. 60

*Mishkin* v. *Peat, Marwick, Mitchell & Co.*,
    744 F. Supp. 531 (S.D.N.Y. 1990) ................................................................... passim

*MLSMK Inv. Co.* v. *JP Morgan Chase & Co.*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)............................................................... 33, 42

*Newdow* v. *Rio Linda Union Sch. Dist.*,
    597 F.3d 1007 (9th Cir. 2010) ................................................................................ 14

*Newfield* v. *Ettlinger*,
    194 N.Y.S.2d 670 (N.Y. Sup. Ct. 1959) ................................................................ 59

*Nigerian Nat'l Petroleum Corp.* v. *Citibank, N.A.*,
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ..................................................... 30, 43

*O'Brien* v. *Nat'l Property Analysts Partners*,
    936 F.2d 674 (2d Cir. 1991).................................................................................... 31

*Parks* v. *ABC, Inc.*,
    2008 WL 205205 (S.D.N.Y. Jan. 24, 2008) .......................................................... 49

*Pereira* v. *Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*,
    301 B.R. 801 (Bankr. S.D.N.Y. 2003), *vacated on other grounds*, 2009 WL 1810112
    (S.D.N.Y. June 25, 2009).................................................................................. 63

*Picard* v. *JPMorgan Chase & Co.*,
    2011 WL 2119720 (S.D.N.Y. May 23, 2011) ......................................................... 7

*Picard* v. *Taylor (In re Park South Securities, LLC)*,
    326 B.R. 505 (Bankr. S.D.N.Y. 2005)................................................................... 20

*Piccoli A/S* v. *Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)...................................................................... 51

*Pivar* v. *Graduate Sch. of Figurative Art of the N.Y. Acad. of Art*,
290 A.D.2d 212 (1st Dep't 2002) .................................................................. 17

*Reading Int'l* v. *Oaktree Capital Mgmt.*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003) ............................................................. 50

*Redington* v. *Touche Ross & Co.*,
592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979) ............................. passim

*Renner* v. *Chase Manhattan Bank*,
2000 WL 781081 (S.D.N.Y. June 16, 2000) ........................................... 39, 41, 44

*RGH Liquidating Trust* v. *Deloitte & Touche*,
71 A.D.3d 198 (1st Dep't 2009) ................................................................ 28, 29

*Richardson* v. *Huntington Nat'l Bank (In re CyberCo Holdings, Inc.)*,
382 B.R. 118 (Bankr. W.D. Mich. 2008) ................................................... 60, 61

*Riley* v. *Cordis Corp.*,
625 F. Supp. 2d 769 (D. Minn. 2009) ............................................................ 54

*Romano* v. *Kazacos*,
609 F.3d 512 (2d Cir. 2010) ........................................................................ 23

*Rosner* v. *Bank of China*,
528 F. Supp. 2d 419 (S.D.N.Y. 2007) ........................................................... 45

*Rosner* v. *Bank of China*,
2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008),
*aff'd*, 349 F. App'x 637 (2d Cir. 2009) ....................... 31, 33-34, 37, 39-40, 43

*Ryan* v. *Hunton & Williams*,
2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ............................................ 38, 44

*Saltz* v. *First Frontier LP*,
2010 WL 5298225 (S.D.N.Y. Dec. 23, 2010) ................................................. 40

*Schmidt* v. *Fleet Bank*,
1998 WL 47827 (S.D.N.Y. Feb. 4, 1998) ....................................................... 30

*Schwartz* v. *Capital Liquidators, Inc.*,
984 F.2d 53 (2d Cir. 1993) .......................................................................... 49

*Seaboard Sand & Gravel Corp.* v. *Moran Towing Corp.*,
154 F.2d 399 (2d Cir. 1946) ........................................................................ 17

*SEC* v. *Cohmad Sec. Corp.*,
2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ..................................................... 40

*Sharp Int'l Corp.* v. *State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005) ................................................. 30, 44, 63, 64, 65

*Shearson Lehman Hutton, Inc.* v. *Wagoner*,
944 F.2d 114 (2d Cir. 1991) ................................................................... passim

*SIPC* v. *BDO Seidman, LLP*,
49 F. Supp. 2d 644 (S.D.N.Y. 1999) ................................... 11, 15 n.3, 19, 20

*SIPC* v. *BDO Seidman, LLP*,
   222 F.3d 63 (2d Cir. 2000) .................................................................. 47, 52

*Swan Brewery Co.* v. *U.S. Trust Co.*,
   832 F. Supp. 714 (S.D.N.Y. 1993) ............................................................ 58

*Timberlake* v. *Synthes Spine, Inc.*,
   2011 WL 711075 (S.D. Tex. Feb. 18, 2011) ............................................. 54

*Wells* v. *Bank of New York*,
   181 Misc. 2d 574 (N.Y. Sup. Ct. N.Y. Co. 1999) .................................... 48

*Williams* v. *Bank Leumi Trust Co.*,
   1997 WL 289865 (S.D.N.Y. May 30, 1997) ......................................... 32, 37

*Williams* v. *Dow Chem. Co.*,
   255 F. Supp. 2d 219 (S.D.N.Y. 2003) ....................................................... 53

## Statutes and Rules

11 U.S.C. § 101(54) ................................................................................... 58

11 U.S.C. § 544(b) .............................................................................. passim

11 U.S.C. § 547(b) ........................................................ 57, 61 & n.13, 62 & n.14

11 U.S.C. § 548(a) .............................................................................. passim

11 U.S.C. § 548(d) ..................................................................................... 64

12 C.F.R. § 21.11 ......................................................................... 53, 54, 55

12 C.F.R. § 225.4(f) ................................................................................... 53

12 U.S.C. § 93 ........................................................................................... 53

12 U.S.C. § 161 ......................................................................................... 53

12 U.S.C. § 164(d) ............................................................................... 53, 54

12 U.S.C. § 325 ......................................................................................... 53

12 U.S.C. § 481 ......................................................................................... 53

12 U.S.C. § 483 ......................................................................................... 53

12 U.S.C. § 1818 ....................................................................................... 53

12 U.S.C. § 1844(a) ................................................................................... 53

12 U.S.C. § 1847 ................................................................................. 53, 54

15 U.S.C. § 77p(b) .............................................................................. 23, 25

15 U.S.C. § 77p(f)(2)(A) ........................................................................... 26

15 U.S.C. § 77p(f)(2)(C) ...................................................................... 27, 28

15 U.S.C. § 78o .......................................................................................... 53

15 U.S.C. § 78u-2 .............................................................................................. 53, 54

15 U.S.C. § 78bb(f)(1) ...................................................................................... 23, 25

15 U.S.C. § 78bb(f)(5)(B) ....................................................................................... 26

15 U.S.C. § 78bb(f)(5)(D) .................................................................................. 27, 28

15 U.S.C. § 78eee(b)(3) ........................................................................................... 11

15 U.S.C. § 78fff ............................................................................................... 20, 21

15 U.S.C. § 78fff(a)(1)(B) ....................................................................................... 21

15 U.S.C. § 78fff(a)(3) ............................................................................................ 18

15 U.S.C. § 78fff-1 ........................................................................................... 11, 12

15 U.S.C. § 78fff-1(a) .............................................................................................. 12

15 U.S.C. § 78fff-1(d) .............................................................................................. 12

15 U.S.C. § 78fff-2(b) ........................................................................................ 20, 21

15 U.S.C. § 78fff-3(a) ................................................................................... 17, 18, 19

31 U.S.C. § 5318(g)(3) ............................................................................................ 41

N.Y. Debt. & Cred. Law § 272 ........................................................................... 64-65

N.Y. Debt. & Cred. Law § 273 ................................................................................. 64

N.Y. Debt. & Cred. Law § 274 ................................................................................. 64

N.Y. Debt. & Cred. Law § 275 ................................................................................. 64

N.Y. Debt. & Cred. Law § 276 ................................................................................. 65

## Other Authorities

1 G. Glenn, *Fraudulent Conveyances and Preferences* (rev. ed. 1940) .................... 63

5 *Collier on Bankruptcy* ¶ 553.09 (16th ed. 2009) ................................................ 58

9 N.Y. Jur. 2d (Banks) § 303 ................................................................................... 57

H.R. Rep. No. 95-595 (1977) ................................................................................... 58

S. Rep. No. 105-182 (1998) ...................................................................................... 26

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC and J.P. Morgan Securities Ltd. (together, "JPMorgan") respectfully submit this brief in support of their motion to dismiss all of the common law claims (causes of action 17 through 21) and certain of the bankruptcy claims (causes of action 1 through 8) in the Complaint filed by the Trustee for the liquidation of Bernard L. Madoff Investment Securities ("BMIS").

## PRELIMINARY STATEMENT

As the appointed successor to Madoff's disgraced brokerage firm, the Trustee has no authority under the Securities Investor Protection Act to bring common law damages claims against JPMorgan on behalf of Madoff's customers. Nor does the Trustee have authority to circumvent the Securities Litigation Uniform Standards Act, which expressly bars the aggregation of more than 50 state law securities claims in a single action. Yet that is precisely what the Trustee is trying to do here. The core of this lawsuit — causes of action 17-21 — involves an illegitimate attempt by the Trustee to usurp and assert thousands of common law securities claims that belong not to BMIS but exclusively to its customers. The Trustee has overstepped the limits of his power. Causes of action 17-21 should be dismissed for lack of standing and for violating SLUSA.

These common law claims should also be dismissed on the merits. At the outset of the Complaint, the Trustee announces ominously that there is a "myth" that Madoff "acted alone" and that he will tell the "true story" of how JPMorgan was "at the very center of" and "thoroughly complicit in" Madoff's crimes. But the Trustee never delivers. He repeatedly couches his allegations in terms of what JPMorgan "could have," "should have," and "would have" known had it acted differently. But the Complaint never alleges facts showing that anyone at JPMorgan knew that Madoff was a crook. Nor does the Trustee substantiate his utterly

implausible theory that JPMorgan collaborated with Madoff in operating a Ponzi scheme, supposedly to earn routine banking fees from BMIS.

Point I below will show that the Trustee has no standing under SIPA to bring customer damages claims.  Under bedrock Second Circuit law, which itself is based on long-settled case law from the United States Supreme Court, a bankruptcy trustee "has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  *Shearson Lehman Hutton, Inc.* v. *Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (citing *Caplin* v. *Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972)).  In addition, a claim against third parties for participating in a failed corporation's fraud "accrues to creditors, not to the guilty corporation."  *Wagoner*, 944 F.2d at 120.  As the successor to BMIS, the Trustee is thus unequivocally barred from bringing customer claims against JPMorgan to redress the harm caused by BMIS's fraud.  *Id.*

To escape the consequences of these settled principles, the Trustee argues that he has "broader powers" than an ordinary bankruptcy trustee and that SIPA permits him to pursue claims against third parties as a "bailee" of customer property and as a "subrogee" or "assignee" of customer claims.  SIPA, however, does no such thing:  although it carefully delineates the powers that a SIPA trustee may exercise, the statute never authorizes a SIPA trustee to assert claims against third parties on behalf of a broker's customers.

Lacking support in the text of the statute, the Trustee relies on *Redington* v. *Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979), in which the Second Circuit:  (1) held that a broker-dealer's customers had an implied private right of action under section 17(a) of the Securities Exchange Act; and (2) found that a SIPA trustee as a "bailee," and SIPC as a "subrogee," had standing to assert this implied cause of action.  But the

Supreme Court reversed the Second Circuit's decision implying a private right of action, thereby concluding that the lower court erred in reaching the question of standing.  As Judge Pollack has recognized, the Supreme Court's decision "wiped out everything that had occurred up to that time," with the result that *Redington* "does not stand as the law of this circuit."  Moreover, even if *Redington* were still good law, it is not applicable here:  the Trustee's standing theories fail on other grounds, including that a thief like BMIS (or its successor) is not a bailee and cannot sue to recover property that it stole.

        Point II will show that the Court can dismiss causes of action 17-21 without reaching the flawed theories of customer standing put forward by the Trustee, because *even if* the Trustee has standing to bring state-law claims belonging to Madoff's customers, SLUSA bars the aggregation and assertion of those claims in this action.  SLUSA has its genesis in another federal statute, the Private Securities Litigation Reform Act of 1995, in which Congress promulgated a comprehensive regime imposing procedural and substantive limitations on the filing of federal claims alleging securities fraud.  Congress enacted SLUSA to prevent plaintiffs from evading that regime by filing state law securities fraud class actions.  SLUSA requires dismissal of "covered class actions" based on state law that allege securities fraud.

        This action falls squarely within SLUSA's definition of a "covered class action." That definition encompasses not only lawsuits explicitly styled as class actions but also any other action that aggregates more than 50 individual claims.  Here, in purporting to bring customer claims as a "bailee," the Trustee's Complaint explicitly alleges that he is suing "on behalf of" customers, the exact language of SLUSA's statutory definition.  Likewise, in purporting to bring claims as an assignee or a subrogee of Madoff's customers, the Trustee is again aggregating claims belonging to more than 50 injured parties, precisely the activity that SLUSA prevents.  In

sum, the very devices that the Trustee has used in seeking to assert standing under *Redington* have put this action in direct conflict with SLUSA.

Point III will show that the Complaint fails to state a claim for aiding and abetting either Madoff's fraud or breach of fiduciary duty. To bring those claims, the Trustee must plead particularized facts raising a "strong inference" that JPMorgan had "actual knowledge" of Madoff's crimes. Suspicions of wrongdoing are not enough to hold a secondary defendant liable to third parties for someone else's fraud. The allegations concerning the activity in BMIS's bank account at JPMorgan do not support an aiding and abetting claim for the simple reason that the Complaint never alleges facts showing that anyone at JPMorgan ever even suspected fraud based on that activity. The allegations concerning JPMorgan's investments in Madoff feeder funds are also insufficient. The Complaint's allegations that JPMorgan conducted multiple rounds of due diligence relating to those investments and yet failed to discover Madoff's fraud refute the conclusory assertion that JPMorgan had "actual knowledge" of that fraud. For these and other reasons, the Complaint fails to state claims for aiding and abetting.

Point IV will show that the Complaint fails to state claims for conversion and unjust enrichment. Under New York law, a customer of a broker has no possible conversion claim against a bank for funds stolen by the broker and deposited in the broker's bank account. Moreover, a plaintiff cannot pursue a claim for unjust enrichment in the absence of any relationship with the defendant; here, Madoff's customers did not have a relationship with JPMorgan in connection with their investments in BMIS.

Point V will show that the Trustee's "fraud on the regulator" claim is defective for multiple reasons. The Trustee relies on New York state law to claim that JPMorgan deceived its federal regulators by not telling them that Madoff was running a Ponzi scheme. This claim fails

4

because (1) New York does not recognize a claim for fraud on a federal regulator; (2) even if it did, such a claim is preempted by federal law; and (3) in any event, the Trustee has failed to plead the elements of a fraud claim against JPMorgan.

Finally, Point VI will show that the Trustee's bankruptcy claims to recover payments made directly from BMIS to JPMorgan — including the repayment of a $145 million loan and the payment of fees to JPMorgan — fail as a matter of law.  The Complaint alleges that JPMorgan debited BMIS's account to satisfy BMIS's debts to JPMorgan.  Under settled law, a debit from a bank account to satisfy a debt to the bank is a setoff, *not* a transfer that is capable of avoidance.  Moreover, even if it were a transfer, the repayment of a *secured* debt — such as BMIS's obligations to JPMorgan — is not avoidable either as a fraudulent transfer or a preference, because such a repayment does not diminish the pool of assets that would otherwise be available to unsecured creditors.  In any event, the repayment of *any* antecedent debt cannot be recovered as a fraudulent transfer absent insider dealing or knowing participation in fraud by the defendant, which the Trustee has failed to plead.  For all these reasons, the Trustee's first eight causes of action — which seek to recover loan repayments and fees paid directly to JPMorgan within six years of BMIS's bankruptcy — should be dismissed.

# BACKGROUND[1]

On December 11, 2008, the FBI arrested Bernard Madoff, and the U.S. Attorney for the Southern District of New York charged him with conducting a multi-billion-dollar securities fraud.  Compl. ¶ 48.  Days later, SIPC filed an application in this Court seeking to commence a liquidation proceeding for BMIS.  *Id.* ¶ 49.  Judge Stanton granted SIPC's application and appointed Irving H. Picard as the Trustee for the liquidation of BMIS.  *Id.* ¶ 50.

On March 12, 2009, Madoff pleaded guilty to federal securities fraud and admitted that he operated a Ponzi scheme through BMIS.  *Id.* ¶ 52.  On June 29, this Court sentenced Madoff to 150 years in prison.  *Id.* ¶ 52.  Madoff was BMIS's Founder, Chairman, Chief Executive Officer and sole owner.  *Id.* ¶ 32.

## A.      JPMorgan's contacts with Madoff

JPMorgan Chase is one of the largest banking institutions in the world with approximately $2 trillion in assets.  Compl. ¶ 18.  BMIS had a bank account at JPMorgan and at a series of predecessor banks since 1986.  *Id.* ¶ 178.  During that period, BMIS deposited customer investments into its so-called "703 Account" at JPMorgan and transferred money out of that account from time to time.  *Id.* ¶¶ 2, 173.

JPMorgan made relatively small, fully secured loans to BMIS and received fees for providing commercial banking services.  In 2005 and 2006, JPMorgan made secured loans to BMIS of $145 million, which were repaid by BMIS.  *Id.* ¶¶ 257-66 & Ex. A.  During the six-year

---

[1] The facts recited are drawn from the Complaint and documents subject to judicial notice.  Allegations in the Complaint are accepted as true only for purposes of this motion.  References to the "Decl." are to the accompanying Declaration of Emil A. Kleinhaus.

period prior to Madoff's bankruptcy, JPMorgan received approximately $597,000 in fee payments from BMIS for banking services.  *See id.* ¶ 277 & Ex. A.

In addition, in 2006, J.P. Morgan Securities Ltd., a UK affiliate of JPMorgan Chase Bank, invested approximately $338 million in four Madoff "feeder funds," *i.e.*, third-party investment funds that invested their assets with BMIS.  These investments served as hedges for certain financial products that were tied to the feeder funds' returns.  *See, e.g.*, *id.* ¶¶ 109, 123.

After JPMorgan acquired Bear Stearns, JPMorgan conducted an across-the-board review of its exposure to hedge funds.  *Id.* ¶ 122.  That review resulted in the bank making significant redemptions from numerous hedge funds, including redemptions of approximately $276 million from three Madoff feeder funds — Fairfield Sentry Ltd., Fairfield Sigma Ltd. and Herald Fund s.p.c.  *Id.* ¶ 169 & Ex. E.

**B.      The Trustee's lawsuit against JPMorgan**

On December 2, 2010, the Trustee commenced this action.  Last month, this Court granted JPMorgan's motion to withdraw the reference of this proceeding from the Bankruptcy Court.  *Picard* v. *JPMorgan Chase & Co.*, 2011 WL 2119720 (S.D.N.Y. May 23, 2011).

The first 16 causes of action in the Complaint are "clawback" claims aimed at recovering payments made to JPMorgan before Madoff's fraud was revealed.  Compl. ¶¶ 292-429 (Claims 1-16).  The challenged payments fall into two categories:  First, the Complaint seeks to recover direct payments by BMIS to JPMorgan, including $145 million in loan repayments, $3.48 million in interest payments on those loans, as well as $597,000 in banking fees.  *See id.* ¶¶ 292-347 & Ex. A (Claims 1-8).  Second, the Complaint seeks to recover the approximately $276 million in redemptions made by JPMorgan from Fairfield Sentry, Fairfield Sigma and Herald

Fund, alleging that those redemptions paid by the feeder funds indirectly came from BMIS.  *Id.* ¶¶ 348-429 & Ex. E (Claims 9-16).

The Trustee's clawback claims pale in comparison to the Trustee's common law claims, as to which the Trustee seeks to recover approximately $6 billion.  *See id.* ¶¶ 430-82 (Claims 17-21).  Based on state law theories of aiding and abetting fraud and breach of fiduciary duty, as well as a theory of "fraud on the regulator," the Trustee asserts that JPMorgan is liable for at least $5.4 billion, apparently the amount that Madoff's customers allegedly lost between December 2004 and December 2008.  *Id.* ¶¶ 443, 458, 482.  In addition, based on theories of conversion and unjust enrichment, the Trustee claims that Madoff's customers are entitled to all the amounts that JPMorgan earned, directly or indirectly, from Madoff's account, which the Trustee estimates (without any factual support) to be $500 million.  *Id.* ¶¶ 468, 471-72, 465.

Recognizing that the losses he is seeking to recover were suffered by *customers* of BMIS as opposed to BMIS itself, the Trustee has explicitly brought this lawsuit as a representative of BMIS's former customers and is purporting to assert their claims.  The Trustee alleges that he is suing "as bailee . . . *on behalf of* the customer-bailors," that SIPC is a "subrogee of claims paid, and to be paid, to customers" by SIPC, and that he is an "assignee" of "certain claims" that customers "could have asserted" and "stands in the shoes of persons who have suffered injury-in-fact."  *Id.* ¶¶ 17(f)-(i) (emphasis added).

# ARGUMENT

## POINT I

### THE TRUSTEE LACKS STANDING TO BRING
### COMMON LAW CLAIMS AGAINST JPMORGAN.

Causes of action 17-21 assert common law damages claims belonging to BMIS's customers, none of whom are parties to this proceeding.  As shown below, the Trustee lacks standing to assert any of these customer claims.  Each of the Trustee's common law claims should be dismissed for lack of standing.

**A.**   **Under *Caplin* and *Wagoner*, the Trustee lacks standing**
**to bring common law claims against JPMorgan.**

In *Shearson Lehman Hutton, Inc.* v. *Wagoner*, 944 F.2d 114 (2d Cir. 1991), the Second Circuit set forth a two-pronged doctrine to govern the standing of a bankruptcy trustee. The first prong of *Wagoner* reaffirms the well-settled rule, established by the Supreme Court in the *Caplin* case, that a bankruptcy trustee "has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  *Wagoner*, 944 F.2d at 118 (citing *Caplin* v. *Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972) (holding that a bankruptcy trustee lacked standing to assert claims on behalf of the holders of debentures issued by the debtor corporation)).

In *Caplin*, the Supreme Court declared that creditors "are capable of deciding for themselves whether or not it is worthwhile to seek to recoup whatever losses they may have suffered by an action against" third parties.  *Caplin*, 406 U.S. at 431.  Permitting a bankruptcy trustee to aggregate and assert creditors' claims, the Court reasoned, would (1) deprive creditors of the opportunity to "make their own assessment of the respective advantages and disadvantages" of litigation; (2) create the risk that "a suit by [the trustee] on behalf of [creditors]

may be inconsistent with any independent actions" creditors might bring; and (3) raise questions as to who would be "bound by any settlement." *Id.* at 431-32. Thus, under *Caplin* and *Wagoner*, "the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings." *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

Under the second prong of *Wagoner*, now known as the *Wagoner* rule, a claim against a third party for defrauding a failed corporation with the cooperation of the corporation's own management "accrues to *creditors*, not to the guilty corporation." *Wagoner*, 944 F.2d at 120 (emphasis added). Accordingly, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Id.* at 118; *see also Kirschner* v. *Grant Thornton LLP*, 2009 WL 1286326, at *10 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010) (dismissing trustee's claims against third parties where debtor "participated in, and benefitted from, the very wrong for which it seeks to recover").

The *Wagoner* rule is rooted in the doctrine of *in pari delicto*. *See Kirschner* v. *KPMG, LLP*, 15 N.Y.3d 446 (2010) (confirming New York's adherence to the principles of *in pari delicto* that underlie the *Wagoner* rule). The *Wagoner* rule "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Kirschner*, 2009 WL 1286326, at *5 (quotation marks omitted). "[B]ecause a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Id.* (quotation marks omitted).

In this case, the Complaint repeatedly alleges that the losses at issue were suffered by Madoff's *customers*, not BMIS itself.  Compl. ¶¶ 443, 458, 468, 471, 481.  Moreover, the Complaint acknowledges, as it must, that BMIS was engaged in Madoff's massive fraud.  As the Trustee alleges:  "BLMIS was a fraud," and it "perpetrat[ed] a massive Ponzi scheme."  *Id*. ¶¶ 440, 445.  Accordingly, under *Caplin* and *Wagoner*, the Trustee lacks standing to bring common law claims against JPMorgan, either on behalf of BMIS or its customers.

**B.      SIPA does not grant the Trustee standing to bring common law claims on behalf of BMIS's customers.**

Despite *Caplin* and *Wagoner*, the Trustee asserts that, as a SIPA trustee, he has "broader powers" than an ordinary bankruptcy trustee to bring claims against third parties. Compl. ¶ 16.  The Trustee alleges that under SIPA, he has standing to sue JPMorgan as a bailee of customer property, as a subrogee of customer claims paid by SIPC, and as an assignee of customer claims.  *Id.* ¶¶ 17(f)-(i).

But SIPA does not provide the Trustee with any of these powers.  SIPA is a comprehensive statutory scheme that created "a new form of liquidation proceeding" for brokerage firms, which was "designed to accomplish the completion of open transactions and the speedy return of most customer property."  *SIPC* v. *BDO Seidman, LLP*, 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) (quotation marks omitted).  The Trustee is a creature of this statute:  his authority is created by and limited to the specific powers that the legislation conferred on him. *See* 15 U.S.C. § 78eee(b)(3) (providing for appointment of a SIPA trustee); 15 U.S.C. § 78fff-1 (setting forth "Powers and duties of a [SIPA] trustee").

Although Congress could easily have authorized a SIPA trustee to assert the rights of brokerage customers against third parties, not a word in the statute does so.  Instead, in the

section of SIPA entitled "Powers and duties of a Trustee," 15 U.S.C. § 78fff-1, the statute

provides that a trustee "shall be vested with the same powers and title with respect to the debtor

and the property of the debtor . . . as a trustee in a case under title 11," including the power to

bring avoidance claims.  *Id.* at § 78fff-1(a).  In the same section, the statute also authorizes the

trustee to perform three additional tasks:  to hire and fix the compensation of the broker's

personnel, to utilize SIPC employees in the liquidation, and to maintain customer accounts.  *Id*.

In contrast, there is nothing in this section or elsewhere in SIPA that states or

suggests that a SIPA trustee can assert damages claims on behalf of customers, or that the rules

set forth in *Caplin* and *Wagoner* do not apply in SIPA proceedings.  To the contrary, the

language and structure of the statute are inconsistent with any notion that a SIPA trustee can

assert customer claims against third parties.  The statute's grant to the trustee of specified

"powers" speaks only in terms of "the debtor and the property of the debtor," not customers or

the property of customers.  *Id*.  Likewise, the "Investigations" mandated of a trustee include

reporting to the court "any causes of action *available to the estate*," not to customers.  *Id.* at §

78fff-1(d) (emphasis added).

## C.     The Trustee lacks standing to sue JPMorgan as a bailee.

As noted above, the Complaint alleges, without elaboration, that the Trustee is

entitled to bring claims "on behalf of the customer-bailors" as a "bailee" of customer property.

Compl. ¶ 17(f).  But not a word in SIPA provides the Trustee with such authority; the terms

bailor, bailment, or bailee do not appear anywhere in the legislation.  The Trustee, accordingly,

lacks authority to bring customer claims against JPMorgan as a "bailee."

1.      *Redington* **is not good law.**

Without an express grant of authority in SIPA for his asserted standing on behalf of customers as a "bailee" of customer property, the Trustee will no doubt rely on the Second Circuit's decision in *Redington* v. *Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979), *on remand*, 612 F.2d 68 (2d Cir. 1979).  *Redington*, however, is not good law. *Mishkin* v. *Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 557-58 (S.D.N.Y. 1990).

In *Redington*, a SIPA trustee and SIPC brought suit against a broker's accountant, asserting claims on behalf of the broker's customers for violations of section 17(a) of the Securities Exchange Act and state law claims.  The Second Circuit majority, over a vigorous dissent by Judge Mulligan, reversed the district court, concluding that — although there was no indication in section 17 or its legislative history that Congress intended to create a private remedy — an implied right of action accorded with the general legislative purpose of protecting customers.  592 F.2d at 622-23.  The majority then pushed this analysis one step further.  Again, without any support in the language or legislative history of SIPA, the majority concluded that a SIPA trustee and SIPC had implied third-party standing to assert the customers' private cause of action under section 17.  The court rested this conclusion on nothing more than extra-statutory common law principles of bailment and subrogation.  *Id.* at 624-25.

The Supreme Court granted *certiorari* in *Redington* to address not only the issue of whether there is an implied private right of action under section 17, but also the standing issues presented by that case — and the case now before this Court.  Decl. Ex. 1 (Brief for Petitioner), at 2-3 (Questions Presented).

The Supreme Court reversed the Second Circuit's decision, holding that there was no implied private right of action to enforce section 17 and thus finding it "unnecessary to reach"

the standing issues.  442 U.S. at 567 n.9, 579.  By reversing the Second Circuit on the predicate

ruling creating an implied right of action under section 17, the Supreme Court effectively held

that the Second Circuit erred in reaching the issue of whether the SIPA trustee had implied

standing to bring this nonexistent claim.  The Second Circuit's ruling on the standing issue is

thus no longer good law.  *See Newdow* v. *Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1041 (9th

Cir. 2010) ("[W]hen the Supreme Court reverses a lower court's decision on a threshold

question," the Supreme Court "effectively holds the lower court erred by reaching" other issues,

and rulings on those issues are not precedential); *Brecht* v. *Abrahamson*, 944 F.2d 1363, 1370

(7th Cir. 1991) (where Supreme Court granted *certiorari* to resolve an issue but did not reach the

issue in reversing the decision, the Supreme Court's reversal "deprived [appellate court's]

opinion of authority" on that issue).[2]

       While the Supreme Court in *Redington* did not need to reach the issues of

bailment or subrogation, its ruling leaves no doubt that the Second Circuit's standing analysis

was defective.  In refusing to recognize an implied private cause of action under section 17, the

Supreme Court held that "[t]he ultimate question is one of congressional intent, not one of

whether this Court thinks that it can improve upon the statutory scheme that Congress enacted."

442 U.S. at 575, 578.  The same error that led to the Second Circuit majority's erroneous section

17 decision — namely, the implication of broad powers to pursue claims despite the absence of

---

[2]  The jurisdictional posture of *Redington* makes it especially clear that the Second Circuit's
ruling on standing is not binding authority.  Following the Supreme Court's reversal, the Second
Circuit considered the trustee's "alternative bases for jurisdiction" over the remaining claims and
found that, absent the section 17(a) claim, there were no grounds for federal subject matter
jurisdiction.  612 F.2d at 70-73.  The reversal thus undermined any basis that the Second Circuit
had for exercising subject matter jurisdiction.  *See LaBarbera* v. *Clestra Hauserman, Inc.*, 369
F.3d 224, 226 n.2 (2d Cir. 2004) (decision reversed for lack of subject matter jurisdiction "is of
no precedential value").

statutory language or even legislative history — likewise infected the Second Circuit's conclusion that the trustee had standing to invoke that implied power to sue third parties.  592 F.2d at 624-25.  Indeed, the Supreme Court's decision in *Redington* sided with Judge Mulligan's dissent in the Second Circuit, in which Judge Mulligan characterized the majority's ruling on standing as "circumvent[ing] the intent of Congress" and its creation of a private right of action as "judicial legislation."  *Id*. at 634-35.

As Judge Pollack subsequently recognized in *Mishkin* v. *Peat, Marwick*, as a result of the Supreme Court's reversal of the Second Circuit's decision in *Redington*, that decision "does not stand as the law of this circuit"; rather, the Supreme Court "wiped out everything that . . . occurred up to that time, and sent the case back accordingly."  Decl. Ex. 2, at 32-33.  In *Mishkin*, therefore, Judge Pollack was free to reject the decision of the *Redington* majority, adopt the reasoning of the *Redington* dissent, and hold that "the liquidating trustee" in a SIPA case "is *not* granted the power to bring fraud claims against third parties on behalf of customers."  744 F. Supp. 531, 558 (S.D.N.Y. 1990) (emphasis added).[3]

## 2. *Wagoner* and *Hirsch* control over *Redington*.

The Second Circuit's decisions in *Wagoner* and *Hirsch*, both of which post-date *Redington*, demonstrate that — even if *Redington* were good law — the Trustee may not sue as a bailee in the circumstances presented in this case.

---

[3] In *BDO Seidman*, despite believing (incorrectly) that the Second Circuit's standing decision in *Redington* remains binding, Judge Preska likewise concluded that the "well-reasoned" opinion in *Mishkin* was "more persuasive" and "more faithful to the letter and purpose of" SIPA than *Redington* and disagreed with *Redington*'s bailee theory.  *BDO Seidman*, 49 F. Supp. 2d at 654. On appeal, the Second Circuit determined that it had no need to revisit *Redington*, even if it were justified in doing so, since the claims failed on other grounds.  *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 69 (2d Cir. 2000).

In *Hirsch*, the Second Circuit applied *Wagoner* to claims brought by a bankruptcy trustee against third parties for alleged participation in the bankrupt debtors' Ponzi scheme. The court held that claims arising from fraud on the investors in the Ponzi scheme "are the property of those investors, and may be asserted *only by them* and to the exclusion of [the trustee]." *Hirsch*, 72 F.3d at 1094 (emphasis added); *see also id.* at 1093 ("when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so"). The court concluded further that the trustee could not bring claims against the third parties on behalf of the debtors, since the debtors participated in the Ponzi scheme. *Id.*; *see also Breeden* v. *Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.)*, 268 B.R. 704, 714 n.8 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) (finding that "involvement of [the debtor's] dominant management in the Ponzi scheme defeats the trustee's standing by operation of the *Wagoner* rule").

The Second Circuit's holdings in *Wagoner* and *Hirsch* prevent the Trustee from asserting claims as a "bailee" of customer property. If BMIS's customers are "bailors," as the Trustee alleges, then the entity to which they entrusted their property, BMIS, is the "bailee." And when the Trustee alleges that he is entitled to pursue customer claims as a "bailee," he is standing in the shoes of BMIS, an admitted Ponzi schemer. BMIS's wrongdoing forecloses the Trustee from asserting supposed rights as bailee to sue for damages arising from BMIS's fraud. To the extent that *Redington* held otherwise, it has been superseded by *Wagoner* and *Hirsch*.

### 3.    A thief cannot be a bailee.

The Trustee's bailee theory also fails, regardless of whether *Redington* is good law, for the independent reason that a thief cannot be a bailee. Under New York law, a bailment relationship can arise only if the bailee takes "lawful possession" of the relevant property

16

"without present intent to appropriate" it.  *Pivar* v. *Graduate Sch. of Figurative Art of the N.Y. Acad. of Art*, 290 A.D.2d 212, 213 (1st Dep't 2002) (quotation marks omitted); *accord Seaboard Sand & Gravel Corp.* v. *Moran Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946); *Martin* v. *Briggs*, 235 A.D.2d 192, 197 (1st Dep't 1997).

Here, as alleged in the Complaint, customers of BMIS delivered possession of their property *to BMIS*, not to the Trustee or to anyone else.  Compl. ¶¶ 32-34.  And as alleged in the Complaint, BMIS and Madoff accepted customer property precisely in order to appropriate (*i.e.*, steal) it.  *E.g.*, *Id.* ¶¶ 37-44.  Accordingly, the Trustee, as the successor to a thief, has no possible standing to bring suit as a bailee.

**D.    The Trustee lacks standing to sue JPMorgan as a subrogee.**

The Trustee alleges that SIPC has standing to assert customer claims against third parties as a subrogee of claims satisfied by SIPC (which have been assigned to the Trustee).  Compl ¶ 17(i).  But as in the case of bailment, no provision of SIPA subrogates either SIPC or the Trustee to customer claims against third parties.

SIPA grants SIPC certain express, limited subrogation rights that do not include the right to assert customer claims against third parties.  As provided by section 78fff-3(a):

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter . . . .

Because "the claims of such customers" that SIPC pays constitute "net equity" claims, which are defined in SIPA section 78lll(11) as claims against *the debtor*, it is well-settled that this provision grants SIPC subrogation rights only with respect to customer claims *against* the debtor's estate.  Indeed, even the Second Circuit in *Redington* interpreted the provision in

this manner.  *See* 592 F.2d at 624 ("SIPA provides expressly that SIPC, upon reimbursing a

customer's losses, shall be subrogated to the customer's claims against the debtor's . . . estate.");

*see also Holmes* v. *SIPC*, 503 U.S. 258, 270 (1992) (noting that "SIPC assumes that SIPA

provides for subrogation to the customers' claims against the failed broker-dealers, but not

against third parties like Holmes").

   The Trustee's asserted subrogee standing is therefore not supported by the

limited, express subrogation rights granted by SIPA.  Nor is there any basis to imply subrogation

rights in favor of SIPC that cannot be found in the statute.  As explained by the dissent in

*Redington*, because SIPA delineates certain specific and limited subrogation rights, "its failure to

provide for subrogation against any third party would clearly dictate that none exist under the . . .

principle: *Expressio unius est exclusio alterius*."  592 F.2d at 634-35 (Mulligan, J., dissenting).

Confirming this conclusion is section 78fff(a)(3) of SIPA, which provides that a purpose of a

SIPA liquidation proceeding is "to enforce rights of subrogation *as provided in this chapter*."

(emphasis added).  Similarly, section 78fff-3(a) of SIPA provides that "SIPC shall be subrogated

to the claims of such customers with *the rights and priorities provided in this chapter*."

(emphasis added).  Thus, the text of SIPA contemplates that SIPC will have only limited

subrogation rights that are expressly created by and subject to SIPA's statutory scheme.

   In *Mishkin*, Judge Pollack closely analyzed the limited subrogation rights found in

SIPA and held that the statute did not grant a SIPA trustee subrogee standing to bring customer

claims against a broker's accountants.  744 F. Supp. at 558.  Following the reasoning of Judge

Mulligan's dissent in *Redington*, the *Mishkin* court concluded that crafting extra-statutory

subrogation rights for SIPC would circumvent Congress's intent that SIPC have the limited

subrogation rights set forth in the statute.  *Id.* at 558 n.15.[4]  Similarly, in *BDO Seidman*, Judge

Preska criticized *Redington* for "its creation of a common law right that circumvents

Congressional intent by ignoring the directive of SIPA that SIPC be subrogated with the rights

and priorities provided in [Section 78fff]."  49 F. Supp. 2d at 653, 654 (internal quotation marks

omitted).

        In arguing that they can assert claims against third parties as a subrogee, the

Trustee and SIPC may attempt to rely, as they did in opposing withdrawal of the reference, on

the phrase in SIPA stating that SIPC's subrogation rights against the estate are "in addition to all

other rights it may have at law or in equity."  15 U.S.C. § 78fff-3(a).  Any such reliance is

misplaced.  In both *Mishkin* and *BDO Seidman*, the courts properly concluded that neither "law"

nor "equity" authorizes SIPC, an agency whose powers are defined by SIPA, to assert claims

against third parties absent statutory authority.  *See Mishkin*, 744 F. Supp. at 558 ("Nor did the

addition of the words 'in addition to all other rights it may have at law or in equity' . . . give the

trustee the power to bring . . . fraud claims against third parties on behalf of customers."); *BDO

Seidman*, 49 F. Supp. 2d at 654 (finding that any interpretation of those words to permit SIPC to

assert customer claims against third parties "conflicts with the rest of [SIPA]").

---

[4]  In *Holmes* v. *SIPC* the Supreme Court cited *Mishkin* with approval and noted that SIPC's
"theory of subrogation" — essentially the same theory of subrogation rights advanced by the
Trustee — was "fraught with unanswered questions."  503 U.S. at 270.  Although the Court did
not decide the issue of subrogee standing, it noted that SIPC had left the Court "to guess at the
nature of the 'common law rights of subrogation' that it claims" and "whether they derive from
federal or state common law, or, if the latter, from common law of which State."  *Id.* at 270-71.

**E.      The Trustee lacks standing to sue JPMorgan as an assignee.**

The Complaint also alleges, without any specificity or explanation, that the Trustee has received "multiple, express assignments of certain claims" from customers.  Compl. ¶ 17(g).  But the Trustee lacks authority under SIPA to sue JPMorgan as an assignee.  Under the statute, the limited authority of a trustee to take assignments as a condition to paying claims does *not* include assignments of customer claims against third parties.  Rather, under section 78fff-2(b) of SIPA, a trustee may condition payments to customers "pursuant to this subsection," which relates to "net equity" claims *against* the debtor, upon "the trustee requiring claimants to execute . . . assignments."  15 U.S.C. § 78fff-2(b).

Courts in this district have repeatedly held that this provision authorizes a SIPA trustee to take assignment of customer claims against the estate — *not* claims that customers may have against third parties.  *BDO Seidman*, 49 F. Supp. 2d at 654 n.7 ("When read in the entire context of Section 78fff, it is clear that those assignments [in Section 78fff-2(b)] relate to payments for net equity claims.  And . . . that does not extend the Trustee's authority to bring suit beyond the brokerage firm-customer relationship to include claims against a third party."); *Mishkin*, 744 F. Supp. at 551 ("SIPA does not provide for compensation of claims of banks nor does it allow the assignment of choses in action by the banks to a SIPC trustee."); *Picard* v. *Taylor (In re Park South Securities, LLC)*, 326 B.R. 505, 515 (Bankr. S.D.N.Y. 2005) (SIPA trustee "does not have standing as a contractual assignee of the injured customers" because Section 78fff-2(b) assignments extend "only to a customer's net equity claim").

The decision rejecting SIPA standing by assignment in *Giddens* v. *D.H. Blair & Co., Inc. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002), is instructive. There, a SIPA trustee contended that he had standing to assert customer claims against third

parties on the ground that the trustee had required and received assignments from customers. The Bankruptcy Court made short work of this contention, explaining that because "section 78fff-2(b) makes it clear that the only payments a trustee can make to customers pursuant to that section are payments for net equity claims, it follows that the only claims that customers could have assigned to the Trustee are their net equity claims and *not* claims against the defendants." *Id.* at 803 (emphasis added).

The result should be the same here.  Although the Complaint pleads no facts regarding the alleged customer assignments, it appears that the Trustee has required customers, as a condition to receiving SIPC payments, to assign to the Trustee rights that they may have against *third parties*.  Such assignments are not authorized by SIPA.  The statute requires a trustee to "satisfy net equity claims" of customers, 15 U.S.C. §§ 78fff(a)(1)(B), 78fff-2(b) — subject, as noted above, to the trustee's right to condition such payment on assignment of *those* net equity claims, *id.* § 78fff-2(b).  The Trustee "has overreached his statutory authority" in seeking to predicate his standing on assignments that are nowhere contemplated by the statute and that the Trustee is not entitled to require as a condition to satisfying claims.  *In re A.R. Baron & Co.*, 280 B.R. at 803.

Faced with narrow statutory language and a solid wall of SIPA precedent rejecting standing by assignment, the Trustee may rely, as he did in opposing JPMorgan's motion to withdraw the reference, on *Bankruptcy Services, Inc.* v. *Ernst & Young (In re CBI Holding Co.)*, a chapter 11 case that did not involve SIPA or a SIPA trustee.  529 F.3d 432 (2d Cir. 2008).  In *CBI Holding*, the court found that a disbursing agent created under a chapter 11 plan could take a post-bankruptcy assignment of specific creditor claims against the debtor's accountants pursuant to that plan.  *Id.* at 441, 455.  *CBI Holding* does not support the Trustee,

21

because the Bankruptcy Code cannot be used to trump the express terms of SIPA, which only authorize the assignment of claims against the estate.  Under SIPA, provisions of the Bankruptcy Code are applicable to a SIPA liquidation only "[t]o the extent *consistent with* [SIPA]."  15 U.S.C. § 78fff (emphasis added).  Permitting the Trustee to assert claims against third parties that were assigned to him by customers would be *in*consistent with SIPA.[5]

**POINT II**

**THE TRUSTEE'S COMMON LAW CLAIMS
ARE PRECLUDED BY SLUSA.**

Even if the Trustee has standing under SIPA to assert state law claims on behalf of BMIS's former customers, SLUSA bars the Trustee's aggregation and assertion of those claims in a single action.  The Trustee has resorted to state common law to avoid the pleading and substantive requirements imposed by federal securities law.  But in so doing, the Trustee has run headlong into SLUSA, which mandates that securities class actions, as broadly defined by the statute, be litigated in federal court under federal law.  Causes of action 17 to 21 violate SLUSA and should be dismissed for this reason as well.

**A.      SLUSA must be interpreted broadly to
foreclose securities class actions based on state law.**

SLUSA has its genesis in the PSLRA, which imposed new procedural and substantive requirements for filing securities actions under federal law in federal court.  Congress enacted the PSLRA to curb "perceived abuses of the class-action vehicle in litigation involving

---

[5]  *CBI Holding* is further distinguishable because it involved a voluntary assignment in connection with a settlement as part of a chapter 11 plan upon emergence from bankruptcy, whereas here the Trustee has apparently required customers to assign their potential claims against third parties in order to obtain the SIPC payments to which they are entitled under SIPA. *See In re CBI Holding*, 529 F.3d at 458.

22

nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71,

81-82 (2006).  But this reform had an unintended consequence:  it prompted the filing of

securities suits under state law, often in state court, as purported class representatives sought to

circumvent "the obstacles set in their path by the [PSLRA]."  *Id.* at 82.

       Congress enacted SLUSA in 1998 to "stem this 'shif[t] from Federal to State

courts' and 'prevent certain State private securities class action lawsuits alleging fraud from

being used to frustrate the objectives' of the Reform Act."  *Id.* (quoting SLUSA, Pub. L. No.

105-353, §§ 2(2), (5), 112 Stat. 3227 (1998) (internal quotation marks omitted)).  SLUSA

accomplished this objective "by making federal court the exclusive venue for class actions

alleging fraud in the sale of certain covered securities and by mandating that such class actions

be governed exclusively by federal law."  *Lander* v. *Hartford Life & Ann. Ins.*, 251 F.3d 101,

108 (2d Cir. 2001).

       SLUSA's preemption provision states as follows:

> No covered class action based upon the statutory or common law
> of any State or subdivision thereof may be maintained in any State
> or Federal court by any private party alleging —
>
> (A) a misrepresentation or omission of a material fact in connec-
> tion with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or de-
> ceptive device or contrivance in connection with the purchase or
> sale of a covered security.

15 U.S.C. §§ 77p(b), 78bb(f)(1).  Thus, by its terms, SLUSA mandates dismissal of (1) any cov-

ered class action, (2) based on state law, (3) alleging a material misrepresentation or omission or

the use of a manipulative or deceptive device or contrivance in connection with the purchase or

sale of a covered security.  *E.g.*, *Romano* v. *Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010).

The United States Supreme Court has held that SLUSA must be afforded a "broad construction" in order to effectuate Congress's intent, explaining that "[a] narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose." *Dabit*, 547 U.S. at 85-86. Moreover, "[c]ourts in this circuit have consistently rejected plaintiffs' attempts through artful pleading to avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages." *Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*, 2004 WL 444554, at *3 (S.D.N.Y. Mar. 10, 2004).

**B.      SLUSA preempts the Trustee's claims
             on behalf of Madoff's customers.**

The Trustee cannot dispute that if a former customer of BMIS purported to bring a class action asserting the same state law claims that the Trustee has leveled against JPMorgan, SLUSA would stop the action in its tracks. The outcome should be exactly the same in this case, where the Trustee is purporting to bring state law claims on behalf of numerous customers. As demonstrated below, the Trustee's action satisfies each of the elements of SLUSA preemption.

**1.      This action is based on state law.**

The non-bankruptcy claims that the Trustee has asserted on behalf of Madoff's customers — causes of action 17 to 21 — are all brought under state common law theories, including fraud on the regulator, aiding and abetting fraud and breach of fiduciary duty, unjust enrichment, and conversion.

**2.      This action alleges misrepresentations or omissions in
             connection with the purchase or sale of securities.**

The Complaint also contains allegations of a material misrepresentation or omission, or the use of a manipulative or deceptive device or contrivance, in connection with the purchase or sale of a covered security. The Complaint alleges that Madoff made "intentional

misrepresentation[s] of fact" to carry out his fraudulent scheme (Compl. ¶ 43) — namely, he falsely claimed to be purchasing and selling publicly traded securities (Compl. ¶ 37) — and that JPMorgan "substantially assisted" Madoff's securities fraud (Compl. ¶ 216).  Additionally, the Trustee alleges that JPMorgan "ignored blatant misrepresentations" (Compl. ¶ 208) and was engaged in its own "fraud" due to its supposed failure to report Madoff's conduct to the securities and banking regulators (Compl. ¶ 474).  Courts in this Circuit have consistently held that claims relying on these types of allegations are covered by SLUSA.  *See, e.g.*, *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010) ("There is 'no question that Madoff's Ponzi scheme was 'in connection with' the purchase and sale of securities.'"); *accord In re J.P. Jeanneret Assocs., Inc.*, 2011 WL 335594, at *18 (S.D.N.Y. Jan. 31, 2011).

All of the Trustee's common law claims meet the "misrepresentation or omission" requirement.  SLUSA preempts any "*action* . . . alleging a misrepresentation or omission."  15 U.S.C. §§ 78bb(f)(1), 77p(b) (emphasis added), whether or not the claims for relief in the action are labeled "fraud."  In light of the Trustee's allegations, SLUSA thus bars not only the Trustee's claims for fraud on the regulator and aiding and abetting fraud but also his claims for aiding and abetting breach of fiduciary duty, unjust enrichment, and conversion.  *See, e.g.*, *Leykin* v. *AT&T Corp.*, 216 F. App'x 14, 17 (2d Cir. 2007) (SLUSA preempted claim for breach of fiduciary duty); *In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593, 596 (S.D.N.Y. 2006) (SLUSA preempted unjust enrichment claim); *Levinson* v. *PSCC Servs.*, 2009 WL 5184363, at *12-13 (D. Conn. Dec. 23, 2009) (SLUSA preempted aiding and abetting conversion claim).

### 3.     This is a covered class action.

In opposing withdrawal of the reference, the Trustee's only argument against SLUSA preclusion was that this is not a "covered class action."  This argument fails.  SLUSA

defines "covered class action" to include not only actions styled as class actions, but all lawsuits

in which common issues other than reliance predominate and (1) "damages are sought on behalf

of more than 50 persons" or (2) the plaintiffs sue "on a representative basis on behalf of

themselves and other unnamed parties similarly situated."  15 U.S.C. §§ 77p(f)(2)(A),

78bb(f)(5)(B).

SLUSA's legislative history, like its language, makes clear that Congress intended

for the "covered class action" definition to "be interpreted broadly to reach . . . *all [] procedural

devices that might be used to circumvent the class action definition*."  S. Rep. No. 105-182, at 6

(1998) (emphasis added).  As the Third Circuit has recognized:

> [T]he statutory text and legislative history signal that the definition
> [of "covered class action"] was designed to prevent securities-
> claims owners from bringing what are, in effect, class actions by
> assigning claims to a single entity. . . .  Put simply, Congress's goal
> was to prevent a class of securities plaintiffs from running their
> claims through a single entity . . . .

*LaSala* v. *Bordier et Cie*, 519 F.3d 121, 136 (3d Cir. 2008); *see also In re AOL Time Warner,*

*Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 671 (S.D.N.Y. 2007) ("SLUSA sets in place certain limita-

tions on class actions *and other 'mass actions'* . . . ." (emphasis added)).

Under the plain language of the statute, this action is a "covered class action."

The Trustee's common law causes of action aggregate and assert thousands of separate,

individual claims of Madoff's customers.  Indeed, in seeking to pursue claims as a "bailee," the

Trustee expressly acknowledges that his claims are brought "on behalf of" customers, *the very*

*language of SLUSA's covered class action definition*.  Compl. ¶ 17(f).  Moreover, although the

Complaint does not specify precisely how many customers he purports to represent, the Trustee

cannot dispute that it is well in excess of 50.  The full list of Madoff customers disclosed by the

Trustee in the bankruptcy court included thousands of names.  *See In re Bernard L. Madoff*, No.

08-1789, Docket No. 76, Exhibit A (Bankr. S.D.N.Y. Feb. 4, 2009).

In opposing JPMorgan's motion to withdraw the reference, the Trustee relied on

SLUSA's "Counting" provision, which states that a "corporation . . . or other entity, shall be

treated as one person or prospective class member, but only if the entity is not established for the

purpose of participating in the action."  15 U.S.C. §§ 77p(f)(2)(C), 78bb(f)(5)(D).  By its terms,

however, that provision is not an exception to the "covered class action" definition.  Rather, it

simply clarifies that when an entity such as a corporation brings an action, it will generally count

as one person under SLUSA — so that a claim brought by a corporation *on its own behalf* will

not run afoul of SLUSA.  The provision, in other words, respects "the usual rule of not looking

through an entity to its constituents unless the entity was established for the purpose of bringing

the action."  *LaSala*, 519 F.3d at 132-33.

SLUSA's counting provision, therefore, does not help the Trustee.  Under the

plain language of the statute, the relevant question is whether the plaintiff is bringing claims "*on

behalf of*" more than 50 persons; if he is, it makes no difference if the plaintiff is "one person" or

many.  Here, the Trustee is not asserting claims on behalf of the corporation to which he is the

court-appointed successor; rather, he is explicitly bringing claims on behalf of (and belonging to)

more than 50 of Madoff's many customers, making this a "covered class action."

The Third Circuit's decision in *LaSala* is directly on point.  In *LaSala*, the trustees

for a liquidating trust brought claims that originally belonged to a debtor as well as claims that

originally belonged to purchasers of the debtor's stock.  Although both sets of claims had been

assigned to the liquidating trust, the court concluded that the trustees' assertion of the claims of

the purchasers/creditors — as opposed to the claims belonging to the debtor corporation itself —

"would seem to take the form of a covered class action." *Id.* at 138.  The Third Circuit explained that, where numerous claims are assigned to a single entity, SLUSA applies when "the *original owners* of the claim" number more than 50.  *Id.* at 134 (emphasis added).  That requirement is met here, where the Trustee is purporting to bring his claims not only as an assignee of more than 50 customer claims but also as a bailee "on behalf of the customer-bailors."  Compl. ¶ 17.

It makes no difference, moreover, that the plaintiff here is a trustee rather than a typical lead plaintiff.  As the Appellate Division observed in *RGH Liquidating Trust*, when a trustee attempts to assert "claims that did not originally belong to the bankrupt" debtor, his purpose "is no different than that of any shareholder class representative."  *RGH Liquidating Trust* v. *Deloitte &* Touche, 71 A.D.3d 198, 215 (1st Dep't 2009) (quotation marks omitted).  In *LaSala*, likewise, the Third Circuit recognized that "Congress's clear intent" that SLUSA not "reach claims asserted by a bankruptcy trustee" embraced only "*claims that the debtor-in-possession once owned.*"  *LaSala*, 519 F.3d at 135 (emphasis added).  In a case such as this one, therefore, where the Trustee is seeking to assert claims that the debtor BMIS *never* owned, SLUSA controls to the same extent as in any other mass action.  *RGH*, 71 A.D.3d at 215 ("To paraphrase a well-worn expression, a class representative by any other name would offend SLUSA as much."); *Cape Ann Investors, LLC* v. *Lepone*, 296 F. Supp. 2d 4, 10 (D. Mass. 2003) (explaining that the role of a trustee bringing claims that did not originally belong to the debtor is no different under SLUSA "than that of any other shareholder class representative").

Finally, although the counting provision of SLUSA has no relevance here, even if it were relevant, the Trustee could not rely on it.  The counting provision only permits an entity to be treated as one person if it was "not established for the purpose of participating in the action."  15 U.S.C. §§ 77p(f)(2)(C), 78bb(f)(5)(D).  In applying this provision, although some

cases have looked to an entity's "primary purpose," in the statute itself "the word 'purpose' is not modified in any way." *RGH*, 71 A.D.3d at 210. In any event, it is readily apparent that a primary purpose of the Trustee's appointment was to pursue causes of action. When the Trustee was appointed, the Madoff estate had minimal assets and no way to recover assets other than through litigation or the threat of litigation. As the Trustee has reported to the bankruptcy court, it was precisely because the amount of "customer property" in the estate was insufficient to pay customers' claims in full that the Trustee commenced hundreds of adversary proceedings, making the Trustee the head of an enormous litigation enterprise. *See* Trustee's Fourth Interim Report for the Period Ending September 30, 2010 at ¶ 52, *In re Bernard L. Madoff*, No. 08-1789, Docket No. 3083 (Bankr. S.D.N.Y. Oct. 30, 2010).

*          *          *

The plain language of the statute, the legislative history, and the judicial decisions demonstrate that SLUSA prohibits the aggregation of thousands of state law securities claims in a single mass action. Because that is precisely what the Trustee is attempting to do here, his common law claims — causes of action 17 to 21 of the Complaint — must be dismissed.

**POINT III**

**THE COMPLAINT FAILS TO STATE CLAIMS FOR AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY.**

Even if the Trustee has standing to bring common law claims, all of those claims are defective and should be dismissed on the merits. The Trustee's aiding and abetting claims, causes of action 17 and 18, fail to state a claim because the Complaint contains no particularized facts giving rise to a strong inference that JPMorgan had actual knowledge of Madoff's fraud, that JPMorgan substantially assisted the fraud, or that any damages were proximately caused by

29

JPMorgan's conduct.  There is, moreover, nothing in the Complaint that would allow the Court

to find plausible the Trustee's theory that JPMorgan knowingly facilitated Madoff's inevitably

doomed Ponzi scheme supposedly in order to earn routine banking fees.  *See, e.g.*, *Schmidt* v.

*Fleet Bank*, 1998 WL 47827, at *6 (S.D.N.Y. Feb. 4, 1998) ("Ponzi schemes are doomed to

collapse . . . and while an individual may be able to escape with the proceeds of a Ponzi scheme,

a bank cannot.  Thus, participation in the scheme would not appear to be in the bank's economic

interest.").

A.      **The Trustee must plead the elements of aiding
        and abetting liability with particularity.**

To state a claim for aiding and abetting fraud under New York law, a plaintiff

must allege:  "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and

(3) that the defendant provided substantial assistance to advance the fraud's commission."

*Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (internal quotation marks omitted);

*Nigerian Nat'l Petroleum Corp.* v. *Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30,

1999).  Similarly, to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff

must allege:  (1) a "'breach by a fiduciary of obligations to another,' of which the aider and

abettor had 'actual knowledge'"; (2) "'that the defendant knowingly induced or participated in

the breach'"; and (3) "'that plaintiff suffered damage as a result of the breach.'"  *Sharp Int'l

Corp.* v. *State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 49-50 (2d Cir. 2005)

(quoting *Kaufman* v. *Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003)).  In addition, both aiding

and abetting claims require a showing that the plaintiff's injury was proximately caused by the

defendant's conduct.  *Jordan (Bermuda) Inv. Co.* v. *Hunter Green Invs. LLC*, 566 F. Supp. 2d

295, 300 (S.D.N.Y. 2008).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)).  A complaint does not state a claim by making allegations that are "merely consistent with" a defendant's liability, or that raise a "sheer possibility" that a defendant has acted unlawfully.  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations omitted).  Rather, the complaint's well-pled, non-conclusory factual allegations must "state a claim to relief that is plausible on its face" by creating a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (quotations omitted).

 "The Second Circuit has applied the heightened pleading requirements of Rule 9(b) to claims for aiding and abetting fraud." *Rosner* v. *Bank of China*, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008).  Those requirements also apply to claims for aiding and abetting a breach of fiduciary duty where, as here, "the underlying primary violations are based on fraud." *Kolbeck* v. *LIT America Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996); *accord Berman* v. *Morgan Keegan & Co.*, 2011 WL 1002683, at *7 (S.D.N.Y. 2011).

To comply with Rule 9(b), allegations must be supported by an "ample factual basis," including facts giving rise to a "strong inference" of fraudulent intent. *See, e.g.*, *O'Brien* v. *Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).  In an aiding and abetting case, accordingly, a complaint must allege facts that "create a strong inference" of the defendant's "actual knowledge" of the underlying fraud. *Lerner*, 459 F.3d at 294.

**B.      The burden of pleading actual knowledge is
            a heavy one.**

To plead an aiding and abetting claim, a plaintiff must plead facts showing that

the defendant had "actual knowledge" of the primary violator's wrongdoing.  *E.g.*, *Kolbeck*, 939

F. Supp. at 246.

Actual knowledge means just that:  "Ordinarily, evidence of recklessness,

conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is

not sufficient to satisfy the knowledge element of [an] aiding and abetting fraud claim."  *In re*

*Agape Litig.*, 2011 WL 1136173, at *8 (E.D.N.Y. Mar. 29, 2011) (internal quotation marks and

alteration omitted).  By the same measure, "constructive knowledge" of another's wrongdoing is

"legally insufficient to impose aiding and abetting liability."  *Kaufman*, 307 A.D.2d at 125; *see*

*also Williams* v. *Bank Leumi Trust Co*., 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997)

("constructive knowledge [] is insufficient to state a claim for aiding and abetting"); *see also*

*Berman*, 2011 WL 1002683, at *10 ("Mere 'allegations of constructive knowledge or

recklessness are insufficient' to satisfy the knowledge requirement.").

The "actual knowledge" requirement is a fundamental principle of aiding and

abetting law.  As Judge Mukasey explained in *Kolbeck*, "[t]o hold all defendants to a standard of

constructive knowledge and subject to a duty of inquiry would mean that all defendants,

regardless of their independent obligations to plaintiff, could be liable for inaction."  939 F.

Supp. at 247 (citing Restatement (Second) of Torts).

The "burden of demonstrating actual knowledge, although not insurmountable, is

nevertheless a heavy one."  *Chemtex, LLC* v. *St. Anthony Enters.*, 490 F. Supp. 2d 536, 546

(S.D.N.Y. 2007) (internal quotation marks omitted).  Actual knowledge must be established by

detailed factual pleading.  As the Second Circuit has held, "conclusory statements" of "actual knowledge" are "insufficient to support an aiding-and-abetting claim under New York law." *Rosner* v. *Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009); *see also MLSMK Invs. Co.* v. *JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 145 (S.D.N.Y. 2010) ("Plaintiff's conclusory allegations of knowledge are insufficient to plead aiding and abetting breach of fiduciary duty."); *Ascot Fund Ltd.* v. *UBS PaineWebber, Inc.*, No. 600341/03, at 14 (Sup. Ct. N.Y. Co. Dec. 17, 2004) (concluding that allegations of actual knowledge were "conclusory" and dismissing the claims because "[t]here are simply no facts from which it could be inferred that [defendant] had actual knowledge"), *aff'd*, 28 A.D.3d 313, 314 (1st Dep't 2006).

        Numerous cases from courts in this Circuit demonstrate the difficulty of pleading an aiding and abetting claim against a financial intermediary (often the only deep pocket once a fraud collapses).  In *Rosner* v. *Bank of China*, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009), the Second Circuit affirmed the dismissal of aiding and abetting claims against a bank.  In *Rosner*, the receiver for a corporation that had defrauded investors attempted to show that Bank of China had knowledge of the fraud by virtue of suspicious banking activity, including large, almost daily cash movements that were inconsistent with the corporation's supposed business as a currency trader.  Dismissing the case, the district court observed that "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warnings signs indicating the fraud's existence." *Id.* at *6.  The Second Circuit affirmed, holding that mere allegations of what a bank "should have known" are "insufficient" to plead actual knowledge.  349 Fed. App'x at 639

33

("Even if [the bank] had reason to suspect that [a customer] was laundering money, this does not mean that [the bank] had actual knowledge of the fraudulent scheme.").

Earlier this year, in *Berman* v. *Morgan Keegan & Co.*, Judge Castel cited *Rosner* in dismissing aiding and abetting claims against a broker-dealer brought by investors in a Ponzi scheme. 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011). The broker-dealer maintained an account for a corporation that was fraudulently marketing tax deferral devices. In attempting to show actual knowledge, the investors relied on a close relationship between an executive of the broker-dealer and the customer's principals, as well as suspicious account activity. *Id.* at *4-5. The investors also alleged that the broker-dealer must have known about the customer's fraud as a result of "Know Your Customer Rules." *Id*. at *5, *10. As in *Rosner*, the court held that the facts alleged did "not give rise to a strong inference" of actual knowledge. *Id.* at *12; *see also id*. at *10 (explaining that the "Know Your Customer Rules" governing the broker-dealer "at most speak to whether [the broker-dealer] should have known of the fraud; they do not reflect actual knowledge of fraud").

Judge Spatt of the Eastern District has since followed *Rosner* and *Berman* in again dismissing claims by investors in a Ponzi scheme that a bank had aided and abetted the fraud. *In re Agape Litig.*, 2011 WL 1136173 (E.D.N.Y. Mar. 29, 2011). In *Agape*, the plaintiff-investors tried to show actual knowledge by alleging that the bank established a special branch at the fraudster's headquarters; allowed the fraudster, a convicted felon, to open and use numerous accounts under different names; and enabled the fraudster to transfer investor funds and commingle that money with other funds. *Id*. at *2-3. The investors also relied heavily on allegations of suspicious account activity, including commingling of investor funds, transfers in and out of the account in equal amounts, empty accounts, and unusually large transfers. *Id.* at

34

*4, *9.  The court rejected the claim, holding that even if "hindsight" would tend to "indicate the obviousness of the fraud," the investors had failed to show actual knowledge with the "level of specificity that New York state courts and courts in the Second Circuit have routinely required before holding that a plaintiff has sufficiently alleged facts that raise a strong inference of actual knowledge from circumstantial evidence."  *Id.* at *19.[6]

C.    **The Trustee has failed to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud.**

These principles of New York law foreclose the Trustee's aiding and abetting claims.  The Complaint attempts to establish actual knowledge through two sets of allegations. The first involve BMIS's supposedly "suspicious" activity in its bank account at JPMorgan; the second involve JPMorgan's due diligence in connection with the issuance of Madoff-related structured products.  The allegations relating to BMIS's bank account, however, do not even show suspicion on the part of the bank.  And the allegations relating to JPMorgan's due diligence, read in the light most favorable to the Trustee, show nothing more than suspicion. None of these allegations supports any inference, let alone a strong inference, that JPMorgan had actual knowledge of Madoff's Ponzi scheme.

---

[6]  In discussing the "actual knowledge" requirement, the *Agape* court noted that certain courts have allowed a plaintiff to meet that burden by showing "conscious avoidance," which only "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge."  *Agape*, 2011 WL 1136173, at *8 (quoting *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)).  The *Agape* court also observed that "a theory of actual knowledge based on conscious avoidance requires facts supporting an inference that the defendant acted with a culpable state of mind," such that "[p]lausibly alleging actual knowledge through conscious avoidance is a very high bar."  *Id.* at *8, *20.

1.      **The Trustee's allegations with respect to the 703
            Account do not show actual knowledge.**

To try to show that JPMorgan knew about Madoff's fraud, the Trustee relies on

alleged irregularities in the 703 Account that Madoff opened at a predecessor bank in 1986.

Those allegations, however, fall far short of establishing actual knowledge.

The Complaint is replete with allegations concerning what JPMorgan "should"

have done as to the 703 Account and what a review of Madoff's accounts "would have

revealed." Compl. ¶¶ 175, 193. For instance, the Trustee suggests that the supposedly

suspicious activity in the accounts should have triggered JPMorgan's anti-money laundering

system. *Id*. ¶ 175. The Trustee also suggests that JPMorgan "should have also been" monitoring

transactions between BMIS and Norman Levy, a bank client and BMIS customer. *Id*. ¶ 232. Yet

according to the Complaint, the bank's anti-money laundering and know-your-customer

programs "were not effectively executed." *Id*. ¶ 188. Supposedly, the bank's automated system

for detecting suspicious activity "issued only a single account alert" with respect to Madoff. *Id*.

¶ 239. Moreover, according to the Trustee, JPMorgan "never meaningfully investigated the

connection between Madoff and Levy." *Id*. ¶ 247.

These allegations go nowhere in terms of showing JPMorgan's actual knowledge

of fraud. The Trustee does not allege that JPMorgan ever disabled, compromised or ignored its

detection system for Madoff's benefit; indeed, when the system did alert, the Trustee recognizes

that a JPMorgan employee followed up. Compl. ¶ 239. And while the Complaint alleges that

certain transactions "*should* have prompted a check-kiting investigation, which undoubtedly

*would* have revealed more suspicious behavior," the Complaint does not allege that JPMorgan

ever took steps that actually uncovered Madoff's fraud. *Id*. ¶ 230 (emphasis added). Indeed,

while the Complaint claims that JPMorgan was "uniquely situated" to uncover the fraud, *id*. ¶¶ 2,

276, and asserts in conclusory fashion that JPMorgan had "actual knowledge of the fraud," *id.* ¶ 431, it ultimately alleges that JPMorgan "utterly failed to 'know its customer' when it came to Madoff and BMIS," and even made loans to BMIS, thus refuting any claim that JPMorgan had actual knowledge of Madoff's crimes.  *Id.* ¶¶ 2, 192.[7]

Moreover, as the *Rosner* court observed, New York courts have consistently rejected attempts to plead "actual knowledge" by relying on supposedly suspicious activity in a bank account.  For instance, in *Williams* v. *Bank Leumi Trust*, the plaintiff brought aiding and abetting claims against a bank based on damages allegedly suffered as a result of a check-kiting and embezzlement scheme.  The plaintiff's theory of "actual knowledge" was that the bank "was aware of the scheme" by virtue of the questionable activity in three separate bank accounts.  1997 WL 289865, at *1-2, *5 (S.D.N.Y. May 30, 1997).  The court rejected this theory, holding that the bank's knowledge of the "sequence of [] account transfers" "[a]t most . . . raise[d] the issue of constructive knowledge which is insufficient to state a claim for aiding and abetting." *Id.* at *5; *see also Agape*, 2011 WL 1136173, at *20-21 (complaint inadequately alleged that bank had "actual knowledge" of customer's fraud despite suspicious account activity and accusations of fraud on the part of the customer that were brought to the bank's attention).

---

[7] The Trustee also claims that Madoff's FOCUS Reports "contained glaring irregularities that *should have been probed* by" JPMorgan.  Compl. ¶ 4 (emphasis added).  But the Complaint is again devoid of any allegation that anyone at JPMorgan concluded, based on the FOCUS Reports, that Madoff was engaged in fraud.  Although the Complaint recites examples of irregularities in the FOCUS Reports, *see id.* ¶¶ 202-13, there is no allegation that anyone at JPMorgan noticed or drew any negative inferences from those reports.  Nor is there any allegation that anyone deliberately compromised the bank's procedures with respect to FOCUS Reports in order to permit Madoff's scheme to succeed.

New York law is equally clear that, even if a bank becomes suspicious that an account-holder is involved in fraud, such suspicion "cannot be equated with actual knowledge" for purposes of an aiding and abetting claim. *E.g.*, *Albion Alliance Mezzanine Fund* v. *State Street Bank & Trust Co.*, 8 Misc. 3d 264, 273 (N.Y. Sup. Ct. N.Y. Co. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003). To impose aiding and abetting liability, "suspicions" are simply not enough:

> [W]hile the . . . inaccuracies in [the company's] account information certainly gave the Bank reason to be *highly suspicious* of its veracity, *such suspicions cannot be equated with actual knowledge* — particularly not actual knowledge that the [fraudsters] were diverting tens of millions of dollar of corporate funds.

*Id.* at 273 (emphasis added); *see also Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (bank's "suspicions" of fraud based on account activity and analysis by the bank's in-house fraud investigators did "not raise an inference of actual knowledge").

These decisions foreclose imposing aiding and abetting liability based on the allegations concerning the 703 Account. The Complaint contains no particularized facts showing that BMIS's account activity caused anyone at JPMorgan to become suspicious of Madoff, let alone to conclude that he was operating a Ponzi scheme.

**2.      The Trustee's allegations concerning JPMorgan's structured products due diligence do not show actual knowledge.**

The Complaint also makes various allegations relating to the due diligence that JPMorgan conducted, beginning in 2006, in connection with structured products issued by JPMorgan that were tied to the returns of Madoff feeder funds. According to the Complaint, as of 2007, when JPMorgan's UK affiliate began issuing those products, the due diligence was "preliminary." Compl. ¶¶ 89-92. The Trustee alleges that JPMorgan had "concerns," but never suggests that anyone at JPMorgan learned at that time that Madoff was engaged in fraud. *Id.* ¶

107.  In fact, as late as November 2007, the Trustee claims that JPMorgan was still looking for "answers."  *Id.* ¶ 119.

The Trustee alleges that the bank engaged in another round of due diligence beginning in March of 2008, when it acquired Bear Stearns and sought to reassess firm-wide exposure in the hedge fund sector.  Compl. ¶¶ 121-22.  Accordingly, in July 2008, certain JPMorgan employees went to Austria to perform a "refresh" of its initial due diligence on a Madoff feeder fund.  *Id.* ¶ 123.  The Complaint recites a number of "questions" that JPMorgan was asking at this time — "many of the same questions it had asked more than a year before."  *Id.* ¶¶ 128-29.

The Trustee makes no effort to explain why JPMorgan would conduct multiple rounds of due diligence relating to Madoff if the bank already knew he was operating a Ponzi scheme.  Instead, the Trustee relies on generic "red flags" to allege that JPMorgan "could have," "should have," and "would have" discovered the fraud if it had only done more.  *E.g.*, Compl. ¶¶ 141, 163.  For instance, the Trustee cites Madoff's lack of transparency (*id.* ¶¶ 5(b), 140); Madoff's role as clearing broker, sub-custodian, and investment advisor (*id.* ¶ 5(e)); the fact that JPMorgan could not identify Madoff's counterparties for options trades (*id.* ¶¶ 5(c), 99, 134); the consistency of Madoff's returns (*id.* ¶ 5(a)); Madoff's use of a small, unknown auditor (*id.* ¶¶ 5(d), 7, 88, 135, 140); and "public speculation" that Madoff was operating a Ponzi scheme or was otherwise engaged in illegal activity (*id.* ¶ 5(g)).

But these "red flag" allegations that the Trustee has alleged establish, at the very most, some degree of "constructive knowledge," which is no substitute for actual knowledge.  Under New York law, what a party "should have known is irrelevant."  *Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000).  Indeed, a "request that the

Court 'impute' actual knowledge through [a bank's] alleged willful blindness . . . *concedes* a lack of actual knowledge."  *Rosner*, 2008 WL 5416380, at *7 (emphasis added).

        In numerous cases arising out of Madoff's fraud, courts have rejected attempts by plaintiffs to rely on the very *same* red flags that the Trustee seeks to rely upon in his Complaint. *See, e.g.*, *Saltz* v. *First Frontier, LP*, 2010 WL 5298225, at *3, *9-10 (S.D.N.Y. Dec. 23, 2010) (dismissing common law fraud claims against auditors of Madoff feeder fund where plaintiff alleged such "red flags" as the "uncanny consistency" of investment returns and Madoff's use of a small, unknown audit firm); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 368, 371 (S.D.N.Y. 2010) (dismissing securities fraud claims against auditors of Madoff feeder fund and rejecting such "red flags" as the inability to duplicate Madoff's returns using his reported investment strategy; the excessive volume of Madoff's purported options trading; and that Madoff's lack of transparency); *SEC* v. *Cohmad Sec. Corp.*, 2010 WL 363844, at *5-6 (S.D.N.Y. Feb. 2, 2010) (holding that the SEC failed to plead facts supporting plausible inference of scienter against broker-dealer used by Madoff and observing that "[i]n light of Madoff's established reputation as a successful and respected investment advisor, the high returns he produced were not generally perceived (even by professionals) as a badge of fraud").[8]

        The Trustee also relies on a suspicious activity report, or a "SAR," that JPMorgan filed in the UK at the end of October 2008, just 45 days before Madoff's fraud was revealed to the world.  As alleged, after conducting further due diligence, JPMorgan began in October 2008

---

[8]  In *Anwar* v. *Fairfield Greenwich Ltd.*, although the court sustained an aiding and abetting claim against the administrator of a Madoff feeder fund, the complaint alleged that the administrator had "actual knowledge" not of the Ponzi scheme but of the manager's misrepresentations to investors in the fund regarding the extent and quality of the manager's due diligence on Madoff.  728 F. Supp. 2d 372, 442-43 (S.D.N.Y. 2010).

to redeem some — but not all — of its investments in the feeder funds.  According to the

Complaint, these redemptions led to a phone call in which a third party threatened a JPMorgan

employee by saying that "Colombian friends" would "cause havoc" if JPMorgan went through

with its plan to redeem the investments.  Compl. ¶ 143.  Following this conversation, JPMorgan

filed a "suspicious activity report" with the British government.  *Id*. ¶¶ 144-46.  According to the

complaint, the report described the background of JPMorgan's redemptions, but it did not point

to any new evidence about Madoff showing that he was engaged in a fraud.  Rather, the report

stated that Madoff's returns "appear" to be too good to be true and that thus they "probably" are.

*Id*. ¶¶ 9, 146.  At most, the report indicates suspicion of fraud, *not* the actual knowledge required

to sustain an aiding and abetting claim.  *See, e.g.*, *Renner*, 2000 WL 781081, at *17, *21

(dismissing aiding and abetting claim for failure to plead actual knowledge, despite alleged

"suspicions" of fraud on the part of Chase).

       The Trustee's reliance on this SAR as a basis to impose liability on JPMorgan is

not only unavailing in showing actual knowledge, but it also violates federal law and policy

prohibiting the imposition of liability on a financial institution for filing such a report.  The entire

purpose of the suspicious activity reporting regime is to encourage early reporting of possible

wrongdoing.  That objective would be severely undermined if financial institutions faced

potential liability for reporting their suspicions.  Accordingly, under federal statute, "[a]ny

financial institution that makes a voluntary disclosure of any possible violation of law or

regulation . . . *shall not be liable to any person under any law* or regulation of the United States

or any constitution, law, or regulation of any State or political subdivision thereof, for such

disclosure . . . ."  31 U.S.C. § 5318(g)(3) (emphasis added).  In relying on the SAR to prosecute

his baseless claims, the Trustee ignores this federal statute, as well as Second Circuit precedent

holding that the statute creates "an unqualified privilege" that "broadly and unambiguously provides for immunity from any law (except the federal Constitution) for any statement" in a SAR.  *Lee* v. *Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).

Nor does JPMorgan's redemption of its investments from the feeder funds show actual knowledge of fraud.  The decision in *MLSMK Investments Co.* v. *JP Morgan Chase & Co.* makes that plain.  The plaintiff in that case, like the Trustee here, sought to rely upon JPMorgan's decision to liquidate part of its investments in Madoff feeder funds as evidence that JPMorgan was aware that Madoff was a fraud.  *MLSMK*, 737 F. Supp. 2d at 144-45.  The court squarely rejected the *MLSMK* plaintiff's allegations and dismissed the claim for aiding and abetting a breach of fiduciary duty — observing that *even if* JPMorgan "could have connected the dots to determine that Madoff was committing fraud, Plaintiff offers no facts to support the claim that [JPMorgan] *actually reached such a conclusion*."  *Id*. at 144 (emphasis added).

The Trustee also points to evidence following the revelation of Madoff's fraud to criticize JPMorgan's due diligence.  But those allegations again refute any inference of actual knowledge.  The Trustee, for example, cites a "Lessons Learned" document circulated after the fraud was revealed.  Compl. ¶¶ 166-71.  But that document never suggests that anyone at JPMorgan knew that BMIS was a criminal enterprise; instead, it focuses on ways for JPMorgan to strengthen its due diligence procedures going forward so that the bank will not fall victim to future Ponzi artists.  The document suggests that JPMorgan put undue reliance on the same positive factors — such as BMIS's status as a regulated business, the absence of any adverse regulatory actions against Madoff, and Madoff's previously solid reputation — that permitted Madoff to deceive banks and investors around the world.  *See, e.g.*, *id*. ¶ 170 (emphasizing JPMorgan's reliance on Madoff's "reputation and SEC regulation").

Ultimately, therefore, none of the Complaint's allegations relating to JPMorgan's due diligence support the inference that JPMorgan *knew* that Madoff was conducting a fraud, as required for an aiding and abetting claim.  In essence, the Trustee is trying to hold JPMorgan liable for Madoff's fraud because the bank *could have* ferreted out the fraud had it conducted more extensive due diligence or monitored its customer differently.  Such allegations, however, are not enough to support an aiding and abetting claim.[9]

**D.     The Trustee has failed to allege facts showing that JPMorgan substantially assisted Madoff's fraud.**

Just as the Trustee has failed to plead any facts showing that JPMorgan had actual knowledge of Madoff's fraud, the Trustee has also failed to plead facts showing that JPMorgan substantially assisted the fraud.  The Trustee's argument is that JPMorgan assisted the fraud by (1) providing routine commercial banking services to BMIS, (2) investing approximately $250 million in Madoff feeder funds, and (3) not reporting Madoff to regulators.

*First*, "the mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance."  *Rosner*, 2008 WL 5416380, at *12 (internal quotation marks omitted).  The banking services provided by JPMorgan to Madoff are precisely the "conventional banking services" that New York courts have consistently held to be insufficient to show "substantial assistance" as a predicate for aiding and abetting liability.  *E.g.*, *In re Agape Litig.*, 681 F. Supp. 2d 352, 365

---

[9]  The Trustee's conclusory allegation that JPMorgan "consciously avoided knowledge of the fraud" likewise fails to establish actual knowledge.  Compl. ¶ 431.  The Complaint alleges no facts showing that anyone at JPMorgan avoided "confirming" knowledge of the fraud "in order later to be able to deny" such knowledge, as required by the case law.  *See, e.g.*, *In re Agape Litig.*, 2011 WL 1136173, at *8.

(E.D.N.Y. 2010); *Nigerian Nat'l*, 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner*, 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase); *Ryan*, 2000 WL 1375265, at *9 ("The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts . . . do not constitute substantial assistance."); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 392-93 (S.D.N.Y. 2009) (characterizing bank's extension of credit to fraudster as "routine" banking service insufficient to support an aiding and abetting claim).

      *Second*, the Trustee's allegation that JPMorgan substantially assisted Madoff by investing $250 million in the feeder funds turns the substantial assistance requirement on its head.  Whether that money ever actually made its way to BMIS is never alleged.  But even if it did, such a tiny fraction of the tens of billions of dollars that Madoff is known to have collected from investors cannot plausibly be characterized as "substantial assistance."  Moreover, by the Trustee's theory, everyone who invested in one of the feeder funds or directly with Madoff himself — *i.e.*, his victims — "substantially assisted" his fraud.  This argument is absurd.

      *Third*, the Trustee cannot adequately plead substantial assistance by alleging that JPMorgan failed to comply with federal anti-money laundering laws or that it "ignor[ed]" allegedly suspicious activity in Madoff's account.  Compl. ¶ 441.  These allegations all amount to *inaction*, which *cannot* amount to substantial assistance unless the defendant owes a fiduciary duty "directly to the plaintiff."  *Kaufman*, 307 A.D.2d at 126; *see also Sharp International*, 403 F.3d at 51-52 (allegations that "come down to omissions or failures to act" do not support a claim of "substantial assistance"); *Kolbeck*, 939 F. Supp. at 247 ("[I]naction, or a failure to

investigate, constitutes actionable participation only when a defendant owes a fiduciary duty

directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not

enough.").  The alleged failure "to comply with domestic and international bank secrecy, know-

your-customer, and anti-money laundering laws, decrees, and regulations" does "not elevate

[defendants'] actions into the realm of 'substantial assistance.'"  *Rosner* v. *Bank of China*, 528 F.

Supp. 2d 419, 427 (S.D.N.Y. 2007); *accord Berman*, 2011 WL 1002683, at *10.

        The Complaint, in sum, fails to allege facts showing that JPMorgan took any

actions to provide "substantial assistance" to Madoff's Ponzi scheme.  Given that the Ponzi

scheme was doomed to fail, the Trustee's claim that JPMorgan knowingly assisted Madoff in his

crimes, risking both liability and reputational harm, is not only unsupported by factual

allegations but also utterly implausible.  *See Kalnit* v. *Eichler*, 264 F.3d 131, 140-41 (2d Cir.

2001) (refusing to credit allegations of fraudulent conduct that "def[y] economic reason").

**E.      The Trustee has failed to plead that JPMorgan's
conduct was the proximate cause of the alleged injury.**

        To state an aiding and abetting claim, "the complaint must allege that the acts of

the aider and abettor proximately caused the harm to the [plaintiff] on which the primary liability

is predicated."  *Bloor* v. *Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir.

1985); *Jordan*, 566 F. Supp. 2d at 300.  "Aiding and abetting liability arises only when plaintiffs'

injury was a 'direct or reasonably foreseeable result' of the complained-of conduct.  'But-for'

causation does not suffice; the breach must proximately cause the loss."  *Kolbeck*, 939 F. Supp.

2d at 249 (internal citation omitted); *accord Bloor*, 754 F.2d at 63 ("Allegations of a 'but for'

causal relationship are insufficient.").

The Trustee's theory of proximate cause appears to be that Madoff could not have run his Ponzi scheme without the commercial banking services provided by JPMorgan. But the Complaint never alleges that BMIS — which after all fooled the SEC and scores of financial institutions around the world — would have been unable to obtain routine banking services from another bank. Compl. ¶¶ 442, 457; *see, e.g.*, *In re Beacon*, 745 F. Supp. 2d at 394 ("Madoff deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ('SEC') and the Financial Industry Regulatory Authority ('FINRA')."). The Complaint thus fails to establish proximate cause. *Edwards & Hanly* v. *Wells Fargo Secs. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979) (allegation that fraudster "would not have been able to finance or to conceal" the fraud without defendant's "acquiescence" and lending of money did not amount to proximate cause); *In re Agape*, 2011 WL 1136173, at *25 ("conventional banking" services provided to Ponzi schemer were "not the proximate cause of the Plaintiffs' damages").

**F.      The Trustee has failed to plead individual fraud claims.**

The aiding and abetting claims also fail because the Complaint makes no attempt to satisfy the requirements for pleading any of the thousands of individual underlying fraud claims on which those claims are predicated. To plead those individual claims, the Trustee would have to identify each customer who was defrauded, specify the misstatements or omissions that each customer relied upon, and explain why each customer's reliance was reasonable. Instead, the Trustee lumps all of Madoff's customers together as if they were a single, unitary plaintiff — even though the Trustee himself has publicly alleged that various customers, including large feeder funds such as Fairfield Sentry and Ascot Partners, participated in Madoff's fraud and did not act reasonably in relying on Madoff. *See, e.g.*, *Picard* v. *Merkin et*

*al.*, No. 09-01182 (Bankr. S.D.N.Y.) (Complaint filed May 7, 2009); *Picard* v. *Fairfield Sentry Limited et al.*, No. 09-01239 (Bankr. S.D.N.Y.) (Amended Complaint filed July 20, 2010).

The Court should not indulge the Trustee's fiction. This is not a fraud-on-the-market case where the plaintiff may dispense with pleading certain elements of fraud. Here, if the Trustee is allowed to aggregate thousands of separate customer fraud claims in a single action, he has to plead the elements of those claims. *See, e.g.*, *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000) (dismissing fraudulent misrepresentation claim brought by SIPC and SIPA trustee on behalf of customers on the grounds that the complaint failed to plead reliance by the customers on the alleged misstatements); *Jana Master Fund, Ltd.* v. *JPMorgan Chase & Co.*, 2008 WL 746540, at *4-5 (Sup. Ct. N.Y. Co. Mar. 12, 2008) (dismissing aiding and abetting fraud and aiding and abetting fiduciary duty claims where plaintiffs did not "particularize the reasonableness of any purchaser's reliance on anything said or communicated"); *In re ICN/Viratek Sec. Litig.*, 1996 WL 164732, at *12 (S.D.N.Y. Apr. 9, 1996) (dismissing fraud claims of absent parties where named plaintiffs failed to show "individualized reliance" on the part of such parties).

The Trustee's failure to plead fraud on behalf of any individual customer underscores the basic flaw in the Trustee's attempt to aggregate the claims of differently situated customers into one mass action. The Trustee should not be relieved of his pleading burden because he is trying to pursue an unmanageable, *de facto* class action.

**POINT IV**

**THE COMPLAINT FAILS TO STATE CLAIMS FOR
CONVERSION AND UNJUST ENRICHMENT.**

In addition to claims for aiding and abetting, the Complaint alleges claims for

conversion and unjust enrichment (causes of action 19 and 20).  For the reasons stated above, the

Trustee lacks standing to bring those claims, and they are barred by SLUSA.  But the Complaint

also fails to state claims for relief based on these theories.

**A.      The Complaint fails to state a claim for conversion.**

Under New York law, "conversion takes place when someone, intentionally and

without authority, assumes or exercises control over personal property belonging to someone

else, interfering with that person's right of possession."  *Colavito* v. *N.Y. Organ Donor Network*,

8 N.Y.3d 43, 49-50 (2006).

The Trustee's conversion claim alleges that JPMorgan intentionally exercised

control over "BLMIS customers' money," Compl. ¶ 464, but it provides no coherent explanation

as to how JPMorgan could have done that.  To the extent the Trustee is saying that JPMorgan

converted customer property by deducting fees from or using the money in BMIS's account, the

Trustee has no viable claim.  Under New York law, "a customer's bank account is merely a debt

owed to it by the bank and funds deposited in it are not sufficiently specific and identifiable, in

relation to the bank's other funds, to support a claim for conversion against a bank."  *Wells* v.

*Bank of New York Co.*, 181 Misc. 2d 574, 577 (N.Y. Sup. Ct. N.Y. Co. 1999) (citing cases).

The conversion claim fails for numerous other reasons as well.  *First*, the

Complaint does not allege facts showing that JPMorgan *intentionally* deprived anyone of his or

her property.  Since the Complaint fails to allege that JPMorgan had actual knowledge of

48

Madoff's crimes, there is no basis to conclude that JPMorgan intentionally deprived customers of property. *See, e.g.*, *In re Agape Litig.*, 2011 WL 1136173, at *26-27 (dismissing claim against bank for aiding and abetting conversion where the complaint failed to allege the bank's "actual knowledge" of its customer's "underlying conversion").

   *Second*, the Complaint fails to allege that JPMorgan took any action with respect to the 703 Account that was not authorized and directed by BMIS, the bank's client. To the contrary, the Complaint makes plain that it was *BMIS* directing the 703 Account transactions. *See, e.g.*, Compl. ¶¶ 226, 258-59, 262-64, 266.

   *Third*, the Complaint does not allege that JPMorgan interfered with any customer's right of possession over specifically identifiable funds. Money cannot be subject to a conversion action unless it is "held in a 'specific, identifiable fund'" and subject to "'an obligation to return or otherwise treat in a particular manner the specific fund in question.'" *Citadel Mgmt.* v. *Telesis Trust*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (citation omitted). Here, the Trustee does not allege facts showing that any customer had specifically identifiable funds in BMIS's 703 Account.

   *Finally*, to state a claim for conversion, a plaintiff must plead that the defendant "acted to exclude the rights of the owner." *Parks* v. *ABC, Inc.*, 2008 WL 205205, at *5 (S.D.N.Y. Jan. 24, 2008) (internal quotation marks omitted). Nowhere does the Trustee allege that JPMorgan withheld money in the face of a demand for its return. *See Schwartz* v. *Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (affirming dismissal of conversion claim where there was no evidence that plaintiff demanded return of property).

**B.      The Complaint fails to state a claim for unjust enrichment.**

To plead unjust enrichment under New York law, a plaintiff must allege that:

"(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and

good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin*

*Trading Ltd.* v. *Wildenstein*, 16 N.Y.3d 173, 182 (2011) (internal quotation marks omitted).  In

addition, the complaint must allege the existence, between the plaintiff and defendant, of "some

type of direct dealings or an actual, substantive relationship."  *Carmona* v. *Spanish Broadcasting*

*Sys., Inc.*, 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009); *accord, e.g., Jet Star Enters., Ltd.*

v. *Soros*, 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006).

The Complaint does not state a claim for unjust enrichment.  Although the

Complaint asserts summarily that "JPMC has been enriched at the expense of the Trustee and,

ultimately, at the expense of BLMIS's customers," Compl. ¶ 471, the Complaint alleges no

direct dealings or actual, substantive relationships between JPMorgan and the BMIS customers

that the Trustee purports to represent.  *See Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*,

2005 WL 1490097, at *7 (S.D.N.Y. June 23, 2005) (dismissing unjust enrichment claim for

failure to allege any relationship between the plaintiff and the defendant); *Reading Int'l, Inc.* v.

*Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) (same).

Here, the only entity with whom JPMorgan had a relationship was BMIS, but the

Trustee does not purport to bring any unjust enrichment claim on behalf of that entity.  The

*Wagoner* rule, *see* Point I.A, *supra*, would bar any such claim.  In addition, any such claim

would also be barred by the agreements between BMIS and JPMorgan, including account and

loan agreements.  "The existence of a valid and enforceable written contract governing a

particular subject matter ordinarily precludes recovery in quasi contract for events arising out of

the same subject matter." *Clark-Fitzpatrick, Inc.* v. *Long Island R.R.*, 70 N.Y.2d 382, 388 (1987).

The Trustee likewise fails to allege facts showing that "equity and good conscience" require restitution by JPMorgan. With respect to this element, "a plaintiff, in order to recover under a theory of quasi-contract," must "prove that performance" by the plaintiff "was rendered for the defendant." *Piccoli A/S* v. *Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 166 (S.D.N.Y. 1998) (internal quotation marks omitted). "It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Kagan* v. *K-Tel Entm't, Inc.*, 172 A.D.2d 375, 376 (1st Dep't 1991) (internal citations omitted). Here, the Trustee cannot allege that BMIS customers invested funds for the benefit of, or at the behest of, JPMorgan. The customers invested for their own benefit, and were acting in their own interest (at Madoff's behest) when they invested with BMIS.

## POINT V

### THE TRUSTEE HAS NO VALID CLAIM FOR "FRAUD ON THE REGULATOR."

In his twenty-first cause of action, the Trustee alleges that JPMorgan deceived its federal regulators — the SEC, the OCC, and the Federal Reserve — by failing to inform these agencies that Madoff was operating a Ponzi scheme. Compl. ¶¶ 474-480. According to the Trustee, had JPMorgan notified these agencies of Madoff's crimes, the regulators would have shut down the Ponzi scheme and massive losses would have been averted. *Id.* ¶ 480. The Trustee purports to assert this novel claim under New York common law. This claim fails for three independent reasons: (1) New York common law does not recognize a cause of action for

fraud on the regulator; (2) even if it did, the claim would be preempted by federal law; and (3) the Trustee has failed to plead the elements of fraud.

*First*, "fraud on the regulator" is a fictional cause of action.  Despite extensive research, JPMorgan is not aware of any New York case that has recognized a cause of action for fraud on a federal regulator.  Nor did the Trustee cite any such case in opposing withdrawal of the reference.  To the extent the issue has been addressed, the Second Circuit has declined to recognize a theory of "fraud on the regulatory process."  *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 71-73 (2d Cir. 2000).

*Second*, any "fraud on the regulator" claim is preempted by federal law.  In *Buckman Co.* v. *Plaintiffs' Legal Committee*, the United States Supreme Court considered a state-law "fraud-on-the-FDA" claim brought by medical patients against a consultant to the manufacturer of orthopedic bone screws, and held that the claim was preempted by the Federal Food, Drug, and Cosmetic Act.  531 U.S. 341, 348 (2001).  Recognizing that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," the Supreme Court held that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."  *Id.* at 347.  The Court explained that the federal statute "prompted" the defendant's "dealings with the FDA" and "dictated" the "very subject matter" of the defendant's statements to the agency.  *Id.* at 347-48.  The Court also found that "the federal statutory scheme amply empower[ed] the FDA to punish and deter fraud against the Administration," and that the agency's "flexibility" in determining how to address misconduct on the part of regulated businesses "is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives."  *Id.* at 348,

349.  Accordingly, because any state-law fraud-on-the-FDA claim would conflict with the

enforcement authority delegated to the FDA, the *Buckman* Court held that plaintiffs' fraud-on-

the-regulator claims were preempted by federal law.  *Id.*; *see also Williams* v. *Dow Chem. Co.*,

255 F. Supp. 2d 219, 232 (S.D.N.Y. 2003) (holding state law "fraud on the EPA" claims

preempted under *Buckman*).

   As in *Buckman*, JPMorgan's communications with the SEC, the OCC and the

Federal Reserve in this case were indisputably "prompted" by federal law.  *Buckman*, 531 U.S. at

347.  And here, as in *Buckman*, the relevant statutes and regulations dictate the "very subject

matter" of JPMorgan's statements to the agencies, including through comprehensive reporting

requirements.  *Id.*; *see also* 15 U.S.C. § 78o (SEC: "Registration and regulation of brokers and

dealers"); 12 U.S.C. § 161 (OCC: "Reports to Comptroller of the Currency"); 12 C.F.R. § 21.11

(OCC: "Suspicious Activity Report"); 12 C.F.R. § 225.4(f) (Federal Reserve: "Suspicious

activity report"); 12 U.S.C. § 1844(a) (Federal Reserve: "[E]ach bank holding company shall

register with the Board on forms prescribed by the Board. . . .").  For example, the federal

regulations that mandate the filing of a Suspicious Activity Report prescribe when a national

bank is required to file a SAR and in what form.  12 C.F.R. § 21.11(c).  In addition, the relevant

statutes grant examination and enforcement authority to the agencies.  *E.g.*, 15 U.S.C. § 78u-2

(SEC); 12 U.S.C. §§ 93, 164(d), 481 (OCC); 12 U.S.C. § 1818 (OCC, Federal Reserve, FDIC);

12 U.S.C. §§ 325, 483, 1847 (Federal Reserve).

   Significantly, like Congress's empowerment of the FDA "to punish and deter

fraud" against the FDA noted in *Buckman*, federal statutes and code provisions empower the

SEC, the OCC and the Federal Reserve to punish and deter fraud or other misconduct by

regulated entities.  For example, failure to file a SAR as required by Section 21.11 of the OCC

regulations can result in "supervisory action" by the OCC.  *See* 12 C.F.R. § 21.11(i).  Indeed, if

JPMorgan were to fail to file required reports, the statute provides that fines "shall be assessed

and collected by the Comptroller of the Currency."  12 U.S.C. § 164(d).  Moreover, under federal

statute, JPMorgan is subject to civil penalties if it willfully violates any SEC regulations, *see* 15

U.S.C. § 78u-2, and criminal penalties if it knowingly violates any provision of the U.S. Code

chapter governing bank holding companies.  *See* 12 U.S.C. § 1847(a).[10]

Accordingly, like the relationship at issue in *Buckman*, JPMorgan's relationship

with its federal regulators is "inherently federal."  531 U.S. at 347.  The Trustee's cause of action

for fraud on the SEC, OCC and Federal Reserve "inevitably conflict[s] with [the agencies']

responsibility to police fraud" and infringes upon those agencies' "flexibility" in pursuing their

"objectives" in regulating national banks such as JPMorgan.  *Id.* at 350, 349; *see also Timberlake*

v. *Synthes Spine, Inc.*, 2011 WL 711075, at *8-9 (S.D. Tex. Feb. 18, 2011) ("fraud as to the

FDA" claims seeking relief for "false representations" to the FDA preempted under *Buckman*

because "it is the Federal Government rather than private litigants [that is] authorized to file suit

for noncompliance"); *Riley* v. *Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009) ("a state-

law claim that the defendant made misrepresentations to the [federal agency] is preempted

because such a claim would not exist absent the federal regulatory scheme").  In addition, as was

the case in *Buckman*, permitting each of the 50 states to authorize private tort claims of the kind

---

[10] The power to enforce any duty to report to the SEC, the OCC and the Federal Reserve lies
exclusively with those regulators; the relevant statutes and regulations do not provide for a
private right of action.  *See B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 476 (7th Cir. 2005)
(regulation requiring banks to notify the Treasury Department of "any known or suspected
Federal criminal violation" does not "create a private right of action for damages"); *AmSouth
Bank* v. *Dale*, 386 F.3d 763, 777 (6th Cir. 2004) ("the Bank Secrecy Act does not create a private
right of action"); *Carran* v. *Morgan*, 2007 WL 3520480, at *5 (S.D. Fla. Nov. 14, 2007) ("Of
course, there is no private right of action for failure to file a suspicious activity report.").

asserted by the Trustee would "dramatically increase the burdens" facing regulated entities in a way that was not contemplated by Congress.  *Buckman*, 531 U.S. at 350.

Third, and finally, the "fraud on the regulator" claim does not meet the basic requirements for a fraud claim under New York law.  To state a claim for fraud under New York law, "the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Lama Holding Co.* v. *Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996).

These elements are not satisfied.  The Complaint fails to allege that JPMorgan knowingly misrepresented or concealed any facts from anyone.  *See* Point III, *supra*.  The Complaint likewise fails to allege that JPMorgan knowingly withheld information from its federal regulators "for the purpose of inducing" BMIS or its customers to rely on that omission; indeed, any such allegation would be entirely implausible given that OCC regulations prohibit banks from disclosing the reports filed with regulators.  *See* 12 C.F.R. § 21.11(k)(1)(i).  Nor does the Complaint plead the element of "justifiable reliance."  The Complaint alleges that JPMorgan's misrepresentations and omissions were directed at the bank's regulators.  Compl. ¶ 474.  But "a plaintiff does not establish the reliance element of fraud for purposes of . . . New York law by showing only that a *third party* relied on a defendant's false statements."  *Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund* v. *Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) (emphasis added); *see also City of New York* v. *Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 565 (S.D.N.Y. 2005) (dismissing common law fraud claim under New York law for failure to plead reliance where plaintiff alleged that it had relied on defendants' submission of reports *to a non-party*, rather than reports to the plaintiff).

The "fraud on the regulator" should therefore be dismissed along with the Trustee's other common law claims.

## POINT VI

### THE TRUSTEE'S CLAIMS TO AVOID PAYMENTS FROM BMIS TO JPMORGAN SHOULD BE DISMISSED.

The first 16 causes of action in the Complaint seek recovery of approximately $425 million from all of the Defendants under the avoidance provisions of the Bankruptcy Code. Invoking those avoidance provisions, the Trustee seeks to recover:  (1) approximately $597,000 in fees paid by BMIS to JPMorgan during the six-year period before BMIS's bankruptcy, including approximately $23,941.65 paid to JPMorgan during the 90 days before the SIPA proceeding (causes of action 1 to 8); (2) repayments of principal and interest on $145 million in secured loans extended to BMIS in late 2005 and early 2006 (causes of action 4 to 8); and (3) payments received by JPMorgan from Fairfield Sentry, Fairfield Sigma, and Herald upon the redemption of investments in those funds in 2008 (causes of action 9 to 16).  For the reasons set forth below, the Trustee's claims to recover the loan repayments and the payments of fees fail to state a claim; accordingly, the first through the eighth causes of action should be dismissed.[11]

**A.      As acts of setoff or repayments of secured debts, the alleged transfers from BMIS to JPMorgan are not avoidable.**

**1.      The Trustee cannot avoid the loan repayments.**

Because the loan repayments were made more than two years before the Madoff bankruptcy filing, they are not subject to avoidance under the Bankruptcy Code's preference

---

[11] The Trustee's ninth through the sixteenth causes of action seek recovery of alleged indirect payments to JPMorgan from BMIS feeder funds, as opposed to the direct payments from BMIS (which are the subject of causes of action 1 through 8).  JPMorgan reserves all of its rights and defenses with respect to those claims, but is not moving to dismiss them at this time.

provision or its fraudulent transfer provision.  *See* 11 U.S.C. § 547(b)(4) (90-day look-back period for preferences); 11 U.S.C. § 548(a)(1) (two-year look-back period for federal-law fraudulent transfers).  Thus, in seeking to recover the loan repayments, the Trustee relies on section 544(b) of the Bankruptcy Code, which authorizes a trustee to avoid a "transfer of an interest of the debtor in property" that "a creditor holding an unsecured claim" could avoid under applicable *state* law.  11 U.S.C. § 544(b)(1).

As explained below, however, (i) the repayment of the loan constituted an act of setoff rather than a "transfer" subject to avoidance; and (ii) even if it were not an act of setoff, the repayment of a *secured* loan is not avoidable, because it does not injure unsecured creditors.

### *The loan repayment was a setoff, not a transfer.*

The Complaint alleges that the BMIS loan was repaid when "Madoff sent a letter to JPMC requesting a decrease in BLMIS's loan amount to zero, and authorizing JPMC to debit the $145 million principal amount of the loan from the 703 Account.  JPMC did as Madoff requested, and debited $145 million from the 703 Account that same day."  Compl. ¶ 266.

The facts as pleaded by the Complaint present a textbook example of a *setoff*, as opposed to a *transfer*.  "As a general rule, when a depositor is indebted to a bank, and the debts are mutual — that is, between the same parties and in the same right — the bank may apply the deposit, or such portion thereof as may be necessary, to the payment of the debt due it by the depositor, provided there is no express agreement to the contrary and the deposit is not specifically applicable to some other purpose."  9 N.Y. Jur. 2d (Banks) § 303; *accord In re Bennett Funding Grp.*, 146 F.3d 136, 139 (2d Cir. 1998) ("Ordinarily, funds in a general deposit account can be used to setoff debts owed to the bank because when a depositor deposits funds into a general account he parts with title to the funds in exchange for a debt owed to him by the

bank, thereby establishing a standard debtor-creditor relationship."); *Chemical Bank* v. *Ettinger*, 196 A.D.2d 711, 714 (1st Dep't 1993) ("a bank has a general lien on funds . . . in its possession to which it may look for repayment of an account owed by the debtor-depositor to the bank").[12]

By pleading that JPMorgan debited the 703 Account at JPMorgan (a JPMorgan debt to BMIS) in order to satisfy JPMorgan's loan to BMIS (a BMIS debt to JPMorgan), the Complaint alleges that a setoff occurred.  JPMorgan thus applied "the funds in a general account to set off debts owed to it by a depositor."  *Swan Brewery Co.* v. *U.S. Trust Co.*, 832 F. Supp. 714, 718 (S.D.N.Y. 1993); *accord, e.g.*, *Fenton* v. *Ives*, 222 A.D.2d 776, 777 (3d Dep't 1995); *Clarkson Co.* v. *Shaheen*, 533 F. Supp. 905, 925 (S.D.N.Y. 1982).

Under the Bankruptcy Code, a setoff is *not* an avoidable transfer, because it is not a "transfer" at all.  The definition of "transfer" in the Bankruptcy Code, 11 U.S.C. § 101(54), deliberately omits any mention of "setoff."  *See* H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 6436, 6439 (statement of Rep. Edwards) ("Inclusion of 'setoff' is deleted" from the definition of "transfer"); 5 *Collier on Bankruptcy* ¶ 553.09[1][a] (16th ed. 2009) ("The term 'transfer' is defined in Code section 101 . . . and the definition intentionally omits 'setoffs.'"). Accordingly, a setoff cannot be avoided under the provisions of the Bankruptcy Code that authorize avoidance of "transfers."  *In re Am. Remanufacturers, Inc.*, 2008 WL 2909871, at *2 (Bankr. D. Del. July 25, 2008) ("it is clear that valid setoffs are not avoidable as preferential or fraudulent transfers for the simple reason that setoffs are not transfers of property of the estate"); *accord Holyoke Nursing Home, Inc.* v. *Health Care Fin. Admin. (In re Holyoke Nursing Home,*

---

[12]  Consistent with standard banking practice, BMIS's account agreements likewise provided JPMorgan with setoff rights and stated that the balance of BMIS's deposit account, along with all other property held by BMIS at JPMorgan, served as security for any debts of BMIS to the bank.

*Inc.)*, 273 B.R. 305, 309-10 (Bankr. D. Mass. 2002); *Belford* v. *Union Trust. Co. (In re Wild Bills, Inc.)*, 206 B.R. 8, 12-13 (Bankr. D. Conn. 1997).

Section 544(b) of the Bankruptcy Code, on which the Complaint relies to seek avoidance of the loan repayment, by its express terms allows the avoidance of nothing but a "transfer." 11 U.S.C. § 544(b)(1). Thus, the loan repayment made by way of setoff from the 703 Account is simply not a "transfer" subject to avoidance.

> *Even if it were a transfer, the secured loan repayment is not avoidable.*

Under the New York law cited above, JPMorgan's $145 million loan to BMIS was secured in full by the balance in the 703 Account. In addition, the Complaint itself alleges that the $145 million loan debt was fully secured by collateral separate from the 703 Account balance. See Compl. ¶ 206 (alleging that JPMorgan's $95 million loan was secured by a $100 million bond); *id.* ¶ 264 (alleging that JPMorgan's $50 million loan was secured by $54 million in bonds); *id.* ¶¶ 257, 268 (alleging that loan was "fully collateralized").

As explained by Judge Chin, "it is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if . . . [it] does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors.'" *Lippe* v. *Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274, 281 (2d Cir. 2004) ("In New York, fraudulent-conveyance liability may not attach absent some prejudice to a creditor of the transferor." (citing numerous cases)). New York courts have long recognized that "[t]here can be no fraudulent conveyance as a matter of fact where there is no resultant diminution of value of the assets or estate of the debtor which remains available to creditors." *Newfield* v. *Ettlinger*, 194 N.Y.S.2d 670, 678 (N.Y. Sup. Ct. 1959) (Baer, J.).

By definition, the repayment of a *fully secured* debt does not prejudice other creditors of the debtor.  Rather, "[r]epayments of fully secured obligations — where a transfer results in a dollar for dollar reduction in the debtor's liability — do not . . . put assets otherwise available in a bankruptcy distribution out of the reach" of other creditors.  *Henry* v. *Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1008 (9th Cir. 2006); *see also Melamed* v. *Lake County Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (concluding that the repayment of a secured loan did not "diminish the assets of the debtor which were available to its creditors" and thus was not avoidable as a fraudulent transfer); *In re Nat'l Century Fin. Enters., Inc*., 2011 WL 1397813, at *23 (S.D. Ohio Apr. 12, 2011) (secured loan repayment by Ponzi scheme operator was not avoidable because "a payment does not harm other creditors when it results in a dollar-for-dollar reduction in secured, antecedent debt"); *Miller* v. *Forge Mench P'ship Ltd.*, 2005 WL 267551, at *4-5 (S.D.N.Y. Feb. 2, 2005) (fraudulent conveyance plaintiff not entitled to avoid debtor's transfer of property pledged as collateral); *Richardson* v. *Huntington Nat'l Bank (In re CyberCo Holdings, Inc.)*, 382 B.R. 118, 139 (Bankr. W.D. Mich. 2008) ("[A] debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral.").

Here, where the Trustee affirmatively alleges that the loan repayment was on account of fully secured debts, the property and value transferred would not have been available to unsecured creditors even if the transfers had not taken place.  As a result, there is no basis to avoid that payment under New York law.

Beyond this, under section 544(b) of the Bankruptcy Code, the repayment of a secured loan is not a transfer of "an interest of the debtor in property."  The "interest in property" element limits avoidable transfers to those that injure creditors, as Judge Buchwald recognized

when she interpreted that statutory language to mean that "only asset transfers that may have actually harmed creditors may be avoided." *Bear, Stearns Securities Corp.* v. *Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002); *accord id*. at 195 ("creditors must actually be harmed in order to avoid a fraudulent transfer").  The Bankruptcy Code's independent requirement that a fraudulent transfer harm creditors cannot be met where, as here, the challenged payment discharges a fully secured debt.  *Richardson*, 382 B.R. at 137, 142 (rejecting fraudulent transfer claim against secured lender under section 544(b) on the basis that the transfer was not of an "interest of the debtor in property").

In sum, the allegations of the Complaint establish as a matter of law that the BMIS loan repayment was an act of setoff, not a transfer.  And in any event, state and federal law each affirm that the repayment of a fully secured loan is not a transfer that harms unsecured creditors.  As a result, the Trustee's claims to avoid the loan repayment (both principal and interest) should be dismissed.

**2.      The Trustee cannot avoid the fee payments.**

For similar reasons, the Trustee's claims to recover fees paid to JPMorgan from the BMIS bank account, either as preferences or as fraudulent transfers, should likewise be dismissed.[13]  The sections of the Bankruptcy Code on which the Trustee relies to recover fees uniformly require a "transfer of an interest of the debtor in property."  11 U.S.C. §§ 547(b),

---

[13]  In the first cause of action, the Trustee seeks to recover fees paid within 90 days of BMIS's bankruptcy as "preferences" under section 547(b) of the Bankruptcy Code.  In the second and third causes of action, the Trustee seeks to recover fees paid within two years of the bankruptcy as fraudulent transfers under section 548(a)(1) of the Bankruptcy Code; and in the fourth through eighth causes of action, the Trustee seeks to recover fees paid within six years of the bankruptcy as fraudulent transfers under section 544(b) of the Bankruptcy Code and New York law.

548(a)(1), 544(b).  But as discussed, debits from a bank account to satisfy debts (here, fees)

owed to the depository bank are setoffs, which are omitted from the Bankruptcy Code definition

of "transfer."  In addition, and again as set forth above, the courts have interpreted the "interest

of the debtor in property" language to require actual harm to unsecured creditors as a result of a

transfer.  The Trustee cannot satisfy the "actual harm" requirement with respect to the fee

payments, because as a matter of law JPMorgan was secured by BMIS's account balance, from

which it had the right to deduct those fees when they were due.[14]

**B.     The Trustee's fraudulent transfer claims are barred by the
        Second Circuit's decision in *Sharp International*.**

Even if the challenged payments to JPMorgan did not amount to setoffs or

repayments of secured debts, the Trustee's fraudulent transfer claims to recover those payments

(causes of action 2-8) would still have to be dismissed on the basis that the Trustee, in seeking to

recover those transfers, is seeking to avoid the repayment of antecedent debts.  While section 547

of the Bankruptcy Code, which governs *preferential* transfers to creditors, permits a trustee to

recover repayments of certain debts made within 90 days of a bankruptcy, the repayment of a

debt is not avoidable as a *fraudulent transfer* unless the defendant was an insider or knowingly

participated in the debtor's fraud.  Here, the Trustee has alleged at most that the payments to

---

[14] The Trustee's claim to avoid payments made within 90 days of the bankruptcy as preferential (the first cause of action) also fails for a further reason.  Under section 547(b)(5) of the Bankruptcy Code, to succeed on a preference claim, the Trustee must establish that the challenged transfers enabled JPMorgan "to receive more than [it] would receive" in a chapter 7 liquidation if the transfer had not been made.  11 U.S.C. § 547(b)(5).  Since secured lenders receive 100 cents on the dollar in a chapter 7 liquidation, the repayment of a secured debt can have no "preferential effect" under Section 547(b)(5).  *E.g.*, *In re CBGB Holdings, LLC*, 439 B.R. 551, 559 (Bankr. S.D.N.Y. 2010).

JPMorgan from BMIS preferred certain creditors over others, but that is not sufficient to state a

claim for fraudulent transfer.

"[I]f there is in our law one point which is more ungrudgingly accepted than

others, it is that the preferential transfer does not constitute a fraudulent conveyance." *Pereira* v.

*Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003),

*vacated on other grounds*, 2009 WL 1810112 (S.D.N.Y. June 25, 2009) (quoting 1 G. Glenn,

*Fraudulent Conveyances and Preferences* § 289, at 488 (rev. ed. 1940)).  The basic object of

preference law is to ensure "equality of distribution among creditors of the debtor." *Lawson* v.

*Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 40 (2d Cir. 1996) (quoting H.R. No. 595,

95th Cong., 1st Sess. 177-78 (1977)).  In contrast, "[t]he basic object of fraudulent conveyance

law is to see that the debtor uses his limited assets to satisfy *some* of his creditors." *Sharp Int'l*

*Corp.* v. *State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005)

(emphasis in original) (quoting *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995)

(quoting *Boston Trading Group, Inc.* v. *Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987))).

The Second Circuit's decision in *Sharp International* is controlling.  In that case,

the Court held that a payment that discharges an antecedent debt — absent insider dealing or

knowing participation in fraud by the creditor — is not a fraudulent transfer.  *Sharp International*

involved a massive fraud perpetrated by Sharp's principals on Sharp's creditors.  State Street,

which was Sharp's largest creditor, realized that Sharp was engaged in fraud and demanded that

Sharp repay its debt, which was accomplished through a fraud on a new set of lenders.  *Id*. at 51-

52.  Despite these facts, the Second Circuit concluded that Sharp's payment to State Street was

*not* a fraudulent transfer, holding that "the preferential repayment of preexisting debts to some

creditors does not constitute a fraudulent conveyance."  *Id*. at 54.  In reaching this conclusion,

the *Sharp International* Court relied heavily on the First Circuit's decision in *Boston Trading Group, Inc.* v. *Burnazos*, 835 F.2d 1504 (1st Cir. 1987) (Breyer, J.).  In that case, the First Circuit likewise held that the repayment of a debt to a non-insider was not avoidable as a fraudulent transfer, despite the creditor's actual knowledge that it was being repaid with the proceeds of a fraud.  835 F.2d at 1510-11.

   *Sharp*'s principle that no fraudulent transfer can be found in the repayment of an antecedent debt — at least in the absence of insider dealing or knowing participation by a lender in the borrower's fraud —  is codified in each of the statutes under which the Trustee brings his fraudulent transfer claims.[15]  To succeed on his claim that the payments to any of the Defendants were constructively fraudulent under section 548(a) of the Bankruptcy Code, the Trustee must show, among other things, that BMIS did not receive "reasonably equivalent value."  11 U.S.C. § 548(a)(1)(B).  The Bankruptcy Code, however, expressly defines "value" to include the "satisfaction [of] antecedent debt."  11 U.S.C. § 548(d)(2)(A); *see also, e.g.*, *In re All-Type Printing, Inc.*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002), *aff'd*, 80 F. App'x 700 (2d Cir. 2003) (holding that transfers in "dollar-for-dollar satisfaction" of antecedent debts provide "reasonably equivalent value").

   Likewise, to succeed on his claim that payments to JPMorgan were constructively fraudulent under New York law, the Trustee must show, among other things, that BMIS did not receive "fair consideration."  N.Y. Debt. & Cred. Law §§ 273-75.  Section 272 of the New York

---

[15] To the extent direct transfers to any Defendant were made within two years of BMIS's bankruptcy filing, the Trustee sues under both section 544(b) of the Bankruptcy Code, incorporating New York law, and section 548(a); to the extent they were made more than two years before the filing date, the Trustee sues only under section 544(b).  *See* Compl. ¶¶ 302-40.

Debtor-Creditor Law defines "fair consideration" to include satisfaction of an "antecedent debt," provided that the payment is a "fair equivalent" of the debt and taken in "good faith." N.Y. Debt. & Cred. Law § 272. In *Sharp International*, the Second Circuit made clear that, absent insider dealing or knowing participation in fraud, "the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property." 403 F.3d at 54.

Finally, to sustain his claims that the payments to JPMorgan were intentional fraudulent transfers, the Trustee must plead that the transfers "hinder[ed], delay[ed], or defraud[ed] either present or future creditors." 11 U.S.C. § 548(a)(1)(A); N.Y. Debt. & Cred. Law § 276; *Sharp Int'l*, 403 F.3d at 56. But here again, *Sharp International* is controlling, because the Second Circuit held in that case that the creditor body as a whole was not hindered, delayed, or defrauded by the repayment of a loan owing to one creditor. *Sharp Int'l*, 403 F.3d at 56 ("The $12.25 million payment was at most a preference between creditors and did not 'hinder, delay, or defraud either present or future creditors.'").[16]

The Trustee's claims in this case are even weaker than the claims dismissed in *Sharp International*, because unlike State Street Bank, the defendants here are not adequately alleged to have had knowledge of Madoff's fraud. Having failed to make such allegations, the Trustee has not stated a claim to recover the repayment of the $145 million in principal loaned to BMIS and, accordingly, as in *Sharp International*, his claims must be dismissed. Nor has the

---

[16] Even apart from *Sharp International*, the Trustee's intentional fraudulent transfer claim under New York law should be dismissed on the basis that the Complaint fails to allege facts showing fraudulent intent on the part of JPMorgan. "Under the New York statute, unlike a claim under Bankruptcy Code § 548(a)(1)," the plaintiff "must plead fraudulent intent of both the transferor and the transferee under § 276." *Andrew Velez Constr., Inc.* v. *Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 276 (Bankr. S.D.N.Y. 2007) (collecting cases).

Trustee stated a claim to recover the interest earned on those loans.  Courts in this Circuit have repeatedly held that contractual interest payments on loans made to a Ponzi scheme operator are not subject to avoidance as fraudulent transfers.  *In re Unified Commercial Capital*, 2002 WL 32500567, at *8-9 (W.D.N.Y. June 21, 2002) (rejecting fraudulent transfer claim to recover a "contractually provided-for, commercially reasonable rate of interest on what amounted to a loan"); *Daly* v. *Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002) (same). Finally, although the Complaint contains little detail regarding the "account fees" that the Trustee seeks to avoid, the Trustee expressly alleges that the payment of such fees satisfied antecedent debts.  Compl. ¶ 296.

## CONCLUSION

For the reasons set forth above, causes of action 17-21 and 1-8 in the Trustee's Complaint should be dismissed with prejudice.

Dated:  New York, New York
      June 3, 2011

Respectfully submitted,

*Of counsel:*

WACHTELL, LIPTON, ROSEN & KATZ

Amy R. Wolf
Douglas K. Mayer
Stephen R. DiPrima
Emil A. Kleinhaus
Meredith L. Turner
Jonathon R. La Chapelle

By: /s/ John F. Savarese
    John F. Savarese

51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., J.P. Morgan Securities*
*LLC and J.P. Morgan Securities Ltd.*