# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., <br><br> Defendants. | 11 Civ. 913 (CM) |

## OPENING BRIEF IN SUPPORT OF JPMORGAN'S MOTION TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., J.P. Morgan Securities
LLC and J.P. Morgan Securities Ltd.*

Dated:  August 1, 2011

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................6

    A.    JPMorgan's contacts with Madoff .....................................................7

    B.    The Trustee's lawsuit against JPMorgan ..........................................7

ARGUMENT ........................................................................................................9

POINT I    THE TRUSTEE LACKS STANDING TO BRING COMMON
    LAW CLAIMS AGAINST JPMORGAN. ..............................................9

    A.    Under *Caplin* and *Wagoner*, the Trustee lacks standing to bring
    common law claims against JPMorgan......................................9

    B.    SIPA does not grant the Trustee standing to bring common law
    claims on behalf of BMIS's customers...................................12

    C.    The Trustee lacks standing to sue JPMorgan as a bailee. ....................13

        1.    *Redington* is not good law........................................14

        2.    A thief cannot be a bailee.......................................17

        3.    *Wagoner* and *Hirsch* control over *Redington*. ...........................18

    D.    The Trustee lacks standing to sue JPMorgan as a subrogee. ................19

    E.    The Trustee lacks standing to sue JPMorgan as an assignee................21

POINT II    THE TRUSTEE'S COMMON LAW CLAIMS ARE
    PRECLUDED BY SLUSA.................................................23

    A.    SLUSA must be interpreted broadly to foreclose securities class
    actions based on state law. ...........................................23

    B.    SLUSA preempts the Trustee's claims on behalf of Madoff's
    customers. ..........................................................25

        1.    This action is based on state law...................................25

        2.    This action alleges misrepresentations or omissions in connection
    with the purchase or sale of securities. ..............................25

        3.    This is a "covered class action" under SLUSA. .........................26

**Table of Contents**
**Continued**

Page

POINT III   THE AMENDED COMPLAINT FAILS TO STATE CLAIMS THAT JPMORGAN AIDED AND ABETTED MADOFF'S PONZI SCHEME ..................................................................32

    A.   The Trustee must plead the elements of aiding and abetting liability with particularity. ...........................................32

    B.   The burden of pleading actual knowledge is a heavy one. ....................34

    C.   The Trustee has failed to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud..................................38

        1.   The Trustee's allegations with respect to activity in the 703 Account do not show actual knowledge of fraud.........................38

        2.   The Trustee's allegations concerning JPMorgan's structured products due diligence do not show actual knowledge of fraud...............40

        3.   The Trustee's assertion that the 703 Account was a "fiduciary account" is baseless and irrelevant. ...........................45

    D.   The Trustee has failed to allege facts showing that JPMorgan substantially assisted Madoff's fraud....................................49

    E.   The Trustee has failed to plead that JPMorgan's conduct was the proximate cause of the alleged injury. ..................................51

    F.   The Trustee has failed to plead individual fraud claims. .....................52

POINT IV   THE AMENDED COMPLAINT FAILS TO STATE CLAIMS FOR CONVERSION OR AIDING AND ABETTING CONVERSION..................................................................53

    A.   The Amended Complaint fails to state a claim for conversion.............53

    B.   The Amended Complaint fails to state a claim for aiding and abetting conversion. ..........................................................55

POINT V   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT.....................................................56

POINT VI   THE TRUSTEE HAS NO VALID CLAIM FOR "FRAUD ON THE REGULATOR."..........................................................57

POINT VII   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTRIBUTION.........................................................63

**Table of Contents**
**Continued**

Page

A.   The Trustee has no authority under SIPA to seek contribution for payments to customers. ...........................................................................64

B.   The Amended Complaint fails to plead the elements of contribution under New York law. ........................................................65

POINT VIII   THE TRUSTEE'S CLAIMS TO AVOID PAYMENTS TO JPMORGAN SHOULD BE DISMISSED. ........................................67

A.   The Trustee cannot avoid BMIS's loan repayments..............................68

  1.   As acts of setoff, the loan repayments are not avoidable.........................68

  2.   The loan repayments are not avoidable because they discharged secured debts. ..................................................................69

  3.   The Trustee's claims to avoid the loan repayments are barred by *Sharp International*...................................................71

B.   The Trustee cannot avoid BMIS's obligations to repay loans from JPMorgan. ............................................................................72

  1.   BMIS's obligations are not avoidable as intentional fraudulent conveyances. ..............................................................73

  2.   BMIS's obligations are not avoidable as constructive fraudulent conveyances. ..............................................................74

CONCLUSION......................................................................................76

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albion Alliance Mezzanine Fund* v. *State Street Bank & Trust Co.*,
   8 Misc. 3d 264 (N.Y. Sup. Ct. N.Y. Co. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003)...........37

*Am. Financial Int'l Group-Asia, L.L.C.* v. *Bennett*,
   2007 WL 1732427 (S.D.N.Y. June 14, 2007) ........................................................................60

*Am. Tissue, Inc.* v. *Arthur Andersen, L.L.P.*,
   2003 WL 22909155 (S.D.N.Y. Dec. 9, 2003) ...............................................................65 n.13

*AmSouth Bank* v. *Dale*,
   386 F.3d 763 (6th Cir. 2004) ........................................................................................62 n.11

*Andrulonis* v. *U.S.*,
   26 F.3d 1224 (2d Cir. 1994)..................................................................................................66

*Anwar* v. *Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010)...........................................................................42 n.9

*Ashcroft* v. *Iqbal*,
   129 S. Ct. 1937 (2009) .........................................................................................................33

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...................................................................................................33

*Bear, Stearns Sec. Corp.* v. *Gredd*,
   275 B.R. 190 (S.D.N.Y. 2002)..............................................................................................70

*Belford* v. *Union Trust Co. (In re Wild Bills, Inc.)*,
   206 B.R. 8 (Bankr. D. Conn. 1997) .....................................................................................69

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)..............................................................................................................33

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
   403 F.3d 474 (7th Cir. 2005) ........................................................................................62 n.11

*Berman* v. *Morgan Keegan & Co.*,
   2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011) ....................................................34, 35, 36, 51

*Bloor* v. *Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985)....................................................................................................51

**Table of Authorities**
**Continued**

Page

*Board of Educ.* v. *Sargent,*
    71 N.Y.2d 21 (1987) ...................................................................................66

*Brecht* v. *Abrahamson,*
    944 F.2d 1363 (7th Cir. 1991) ....................................................................15

*Breeden* v. *Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.),*
    268 B.R. 704 (S.D.N.Y. 2001), *aff'd,* 336 F.3d 94 (2d Cir. 2003) .........18

*Buckman Co.* v. *Plaintiffs' Legal Committee,*
    531 U.S. 341 (2001)........................................................................60, 61, 62

*Cape Ann Investors LLC* v. *Lepone,*
    296 F. Supp. 2d 4 (D. Mass. 2003) .............................................................29

*Caplin* v. *Marine Midland Grace Trust Co. of N.Y.,*
    406 U.S. 416 (1972)...................................................................................9, 10

*Carmona* v. *Spanish Broadcasting Sys., Inc.,*
    2009 WL 890054 (S.D.N.Y. Mar. 30, 2009) ..............................................56

*Carran* v. *Morgan,*
    2007 WL 3520480 (S.D. Fla. Nov. 14, 2007)........................................62 n.11

*Carrier* v. *Salvation Army,*
    88 N.Y.2d 298 (1996) ..................................................................................63

*Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund,*
    *Legal Services Fund and Annuity Fund* v. *Lollo,*
    148 F.3d 194 (2d Cir. 1998)....................................................................59-60

*CFTC* v. *Walsh,*
    618 F.3d 218 (2d Cir. 2010).........................................................................75

*Chambers* v. *Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002)........................................................................48

*Citadel Mgmt.* v. *Telesis Trust,*
    123 F. Supp. 2d 133 (S.D.N.Y. 2000) .........................................................54

*City of New York* v. *Cyco.Net, Inc.,*
    383 F. Supp. 2d 526 (S.D.N.Y. 2005)..........................................................60

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R.,*
    70 N.Y.2d 382 (1987) ..................................................................................57

**Table of Authorities**
**Continued**

Page

*CNB Int'l, Inc. Litig. Trust* v. *Lloyds TSB Bank plc (In re CNB Int'l, Inc.)*,
  440 B.R. 31 (W.D.N.Y. 2010) ........................................................................73

*Colavito* v. *N.Y. Organ Donor Network*,
  8 N.Y.3d 43 (2006) ......................................................................................54

*Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*,
  2005 WL 1490097 (S.D.N.Y. June 23, 2005) .......................................................56

*Daly* v. *Castro Llanes*,
  30 F. Supp. 2d 407 (S.D.N.Y. 1998)..................................................................54

*Daly* v. *Deptula (In re Carrozzella & Richardson)*,
  286 B.R. 480 (D. Conn. 2002) ........................................................................72

*Denney* v. *Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)........................................................................9 n.3

*Edwards & Hanly* v. *Wells Fargo Secs. Clearance Corp.*,
  602 F.2d 478 (2d Cir. 1979)..........................................................................52

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007)............................................................37 n.7

*Giddens* v. *D.H. Blair & Co. (In re A.R. Baron & Co., Inc.)*,
  280 B.R. 794 (Bankr. S.D.N.Y. 2002)................................................................22

*Gowan* v. *The Patriot Group, LLC (In re Dreier LLP)*,
  2011 WL 2412581 (Bankr. S.D.N.Y. June 16, 2011).........................................73 n.17

*Gredd* v. *Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
  310 B.R. 500 (Bankr. S.D.N.Y. 2002) ...............................................................73

*HBE Leasing Corp.* v. *Frank*,
  48 F.3d 623 (2d Cir. 1995)...........................................................................75

*Henry* v. *Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*,
  471 F.3d 977 (9th Cir. 2006) ........................................................................70

*Herrington* v. *Verrilli*,
  151 F. Supp. 2d 449 (S.D.N.Y. 2001)................................................................18

*Hirsch* v. *Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)......................................................................10, 18

*Holmes* v. *SIPC*,
  503 U.S. 258 (1992)...................................................................................21

# Table of Authorities
**Continued**

Page

*In re Agape Litig.*,
    681 F. Supp. 2d 352 (E.D.N.Y. 2010) ..............................................46, 50

*In re Agape Litig.*,
    2011 WL 1136173 (E.D.N.Y. Mar. 29, 2011)............................. passim

*In re Am. Remanufacturers, Inc.*,
    2008 WL 2909871 (Bankr. D. Del. July 25, 2008) ................................69

*In re Amaranth Natural Gas Commodities Litig.*,
    612 F. Supp. 2d 376 (S.D.N.Y. 2009)....................................................50

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007).....................................................27

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010)..............................25-26, 51-52

*In re Bennett Funding Grp.*,
    146 F.3d 136 (2d Cir. 1998).................................................................68, 69

*In re Granite Partners, L.P.*,
    194 B.R. 318 (Bankr. S.D.N.Y. 1996) ..............................................11 n.4

*In re J.P. Jeanneret Assocs., Inc.*,
    2011 WL 335594 (S.D.N.Y. Jan. 31, 2011) .........................................26

*In re Kingate Mgmt. Ltd. Litig.*,
    2011 WL 1362106 (S.D.N.Y. Mar. 30, 2011) .....................................24

*In re Nat'l Century Fin. Enters., Inc.*,
    2011 WL 1397813 (S.D. Ohio Apr. 12, 2011) ...............................70 n.16

*In re Oppenheimer Funds Fees Litig.*,
    419 F. Supp. 2d 593 (S.D.N.Y. 2006).....................................................26

*In re Teleservices Grp., Inc.*,
    444 B.R. 767 (Bankr. W.D. Mich. 2011).................................................75

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010)...............................................41-42

*In re Unified Commercial Capital*,
    2002 WL 32500567 (W.D.N.Y. June 21, 2002)....................................72

*Jana Master Fund, Ltd.* v. *JPMorgan Chase & Co.*,
    2008 WL 746540 (Sup. Ct. N.Y. Co. Mar. 12, 2008).............................53

**Table of Authorities**
**Continued**

Page

*Jet Star Enters., Ltd.* v. *Soros*,
　2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006) ........................................................56

*Jordan (Bermuda) Inv.* v. *Hunter Green Inv.*,
　566 F. Supp. 2d 295 (S.D.N.Y. 2008) ..............................................................51

*Kagan* v. *K-Tel Entm't, Inc.*,
　172 A.D.2d 375 (1st Dep't 1991) ....................................................................57

*Kalnit* v. *Eichler*,
　264 F.3d 131 (2d Cir. 2001) ......................................................................32, 74

*Kaufman* v. *Cohen*,
　307 A.D.2d 113 (1st Dep't 2003) ...............................................................35, 50

*KBL Corp.* v. *Arnouts*,
　646 F. Supp. 2d 335 (S.D.N.Y. 2009) ..............................................................65

*Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*,
　2004 WL 444554 (S.D.N.Y. Mar. 10, 2004) .....................................................24

*Kirschner* v. *Grant Thornton LLP*,
　2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010) ...........10, 11

*Kirschner* v. *KPMG LLP*,
　15 N.Y.3d 446 (2010) .................................................................................11

*Kolbeck* v. *LIT America Inc.*,
　939 F. Supp. 240 (S.D.N.Y. 1996) .............................................................34, 51

*LaBarbera* v. *Clestra Hauserman Inc.*,
　369 F.3d 224 (2d Cir. 2004) ........................................................................16

*Lama Holding Co.* v. *Smith Barney, Inc.*,
　88 N.Y.2d 413 (1996) .................................................................................58

*Lander* v. *Hartford Life & Ann. Ins.*,
　251 F.3d 101 (2d Cir. 2001) ......................................................................23-24

*LaSala* v. *Bordier et Cie*,
　519 F.3d 121 (3d Cir. 2008) ..................................................27, 28 & n.6, 28-29, 31

*Lee* v. *Bankers Trust Co.*,
　166 F.3d 540 (2d Cir. 1999) ........................................................................43

*Lehman Brothers, Inc.* v. *Wu*,
　294 F. Supp. 2d 504 (S.D.N.Y. 2003) ..........................................................64, 65

**Table of Authorities**
**Continued**

Page

*Lerner* v. *Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006)..........................................................................32, 34

*Levinson* v. *PSCC Servs.,*
    2009 WL 5184363 (D. Conn. Dec. 23, 2009) ................................................26

*Leykin* v. *AT&T Corp.,*
    216 F. App'x 14 (2d Cir. 2007) ....................................................................26

*Lippe* v. *Bairnco Corp.,*
    249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd,* 99 F. App'x 274 (2d Cir. 2004)................70, 72

*LNC Inv., Inc.* v. *First Fid. Bank,*
    935 F. Supp. 1333 (S.D.N.Y. 1996)..............................................................64

*Mandarin Trading Ltd.* v. *Wildenstein,*
    16 N.Y.3d 173 (2011) ...................................................................................56

*Martin* v. *Briggs,*
    235 A.D.2d 192 (1st Dep't 1997) .................................................................17

*Melamed* v. *Lake County Nat'l Bank,*
    727 F.2d 1399 (6th Cir. 1984) ................................................................70 n.16

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit,*
    547 U.S. 71 (2006).....................................................................................23, 24

*Miller* v. *Forge Mench P'ship Ltd.,*
    2005 WL 267551 (S.D.N.Y. Feb. 2, 2005).............................................70 n.16

*Mishkin* v. *Peat, Marwick, Mitchell & Co.,*
    744 F. Supp. 531 (S.D.N.Y. 1990)........................... 14, 16-17, 20, 21, 22

*MLSMK* v. *JP Morgan Chase & Co.,*
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)........................................................44, 45

*MLSMK* v. *JP Morgan Chase & Co.,*
    2011 WL 2176152 (2d Cir. June 6, 2011) ...........................34, 40, 45, 49

*Muller-Paisner* v. *TIAA,*
    289 F. App'x 461 (2d Cir. 2008) .................................................................58

*Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.,*
    261 F.R.D. 13 (S.D.N.Y. 2009) ...............................................................47-48

*Nassau Roofing & Sheet Metal Co.* v. *Facilities Dev. Corp.,*
    71 N.Y.2d 599 (1988)..................................................................................66

**Table of Authorities**
**Continued**

Page

*Nevin* v. *Citibank, N.A.*,
    107 F. Supp. 2d 333 (S.D.N.Y. 2000).................................................................43

*Newdow* v. *Rio Linda Union Sch. Dist.*,
    597 F.3d 1007 (9th Cir. 2010) ...........................................................................15

*Nigerian Nat'l Petroleum Corp.* v. *Citibank, N.A.*,
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ...............................................32, 50

*Nisselson* v. *Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
    361 B.R. 369 (Bankr. S.D.N.Y. 2007).................................................................73

*Nw. Airlines, Inc.* v. *Transp. Workers Union of Am.*,
    451 U.S. 77 (1981)...............................................................................................64

*O'Brien* v. *Nat'l Prop. Analysts Partners*,
    936 F.2d 674 (2d Cir. 1991).........................................................................34, 58

*Osborn* v. *Cline*,
    263 N.Y. 434 (1934) ............................................................................................18

*Parks* v. *ABC, Inc.*,
    2008 WL 205205 (S.D.N.Y. Jan. 24, 2008) .......................................................54

*Peoples Westchester Savings Bank* v. *FDIC*,
    961 F.2d 327 (2d Cir. 1992).................................................................................47

*Picard* v. *HSBC Bank PLC*,
    No. 11 Civ. 763 (JSR) (S.D.N.Y. July 28, 2011)........................................ passim

*Picard* v. *JPMorgan Chase & Co.*,
    2011 WL 2119720 (S.D.N.Y. May 23, 2011) .......................................................8

*Picard* v. *Taylor (In re Park S. Sec., LLC)*,
    326 B.R. 505 (Bankr. S.D.N.Y. 2005).................................................................22

*Piccoli A/S* v. *Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)...................................................................57

*Pivar* v. *Graduate Sch. of Figurative Art of the N.Y. Acad. of Art*,
    290 A.D.2d 212 (1st Dep't 2002) ........................................................................17

*Reading Int'l, Inc.* v. *Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)..................................................................56

**Table of Authorities**
**Continued**

Page

*Redington* v. *Touche Ross & Co.*,
  592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979),
  *on remand*, 612 F.2d 68 (2d Cir. 1979) ........................................................3, 14, 15, 16, 20

*Renner* v. *Chase Manhattan Bank*,
  1999 WL 47239 (S.D.N.Y. Feb. 3, 1999)................................................................46, 48, 49

*Renner* v. *Chase Manhattan Bank*,
  2000 WL 781081 (S.D.N.Y. June 16, 2000) ...........................................................43, 47, 50

*RGH Liquidating Trust* v. *Deloitte & Touche LLP*,
  2011 N.Y. LEXIS 1703 (N.Y. June 23, 2011).........................................................29, 30, 31

*Riley* v. *Cordis Corp.*,
  625 F. Supp. 2d 769 (D. Minn. 2009)...................................................................................62

*Rizer* v. *Breen*,
  2007 N.Y. Misc. LEXIS 801 (Sup. Ct. N.Y. Co. Jan. 29, 2007)..........................................47

*Romano* v. *Kazacos*,
  609 F.3d 512 (2d Cir. 2010)................................................................................................24

*Rosenshein* v. *Kleban*,
  918 F. Supp. 98 (S.D.N.Y. 1996).........................................................................................22

*Rosner* v. *Bank of China*,
  528 F. Supp. 2d 419 (S.D.N.Y. 2007)..................................................................................51

*Rosner* v. *Bank of China*,
  2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) .........................................................34, 35, 49

*Rosner* v. *Bank of China*,
  349 F. App'x 637 (2d Cir. 2009) .........................................................................................35

*Ryan* v. *Hunton & Williams*,
  2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...............................................................37, 50

*S & K Sales Co.* v. *Nike, Inc.*,
  816 F.2d 843 (2d Cir. 1987).................................................................................................33

*Saltz* v. *First Frontier, LP*,
  2010 WL 5298225 (S.D.N.Y. Dec. 23, 2010) ......................................................................41

*Schmidt* v. *Fleet Bank*,
  1998 WL 47827 (S.D.N.Y. Feb. 4, 1998).............................................................................32

Table of Authorities
Continued

Page

*Schwartz* v. *Capital Liquidators, Inc.*,
    984 F.2d 53 (2d Cir. 1993)................................................................................55

*Seaboard Sand & Gravel Corp.* v. *Moran Towing Corp.*,
    154 F.2d 399 (2d Cir. 1946)..............................................................................17

*SEC* v. *Cohmad Sec. Corp.*,
    2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)............................................42, 44, 59

*Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005)........................................................ 33, 50-51, 71

*Shearson Lehman Hutton, Inc.* v. *Wagoner*,
    944 F.2d 114 (2d Cir. 1991)........................................................ 2, 9 & n.3, 10

*Silverman Partners* v. *First Bank*,
    687 F. Supp. 2d 269 (E.D.N.Y. 2010) ..............................................................55

*SIPC* v. *BDO Seidman, LLP*,
    49 F. Supp. 2d 644 (S.D.N.Y. 1999)....................................12, 17 n.5, 21, 22

*SIPC* v. *BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000)......................................................17 n.5, 53, 58

*SIPC* v. *BDO Seidman, LLP*,
    95 N.Y.2d 702 (2001) ....................................................................................58

*Swan Brewery Co.* v. *U.S. Trust Co.*,
    832 F. Supp. 714 (S.D.N.Y. 1993)....................................................................68

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................34

*Texas Indus., Inc.* v. *Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)..........................................................................................64

*Timberlake* v. *Synthes Spine, Inc.*,
    2011 WL 711075 (S.D. Tex. Feb. 18, 2011) ....................................................62

*Tzaras* v. *Evergreen Int'l Spot Trading*,
    2003 WL 470611 (S.D.N.Y. Feb. 25, 2003)....................................................47

*Varela* v. *Investors Ins. Holding Corp.*,
    81 N.Y.2d 958 (1993) ......................................................................................63

*Warth* v. *Seldin*,
    422 U.S. 490 (1975)......................................................................................9 n.3

**Table of Authorities**
**Continued**

Page

*Wechsler* v. *Bowman,*
    285 N.Y. 284 (1941) ............................................................................................33

*Wells* v. *Bank of New York Co.,*
    181 Misc. 2d 574 (Sup. Ct. N.Y. Co. 1999) ......................................................54

*Whitney* v. *Citibank, N.A.,*
    782 F.2d 1106 (2d Cir. 1986) ...........................................................................33

*Williams* v. *Bank Leumi Trust Co.,*
    1997 WL 289865 (S.D.N.Y. May 30, 1997) .....................................................37

*Williams* v. *Dow Chem. Co.,*
    255 F. Supp. 2d 219 (S.D.N.Y. 2003) ..............................................................61

**Statutes and Rules**

3 N.Y. Comp. Codes R. & Regs. § 116.2 .................................................................63

11 U.S.C. § 101(54) ..................................................................................................69

11 U.S.C. § 544(b) ............................................................................................68, 69

11 U.S.C. § 547(b) ...........................................................................................75 n.19

11 U.S.C. § 548(a) ...........................................................................................75 n.19

12 C.F.R. § 21.11 .............................................................................................59, 61

12 C.F.R. § 225.4(f) ..................................................................................................61

12 U.S.C. § 93 ...........................................................................................................61

12 U.S.C. § 161 .........................................................................................................61

12 U.S.C. § 164(d) .......................................................................................61, 61-62

12 U.S.C. § 325 .........................................................................................................61

12 U.S.C. § 481 .........................................................................................................61

12 U.S.C. § 483 .........................................................................................................61

12 U.S.C. § 1818 .......................................................................................................61

12 U.S.C. § 1844(a) ..................................................................................................61

**Table of Authorities**
**Continued**

Page

12 U.S.C. § 1847.................................................................................................61, 62

15 U.S.C. § 77p(b)...............................................................................................24, 26

15 U.S.C. § 77p(f)(2)(A)............................................................................................26

15 U.S.C. § 77p(f)(2)(C).......................................................................................27, 29

15 U.S.C. § 78o........................................................................................................61

15 U.S.C. § 78u-2.................................................................................................61, 62

15 U.S.C. § 78bb(f)(1)...........................................................................................24, 26

15 U.S.C. § 78bb(f)(5)(B)...........................................................................................26

15 U.S.C. § 78bb(f)(5)(D)...................................................................................27, 29, 30

15 U.S.C. § 78eee(b)(2)(A).........................................................................................13

15 U.S.C. § 78eee(b)(3).............................................................................................12

15 U.S.C. § 78fff(a)(3)..............................................................................................20

15 U.S.C. § 78fff-1...................................................................................................12

15 U.S.C. § 78fff-1(a)...........................................................................................12, 13

15 U.S.C. § 78fff-1(d)...............................................................................................13

15 U.S.C. § 78fff-2(b)......................................................................................22, 64 n.12

15 U.S.C. § 78fff-2(c)..........................................................................................64 n.12

15 U.S.C. § 78fff-2(c)(1)............................................................................................20

15 U.S.C. § 78fff-2(c)(3)............................................................................................65

15 U.S.C. § 78fff-3(a)...........................................................................................19, 21

15 U.S.C. § 78lll(11).................................................................................................19

31 U.S.C. § 5318(g)(3)...............................................................................................43

Fed. R. Bankr. P. 7001.........................................................................................67 n.14

Fed. R. Bankr. P. 7014.........................................................................................67 n.14

**Table of Authorities**
Continued

Page

Fed. R. Civ. P. 14 .................................................................................................67 n.14

N.Y. C.P.L.R. § 1401 ............................................................................................ 65-66

N.Y. C.P.L.R. § 1402 ..............................................................................................66

N.Y. Banking Law § 36(10) ....................................................................................59

N.Y. Banking Law § 37 ...........................................................................................63

N.Y. Banking Law § 44-a ........................................................................................63

N.Y. Debt. & Cred. Law § 272 ................................................................................74

N.Y. Debt. & Cred. Law § 273 ..........................................................................71, 74

N.Y. Debt. & Cred. Law § 274 .................................................................71, 74 n.18

N.Y. Debt. & Cred. Law § 275 ..........................................................................71, 74

N.Y. Debt. & Cred. Law § 276 ................................................................ 71, 73 & n.17

N.Y. Debt. & Cred. Law § 278 ...................................................................... 73 & n.17

**Other Authorities**

5 *Collier on Bankruptcy* ¶ 544.01 (16th ed. 2011) .............................................11 n.4

9 N.Y. Jur. 2d (Banks) § 303 ...................................................................................68

30 N.Y. Jur. 2d (Creditors' Rights) § 403.................................................................73

S. Rep. No. 105-182 (1998) .....................................................................................26

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC and J.P. Morgan Securities Ltd. (together, "JPMorgan") submit this brief in support of their motion to dismiss all of the common law claims (causes of action 21 through 28) and certain of the bankruptcy claims (causes of action 1 through 12) in the Amended Complaint filed by the Trustee for the liquidation of Bernard L. Madoff Investment Securities ("BMIS").

## PRELIMINARY STATEMENT

As the appointed successor to Bernard Madoff's disgraced brokerage firm, the Trustee has no authority under the Securities Investor Protection Act to bring common law damages claims against JPMorgan on behalf of Madoff's customers.  Nor does the Trustee have authority to circumvent the Securities Litigation Uniform Standards Act, which expressly bars the aggregation of state law securities claims of more than 50 plaintiffs.  Yet that is precisely what the Trustee is trying to do here.  The core of this lawsuit — now causes of action 21 to 28 — represents an illegitimate attempt by the Trustee to usurp and assert thousands of state law securities claims that belong not to BMIS but exclusively to its customers.  The Trustee's common law claims should be dismissed for lack of standing and for violating SLUSA.

Even if the Trustee could bring customer claims under SIPA and SLUSA, he has failed to state valid claims on the customers' behalf.  At the outset of his pleading, the Trustee announces ominously that there is a "myth" that Madoff "acted alone" and that he will tell the "true story" of how JPMorgan was "thoroughly complicit in" Madoff's crimes.  But the Trustee never delivers.  He couches his allegations in terms of what JPMorgan "could have," "should have," and "would have" known had it acted differently.  Yet the Trustee never alleges facts showing that anyone at JPMorgan had *actual knowledge* of Madoff's crimes.  Nor does the

Trustee substantiate his utterly implausible theory that JPMorgan deliberately collaborated with Madoff in perpetrating a Ponzi scheme in order to earn routine banking fees from BMIS.

JPMorgan's original motion to dismiss, filed on June 3, demonstrated that the Trustee's original complaint should be dismissed on all of these grounds.  Effectively conceding the force of JPMorgan's arguments, the Trustee filed an amended complaint rather than an opposition to JPMorgan's motion as contemplated by the Court's scheduling order.  In his new pleading, the Trustee tinkers with the wording of his standing allegations, but he persists in attempting to pursue claims belonging to customers.  The Trustee has also added some new factual allegations, but these new allegations do nothing to support his claim of actual knowledge.  As a result, the Trustee has not fixed the defects of this lawsuit.

Point I below will show that, as Judge Rakoff held in the *HSBC* case, the Trustee has no standing to bring customer damages claims.  Under bedrock Second Circuit law, which itself is based on long-settled case law from the United States Supreme Court, a bankruptcy trustee "has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  *Shearson Lehman Hutton, Inc.* v. *Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).  In addition, a claim against third parties for participating in a failed corporation's fraud "accrues to creditors, not to the guilty corporation."  *Id.* at 120.  As the successor to BMIS, the Trustee is thus unequivocally barred from bringing customer claims against JPMorgan to redress the harm caused by BMIS's fraud.  *See Picard* v. *HSBC Bank PLC*, No. 11 Civ. 763 (JSR) (S.D.N.Y. July 28, 2011).[1]

---

[1]  Judge Rakoff's opinion in the *HSBC* case, issued on July 28, 2011, is attached to the accompanying Declaration of Emil A. Kleinhaus as Exhibit 1 and cited herein as "HSBC Op."

To escape the consequences of these settled principles, the Trustee alleges that he has "broader powers" than an ordinary bankruptcy trustee and that SIPA permits him to pursue claims against third parties as a supposed "bailee." The Trustee also claims that he can sue as a "subrogee" of customer claims or as an assignee of such claims "to the extent" of any valid assignments. But SIPA does not provide the Trustee with any of these powers. Although the statute carefully delineates the powers that a SIPA trustee may exercise, the statute nowhere authorizes a SIPA trustee to assert claims against third parties on behalf of a broker's customers.

Lacking support in the text of the governing statute, the Trustee has relied upon *Redington* v. *Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979), in which the Second Circuit: (1) held that a broker-dealer's customers had an implied private right of action under section 17(a) of the Securities Exchange Act; and (2) found that a SIPA trustee as a "bailee," and SIPC as a "subrogee," had standing to assert this implied cause of action. The Supreme Court, however, reversed the Second Circuit's decision implying a private right of action, thereby concluding that the lower court erred in reaching the question of standing. As Judge Pollack recognized, the Supreme Court's decision "wiped out everything that had occurred up to that time," with the result that *Redington* "does not stand as the law of this circuit." *Accord* HSBC Op. at 16-19. Moreover, even if *Redington* were still good law, it is not applicable here: the Trustee's standing theories fail on other grounds, including that a thief like BMIS (or its successor) cannot be a bailee and cannot sue to recover property that it stole. *See id*. at 13.

Point II will show that *even if* the Trustee has standing to bring state law claims belonging to Madoff's customers, SLUSA bars the aggregation and assertion of those claims in this action. SLUSA has its genesis in the Private Securities Litigation Reform Act of 1995, in which Congress promulgated a comprehensive regime imposing procedural and substantive

limitations on the filing of federal claims alleging securities fraud.  Congress enacted SLUSA to

prevent plaintiffs from evading that regime by filing state law securities fraud mass actions.  By

its terms, SLUSA requires dismissal of "covered class actions" based on state law that allege

securities fraud.

       This action falls squarely within SLUSA's definition of a "covered class action."

That definition encompasses not only lawsuits explicitly styled as class actions but also any other

action that aggregates the claims of more than 50 plaintiffs.  Although the Trustee has deleted

from his Amended Complaint the express admission in his original complaint that he is suing

"on behalf of" Madoff's customers — the very language in SLUSA's statutory definition — that

continues to be precisely what he is doing.  SLUSA cannot be evaded through artful pleading,

and the Trustee's tactical deletion of the concession in his original complaint does nothing to

change the substance of his claims, which are brought on behalf of customers.

       Point III will show that the Amended Complaint fails to state a claim either for

aiding and abetting or for knowing participation in Madoff's fraud and breach of fiduciary duty.

To sustain those claims, the Trustee must plead particularized facts raising a "strong inference"

that JPMorgan had "actual knowledge" of Madoff's crimes.  The Amended Complaint does not

meet this high standard.  With respect to the activity in BMIS's bank account, the Trustee fails to

allege that JPMorgan so much as suspected fraud based on that activity, let alone that it actually

discovered Madoff's fraud.  The allegations concerning JPMorgan's investments in BMIS feeder

funds are also insufficient; they show, at most, that JPMorgan raised questions about Madoff, but

they certainly do not show actual knowledge of Madoff's crimes.

       In an apparent attempt to avoid having to satisfy the "actual knowledge" standard,

the Trustee alleges for the first time in his Amended Complaint that BMIS's deposit account at

JPMorgan was a "fiduciary account" that was "impressed with a trust."  But the account was a simple depository account, not a trust account, as a court in this district has already held.  Recent decisions, moreover, have squarely rejected the notion that a bank owes a duty to protect *non*-bank customers from fraud conducted by a bank customer through a depository account.

Point IV will show that the Amended Complaint fails to state claims for conversion or aiding and abetting conversion.  A customer of a broker has no conversion claim against a bank for funds stolen by the broker and deposited in the broker's bank account.  Moreover, a customer of a broker has no claim against the bank for aiding and abetting conversion where, as in this case, the bank had no knowledge of the underlying conversion.

Point V will show that the Amended Complaint fails to state a claim for unjust enrichment.  Under New York law, a plaintiff cannot pursue a claim for unjust enrichment in the absence of any relationship with the defendant; here, Madoff's customers had no relationship with JPMorgan in connection with their investments in BMIS.

Point VI will show that the Trustee's "fraud on the regulator" claim is defective for multiple reasons.  The Trustee relies on New York state law to claim that JPMorgan deceived regulators by not telling them that Madoff was running a Ponzi scheme.  This claim fails because (1) New York does not recognize any such claim for fraud on regulators; (2) the Trustee has failed to plead the basic elements of a fraud claim against JPMorgan; and (3) a claim of fraud on federal regulators is preempted by federal law.

Point VII will show that the Trustee's new claim for contribution should be dismissed.  At the outset, the claim fails on the basis that JPMorgan has no tort liability for any harm to BMIS's customers, as is required for a contribution claim.  In addition, as Judge Rakoff

concluded, nothing in SIPA authorizes a trustee to bring contribution claims, and New York law does not permit contribution claims to be asserted to recover payments mandated by SIPA.

Finally, Point VIII will show that the Trustee's bankruptcy claims to recover the repayment of JPMorgan's $145 million loan to BMIS, as well as interest and fees, fail as a matter of law. To prevail on these claims, the Trustee would have to allege facts showing that JPMorgan loaned money to BMIS knowing that it was propping up a Ponzi scheme. The Amended Complaint alleges no facts to support that facially absurd contention.

## BACKGROUND[2]

On December 11, 2008, the FBI arrested Bernard Madoff, and the U.S. Attorney for the Southern District of New York charged him with conducting a multi-billion-dollar securities fraud. Am. Compl. ¶ 53. Days later, SIPC filed an application in this Court seeking to commence a liquidation proceeding for BMIS. Judge Stanton granted SIPC's application and appointed Irving H. Picard as the Trustee for the liquidation of BMIS. *Id.* ¶ 56.

On March 12, 2009, Madoff pleaded guilty to federal securities fraud and admitted that he operated a Ponzi scheme through BMIS. *Id.* ¶ 58. On June 29, this Court sentenced Madoff to 150 years in prison. *Id.* Madoff was BMIS's Founder, Chairman, Chief Executive Officer and sole owner. *Id.* ¶ 36.

---

[2] The facts recited are drawn from the Amended Complaint and documents subject to judicial notice. Allegations in the Amended Complaint are accepted as true only for purposes of this motion. References to the "Decl." are to the Declaration of Emil A. Kleinhaus.

**A.      JPMorgan's contacts with Madoff**

JPMorgan Chase is one of the largest banking institutions in the world with approximately $2 trillion in assets.  Am. Compl. ¶ 22.  BMIS had a deposit account at JPMorgan and predecessor banks since 1986, which has been called the "703 Account."  *Id.* ¶¶ 104, 199.

JPMorgan made fully secured loans to BMIS and received modest fees for providing banking services.  In 2005 and 2006, JPMorgan made secured loans to BMIS of $145 million, which were repaid by BMIS through debiting the 703 Account.  *Id.* ¶¶ 279-88 & Ex. A.  During the six-year period prior to BMIS's bankruptcy, JPMorgan received approximately $590,000 in fees from BMIS for banking services.  *See id.* ¶ 306 & Ex. A.

In 2006, J.P. Morgan Securities Ltd. invested approximately $338 million in four Madoff "feeder funds," *i.e.*, third-party investment funds that invested their assets with BMIS.  These investments served as hedges for financial products that were tied to the feeder funds' returns.  *See, e.g.*, *id.* ¶¶ 117, 131.

After JPMorgan acquired Bear Stearns, JPMorgan conducted an across-the-board review of its exposure to hedge funds.  *Id.* ¶ 130.  That review resulted in the bank making significant redemptions from numerous hedge funds, including redemptions of approximately $276 million from three Madoff feeder funds — Fairfield Sentry Ltd., Fairfield Sigma Ltd. and Herald Fund s.p.c.  *Id.* ¶ 178 & Ex. E.

**B.      The Trustee's lawsuit against JPMorgan**

On December 2, 2010, after taking document and deposition discovery from JPMorgan for over a year under Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Trustee commenced this action in the Bankruptcy Court.  At a hearing held on May 4, 2011, this

Court granted JPMorgan's motion to withdraw the reference from the Bankruptcy Court. *See Picard* v. *JPMorgan Chase & Co.*, 2011 WL 2119720 (S.D.N.Y. May 23, 2011).

At the hearing on the withdrawal motion, this Court stated its desire to proceed expeditiously and, with the Trustee's consent, set an expedited schedule for briefing on JPMorgan's motion to dismiss. The Trustee offered no indication at the hearing of his intent to amend his complaint. Accordingly, pursuant to the Court's schedule, on June 3, JPMorgan filed its motion to dismiss. Rather than respond to the motion, however, the Trustee filed the Amended Complaint on June 24.

The first 20 causes of action in the Amended Complaint are "clawback" claims under federal bankruptcy law. Am. Compl. ¶¶ 328-489. Like the original complaint, the Amended Complaint seeks to recover direct payments by BMIS to JPMorgan, including $145 million in loan repayments, $3.48 million in interest payments on those loans, as well as $590,000 in banking fees. *See id.* ¶¶ 352-400 & Ex. A. Unlike the original complaint, however, the Amended Complaint also seeks to avoid the contractual obligations that were satisfied by those payments. *See id.* ¶¶ 328-51. In addition, the Amended Complaint seeks to recover the approximately $276 million in redemptions made by JPMorgan from Fairfield Sentry, Fairfield Sigma and Herald Fund, alleging that those redemptions paid by the feeder funds indirectly came from BMIS. *Id.* ¶¶ 401-89 & Ex. E.

The Trustee's clawback claims pale in comparison to the Trustee's common law claims. The Amended Complaint, like the original complaint, asserts claims of aiding and abetting fraud and breach of fiduciary duty, "fraud on the regulator," unjust enrichment, and conversion. The Amended Complaint also asserts claims for knowing participation in a breach of trust, aiding and abetting conversion, and contribution. *See id.* ¶¶ 490-589. In addition,

without alleging new facts of any significance, the Amended Complaint increases the damages

being sought from JPMorgan from $5.4 billion to $19 billion, apparently the full amount of all

customer losses resulting from Madoff's fraud.  *Id.* ¶¶ 506, 520, 535, 555, 583.

## ARGUMENT

### POINT I

### THE TRUSTEE LACKS STANDING TO BRING
### COMMON LAW CLAIMS AGAINST JPMORGAN.

Causes of action 21 to 27 in the Amended Complaint assert common law damages

claims belonging to BMIS's customers, none of whom are parties to this proceeding.  As shown

below, the Trustee lacks standing to bring any of these customer claims.[3]

**A.     Under *Caplin* and *Wagoner*, the Trustee lacks standing
to bring common law claims against JPMorgan.**

In *Shearson Lehman Hutton, Inc.* v. *Wagoner*, the Second Circuit set forth a two-

pronged doctrine to govern the standing of a bankruptcy trustee.  The first prong of *Wagoner*

reaffirms the settled rule, established by the Supreme Court in the *Caplin* case, that a bankruptcy

trustee "has no standing generally to sue third parties on behalf of the estate's creditors, but may

only assert claims held by the bankrupt corporation itself."  *Wagoner*, 944 F.2d at 118 (citing

*Caplin* v. *Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972)).

---

[3] The issue of standing "is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court."  *Shearson Lehman Hutton, Inc.* v. *Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991).  To satisfy Article III, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable.'"  *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).  To satisfy prudential limitations on standing, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth* v. *Seldin*, 422 U.S. 490, 499 (1975); *accord* HSBC Op. at 4-5.

In *Caplin*, the Supreme Court rejected a bankruptcy trustee's argument that federal bankruptcy law "enables him to collect money" owed to creditors, ruling instead that the statute only permitted the trustee to seek recovery of funds "owed to the estate."  406 U.S. at 428.  The Court declared that creditors "are capable of deciding for themselves whether or not it is worthwhile to seek to recoup whatever losses they may have suffered by an action against" third parties.  *Caplin*, 406 U.S. at 431.  Permitting a bankruptcy trustee to aggregate and assert creditors' claims, the Court reasoned, would (1) deprive creditors of the opportunity to "make their own assessment of the respective advantages and disadvantages" of litigation; (2) create the risk that "a suit by [the trustee] on behalf of [creditors] may be inconsistent with any independent actions" creditors might bring; and (3) raise questions as to who would be "bound by any settlement."  *Id.* at 431-32.  Thus, under *Caplin* and *Wagoner*, "the trustee stands in the shoes of the debtors, and can only maintain those actions that the *debtors* could have brought prior to the bankruptcy proceedings."  *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995) (emphasis added); *accord* HSBC Op. at 5, 8-9.

Under the second prong of *Wagoner*, now known as the *Wagoner* rule, a claim against a third party for defrauding a failed corporation with the cooperation of the corporation's management "accrues to *creditors*, not to the guilty corporation."  *Wagoner*, 944 F.2d at 120 (emphasis added).  Accordingly, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors."  *Id.* at 118; *accord Kirschner* v. *Grant Thornton LLP*, 2009 WL 1286326, at *10 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010) (dismissing trustee's claims against third parties where debtor "participated in, and benefitted from, the very wrong for which it seeks to recover"); HSBC Op. at 5-6.

-10-

The *Wagoner* rule is rooted in the doctrine of *in pari delicto.  See Kirschner* v.

*KPMG LLP*, 15 N.Y.3d 446, 457 (2010).  The *Wagoner* rule "derives from the fundamental

principle of agency that the misconduct of managers within the scope of their employment will

normally be imputed to the corporation."  *Kirschner*, 2009 WL 1286326, at *5.  "[B]ecause a

trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to

recover for a wrong that he himself essentially took part in."  *Id.*; *see also* HSBC Op. at 5-6

("[I]n federal court prudential considerations deprive a bankruptcy trustee of standing to even

bring a claim that would be barred by *in pari delicto*.").

Under *Caplin* and *Wagoner*, the Trustee lacks standing to bring common law

damages claims against JPMorgan.  *Caplin* and the first prong of *Wagoner* bar the Trustee from

asserting such claims on behalf of customers.  And the second prong of *Wagoner* bars the

Trustee from asserting such claims on behalf of BMIS — a firm that was "wholly owned by

Madoff," Am. Compl. ¶ 36, that functioned as a "Ponzi scheme," *id.* ¶¶ 44, 46, 222, and that, as

the Trustee has declared in court filings, was Madoff's "alter ego."  Decl. Ex. 2, at 1 (brief

seeking substantive consolidation of BMIS's and Madoff's bankruptcy proceedings); *see also*

HSBC Op. at 24 ("the overwhelming wrongdoing of Madoff and his now-defunct company,

Madoff Securities, is abundantly clear from the face of the Trustee's own complaint").[4]

---

[4]  The allegation of the Amended Complaint that the Trustee "has the rights and powers of any
creditor under § 544 of the Bankruptcy Code," Am. Compl. ¶ 20(j), cannot change that outcome.
It is settled law that "[s]ection 544 is limited to avoidance actions and does not give the trustee
standing to pursue tort claims that were not property of the estate at the commencement of the
case."  5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2011) (citing numerous cases); *accord, e.g.*,
*In re Granite Partners, L.P.*, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996).

**B.      SIPA does not grant the Trustee standing to bring
common law claims on behalf of BMIS's customers.**

Despite *Caplin* and *Wagoner*, the Trustee asserts that, as a SIPA trustee, he has

"broader powers" than an ordinary bankruptcy trustee to bring claims against third parties.  Am.

Compl. ¶ 19.  The Trustee alleges that under SIPA, he has standing to sue JPMorgan as bailee of

a "Customer Property estate," as a subrogee of customer claims paid by SIPC, and as an assignee

of customer claims "to the extent of" any valid assignments.  *Id.* ¶¶ 20(f)-(h).

But SIPA does not provide the Trustee with any of these powers.  SIPA is a

comprehensive statutory scheme that created "a new form of liquidation proceeding" for

brokerage firms, which was "designed to accomplish the completion of open transactions and the

speedy return of most customer property."  *SIPC* v. *BDO Seidman, LLP*, 49 F. Supp. 2d 644, 649

(S.D.N.Y. 1999) (quotation marks omitted).  A SIPA trustee, who is appointed to preside over a

brokerage liquidation, is a creature of this statute:  his authority is created by and limited to the

specific powers that the legislation conferred on him.  *See* 15 U.S.C. § 78eee(b)(3) (providing for

appointment of a SIPA trustee); 15 U.S.C. § 78fff-1 (setting forth "Powers and duties of a

[SIPA] trustee").

Although Congress easily could have authorized a SIPA trustee to assert the rights

of brokerage customers against third parties, not a word in the statute does so.  Instead, in the

section of SIPA entitled "Powers and duties of a Trustee," 15 U.S.C. § 78fff-1, the statute

provides that a trustee "shall be vested with the same powers and title with respect to the debtor

and the property of the debtor . . . as a trustee in a case under title 11," including the power to

bring preference claims.  *Id.* at § 78fff-1(a).  In the same section, the statute also authorizes the

trustee to perform three additional tasks:  to hire and fix the compensation of the broker's

personnel, to utilize SIPC employees in the liquidation, and to maintain customer accounts.  *Id.*

There is nothing in this section or elsewhere in SIPA that states or suggests either that a SIPA trustee can assert damages claims on behalf of customers or that the rules set forth in *Caplin* and *Wagoner* do not apply in SIPA proceedings. To the contrary, the language and structure of the statute are inconsistent with any notion that a SIPA trustee can assert customer claims against third parties. The statute's grant to the trustee of specified "powers" speaks only in terms of "the debtor and the property *of the debtor*," not customers or the property of customers. *Id.* (emphasis added); *see also id.* at § 78eee(b)(2)(A) (bankruptcy court has exclusive jurisdiction over the "debtor and its property"); § 78fff-1(d) (mandating investigation of "causes of action available to the estate," not to customers).

In sum, as Judge Rakoff concluded in the *HSBC* case, "the powers of a SIPA trustee are still, as indicated, cabined by Title 11," and "[n]either the language nor the structure of SIPA" supports the Trustee's position that he has special powers to assert damages claims on behalf of customers. HSBC Op. at 7.

**C.     The Trustee lacks standing to sue JPMorgan as a bailee.**

In the original complaint, the Trustee admitted that he was suing "as bailee . . . on behalf of the customer-bailors." Orig. Compl. ¶ 17(f). Similarly, in complaints against other defendants that are incorporated by reference into the Amended Complaint, *see* ¶ 320, the Trustee continues to allege that he is bringing damages claims "on behalf of customer-bailors." *See* Decl. Ex. 3 (Fairfield Complaint) ¶ 31(f); Ex. 4 (HSBC Complaint) ¶ 50(f).

The Amended Complaint, in contrast, has replaced these clear standing allegations with the novel assertion that the Trustee is suing "as representative of, and as bailee of, the Customer Property estate." Am. Compl. ¶ 20(f). This contorted formulation does not change the fact that the Trustee is in fact asserting *customer* claims. However the Trustee styles

his theory of bailment, the damages claims in the Amended Complaint sound in fraud, breach of fiduciary duty, and conversion.  It was Madoff's *customers* who were defrauded by BMIS, the *customers* who were owed the fiduciary duties that were breached by BMIS, the *customers* whose property was converted by BMIS, and the *customers* who suffered the damages that the Trustee is trying to recover.  If the Trustee is now suggesting that he is not bringing claims on behalf of customers, then he is not bringing claims on behalf of anyone at all.

In any event, the Trustee's bailee theory lacks any support in the statute.  Nothing in SIPA authorizes the Trustee to bring damages claims as a bailee; indeed, the words bailor, bailment, and bailee do not even appear in the statute.  Accordingly, as in *HSBC*, this Court should "reject[] in its entirety the claim by the Trustee that he has standing to bring his common law claims as bailee of customer property."  HSBC Op. at 14.

### 1.     *Redington* is not good law.

Without any basis in the statute for his asserted standing as a "bailee," the Trustee will no doubt rely on the Second Circuit's decision in *Redington* v. *Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979), *on remand*, 612 F.2d 68 (2d Cir. 1979). *Redington*, however, is not good law.  *Mishkin* v. *Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 557-58 (S.D.N.Y. 1990); HSBC Op. at 17-19.

In *Redington*, a SIPA trustee and SIPC brought suit against a broker's accountant, asserting claims on behalf of the broker's customers for violations of section 17(a) of the Securities Exchange Act and state law claims.  The Second Circuit majority, over a vigorous dissent by Judge Mulligan, reversed the district court, concluding that — although there was no indication in section 17 or its legislative history that Congress intended to create a private remedy — an implied right of action accorded with the general legislative purpose of protecting

customers.  592 F.2d at 622-23.  The majority then pushed this analysis one step further.

Without any support in the language or legislative history of SIPA, the majority concluded that a

SIPA trustee and SIPC had implied third-party standing to assert *the customers'* private cause of

action under section 17.  The court rested this conclusion on nothing more than extra-statutory

common law principles of bailment and subrogation.  *Id.* at 624-25.

       The Supreme Court granted *certiorari* in *Redington* to address not only the issue

of whether there is an implied private right of action under section 17, but also the standing

issues presented by that case.  Decl. Ex. 5 (Brief for Petitioner), at 2-3 (Questions Presented).

       The Supreme Court reversed the Second Circuit's decision, holding that there was

no implied private right of action to enforce section 17 and thus finding it "unnecessary to reach"

the standing issues.  442 U.S. at 567 n.9, 579.  By reversing the Second Circuit on the predicate

ruling creating an implied right of action under section 17, the Supreme Court held that the

Second Circuit erred in reaching the issue of whether the SIPA trustee had standing to bring this

nonexistent claim.  The Second Circuit's ruling on the standing issue is thus no longer good law.

*See Newdow* v. *Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1041 (9th Cir. 2010) ("[W]hen the

Supreme Court reverses a lower court's decision on a threshold question," the Supreme Court

"effectively holds the lower court erred by reaching" other issues, and rulings on those issues are

not precedential); *Brecht* v. *Abrahamson*, 944 F.2d 1363, 1370 (7th Cir. 1991) (where Supreme

Court granted *certiorari* to resolve an issue but did not reach the issue in reversing the decision,

the Supreme Court's reversal "deprived [appellate court's] opinion of authority" on that issue).

       The jurisdictional posture of *Redington* makes it especially clear that the Second

Circuit's ruling on standing is not binding authority.  Following the Supreme Court's reversal,

the Second Circuit considered the trustee's "alternative bases for jurisdiction" over the remaining

claims and found that, absent the section 17(a) claim, there were no grounds for federal subject

matter jurisdiction.  612 F.2d at 70-73.  Thus, as Judge Rakoff explained, "while the Supreme

Court did not actually reach the standing issue in *Redington*, a reversal based on want of subject

matter jurisdiction deprives *Redington* of any precedential value."  HSBC Op. at 17 (citing

*LaBarbera* v. *Clestra Hauserman Inc*., 369 F.3d 224, 226 n.2 (2d Cir. 2004) (decision reversed

for lack of subject matter jurisdiction "is of no precedential value")).

   The Supreme Court's ruling in *Redington* likewise leaves no doubt that the

Second Circuit's standing analysis was defective.  In refusing to recognize an implied private

cause of action under section 17, the Supreme Court held that "[t]he ultimate question is one of

congressional intent, not one of whether this Court thinks that it can improve upon the statutory

scheme that Congress enacted."  442 U.S. at 575, 578.  The same error that led the Second

Circuit majority to its erroneous section 17 decision — namely, the implication of broad powers

to pursue claims despite the absence of statutory language or even legislative history — likewise

infected the majority's conclusion that the trustee had standing to invoke that implied power to

sue third parties (again, without any basis in the statute or legislative history).  592 F.2d at 624-

25.  Indeed, the Supreme Court's decision in *Redington* sided with Judge Mulligan's dissent in

the Second Circuit, in which Judge Mulligan characterized the majority's ruling on standing as

"circumvent[ing] the intent of Congress" and its creation of a private right of action as "judicial

legislation."  *Id*. at 631, 634-35.

   As Judge Pollack and now Judge Rakoff have subsequently recognized, as a result

of the Supreme Court's reversal of the Second Circuit's decision in *Redington*, that decision

"does not stand as the law of this circuit"; rather, the Supreme Court "wiped out everything that .

. . occurred up to that time, and sent the case back accordingly."  Decl. Ex. 6, at 32-33 (*Mishkin*

transcript); *see also* HSBC Op. at 17-19.  In *Mishkin*, therefore, Judge Pollack was free to reject

the decision of the *Redington* majority, adopt the reasoning of the *Redington* dissent, and hold

that "the liquidating trustee" in a SIPA case "is not granted the power to bring fraud claims

against third parties on behalf of customers."  744 F. Supp. 531, 558 (S.D.N.Y. 1990).  Judge

Rakoff likewise concluded, in dismissing the Trustee's complaint in *HSBC*, that the majority

decision in *Redington* "is no longer good law."  HSBC Op. at 17.[5]

### 2.      A thief cannot be a bailee.

Regardless of whether *Redington* is good law, the Trustee's bailee theory fails on

the basis that, as Judge Rakoff recognized, "no bailment can exist where the would-be bailee is a

thief."  HSBC Op. at 13.  Under New York law, an essential element of a bailment relationship is

that the bailee takes "lawful possession" of property "without present intent to appropriate" it.

*Pivar* v. *Graduate Sch. of Figurative Art of the N.Y. Acad. of Art*, 290 A.D.2d 212, 213 (1st

Dep't 2002) (quotation marks omitted); *accord Seaboard Sand & Gravel Corp.* v. *Moran*

*Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946); *Martin* v. *Briggs*, 235 A.D.2d 192, 197 (1st

Dep't 1997).  Here, BMIS accepted customer property precisely in order to appropriate (*i.e.*,

steal) it.  *E.g.*, Am. Compl. ¶¶ 36-38.  Thus, the Trustee, as the successor to a thief, has no

possible standing to bring suit as a bailee.  *See* HSBC Op. at 13.

---

[5] In *BDO Seidman*, despite believing (incorrectly) that the Second Circuit's standing decision in
*Redington* remains binding, Judge Preska likewise concluded that the "well reasoned" opinion in
*Mishkin* was "more persuasive" and "more faithful to the letter and purpose of" SIPA than
*Redington*.  *BDO Seidman*, 49 F. Supp. 2d at 651, 653-54.  On appeal, the Second Circuit
determined that it had no need to revisit *Redington*, even if it were justified in doing so, since the
claims failed on other grounds.  *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 69 (2d Cir. 2000).

3.    *Wagoner* and *Hirsch* control over *Redington*.

The Second Circuit's decisions in *Wagoner* and *Hirsch*, both of which post-date *Redington*, further demonstrate that, even if *Redington* were good law, the Trustee may not sue as a bailee in the circumstances presented in this case.

In *Hirsch*, the Second Circuit applied *Wagoner* to common law claims brought by a bankruptcy trustee against third parties for alleged participation in the bankrupt debtors' Ponzi scheme.  The court held that claims arising from fraud on the investors in the Ponzi scheme "are the property of those investors, and may be asserted *only by them* and to the exclusion of [the trustee]."  *Hirsch*, 72 F.3d at 1094 (emphasis added).  The court concluded further that the trustee could not bring claims against the third parties on behalf of the debtors, since the debtors participated in the Ponzi scheme.  *Id.*; *see also Breeden* v. *Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.)*, 268 B.R. 704, 714 n.8 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) (finding that "involvement of [the debtor's] dominant management in the Ponzi scheme defeats the trustee's standing by operation of the *Wagoner* rule").

The Second Circuit's holdings in *Wagoner* and *Hirsch* prevent the Trustee from asserting claims as a "bailee" of customer property.  A bailment requires "a delivery of personal property for some particular purpose" along with an agreement that the property will be "redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it."  *Herrington* v. *Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (McMahon, J.) (quoting *Osborn* v. *Cline*, 263 N.Y. 434, 437 (1934)).  Here, as alleged in the Amended Complaint, customers of BMIS delivered possession of their property to *BMIS*.  Am. Compl. ¶¶ 36-38.  Accordingly, if the Trustee could assert claims as a "bailee" of customer property, it would only be as the successor to BMIS, an admitted Ponzi schemer.

-18-

Under *Wagoner* and *Hirsch*, BMIS's wrongdoing forecloses the Trustee from asserting BMIS's rights, if any, to bring common law claims as a bailee of the property that BMIS received from customers.  On its face, *Redington* does not hold otherwise.  As Judge Rakoff explained, "*Redington* does not anywhere hold that a SIPA trustee has standing to pursue *common law claims* against third parties as bailee of customer property."  HSBC Op. at 19 (emphasis in original).  But to the extent that *Redington* has any bearing on common law claims asserted by the Trustee, it has been superseded by *Wagoner* and *Hirsch.*

**D.    The Trustee lacks standing to sue JPMorgan as a subrogee.**

The Trustee alleges that SIPC has standing to assert customer claims against third parties as a subrogee of claims against third parties that have been satisfied in whole or in part by SIPC.  Am. Compl. ¶ 20(h).  But as in the case of bailment, no provision of SIPA subrogates either SIPC or the Trustee to customer claims against third parties.

SIPA grants SIPC certain express, limited subrogation rights that do not include the right to assert customer claims against third parties.  As provided by section 78fff-3(a):

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter . . . .

Judge Rakoff correctly held that because "the claims of such customers" that SIPC pays are "net equity" claims (which are defined in section 78lll(11) of SIPA as claims against *the debtor*), this provision grants subrogation rights to SIPC only with respect to customer claims *against* the debtor's estate.  *See* HSBC Op. at 15 ("The plain language of SIPA thus makes clear that SIPC is only subrogated to customer *net equity claims against the estate*, not to all customer claims against third parties.").  Indeed, even the Second Circuit in *Redington* interpreted the provision in

this manner.  *See* 592 F.2d at 624 ("SIPA provides expressly that SIPC, upon reimbursing a

customer's losses, shall be subrogated to that customer's claims against the debtor's . . . estate.").

The Trustee's asserted subrogee standing is therefore not supported by the

limited, express subrogation rights granted by SIPA.  Nor is there any basis to imply subrogation

rights in favor of SIPC that cannot be found in the statute.  As explained by the dissent in

*Redington*, because SIPA delineates certain specific and limited subrogation rights, "its failure to

provide for subrogation against any third party would clearly dictate that none exist under the . . .

principle:  *Expressio unius est exclusio alterius*."  592 F.2d at 634-35 (Mulligan, J., dissenting).

Confirming this conclusion is section 78fff(a)(3) of SIPA, which provides that a purpose of a

SIPA liquidation proceeding is "to enforce rights of subrogation as provided *in this chapter*"

(emphasis added).  Thus, the text of SIPA contemplates that SIPC will have only limited

subrogation rights that are expressly created by and subject to SIPA's statutory scheme.

Moreover, as Judge Rakoff concluded, "any implied right of subrogation against

third parties would subvert SIPA's provision detailing the priority of customer property

distribution."  HSBC Op. at 15.  SIPA was amended in May of 1978 — after the decision in

*Redington* — to state that "SIPC cannot recover as subrogee until the customers are made

whole."  HSBC Op. at 15 (citing 15 U.S.C. § 78fff-2(c)(1)); *see also id.* at 20-21.  Contrary to

SIPA's priority scheme, the Trustee's subrogee standing theory "would permit SIPC to recover

from third parties *before* customers' net equity claims had been fully satisfied."  HSBC Op. at 15

(emphasis added).

Like Judge Rakoff in *HSBC*, Judge Pollack in *Mishkin* closely analyzed the

limited subrogation rights found in SIPA and held that the statute did not grant a SIPA trustee

subrogee standing to bring customer claims against third parties.  744 F. Supp. at 558.  Following

the reasoning of Judge Mulligan's dissent in *Redington*, the *Mishkin* court concluded that crafting extra-statutory subrogation rights for SIPC would circumvent Congress's intent that SIPC have only the limited subrogation rights set forth in the statute. *Id.* at 558 n.15. In *Holmes* v. *SIPC*, the Supreme Court cited *Mishkin* with approval and noted that SIPC's "theory of subrogation" — essentially the same theory of subrogation rights advanced by the Trustee — was "fraught with unanswered questions." 503 U.S. 258, 270 (1992).

In arguing that they can assert claims against third parties as a subrogee, the Trustee and SIPC may rely, as they did in opposing withdrawal of the reference, on the phrase in SIPA stating that SIPC's subrogation rights against the estate are "in addition to all other rights it may have at law or in equity." 15 U.S.C. § 78fff-3(a). Any such reliance is misplaced. As Judge Rakoff concluded, "this catch-all phrase appearing in SIPA's text cannot be read to contradict" the specific provisions of SIPA, including the provision limiting SIPC's subrogation rights to claims against the estate and its priority provision. HSBC Op. at 15; *accord Mishkin*, 744 F. Supp. at 558; *BDO Seidman*, 49 F. Supp. 2d at 654.

E.    **The Trustee lacks standing to sue JPMorgan as an assignee.**

The original complaint alleged that the Trustee has received "express assignments of certain claims" from customers, without attaching any of the assignments or identifying the assignors. Orig. Compl. ¶ 17(g). In the Amended Complaint, however, the Trustee alleges that the Trustee has standing to sue JPMorgan only "to the extent" he has received assignments. Am. Compl. ¶ 20(g). In the *HSBC* decision, moreover, Judge Rakoff noted that "the Trustee appears to admit that he has received no assignments of customer claims against third parties." HSBC Op. at 22. That admission is consistent with the Trustee's decision in this case to withdraw the allegation that he has received valid assignments. Without a clear allegation in the Amended

Complaint that the Trustee has received assignments of claims against JPMorgan, the Trustee cannot rely on a theory of assignee standing in asserting his claims.  *See, e.g.*, *Rosenshein* v. *Kleban*, 918 F. Supp. 98, 106 (S.D.N.Y. 1996) (denying leave to amend to assert assigned claims where the plaintiff failed to "allege a valid assignment").

And, in any event, the Trustee lacks authority under SIPA to sue JPMorgan as an assignee.  Under the statute, the limited authority of a trustee to take assignments as a condition to paying claims does *not* include assignments of customer claims against third parties.  Rather, a trustee can only require assignments as a condition to payments on "net equity" claims *against* the estate.  15 U.S.C. § 78fff-2(b).  Courts in this district have thus repeatedly held that "the assignments authorized by section 78fff-2(b) of SIPA do not extend to all claims of customers against third parties but, rather, only to a customer's net equity claim" against the estate.  *Picard* v. *Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 514 (Bankr. S.D.N.Y. 2005)); *see also* *Giddens* v. *D.H. Blair & Co. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002) (because "section 78fff-2(b) makes it clear that the only payments a trustee can make to customers pursuant to that section are payments for net equity claims, it follows that the only claims that customers could have assigned to the Trustee are their net equity claims and not claims against the defendants"); *BDO Seidman*, 49 F. Supp. 2d at 654 n.7; *Mishkin*, 744 F. Supp. at 551.  Judge Rakoff adhered to these decisions in dismissing the Trustee's assignee standing theory in the *HSBC* case.  HSBC Op. at 21-22.

**POINT II**

**THE TRUSTEE'S COMMON LAW CLAIMS
ARE PRECLUDED BY SLUSA.**

SLUSA bars the Trustee's aggregation and assertion in a single action of state law claims belonging to Madoff's customers, even if the Trustee has standing to assert such claims. The Trustee has resorted to state common law to avoid the pleading and substantive requirements imposed by federal securities law. But in so doing, the Trustee has run headlong into SLUSA, which mandates that securities class actions, as broadly defined by the statute, be litigated in federal court exclusively under federal law. Causes of action 21 to 27 violate SLUSA and should be dismissed for this reason as well.

**A.      SLUSA must be interpreted broadly to
foreclose securities class actions based on state law.**

SLUSA had its genesis in the PSLRA, which imposed new procedural and substantive requirements for filing securities actions. Congress enacted the PSLRA to curb "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006). But this reform had an unintended consequence: it prompted the filing of securities suits under state law, often in state court, as purported class representatives sought to circumvent "the obstacles set in their path by the [PSLRA]." *Id.* at 82.

Congress enacted SLUSA in 1998 to "'prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives' of the Reform Act." *Id.* (quoting SLUSA, Pub. L. No. 105-353, §§ 2(2), (5), 112 Stat. 3227 (1998) (quotation marks omitted)). SLUSA accomplished this objective "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating

that such class actions be governed *exclusively by federal law*." *Lander* v. *Hartford Life & Ann. Ins.*, 251 F.3d 101, 108 (2d Cir. 2001) (emphasis added).

> SLUSA's preemption provision states as follows:
>
> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. §§ 77p(b), 78bb(f)(1).  By its terms, SLUSA thus mandates dismissal of (1) any covered class action, (2) based on state law, (3) alleging a material misrepresentation or omission or the use of a manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.  *E.g.*, *Romano* v. *Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010).

The United States Supreme Court has held that SLUSA must be given a "broad construction" to effectuate Congress's intent, explaining that "[a] narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose." *Dabit*, 547 U.S. at 85-86.  Moreover, "[c]ourts in this circuit have consistently rejected plaintiffs' attempts through artful pleading to avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages." *Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*, 2004 WL 444554, at *3 (S.D.N.Y. Mar. 10, 2004); *see also In re Kingate Mgmt. Ltd. Litig.*, 2011 WL 1362106, at *6 (S.D.N.Y. Mar. 30, 2011) ("Because plaintiffs may seek to avoid SLUSA preemption through artful pleading, courts 'must look beyond the face of the complaint to analyze the substance of the allegations made.'" (quoting *Dabit*, 395 F.3d at 34)).

**B.     SLUSA preempts the Trustee's claims
           on behalf of Madoff's customers.**

The Trustee cannot dispute that if a former customer of BMIS purported to bring

a class action asserting the same state law claims that the Trustee has leveled against JPMorgan,

SLUSA would stop the action in its tracks.  The outcome should be exactly the same in this case,

where the Trustee is seeking to recover damages suffered by Madoff's customers by asserting

state law claims that, under *Wagoner* and *Hirsch*, belong exclusively to those customers.

**1.     This action is based on state law.**

The non-bankruptcy claims that the Trustee has asserted against JPMorgan are

brought under state common law theories, such as fraud, aiding and abetting, unjust enrichment,

and conversion.

**2.     This action alleges misrepresentations or omissions in
           connection with the purchase or sale of securities.**

The Amended Complaint contains allegations of a material misrepresentation or

omission, or the use of a manipulative or deceptive device or contrivance, in connection with the

purchase or sale of a covered security.  The Amended Complaint alleges that Madoff made

"intentional misrepresentation[s] of fact" to carry out his fraudulent scheme (Am. Compl. ¶ 47)

— namely, he falsely claimed to be purchasing and selling publicly traded securities (*id*. ¶ 41) —

and that JPMorgan "substantially assisted" Madoff's securities fraud (*id*. ¶ 239).  Additionally,

the Trustee alleges that JPMorgan "ignored blatant misrepresentations" (*id*. ¶ 231) and engaged

in its own "fraud" due to its supposed failure to report Madoff's conduct to regulators (*id*. ¶ 583).

Courts in this Circuit have consistently held that SLUSA bars claims relying on these types of

allegations.  *See, e.g.*, *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010)

("There is 'no question that Madoff's Ponzi scheme was 'in connection with' the purchase and

sale of securities.'"); *accord In re J.P. Jeanneret Assocs., Inc.*, 2011 WL 335594, at *18 (S.D.N.Y. Jan. 31, 2011).

All of the Trustee's common law claims meet the "misrepresentation or omission" requirement.  SLUSA preempts any "*action . . .* alleging a misrepresentation or omission," 15 U.S.C. §§ 78bb(f)(1), 77p(b) (emphasis added), whether or not the claims for relief in the action are labeled "fraud."  In light of the Trustee's allegations, SLUSA thus bars not only the Trustee's claims for fraud and aiding and abetting fraud but also his claims for knowing participation in a breach of trust, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, unjust enrichment, and conversion.  *See, e.g.*, *Leykin* v. *AT&T Corp.*, 216 F. App'x 14, 17 (2d Cir. 2007) (SLUSA preempted claim for breach of fiduciary duty); *In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593, 596 (S.D.N.Y. 2006) (SLUSA preempted unjust enrichment claim); *Levinson* v. *PSCC Servs.*, 2009 WL 5184363, at *12-13 (D. Conn. Dec. 23, 2009) (SLUSA preempted aiding and abetting conversion claim).

**3.     This is a "covered class action" under SLUSA.**

SLUSA defines "covered class action" to include not only actions styled as class actions, but all lawsuits in which common issues other than reliance predominate and (1) "damages are sought on behalf of more than 50 persons" or (2) the plaintiffs are suing "on a representative basis on behalf of themselves and other unnamed parties similarly situated." 15 U.S.C. §§ 77p(f)(2)(A), 78bb(f)(5)(B).

SLUSA's legislative history, like its language, makes clear that Congress intended for the "covered class action" definition to "be interpreted broadly to reach . . . *all [] procedural devices that might be used to circumvent the class action definition*."  S. Rep. No. 105-182, at 6 (1998) (emphasis added).  As the Third Circuit has recognized:

> [T]he statutory text and legislative history signal that the definition
> [of "covered class action"] was designed to prevent securities-
> claims owners from bringing what are, in effect, class actions by
> assigning claims to a single entity. . . .  Put simply, Congress's goal
> was to prevent a class of securities plaintiffs from running their
> claims through a single entity . . . .

*LaSala* v. *Bordier et Cie*, 519 F.3d 121, 136 (3d Cir. 2008); *see also In re AOL Time Warner,*

*Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 671 (S.D.N.Y. 2007) ("SLUSA sets in place certain limita-

tions on class actions *and other 'mass actions'* . . . ." (emphasis added)).

    Under the plain language of the statute, this action is a "covered class action."

The Trustee's common law causes of action aggregate and assert thousands of separate,

individual claims of Madoff's customers.  Indeed, in seeking to pursue claims as a "bailee," the

Trustee's original complaint expressly acknowledged that his claims were brought "on behalf of

the customer-bailors," the very language of SLUSA's covered class action definition.  Orig.

Compl. ¶ 17(f).  The Trustee's deletion of that admission in no way changes the substance of his

common law claims, which uniformly seek to invoke customer rights to recover customer losses.

    In opposing JPMorgan's motion to withdraw the reference, the Trustee relied on

SLUSA's "Counting" provision, which states that a "corporation . . . or other entity, shall be

treated as one person or prospective class member, but only if the entity is not established for the

purpose of participating in the action."  15 U.S.C. §§ 77p(f)(2)(C), 78bb(f)(5)(D).  By its terms,

however, that provision is not an exception to the "covered class action" definition.  Rather, it

simply clarifies that when an entity such as a corporation brings an action, it will generally count

as one person under SLUSA — so that a claim brought by a corporation *on its own behalf* will

not run afoul of SLUSA.  The provision, in other words, respects "the usual rule of not looking

through an entity to its constituents unless the entity was established for the purpose of bringing

the action."  *LaSala*, 519 F.3d at 132-33.

SLUSA's counting provision, therefore, does not help the Trustee. Under the plain language of the statute, the relevant question is whether the plaintiff is bringing claims "*on behalf of*" more than 50 persons; if he is, it makes no difference if the plaintiff is "one person" or many. Here, the Trustee is not asserting claims on behalf of BMIS, the corporation to which he is the court-appointed successor; rather, he is bringing claims on behalf of (and belonging to) more than 50 of BMIS's many customers, making this a "covered class action."

The Third Circuit's decision in *LaSala* is directly on point. In *LaSala*, the trustees for a liquidating trust brought claims that had been assigned to the trust by a bankrupt debtor as well as claims that had been assigned to the trust by purchasers of the debtor's stock. The court concluded that the claims that originally belonged to the debtor corporation were *not* barred by SLUSA, because those claims alleged an injury to the debtor, a single entity. 519 F.3d at 133-34. By contrast, the court found that the claims that originally belonged to the *purchasers* "would seem to take the form of a covered class action." *Id.* at 138. In drawing this distinction between the debtor's claims and the purchasers' claims, the Third Circuit explained that, where numerous claims are assigned to a single entity, SLUSA applies with full force when "the *original owners* of the claim" number more than 50. *Id.* at 134 (emphasis added).[6]

This requirement is plainly met here, where the Trustee is purporting to bring claims that originally belonged to hundreds or thousands of BMIS's former customers. It makes no difference that the plaintiff is a trustee rather than a typical lead plaintiff. As the Third Circuit explained in *LaSala*, "Congress's clear intent [for SLUSA] not to reach claims asserted by a

---

[6] The Court ultimately found that SLUSA did not apply to the claims that originally belonged to the purchasers only because they were based on foreign law. 519 F.3d at 138, 143.

bankruptcy trustee" embraced only "claims that *the debtor-in-possession once owned*." *LaSala*, 519 F.3d at 135 (emphasis added). In a case such as this one, therefore, where the Trustee is seeking to assert claims that the debtor BMIS *never* owned, SLUSA controls to the same extent as in any other mass action. *See also Cape Ann Investors LLC* v. *Lepone*, 296 F. Supp. 2d 4, 10 (D. Mass. 2003) (explaining that the role of a trustee bringing claims that did not originally belong to the debtor is no different under SLUSA "than that of any shareholder class representative").

Finally, even if the "Counting" provision of SLUSA were relevant, the Trustee could not rely on it. The counting provision only permits an entity to be treated as one person if it was "not established for the purpose of participating in the action." 15 U.S.C. §§ 77p(f)(2)(C), 78bb(f)(5)(D). The Trustee was clearly appointed for the purpose of pursuing litigation. At the time of the Trustee's appointment, the BMIS estate had minimal assets and no way to recover assets other than through litigation. As the Trustee has reported to the bankruptcy court, it was precisely because the amount of "customer property" in the estate was insufficient to pay customers' claims in full that the Trustee commenced hundreds of adversary proceedings, making the Trustee the head of an enormous litigation enterprise. *See* Trustee's Fourth Interim Report for the Period Ending September 30, 2010 at ¶ 52, *In re Bernard L. Madoff*, No. 08-1789, Docket No. 3083 (Bankr. S.D.N.Y. Oct. 30, 2010).

The recent decision of the New York Court of Appeals in *RGH Liquidating Trust* v. *Deloitte & Touche LLP*, 2011 N.Y. LEXIS 1703 (N.Y. June 23, 2011), does not support a different result. In *RGH Liquidating Trust*, the Court of Appeals — over a strong dissent by Judge Robert Smith — held that a liquidating trust that succeeded to a debtor's rights under a chapter 11 plan was not precluded by SLUSA from bringing state law claims against the debtor's

accountants and managers that the debtor's bondholders had assigned to the debtor under the

same plan.  Noting that the question presented was a "difficult one" that would "ultimately be

resolved by the federal courts," including this Court, *id*. at \*\*15 & n.6, the majority concluded

that, under SLUSA's "Counting" provision, the liquidating trust could pursue its claims in its

capacity as a "single entity" asserting the debtor's rights, *id*. at \*\*32-33.  The Court concluded

further that the "primary purpose" of the trust was "far broader than the pursuit of creditors'

causes of action."  *Id*. at \*\*30.  In reaching these conclusions, the Court analogized the

liquidating trust at issue to the trust addressed by the Third Circuit in *LaSala*, which was

permitted to pursue claims against third parties that originally belonged to the bankrupt debtor.

*Id*. at \*\*31-32.

Judge Smith's dissent in *RGH Liquidating Trust* persuasively refutes the

majority's reasoning.  As explained by Judge Smith, the lawsuit at issue was manifestly brought

"on behalf of more than 50 persons," since the trust was "the assignee of more than 50

bondholders."  *Id*. at \*\*34-35.  Judge Smith reasoned that SLUSA's "Counting" provision is "not

relevant," because "even if the Trust is 'treated as one person' it is still suing 'on behalf of' more

than 50 others — just as a class representative may be one person, but a class action will still be

barred by SLUSA."  *Id*. at \*\*35 (quoting 15 U.S.C. § 78bb(f)(5)(D)).  As Judge Smith explained,

"the majority ignores the difference, critical for SLUSA purposes, between a trustee in

bankruptcy — who sues, ordinarily, on behalf of a single entity, the debtor — and a liquidating

trust like this one, which is bringing claims assigned to it for the purpose of suit by more than 50

potential plaintiffs."  *Id*. at \*\*37-38.

In addition, it is clear that Judge Smith, rather than the majority, had the correct

reading of the Third Circuit's decision in *LaSala*.  As Judge Smith explained, "the critical fact

supporting the Third Circuit's holding that the case was not barred by SLUSA" was that "the claims being litigated there had originally belonged not to many entities, but to one, a bankrupt company." *Id*. at **38.  In contrast, with respect to claims that originally belonged to more than 50 entities — *i.e.*, the claims belonging to purchasers of the company's stock — the Third Circuit concluded that they *did* fit within the definition of "covered class action," *LaSala*, 519 F.3d at 137-38.

Even under the majority opinion, however, the Trustee's claims are barred by SLUSA.  The Trustee in this case, in contrast to the trust in *RGH Liquidating Trust*, is not suing solely as a supposed assignee of claims that originally belonged to customers.  Rather, based on the flawed standing theory adopted in *Redington*, the Trustee is also asserting customer claims as a self-proclaimed "bailee."  The majority's decision in *RGH Liquidating Trust*, which placed heavy emphasis on the valid assignment of creditor claims to the debtor and then the trust, has no application to the Trustee's bailment theory.  The claims that the Trustee is asserting as a "bailee" were never assigned to him and are being asserted on a representative basis on behalf of customers, in violation of SLUSA.

*          *          *

The plain language of the statute, the legislative history, and the judicial decisions discussed above demonstrate that SLUSA prohibits the aggregation of thousands of state law securities claims in a single mass action.  Because that is precisely what the Trustee is attempting to do here, his common law damages claims — causes of action 21 to 27 of the Amended Complaint — must be dismissed.

**POINT III**

**THE AMENDED COMPLAINT FAILS TO STATE CLAIMS THAT
JPMORGAN AIDED AND ABETTED MADOFF'S PONZI SCHEME.**

Even if the Trustee has standing to bring common law damages claims, all of

those claims are defective and should be dismissed.  The Trustee's aiding and abetting claims

(causes of action 21, 22 and 23) should be dismissed on the grounds that the Amended

Complaint fails to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud,

substantially assisted the fraud, or proximately caused damages to customers.  There is,

moreover, nothing in the Amended Complaint that would allow the Court to find plausible the

Trustee's theory that JPMorgan knowingly facilitated Madoff's inevitably doomed Ponzi scheme

in order to earn routine banking fees.  *See Schmidt* v. *Fleet Bank*, 1998 WL 47827, at *6

(S.D.N.Y. Feb. 4, 1998) ("Ponzi schemes are doomed to collapse . . . and while an individual

may be able to escape with the proceeds of a Ponzi scheme, a bank cannot.  Thus, participation

in the scheme would not appear to be in the bank's economic interest."); *Kalnit* v. *Eichler*, 264

F.3d 131, 140-41 (2d Cir. 2001) (refusing to credit allegations of fraudulent conduct that "def[y]

economic reason").

A.     **The Trustee must plead the elements of aiding
       and abetting liability with particularity.**

To state a claim for aiding and abetting fraud under New York law, a plaintiff

must allege:  "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and

(3) that the defendant provided substantial assistance to advance the fraud's commission."

*Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quotation marks omitted);

*Nigerian Nat'l Petroleum Corp.* v. *Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30,

1999).  Similarly, to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff

-32-

must allege:  (1) a breach of fiduciary duty by another; (2) knowing participation in or inducement of the breach; and (3) damages.  *Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 49-50 (2d Cir. 2005).

The Trustee's new claim for "knowing participation in a breach of trust," although pleaded separately, is duplicative of the claim for aiding and abetting breach of fiduciary duty.  In *Whitney* v. *Citibank, N.A.*, the Second Circuit described a "knowing participation" claim as "analogous" to a claim for "aiding and abetting a securities fraud."  782 F.2d 1106, 1115 (2d Cir. 1986).  The Second Circuit has explained that "the gravamen of the claim of participation in a breach of fiduciary duty is the 'knowing participation' . . . of the third party in the fiduciary's breach of trust."  *S & K Sales Co.* v. *Nike, Inc.*, 816 F.2d 843, 848 (2d Cir. 1987) (quoting *Wechsler* v. *Bowman*, 285 N.Y. 284, 291 (1941)); *see also Sharp*, 403 F.3d at 49-50 (conflating claims for aiding and abetting breach of fiduciary duty and knowing participation in breach of trust).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)).  A complaint does not state a claim by making allegations that are "merely consistent with" a defendant's liability, or that raise a "sheer possibility" that a defendant has acted unlawfully.  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations omitted).  Rather, the complaint's well-pled, non-conclusory factual allegations must "state a claim to relief that is plausible on its face" by creating a "reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quotations omitted).

"The Second Circuit has applied the heightened pleading requirements of Rule 9(b) to claims for aiding and abetting fraud." *Rosner* v. *Bank of China*, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008).  Those requirements also apply to claims for aiding and abetting a breach of fiduciary duty where, as here, "the underlying primary violations are based on fraud." *Kolbeck* v. *LIT America Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996); *accord Berman* v. *Morgan Keegan & Co.*, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011).

To comply with Rule 9(b), the plaintiff must allege particularized facts giving rise to a "strong inference" of fraudulent intent or, in an aiding and abetting case, "actual knowledge" of the underlying fraud.  *See, e.g.*, *O'Brien* v. *Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991); *Lerner*, 459 F.3d at 294.  As explained by the Supreme Court in the context of a claim for securities fraud, a "strong inference" of scienter is raised at the pleading stage "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## B.     The burden of pleading actual knowledge is a heavy one.

To plead a claim for aiding and abetting or knowing participation, a plaintiff must plead facts showing that the defendant had "actual knowledge" of the primary violator's wrongdoing.  *E.g.*, *Kolbeck*, 939 F. Supp. at 246; *see also MLSMK* v. *JP Morgan Chase & Co.*, 2011 WL 2176152, at *1-2 (2d Cir. June 6, 2011) (Madoff customer failed to allege facts showing JPMorgan's "actual knowledge" of Madoff's fraud).

Actual knowledge means just that:  "Ordinarily, evidence of recklessness, conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is

not sufficient to satisfy the knowledge element of [an] aiding and abetting fraud claim." *In re Agape Litig.*, 2011 WL 1136173, at *8 (E.D.N.Y. Mar. 29, 2011) (quotation marks and alteration omitted).  By the same measure, "constructive knowledge" of another's wrongdoing is "legally insufficient to impose aiding and abetting liability." *Kaufman* v. *Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003); *accord, e.g.*, *Berman*, 2011 WL 1002683, at *10.  Moreover, as the Second Circuit has held, "conclusory statements" of "actual knowledge" are "insufficient to support an aiding-and-abetting claim under New York law." *Rosner* v. *Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009).

Numerous cases from courts in this Circuit demonstrate the difficulty of pleading an aiding and abetting claim against a financial intermediary (often the only deep pocket once a fraud collapses).  For example, in *Rosner* v. *Bank of China*, the Second Circuit affirmed the dismissal of aiding and abetting claims against a bank.  2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009).  In *Rosner*, the receiver for a corporation that had defrauded investors attempted to show that Bank of China had knowledge of the fraud by virtue of suspicious banking activity, including large, almost daily cash movements that were inconsistent with the corporation's business as a currency trader.  Dismissing the case, the district court observed that "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Id.* at *6.  The Second Circuit affirmed, holding that mere allegations of what a bank "should have known" are "insufficient" to plead actual knowledge.  349 F. App'x at 639 ("Even if [the bank] had reason to suspect that [a customer] was laundering money, this does not mean that [the bank] had actual knowledge of the fraudulent scheme.").

Earlier this year, in *Berman* v. *Morgan Keegan & Co.*, Judge Castel cited *Rosner* in dismissing aiding and abetting claims against a broker-dealer brought by investors in a Ponzi scheme. 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011). The broker-dealer maintained an account for a corporation that was fraudulently marketing tax deferral devices. In attempting to show actual knowledge, the investors relied on a close relationship between an executive of the broker-dealer and the customer's principals, as well as suspicious account activity. *Id.* at *4-5. The plaintiff-investors also alleged that the broker-dealer must have known about the customer's fraud as a result of "Know Your Customer Rules." *Id.* at *5, *10. As in *Rosner*, the court held that the facts alleged did "not give rise to a strong inference" of actual knowledge. *Id.* at *12; *see also id.* at *10 (explaining that the "Know Your Customer Rules" governing the broker-dealer "at most speak to whether [the broker-dealer] should have known of the fraud; they do not reflect actual knowledge of fraud").

Judge Spatt of the Eastern District has since followed *Rosner* and *Berman* in dismissing aiding and abetting claims by investors in a Ponzi scheme. *See In re Agape Litig.*, 2011 WL 1136173 (E.D.N.Y. Mar. 29, 2011). In *Agape*, the plaintiff-investors tried to show actual knowledge by alleging that the bank established a special branch at a fraudulent customer's headquarters; allowed the fraudster, a convicted felon, to open numerous accounts under different names; and enabled the fraudster to transfer investor funds and commingle that money with other funds. *Id.* at *2-3. The investors also relied heavily on allegations of suspicious account activity, including commingling of investor funds, transfers in and out of the account in equal amounts, empty accounts, and unusually large transfers. *Id.* at *4, *9. The court rejected the claim, holding that even if "hindsight" would tend to "indicate the obviousness of the fraud," the investors had failed to show actual knowledge with the "level of specificity that

New York state courts and courts in the Second Circuit have routinely required." *Id.* at \*19; *see also Williams* v. *Bank Leumi Trust Co.*, 1997 WL 289865, at \*5 (S.D.N.Y. May 30, 1997) (dismissing aiding and abetting claim predicated on "conclusory allegations" that a bank had "actual knowledge" of fraudulent scheme based on allegedly suspicious account activity).[7]

New York law is also clear that, even if a bank becomes suspicious that an account holder is involved in fraud, such suspicion "cannot be equated with actual knowledge." *Albion Alliance Mezzanine Fund* v. *State Street Bank & Trust Co.*, 8 Misc. 3d 264, 273 (N.Y. Sup. Ct. N.Y. Co. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003). To impose aiding and abetting liability, "suspicions" are simply not enough:

> [W]hile the . . . inaccuracies in [the company's] account information certainly gave the Bank reason to be *highly suspicious* of its veracity, *such suspicions cannot be equated with actual knowledge* — particularly not actual knowledge that the [fraudsters] were diverting tens of millions of dollar of corporate funds.

*Id.* at 273 (emphasis added); *see also Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at \*9 (E.D.N.Y. Sept. 20, 2000) (bank's "suspicions" of fraud based on account activity and analysis by the bank's in-house fraud investigators did "not raise an inference of actual knowledge").

---

[7] In discussing the "actual knowledge" requirement, the *Agape* court noted that certain courts have allowed a plaintiff to meet that burden by showing "conscious avoidance," which only "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Agape*, 2011 WL 1136173, at \*8 (quoting *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007)). The *Agape* court also observed that "a theory of actual knowledge based on conscious avoidance requires facts supporting an inference that the defendant acted with a culpable state of mind," such that "[p]lausibly alleging actual knowledge through conscious avoidance is a very high bar." *Id.* at \*8, \*20.

**C.      The Trustee has failed to allege facts showing that**
**         JPMorgan had actual knowledge of Madoff's fraud.**

These principles of New York law foreclose the Trustee's aiding and abetting

claims.  The Amended Complaint attempts to establish actual knowledge through two sets of

allegations.  The first involve BMIS's supposedly "suspicious" activity in its bank account at

JPMorgan; the second involve JPMorgan's due diligence in connection with the issuance of

Madoff-related structured products.  The allegations relating to BMIS's bank account, however,

do not even show suspicion on the part of the bank.  The allegations relating to JPMorgan's due

diligence likewise do not show actual knowledge of fraud.

**1.      The Trustee's allegations with respect to activity in the**
**         703 Account do not show actual knowledge of fraud.**

To try to show that JPMorgan knew about Madoff's fraud, the Trustee relies on

alleged irregularities in the 703 Account that Madoff opened at a predecessor bank in 1986.

Those allegations, however, fall far short of establishing actual knowledge.

The Amended Complaint is replete with allegations concerning what JPMorgan

"should" have done as to the 703 Account and what a review of Madoff's accounts "would have

revealed."  Am. Compl. ¶¶ 196, 249(e).  For instance, the Trustee suggests that the activity in the

accounts should have triggered JPMorgan's anti-money laundering system.  *Id.* ¶ 196.  The

Trustee also suggests that JPMorgan should have investigated transactions between BMIS and

Norman Levy, a bank client and BMIS customer.  *Id.* ¶ 250.  According to the Amended

Complaint, however, the bank's anti-money laundering and know-your-customer programs

"were not effectively executed."  *Id.* ¶ 210.  Supposedly, the bank's automated system for

detecting suspicious activity "failed to issue alerts even when analyzing highly suspicious

activities with respect to Madoff." *Id.* ¶ 261.  Moreover, according to the Trustee, JPMorgan

"never meaningfully investigated the connection between Madoff and Levy." *Id.* ¶ 256.

       These allegations go nowhere in terms of showing JPMorgan's actual knowledge

of fraud.  The Trustee does not allege that JPMorgan ever disabled, compromised, or ignored its

detection system for Madoff's benefit; indeed, when the system did alert, the Trustee recognizes

that a JPMorgan employee followed up.  Am. Compl. ¶¶ 265-67.  And while the Amended

Complaint alleges that certain transactions "*should* have prompted a check-fraud investigation,

which *would* have revealed more suspicious behavior," the Amended Complaint does not allege

that JPMorgan ever took steps that actually uncovered Madoff's fraud.  *Id.* ¶ 249(e) (emphasis

added).  Indeed, while the Amended Complaint claims that JPMorgan was "uniquely positioned"

to uncover the fraud, *id.* ¶ 298, it ultimately alleges that JPMorgan "fail[ed] to 'know' Madoff or

BLMIS" and even made large loans to BMIS, refuting any claim that JPMorgan had actual

knowledge of Madoff's inevitably doomed Ponzi scheme.  *Id.* ¶¶ 240, 278-86.[8]

       The new factual allegations that the Trustee has added to the complaint likewise

do not come close to establishing that JPMorgan had "actual knowledge" of Madoff's fraud.  The

Trustee now alleges that "in or about 1997" two anonymous employees at an unnamed financial

institution observed Madoff drawing checks on his account at the same institution and depositing

them on "virtually a daily basis" into his JPMorgan account.  Am. Compl. ¶¶ 5, 211.  When this

---

[8]  The Trustee also claims that Madoff's FOCUS Reports "contained glaring irregularities that
should have been probed by" JPMorgan.  Am. Compl. ¶ 4.  But the Amended Complaint is again
devoid of any allegation that anyone at JPMorgan concluded, based on the FOCUS Reports, that
Madoff was engaged in fraud.  Although the pleading recites examples of inconsistencies in the
FOCUS Reports, *see id.* ¶¶ 217-39, there is no allegation that anyone at JPMorgan noticed or
drew negative inferences from them.  Nor is there any allegation that anyone deliberately
compromised the bank's procedures relating to FOCUS Reports for Madoff's benefit.

other financial institution "failed to receive a satisfactory explanation" for the activity, it closed

Madoff's account. *Id.* The Trustee never alleges that the other institution acquired knowledge of

the Ponzi scheme or that it alerted JPMorgan to its suspicions. All the Trustee alleges is that the

other institution "*would* have contacted" JPMorgan under normal operating procedures. *Id.*

(emphasis added). But what "would have" happened is nothing more than speculation, which is

insufficient to plead actual knowledge. *See MLSMK*, 2011 WL 2176152, at *2.

      The Amended Complaint also alleges additional facts regarding JPMorgan's

business relationships with BMIS customers Norman Levy and Sterling Equities. *E.g.*, Am.

Compl. ¶¶ 85-86, 250-59. At most, however, those allegations identify account activity that, in

retrospect, the Trustee believes "*should* have prompted investigation." *Id.* at ¶ 250 (emphasis

added). In addition, the Amended Complaint alleges that JPMorgan supposedly participated in

"other high-profile misdeeds," including the Enron fraud, but without drawing any specific

connection between those alleged misdeeds and the Madoff fraud. *See id.* ¶¶ 181-89. None of

the Trustee's new allegations remotely supports the Trustee's claim of actual knowledge.

    **2.**    **The Trustee's allegations concerning JPMorgan's structured
products due diligence do not show actual knowledge of fraud.**

      The Amended Complaint also makes various allegations relating to the due

diligence that JPMorgan conducted, beginning in 2006, in connection with structured products

issued by JPMorgan that were tied to the returns of Madoff feeder funds. According to the

Amended Complaint, as of 2007, when JPMorgan's UK affiliate began issuing those products,

the due diligence was "preliminary." Am. Compl. ¶¶ 97-100. The Trustee alleges that

JPMorgan had "concerns" about Madoff, but does not allege that anyone at JPMorgan learned at

that time that Madoff was engaged in fraud. *Id.* ¶ 98.

The Trustee alleges that the bank engaged in another round of due diligence beginning in March of 2008, when it acquired Bear Stearns and sought to reassess firm-wide exposure to hedge funds.  Am. Compl. ¶¶ 135-36.  Accordingly, in July 2008, JPMorgan employees went to Austria to perform a "refresh" of the due diligence on a Madoff feeder fund.  *Id*. ¶ 131.  The Amended Complaint recites various "questions" that JPMorgan was asking at this time — "many of the same questions it had asked more than a year before."  *Id*. ¶¶ 136-37.

The Trustee makes no effort to explain why JPMorgan would conduct multiple rounds of due diligence relating to Madoff if the bank already knew he was operating a Ponzi scheme.  Instead, the Trustee relies on generic "red flags" to allege that JPMorgan "could have," "should have," and "would have" discovered the fraud if it had only done more.  *E.g.*, Am. Compl. ¶¶ 98, 143, 179.  For instance, the Trustee cites Madoff's lack of transparency (*id*. ¶¶ 6(b), 149); Madoff's role as clearing broker, sub-custodian, and investment advisor (*id*. ¶ 6(e)); the fact that JPMorgan could not identify Madoff's counterparties for options trades (*id*. ¶¶ 6(c), 107, 142); the consistency of Madoff's returns (*id*. ¶ 6(a)); Madoff's use of a small, unknown auditor (*id*. ¶¶ 6(d), 9, 96, 143, 149); and "public speculation" that Madoff was operating a Ponzi scheme or was otherwise engaged in illegal activity (*id*. ¶ 6(g)).

These "red flag" allegations do not satisfy the high standard of pleading actual knowledge of fraud.  Indeed, in numerous cases arising out of Madoff's Ponzi scheme, courts have rejected attempts by plaintiffs to rely on the very same red flags that the Trustee seeks to rely upon in his Amended Complaint.  *See, e.g.*, *Saltz* v. *First Frontier, LP*, 2010 WL 5298225, at *3, *9-10 (S.D.N.Y. Dec. 23, 2010) (dismissing common law fraud claims against auditors of Madoff feeder fund where plaintiff alleged such "red flags" as the "uncanny consistency" of investment returns and Madoff's use of a small, unknown audit firm); *In re Tremont Sec. Law,*

-41-

*State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 368, 371 (S.D.N.Y. 2010) (dismissing securities

fraud claims against auditors of Madoff feeder fund and rejecting "red flags" such as the inability

to duplicate Madoff's returns using his reported investment strategy, the excessive volume of

Madoff's purported options trading, and Madoff's lack of transparency); *SEC* v. *Cohmad Sec.*

*Corp.*, 2010 WL 363844, at *5-6 (S.D.N.Y. Feb. 2, 2010) (holding that the SEC failed to plead

facts supporting a plausible inference of scienter against a broker-dealer used by Madoff and

observing that "[i]n light of Madoff's established reputation as a successful and respected

investment adviser, the high returns he produced were not generally perceived (even by

professionals) as a badge of fraud").[9]

   The Trustee also relies on a suspicious activity report, or a "SAR," that JPMorgan

filed in the UK at the end of October 2008, just 45 days before Madoff's fraud was revealed to

the world.  As alleged, after conducting further due diligence, JPMorgan began in October 2008

to redeem some — but not all — of its investments in BMIS feeder funds.  According to the

Amended Complaint, these redemptions led to a phone call in which a third party threatened a

JPMorgan employee by saying that "Colombian friends" would "cause havoc" if JPMorgan went

through with its plan to redeem the investments.  Am. Compl. ¶ 152.  Following this

conversation, JPMorgan filed a "suspicious activity report" with the British government.  *Id*.

¶ 155.  According to the Amended Complaint, the report described the background of

JPMorgan's redemptions, but it did not point to new evidence about Madoff showing that he was

---

[9]  In *Anwar* v. *Fairfield Greenwich Ltd.*, although the court sustained an aiding and abetting
claim against the administrator of a Madoff feeder fund, the complaint alleged that the
administrator had "actual knowledge" not of the Ponzi scheme but of the manager's
misrepresentations to investors in the fund regarding the extent and quality of the manager's due
diligence on Madoff.  728 F. Supp. 2d 372, 442-43 (S.D.N.Y. 2010).

engaged in a fraud.  Rather, the report stated that Madoff's returns "appear" to be too good to be true and that thus they "probably" are.  *Id.* ¶¶ 11, 155.  At most, the report indicates suspicion of fraud, *not* the actual knowledge required to sustain an aiding and abetting claim.  *See, e.g.*, *Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at *17, *21 (S.D.N.Y. June 16, 2000) (dismissing aiding and abetting claim for failure to plead actual knowledge, despite alleged "suspicions" of fraud on the part of Chase).

          The Trustee's reliance on this SAR as a basis to impose liability on JPMorgan is not only unavailing in showing actual knowledge, but it also violates federal law and policy prohibiting the imposition of liability on a financial institution for filing such a report.  The entire purpose of the suspicious activity reporting regime is to encourage early reporting of possible wrongdoing.  That objective would be severely undermined if financial institutions faced potential liability for reporting questionable activity.  Accordingly, under federal statute, "[a]ny financial institution that makes a voluntary disclosure of any possible violation of law or regulation . . . *shall not be liable to any person under any law* or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure . . . ."  31 U.S.C. § 5318(g)(3) (emphasis added).  In relying on a SAR to prosecute his claims, the Trustee flouts this federal statute, as well as Second Circuit precedent holding that the statute creates "an unqualified privilege" that "broadly and unambiguously provides for immunity from any law (except the federal Constitution) for any statement" contained in a SAR filing.  *Lee* v. *Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999); *see also Nevin* v. *Citibank, N.A.*, 107 F. Supp. 2d 333, 342 (S.D.N.Y. 2000) (McMahon, J.) ("[N]ot only the plain language of the statute but also sound public policy dictate[] that anything contained in a SAR enjoy an unqualified privilege.").

Nor does JPMorgan's redemption of investments in Madoff feeder funds show actual knowledge of fraud.  The decision in *MLSMK* v. *JPMorgan Chase & Co.*, makes that plain.  The plaintiff in that case, like the Trustee here, sought to rely upon JPMorgan's decision to redeem investments in the feeder funds as evidence that JPMorgan was aware of Madoff's fraud.  737 F. Supp. 2d 137, 144-45 (S.D.N.Y. 2010).  The court dismissed the claim for aiding and abetting breach of fiduciary duty — observing that *even if* JPMorgan "could have connected the dots to determine that Madoff was committing fraud, Plaintiff offers no facts to support the claim that [JPMorgan] *actually reached such a conclusion*."  *Id*. at 144 (emphasis added).

The Trustee also points to communications within JPMorgan following the revelation of Madoff's fraud.  The Trustee, for example, cites a "Lessons Learned" document circulated after the fraud was revealed.  Am. Compl. ¶¶ 175-80.  But that document never suggests that anyone at JPMorgan knew all along that BMIS was a criminal enterprise; instead, it focuses on ways for JPMorgan to strengthen its due diligence procedures going forward so that the bank will not fall victim to future Ponzi artists.  At most, the document suggests that JPMorgan put too much reliance on the same positive factors — such as BMIS's status as a regulated business and Madoff's previously solid reputation — that permitted Madoff to deceive banks and investors around the world.  *See id*. ¶ 179; *see generally SEC* v. *Cohmad Sec. Corp.*, 2010 WL 363844, at *5-6 (observing that "Madoff's established reputation as a successful and respected investment adviser" contributed to the success of his fraud).[10]

---

[10]  The Trustee's conclusory allegations that JPMorgan "consciously avoided knowledge of the fraud" likewise fails to establish actual knowledge.  *E.g.*, Am. Compl. ¶ 508.  The Amended Complaint alleges no facts showing that anyone at JPMorgan avoided "confirming" knowledge of the fraud "in order later to be able to deny" such knowledge, as required by the case law.  *See, e.g.*, *In re Agape Litig.*, 2011 WL 1136173, at *8.

### 3.  The Trustee's assertion that the 703 Account was a "fiduciary account" is baseless and irrelevant.

Recognizing that he cannot plead particularized facts showing that JPMorgan had actual knowledge of Madoff's Ponzi scheme, the Trustee shifts course in the Amended Complaint and alleges for the first time that the 703 Account at JPMorgan was a "fiduciary account" in which funds were "impressed with a trust."  Am. Compl. ¶¶ 200, 492.  The obvious purpose of that allegation is to try to exploit language in Second Circuit decisions stating that, although "[b]anks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers," the court "on occasion" has "recognized a narrow exception to this rule that arises when a bank fails to act to safeguard trust funds on deposit in a fiduciary account after receiving 'clear evidence' of misappropriation."  *MLSMK*, 2011 WL 2176152, at *3.

The Amended Complaint, however, alleges *no* facts to support the claim that the 703 Account contained "trust funds" or was a "fiduciary account" of any kind.  To the contrary, the facts pled show that the account was a routine checking account — *not* a fiduciary account.  The Amended Complaint explicitly alleges that the 703 Account was "BLMIS's checking account" and that the money deposited in the account was "commingled."  Am. Compl. ¶¶ 200, 215; *see also id.* ¶¶ 199-202 (703 Account was "Madoff's Account").  The Amended Complaint does *not* allege that the 703 Account had any attributes of a trust account, such as an account name reflecting fiduciary status or an agreement requiring that funds in the account be segregated or held in trust.  Thus, as Judge Jones correctly recognized in granting a motion to dismiss filed by JPMorgan in a lawsuit filed by a Madoff customer, the 703 Account was a simple "demand deposit account, *not* a fiduciary account."  *MLSMK*, 737 F. Supp. 2d at 147 n.2 (emphasis added).

To support the assertion that the 703 Account was something other than a simple deposit account, the Trustee intimates that the account should be treated as a "fiduciary account" because BMIS, the holder of the account, owed fiduciary obligations to *its* customers, including as a trustee for retirement accounts, pension funds and trusts. Am. Compl. ¶ 200. But, whatever the nature of BMIS's relationships with its customers, New York courts have repeatedly held that a bank account is *not* a "fiduciary account" merely because the account holder may owe fiduciary duties to its own clients. For example, in *Agape*, plaintiff-investors sought to hold a depository bank liable for its supposed participation in an account holder's Ponzi scheme based on allegedly suspicious account activity. 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010). The court rejected this argument, recognizing that the "conventional depository accounts" at issue in that case were *not* fiduciary accounts. *Id.* In words that apply with full force to this case, the court observed that "[n]either the Plaintiffs nor the Court have been able to locate a case which even suggests that New York law imposes upon banks a duty to protect non-customers from a fraud involving *depository* accounts." *Id.* (emphasis in original).

*Renner* reached the same result. The plaintiff in that case was an investor who was defrauded of $3 million by a Chase account holder. *Renner* v. *Chase Manhattan Bank*, 1999 WL 47239, at *1 (S.D.N.Y. Feb. 3, 1999). Because the plaintiff-investor had transferred those funds directly to the Chase account, the plaintiff sued Chase on a number of theories, including aiding and abetting fraud. *Id.* at *11, *14. In dismissing the claims, the court observed that the plaintiff was "not a customer of Chase" to which Chase owed any duty. *Id.* at *13. The court concluded that the account "was not a fiduciary account" and, accordingly, that there was "no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts." *Id.* at *14. In amending his complaint, the plaintiff

claimed that the Chase account differed from a general deposit account because of the account

holder's fiduciary duties.  *Renner*, 2000 WL 781081, at *13.  But just as the court had earlier

rejected plaintiff's characterization of the account as a "fiduciary account," the court rejected

plaintiff's new theory.  Citing the Second Circuit's decision in *Peoples Westchester Savings*

*Bank* v. *FDIC*, 961 F.2d 327, 330 (2d Cir. 1992), the court held that although the account holder

"may have had a special duty with respect to [the plaintiff's] funds, . . . that duty did not pass to

Chase."  *Renner*, 2000 WL 781081, at *13.

Similarly, in *Rizer* v. *Breen*, 2007 N.Y. Misc. LEXIS 801 (Sup. Ct. N.Y. Co. Jan.

29, 2007), the plaintiff had given her stepfather the authority to invest her assets, as well as the

power to effect transactions using her HSBC bank accounts.  The stepfather proceeded to

embezzle $3 million from those accounts.  *Id.* at *1-3.  When the plaintiff sought to hold HSBC

liable, the court rejected the plaintiff's claims, holding that the bank "did not have a duty to

monitor or police [the plaintiff's] accounts and the actions of her chosen attorney-in-fact."  *Id.* at

*15.  Although the plaintiff had alleged summarily that the accounts were "fiduciary accounts,"

the court disagreed, observing that "the account opening documents, as well as the account

statements and the Rules, all establish that the accounts were *merely standard deposit accounts*."

*Id.* at *16 (emphasis added).  The only plausible conclusion, therefore, was that the bank had

intended for the "relationship" to be "the normal relationship of a bank and its depositor."  *Id.* at

*15-16; *see also Tzaras* v. *Evergreen Int'l Spot Trading*, 2003 WL 470611, at *6 (S.D.N.Y. Feb.

25, 2003) (dismissing claims against JPMorgan predicated on account holder's wrongdoing and

rejecting claim that account held by a fraudulent investment firm at Chase was a "fiduciary

account"); *Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13,

27 (S.D.N.Y. 2009) (dismissing breach of fiduciary duty claims against Chase based on

allegations that an investment advisor defrauded an investor into making deposits into the advisor's account at Chase (citing *Renner* and *Tzaras*)).

In this case, the Trustee has alleged no facts suggesting that the relationship between JPMorgan and BMIS was anything more than an ordinary relationship between a bank and a general depositor. There are no allegations that Madoff or JPMorgan intended to create anything other than an ordinary deposit account. Nor are there allegations that the documents governing the 703 Account identified the account as a trust account. There is thus "no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts." *Renner*, 1999 WL 47239, at *14.

In addition, while the Court can readily discard the Trustee's "fiduciary account" claim on the face of the pleadings, the Court is entitled to consider the governing account documents in resolving JPMorgan's motion. In pre-litigation discovery, JPMorgan produced the documents through which Madoff confirmed that his account was a standard business deposit account subject to standard terms and conditions for such accounts. Indeed, Madoff's signature card for the 703 Account identifies Madoff as the "Depositor" and a "sole proprietor" — *not* a "fiduciary" or a "trustee." *See* Decl. Ex. 7. In preparing his pleading, the Trustee necessarily relied on those documents, which make it perfectly clear that the 703 Account was a plain deposit account and not a fiduciary account. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (documents integral to complaint may be considered on motion to dismiss).

Finally, even assuming that the 703 Account was a "fiduciary account," the Trustee's claims must be rejected. It is well settled that "[a]s a general rule, a bank has no duty to monitor even a fiduciary account under New York law." *Renner*, 1999 WL 47239, at *14. And a bank is entitled "'to presume that the fiduciary will apply the funds to their proper

-48-

purposes.'"  *In re Agape Litig.*, 2011 WL 1136173, at *26.  Thus, a bank is only subject to

possible liability if it fails to safeguard funds in such an account "after receiving 'clear evidence'

of misappropriation."  *MLSMK*, 2011 WL 2176152, at *3.  Nothing in the Amended Complaint

shows that JPMorgan received anything approaching "clear evidence of misappropriation."  The

traditional indicia of misappropriation include "a history of overdrafts in the fiduciary account"

and the use of "money from a fiduciary account in order to satisfy the fiduciary's personal debt

to the bank," factors that are not alleged here.  *Renner*, 1999 WL 47239, at *14.  And the fact

that large amounts of money were transferred in and out of the 703 Account is hardly "clear

evidence" that BMIS, a registered broker-dealer, was stealing customer money.  As the Second

Circuit observed in affirming the dismissal of a Madoff customer's claims against JPMorgan, "it

is not unusual for money to be transferred into and out of investment accounts; investment

advisors could not buy and sell securities on behalf of their clients if they did not transfer money

to and from various accounts."  *MLSMK*, 2011 WL 2176152, at *3.

**D.      The Trustee has failed to allege facts showing that
         JPMorgan substantially assisted Madoff's fraud.**

Just as the Trustee has failed to plead any facts showing that JPMorgan had actual

knowledge of Madoff's fraud, the Trustee has also failed to plead facts showing that JPMorgan

substantially assisted the fraud.  The Trustee's argument is that JPMorgan assisted the fraud by

(1) providing commercial banking services to BMIS, (2) investing approximately $250 million in

Madoff feeder funds, and (3) not reporting Madoff to regulators.

*First*, "the mere fact that participants in a fraudulent scheme use accounts at a

bank to perpetrate it, without more, does not in and of itself rise to the level of substantial

assistance."  *Rosner*, 2008 WL 5416380, at *12 (quotation marks omitted).  The banking services

provided by JPMorgan to Madoff are precisely the "conventional banking services" that New

York courts have consistently held to be insufficient to show "substantial assistance" as a predicate for aiding and abetting liability.  *E.g.*, *In re Agape Litig.*, 681 F. Supp. 2d at 365; *Nigerian Nat'l*, 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner*, 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase); *Ryan*, 2000 WL 1375265, at *9 ("The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts . . . do not constitute substantial assistance."); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 392-93 (S.D.N.Y. 2009) (characterizing bank's extension of credit to fraudster as "routine" banking service insufficient to support an aiding and abetting claim).

    *Second*, the Trustee's allegation that JPMorgan substantially assisted Madoff by investing $250 million in the feeder funds turns the substantial assistance requirement on its head.  Whether that money ever actually made its way to BMIS is never alleged.  But even if it did, such a tiny fraction of the tens of billions of dollars that Madoff is known to have collected from investors cannot plausibly be characterized as "substantial assistance."  Moreover, by the Trustee's theory, everyone who invested in one of the feeder funds or directly with Madoff himself — *i.e.*, his victims — "substantially assisted" his fraud.  This argument is absurd.

    *Third*, the Trustee cannot adequately plead substantial assistance by alleging that JPMorgan failed to comply with federal anti-money laundering laws or that it "ignor[ed]" allegedly suspicious activity in Madoff's account.  Am. Compl. ¶ 518.  These allegations all amount to *inaction*, which *cannot* amount to substantial assistance unless the defendant owes a fiduciary duty "directly to the plaintiff."  *Kaufman*, 307 A.D.2d at 126; *see also Sharp*

*International*, 403 F.3d at 51-52 (allegations that "come down to omissions or failures to act" do not support a claim of "substantial assistance"). The alleged failure "to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations" does "not elevate [defendants'] actions into the realm of 'substantial assistance.'" *Rosner* v. *Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007); *accord Berman*, 2011 WL 1002683, at *10.

**E.     The Trustee has failed to plead that JPMorgan's conduct was the proximate cause of the alleged injury.**

To state an aiding and abetting claim, "the complaint must allege that the acts of the aider and abettor proximately caused the harm to the [plaintiff] on which the primary liability is predicated." *Bloor* v. *Carro, Spanback, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985); *Jordan (Bermuda) Inv.* v. *Hunter Green Inv.*, 566 F. Supp. 2d 295, 300 (S.D.N.Y. 2008). "Aiding and abetting liability arises only when plaintiffs' injury was a 'direct or reasonably foreseeable result' of the complained-of conduct. 'But-for' causation does not suffice; the breach must proximately cause the loss." *Kolbeck*, 939 F. Supp. 2d at 249 (internal citation omitted); *accord Bloor*, 754 F.2d at 63 ("Allegations of a 'but for' causal relationship are insufficient.").

The Trustee's theory of proximate cause appears to be that Madoff could not have run his Ponzi scheme without the commercial banking services provided by JPMorgan. But the Amended Complaint never alleges that BMIS — which after all fooled the SEC and scores of financial institutions around the world — would have been unable to obtain routine banking services from another bank. Am. Compl. ¶¶ 519, 534; *see, e.g.*, *In re Beacon*, 745 F. Supp. 2d at 394 ("Madoff deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ('SEC') and the Financial Industry Regulatory

Authority ('FINRA')."). The Amended Complaint thus fails to establish proximate cause. *Edwards & Hanly* v. *Wells Fargo Secs. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979) (allegation that fraudster "would not have been able to finance or to conceal" the fraud without defendant's "acquiescence" and lending of money did not amount to proximate cause); *In re Agape Litig.*, 2011 WL 1136173, at *25 ("conventional banking" services provided to Ponzi schemer were "not the proximate cause of the Plaintiffs' damages").

## F.    The Trustee has failed to plead individual fraud claims.

The aiding and abetting and knowing participation claims also fail because the Amended Complaint makes no attempt to satisfy the requirements for pleading any of the thousands of individual customer fraud claims on which those claims are predicated. To plead those individual claims, the Trustee would have to identify each customer who was defrauded, specify the misstatements or omissions that each customer relied upon, and explain why each customer's reliance was reasonable. Instead, the Trustee lumps all of Madoff's customers together as if they were a single, unitary plaintiff — even though the Trustee himself has publicly alleged that various customers, including large feeder funds such as Fairfield Sentry, participated in Madoff's fraud and did not act reasonably in relying on Madoff. *See, e.g.*, Decl. Ex. 3, *Picard* v. *Fairfield Sentry Ltd. et al.*, No. 09-01239 (Bankr. S.D.N.Y.).

The Court should not indulge the Trustee's fiction. As Judge Rakoff observed in *HSBC*, "unlike the implied private right of action for failure to discharge a regulatory duty that was at issue in *Redington*, common law claims (such as those asserted here) generally require proof of individual reliance and causation." HSBC Op. at 19. This case, in other words, is not a fraud-on-the-market case where the plaintiff may dispense with pleading certain elements of fraud. Here, if the Trustee were allowed to aggregate thousands of separate customer fraud

claims in a single action, he would have to plead the individual elements of each of those claims — which he has utterly failed to do.  *See, e.g.*, *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000) (dismissing fraudulent misrepresentation claim brought by SIPC and SIPA trustee on behalf of customers on the grounds that the complaint failed to plead reliance by the customers on the alleged misstatements); *Jana Master Fund, Ltd.* v. *JPMorgan Chase & Co.*, 2008 WL 746540, at *4-5 (Sup. Ct. N.Y. Co. Mar. 12, 2008) (dismissing aiding and abetting fraud and aiding and abetting breach of fiduciary duty claims where plaintiffs did not "particularize the reasonableness of any purchaser's reliance on anything said or communicated").

The Trustee's failure to plead the elements of fraud on behalf of any individual customer underscores the basic flaw in the Trustee's attempt to aggregate the claims of differently situated customers into one mass action.  The Trustee should not be relieved of his pleading burden because he is trying to pursue an unmanageable, *de facto* class action.

## POINT IV

### THE AMENDED COMPLAINT FAILS TO STATE CLAIMS FOR CONVERSION OR AIDING AND ABETTING CONVERSION.

The Amended Complaint alleges claims for conversion and aiding and abetting conversion (causes of action 24 and 25).  For the reasons stated above, the Trustee lacks standing to bring those claims and they are barred by SLUSA.  But the Amended Complaint also fails to state claims for relief based on these theories.

**A.**    **The Amended Complaint fails to state a claim for conversion.**

The Amended Complaint alleges that JPMorgan converted customer funds when it debited the 703 Account to repay BMIS's outstanding loan to the bank.  Am. Compl. ¶¶ 537-

40.  Under New York law, "conversion takes place when someone, intentionally and without

authority, assumes or exercises control over personal property belonging to someone else,

interfering with that person's right of possession."  *Colavito* v. *N.Y. Organ Donor Network*, 8

N.Y.3d 43, 49-50 (2006).

The conversion claim fails on numerous grounds.  *First*, when JPMorgan debited

BMIS's deposit account, it did not exercise control over specifically identifiable property

belonging to "someone else."  "[A] customer's bank account is merely a debt owed to it by the

bank and funds deposited are not sufficiently specific and identifiable, in relation to the bank's

other funds, to support a claim for conversion against a bank."  *Wells* v. *Bank of New York Co.*,

181 Misc. 2d 574, 577 (Sup. Ct. N.Y. Co. 1999) (citing cases).  Accordingly, money in a bank

account is not "held in a 'specific, identifiable fund,'" as required for a conversion action.

*Citadel Mgmt.* v. *Telesis Trust*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (citation omitted).

*Second*, a conversion claim that "rests on an allegation of fraudulent taking" is

subject to Rule 9(b), just like any other claim sounding in fraud.  *Daly* v. *Castro Llanes*, 30 F.

Supp. 2d 407, 414 (S.D.N.Y. 1998).  To plead conversion, therefore, the Amended Complaint

must allege with particularity that JPMorgan *intentionally* deprived another person of his or her

property.  The Amended Complaint does nothing of the kind.

*Third*, to state a claim for conversion, a plaintiff must plead that the defendant

"acted to exclude the rights of the owner."  *Parks* v. *ABC, Inc.*, 2008 WL 205205, at *5

(S.D.N.Y. Jan. 24, 2008) (quotation marks omitted).  The Amended Complaint, however, does

not allege that JPMorgan took any action with respect to the 703 Account that was not authorized

and directed by Madoff and BMIS, the bank's clients.  *See, e.g.*, Am. Compl. ¶¶ 249(b), 280-81,

284-85, 288.  Nor does the Amended Complaint allege that JPMorgan withheld money in the

-54-

face of a demand for its return, as is required by the case law. *See Schwartz* v. *Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (affirming dismissal of conversion claim where there was no evidence that plaintiff demanded return of property).

In sum, the Amended Complaint does not plausibly allege any of the elements of conversion with respect to the debit of the 703 Account. Instead, the only plausible inference to be drawn from the Trustee's allegations is that the 703 Account was an ordinary deposit account that BMIS, the account holder, authorized JPMorgan to debit.

**B.    The Amended Complaint fails to state a claim for aiding and abetting conversion.**

The Trustee's new claim for aiding and abetting conversion, which alleges that JPMorgan is liable for Madoff's alleged conversion of his customers' property, fails for the same reasons as the Trustee's other aiding and abetting claims.

To sustain a claim for aiding and abetting conversion, a plaintiff must allege "the 'existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance.'" *In re Agape Litig.*, 2011 WL 1136173, at *26. Rule 9(b) applies where, as here, the conversion is predicated on fraud. *Silverman Partners* v. *First Bank*, 687 F. Supp. 2d 269, 288 (E.D.N.Y. 2010).

As demonstrated above, the Trustee has failed to allege that JPMorgan had actual knowledge of Madoff's crimes, that JPMorgan provided substantial assistance to Madoff's scheme, or that JPMorgan's conduct was the proximate cause of customer losses. These pleading failures are fatal. *See, e.g., In re Agape Litig.*, 2011 WL 1136173, at *26-27 (dismissing aiding and abetting conversion claim against bank where the complaint failed to allege the bank's "actual knowledge" of its customer's "underlying conversion").

**POINT V**

**THE AMENDED COMPLAINT FAILS TO STATE A
CLAIM FOR UNJUST ENRICHMENT.**

The Amended Complaint includes a claim for unjust enrichment (cause of action 26).  That claim should be dismissed not only for lack of standing and under SLUSA but also for failure to state a claim.

To plead unjust enrichment under New York law, a plaintiff must allege that: "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."  *Mandarin Trading Ltd.* v. *Wildenstein*, 16 N.Y.3d 173, 182 (2011) (quotation marks omitted).  In addition, the complaint must allege the existence, between the plaintiff and defendant, of "some type of direct dealings or an actual, substantive relationship."  *Carmona* v. *Spanish Broadcasting Sys., Inc.*, 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009); *accord, e.g.*, *Jet Star Enters., Ltd.* v. *Soros*, 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006).

The Amended Complaint does not state a claim for unjust enrichment.  Although the Amended Complaint asserts summarily that "JPMC has unjustly benefitted through its receipt of Customer Property," Am. Compl. ¶ 557, the Amended Complaint alleges no direct dealings or actual, substantive relationships between JPMorgan and the BMIS customers that the Trustee purports to represent.  *See Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*, 2005 WL 1490097, at *7 (S.D.N.Y. June 23, 2005) (dismissing unjust enrichment claim for failure to allege any relationship between the plaintiff and the defendant); *Reading Int'l, Inc.* v. *Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) (same).

Here, the only entity with whom JPMorgan had any relationship was BMIS, but the Trustee cannot bring an unjust enrichment claim on behalf of BMIS.  As explained above, the *Wagoner* rule would bar any such claim.  *See* Point I.A, *supra*.  In addition, any such claim would be barred by the agreements between BMIS and JPMorgan, including account and loan agreements.  "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Clark-Fitzpatrick, Inc.* v. *Long Island R.R.*, 70 N.Y.2d 382, 388 (1987).

The Trustee likewise fails to allege facts showing that "equity and good conscience" require restitution by JPMorgan.  With respect to this element, "a plaintiff, in order to recover under a theory of quasi-contract," must "prove that performance" by the plaintiff "was rendered for the defendant."  *Piccoli A/S* v. *Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 166 (S.D.N.Y. 1998) (quotation marks omitted).  "It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery."  *Kagan* v. *K-Tel Entm't, Inc.*, 172 A.D.2d 375, 376 (1st Dep't 1991) (internal citations omitted).  Here, the Trustee cannot — and does not — allege that BMIS customers invested funds for the benefit of, or at the behest of, JPMorgan.  The customers invested for their own benefit, and they were acting in their own interest (at Madoff's behest) when they invested with BMIS.

## POINT VI

### THE TRUSTEE HAS NO VALID CLAIM FOR "FRAUD ON THE REGULATOR."

Cause of action 27 is a state law claim alleging that JPMorgan deceived regulators by failing to inform them of Madoff's Ponzi scheme.  Am. Compl. ¶¶ 562-83.  According to the Trustee, had JPMorgan notified these regulators of Madoff's crimes, they would have shut down

the Ponzi scheme and customer losses would have been averted.  *Id.* ¶ 582.  The Trustee's novel

claim should be dismissed for lack of standing and under SLUSA, as set forth above, and also on

numerous other grounds.

    *First*, "fraud on the regulator" is a made up cause of action.  Despite extensive

research, JPMorgan is not aware of any New York case that has ever recognized a cause of

action for fraud on a regulator.  Nor did the Trustee cite any such case in opposing withdrawal of

the reference.  To the extent the issue has been addressed, the Second Circuit and the New York

Court of Appeals have declined to recognize a theory of fraud based on a plaintiff's alleged

reliance on the "regulatory process."  *SIPC* v. *BDO Seidman, LLP*, 222 F.3d 63, 71-73 (2d Cir.

2000); *accord SIPC* v. *BDO Seidman, LLP*, 95 N.Y.2d 702, 709-10 (2001).

    *Second*, the Trustee's purported "fraud on the regulator" claim does not meet the

basic requirements for a fraud claim under New York law.  To state a claim for fraud, "the

plaintiff must prove a misrepresentation or a material omission of fact which was false and

known to be false by defendant, made for the purpose of inducing the other party to rely upon it,

justifiable reliance of the other party on the misrepresentation or material omission, and injury."

*Lama Holding Co.* v. *Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996).  In addition, to meet the

requirements of Rule 9(b), a plaintiff must "specify the statements or omissions that the plaintiff

contends were fraudulent, identify the speaker, state where and when the statements were made,

and explain why the statements were fraudulent."  *Muller-Paisner* v. *TIAA*, 289 F. App'x 461,

463 (2d Cir. 2008).  To plead the required element of scienter, a plaintiff must allege facts that

"'give[] rise to a strong inference of fraudulent intent.'"  *O'Brien* v. *Nat'l Property Analysts*

*Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quotation marks omitted).

The elements of a fraud claim are not satisfied here.  The Amended Complaint fails to allege that JPMorgan knowingly misrepresented or concealed facts from any regulator. Instead, the Trustee merely alleges that he "is informed and believes" that JPMorgan supposedly "omitted and misrepresented material facts" to regulators.  Am. Compl. ¶ 565.  This conclusory allegation is plainly deficient under Rule 9(b).

The Amended Complaint also fails to allege, as required, that JPMorgan knowingly withheld information from regulators "for the purpose of inducing" the *plaintiffs* — *i.e.*, BMIS or its customers — to rely on that omission; indeed, any such allegation would be entirely implausible given that OCC regulations and state laws prohibit banks from disclosing reports filed with regulators.  *See* 12 C.F.R. § 21.11(k)(1)(i); N.Y. Banking Law § 36(10). Rather than supporting "a strong inference of fraudulent intent" on the part of JPMorgan, the Amended Complaint supports the inference that Madoff duped JPMorgan just as he duped regulators, other financial institutions, and other investors.  *See, e.g.*, *SEC* v. *Cohmad Sec. Corp.*, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (dismissing securities fraud claim for failure to adequately plead scienter where "the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators"); *see also* Point III.C, *supra*.

In addition, the Amended Complaint fails to plead the element of "justifiable reliance."  The Amended Complaint alleges that JPMorgan's misrepresentations and omissions were directed at the bank's regulators.  Am. Compl. ¶ 565.  But "a plaintiff does not establish the reliance element of fraud for purposes of . . . New York law by showing only that a *third party* relied on a defendant's false statements" or omissions.  *Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund* v. *Lollo*, 148 F.3d

194, 196 (2d Cir. 1998) (emphasis added); *see also Am. Financial Int'l Group-Asia, L.L.C.* v.

*Bennett*, 2007 WL 1732427, at *9 (S.D.N.Y. June 14, 2007) (dismissing fraud claims based on

"cursory allegations [of] reliance" that "fail[ed] to allege that plaintiffs read the allegedly

misleading . . . statements, or even that they knew of their existence"); *City of New York* v.

*Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 565 (S.D.N.Y. 2005) (dismissing common law fraud claim

under New York law for failure to plead reliance where plaintiff alleged that it had relied on

defendants' submission of reports to a *non-party*, rather than reports to the plaintiff).

   *Third*, insofar as the Trustee's "fraud on the regulator" claim alleges that

JPMorgan misled its federal regulators, the claim is preempted by federal law.  In *Buckman Co.*

v. *Plaintiffs' Legal Committee*, the Supreme Court considered a state law "fraud-on-the-FDA"

claim brought by medical patients against a consultant to the manufacturer of orthopedic bone

screws, and held that the claim was preempted by the Federal Food, Drug, and Cosmetic Act.

531 U.S. 341, 348 (2001).  Recognizing that "[p]olicing fraud against federal agencies is hardly a

field which the States have traditionally occupied," the Supreme Court held that "the relationship

between a federal agency and the entity it regulates is inherently federal in character because the

relationship originates from, is governed by, and terminates according to federal law."  *Id*. at

347.  The Court explained that the federal statute "prompted" the defendant's "dealings with the

FDA" and "dictated" the "very subject matter" of the defendant's statements to the agency.  *Id.*

at 347-48.  The Court also found that "the federal statutory scheme amply empower[ed] the FDA

to punish and deter fraud against the Administration," and that the agency's "flexibility" in

determining how to address misconduct on the part of regulated businesses "is a critical

component of the statutory and regulatory framework under which the FDA pursues difficult

(and often competing) objectives."  *Id.* at 348, 349.  Accordingly, because any state law fraud-

on-the-FDA claim would conflict with the enforcement authority delegated to the FDA, the

*Buckman* Court held that plaintiffs' fraud-on-the-regulator claims were preempted. *Id.*; *see also*

*Williams* v. *Dow Chem. Co.*, 255 F. Supp. 2d 219, 232 (S.D.N.Y. 2003) (holding state law "fraud

on the EPA" claims preempted under *Buckman*).

As in *Buckman*, JPMorgan's communications with federal regulators in this case

were indisputably "prompted" by federal law. *Buckman*, 531 U.S. at 347. And here, as in

*Buckman*, the relevant statutes and regulations dictate the "subject matter" of JPMorgan's

statements to the agencies. *Id.*; *see also* 15 U.S.C. § 78o (SEC: "Registration and regulation of

brokers and dealers"); 12 U.S.C. § 161 (OCC: "Reports to Comptroller of the Currency"); 12

C.F.R. § 21.11 (OCC: "Suspicious Activity Report"); 12 C.F.R. § 225.4(f) (Federal Reserve:

"Suspicious activity report"); 12 U.S.C. § 1844(a) (Federal Reserve: "[E]ach bank holding

company shall register with the Board on forms prescribed by the Board. . . ."). For example, the

federal regulations that mandate the filing of a Suspicious Activity Report prescribe when a

national bank is required to file a SAR and in what form. 12 C.F.R. § 21.11(c). In addition, the

relevant statutes grant examination and enforcement authority to the agencies. *E.g.*, 15 U.S.C. §

78u-2 (SEC); 12 U.S.C. §§ 93, 164(d), 481 (OCC); 12 U.S.C. § 1818 (OCC, Federal Reserve,

FDIC); 12 U.S.C. §§ 325, 483, 1847 (Federal Reserve).

Significantly, like Congress's empowerment of the FDA "to punish and deter

fraud" against the FDA noted in *Buckman*, federal statutes and code provisions empower the

SEC, the OCC and the Federal Reserve to punish and deter fraud or other misconduct by

regulated entities. For example, failure to file a SAR as required by Section 21.11 of the OCC

regulations can result in "supervisory action" by the OCC. *See* 12 C.F.R. § 21.11(i). Indeed, if

JPMorgan were to fail to file required reports, the statute provides that fines "shall be assessed

and collected by the Comptroller of the Currency."  12 U.S.C. § 164(d).  Moreover, under federal

statute, JPMorgan is subject to civil penalties if it willfully violates any SEC regulations, *see* 15

U.S.C. § 78u-2, and criminal penalties if it knowingly violates any provision of the U.S. Code

chapter governing bank holding companies.  *See* 12 U.S.C. § 1847(a).[11]

Accordingly, like the relationship at issue in *Buckman*, JPMorgan's relationship

with its federal regulators is "inherently federal."  531 U.S. at 347.  The Trustee's cause of action

for fraud on the SEC, OCC and Federal Reserve "inevitably conflict[s] with [the agencies']

responsibility to police fraud" and infringes upon those agencies' "flexibility" in pursuing their

"objectives" in regulating national banks such as JPMorgan.  *Id.* at 350, 349; *see also Timberlake*

v. *Synthes Spine, Inc.*, 2011 WL 711075, at *8-9 (S.D. Tex. Feb. 18, 2011) ("fraud as to the

FDA" claims seeking relief for "false representations" to the FDA preempted under *Buckman*

because "it is the Federal Government rather than private litigants [that is] authorized to file suit

for noncompliance"); *Riley* v. *Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009) ("a state-

law claim that the defendant made misrepresentations to the [federal agency] is preempted

because such a claim would not exist absent the federal regulatory scheme").

The Trustee cannot evade dismissal based on federal preemption by claiming that

JPMorgan somehow defrauded *state* regulators.  The state banking laws empower state

---

[11]  The power to enforce any duty to report to the SEC, OCC and Federal Reserve lies exclusively with those regulators; the relevant statutes and regulations do not provide for a private right of action.  *See B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 476 (7th Cir. 2005) (regulation requiring banks to notify the Treasury Department of "any known or suspected Federal criminal violation" does not "create a private right of action for damages"); *AmSouth Bank* v. *Dale*, 386 F.3d 763, 777 (6th Cir. 2004) ("the Bank Secrecy Act does not create a private right of action"); *Carran* v. *Morgan*, 2007 WL 3520480, at *5 (S.D. Fla. Nov. 14, 2007) ("Of course, there is no private right of action for failure to file a suspicious activity report.").

regulators to enforce alleged violations of state regulations.  Although certain provisions of New

York's Banking Law provide for private rights of action, the provisions that govern reports to

bank regulators do *not* do so.  *See, e.g.*, 3 N.Y. Comp. Codes R. & Regs. § 116.2.  Moreover, the

Banking Law expressly confers enforcement authority only on the superintendent of banks.  *See*

N.Y. Banking Law § 37 (authorizing superintendent to require reports); N.Y. Banking Law § 44-

a (authorizing superintendent to impose monetary penalties for failure to make reports).  In these

circumstances, implying a private right of action for violations of Banking Law reporting

requirements "would be inconsistent with both the enforcement means chosen by the Legislature

and the basic purposes underlying [the reporting provisions]."  *Carrier* v. *Salvation Army*, 88

N.Y.2d 298, 302 (1996); *see also Varela* v. *Investors Ins. Holding Corp.*, 81 N.Y.2d 958 (1993)

(declining to imply private right of action under provision of New York's General Business Law

where provision expressly conferred enforcement authority on Attorney General and did not

provide for a private cause of action).  And, as noted above, the total lack of any New York state

court authority for a private "fraud on the regulator" claim reinforces the fact that the regulation

of a bank's reports to state agencies is the exclusive province of those agencies.

## POINT VII

### THE AMENDED COMPLAINT FAILS TO STATE A
### CLAIM FOR CONTRIBUTION.

The Amended Complaint seeks contribution for the payment of "customer

claims" asserted in the SIPA liquidation, including $6.9 billion in claims that the Trustee

indicates he has "allowed," but not yet paid, and almost $800 million in payments made to

customers by SIPC.  *See* Am. Compl. ¶¶ 588-89.

In *HSBC*, Judge Rakoff dismissed essentially identical claims for contribution on

the grounds that (1) SIPA does not permit a trustee to seek contribution for payments to

customers that are mandated by the statute, and (2) the New York contribution statute does not apply to the payment of customer claims under SIPA. *See* HSBC Op. at 24-25. The contribution claim against JPMorgan fails for these and additional reasons.

### A.   The Trustee has no authority under SIPA to seek contribution for payments to customers.

A right to contribution exists under a federal statute only if: (1) the statute provides for such a right, "either expressly or by clear implication," or (2) the right arises under federal common law. *Texas Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 638 (1981). Absent one of these two circumstances, a plaintiff may not seek contribution under a federal statutory scheme. *See, e.g.*, *id.* at 647 (no right of contribution under the Sherman Act or Clayton Act); *Nw. Airlines, Inc.* v. *Transp. Workers Union of Am.*, 451 U.S. 77, 94-95 (1981) (no right of contribution under the Equal Pay Act or Title VII of the Civil Rights Act of 1964); *Lehman Brothers, Inc.* v. *Wu*, 294 F. Supp. 2d 504, 505 (S.D.N.Y. 2003) (no right of contribution under the Copyright Act); *LNC Inv., Inc.* v. *First Fid. Bank*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996) (no right of contribution under the Trust Indenture Act).

As Judge Rakoff concluded, SIPA does not provide the Trustee with a contribution right for payments to customers. The statute requires a SIPA trustee to distribute customer property to the broker's customers ratably based on their "net equities."[12] But the

---

[12] *See, e.g.*, 15 U.S.C. § 78fff-2(b) ("After receipt of a written statement of claim [by a customer]," the trustee "shall promptly discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to" the customer, including by payment of "moneys made available . . . by SIPC."); 15 U.S.C. § 78fff-2(c) (directing that the Trustee "shall allocate customer property of the debtor . . . to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities").

statute does not empower a trustee to seek contribution for those payments.  To the contrary, although SIPA expressly provides that a trustee may recover property through avoidance actions, 15 U.S.C. § 78fff-2(c)(3), it makes no similar provision for contribution claims.  "If Congress had intended to confer upon the Trustee authority to seek contribution for payments of customer claims, it would have said so in SIPA."  HSBC Op. at 25.

Lacking any basis under SIPA for his contribution claim, the Trustee may attempt to invoke state law.  But "[g]iven that these payments are being made pursuant to a comprehensive statutory scheme," the Trustee "cannot rely on state law to seek contribution where a right to contribution is not expressly provided by a federal statute."  *Id.* at 24; *accord Wu*, 294 F. Supp. 2d at 505 n.1 ("'[W]hether contribution is available in connection with a federal statutory scheme is a question governed solely by federal law.'"); *KBL Corp.* v. *Arnouts*, 646 F. Supp. 2d 335, 341 (S.D.N.Y. 2009) (holding that a plaintiff seeking contribution under the Copyright Act could not "use New York State common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme").[13]

## B.     The Amended Complaint fails to plead the elements of contribution under New York law.

Even if the Trustee could invoke New York law, the Amended Complaint fails to state a claim for contribution.  Under New York law, joint tortfeasors "who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may

---

[13] Any contribution claim is also barred under the *Wagoner* rule.  "The *Wagoner* rule is a *standing* rule — it says that a bankrupt corporation cannot sue a third party for fraud that the corporation itself participated in."  *Am. Tissue, Inc.* v. *Arthur Andersen, L.L.P.*, 2003 WL 22909155, at *4 (S.D.N.Y. Dec. 9, 2003) (emphasis in original).  *Wagoner* thus prevents the Trustee from suing for contribution just as it prevents him from suing for damages.

claim contribution among them." N.Y. C.P.L.R. § 1401. The amount of contribution that may be recovered "shall be the excess paid by [one tortfeasor] over and above his equitable share of the judgment recovered by the injured party." N.Y. C.P.L.R. § 1402.

The Trustee's contribution claim has numerous flaws. *First*, it is well established that a contribution claim must be based on shared "tort liability." *Board of Educ.* v. *Sargent*, 71 N.Y.2d 21, 28 (1987). "Here, while the Trustee is obligated to pay customer claims pursuant to a statutory scheme, he is not subject to 'liability for damages' in the sense contemplated by New York's contribution statute." HSBC Op. at 25.

*Second*, the Trustee has failed to plead that JPMorgan is liable for any injury to BMIS customers. To recover on a contribution claim, "[t]he critical requirement . . . is that [a] breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." *Nassau Roofing & Sheet Metal Co.* v. *Facilities Dev. Corp.*, 71 N.Y.2d 599, 603 (1988). Here, as demonstrated in this brief, the Trustee has not stated a claim for relief on any of the common law claims asserted against JPMorgan.

*Third*, the Trustee has failed to plead that BMIS has paid — or ever will pay — more than its "equitable share" of any judgment, as required to state a contribution claim. *Andrulonis* v. *U.S.*, 26 F.3d 1224, 1233 (2d Cir. 1994) (right of contribution does not accrue "unless and until the defendant pays the plaintiff an amount exceeding its equitable share of the primary judgment"). In particular, the Amended Complaint does not allege that the Trustee has made, or ever will make, payments to customers in an amount greater than BMIS's share of the

damages caused by BMIS's fraud.  Absent such allegations, the Trustee cannot seek

contribution.[14]

## POINT VIII

### THE TRUSTEE'S CLAIMS TO AVOID PAYMENTS TO JPMORGAN SHOULD BE DISMISSED.

The first 20 causes of action in the Amended Complaint seek recovery of

approximately $425 million under the avoidance provisions of the Bankruptcy Code and New

York law.  The Trustee seeks to recover:  (1) repayments of principal and interest on $145

million in secured loans to BMIS; (2) approximately $590,000 in fees paid to JPMorgan; and

(3) payments received by JPMorgan from BMIS feeder funds upon the redemption of

investments in those funds in 2008.  In the Amended Complaint, the Trustee has also added

claims to avoid BMIS's already-performed *obligation* to repay its $145 million loan from

JPMorgan.  JPMorgan seeks dismissal of the Trustee's claims to recover direct payments from

BMIS to JPMorgan and associated obligations (causes of action 1 to 12).[15]

---

[14]  Faced with the requirement that a tortfeasor pay more than its equitable share prior to bringing a contribution action, the Trustee purports to "implead" JPMorgan into "the SIPA Proceeding" — *i.e.*, the brokerage liquidation before Judge Lifland — "pursuant to Rule 14 of the Federal Rules of Civil Procedure and Rule 7014 of the Federal Rules of Bankruptcy Procedure."  Am. Compl. ¶ 21.  The Trustee's theory appears to be that JPMorgan should essentially be treated as a third-party defendant as to each claim filed by a customer of BMIS against the estate.  But under Bankruptcy Rule 7014, Rule 14 applies only "in adversary proceedings," not in contested matters such as objections to claims.  *See* F.R.B.P. 7001.  Moreover, to the extent the Trustee has *accepted* claims for payment, there is no litigation into which JPMorgan could be impleaded.

[15]  JPMorgan also has complete defenses to the Trustee's claims to recover alleged indirect transfers via the feeder funds (causes of action 13 to 20), but is not moving to dismiss those claims at this time.

## A.     The Trustee cannot avoid BMIS's loan repayments.

In seeking to recover the repayment of JPMorgan's $145 million loan, the Trustee relies on section 544(b) of the Bankruptcy Code, which authorizes a trustee to avoid a "transfer of an interest of the debtor in property" that "a creditor holding an unsecured claim" could avoid under applicable *state* law.  11 U.S.C. § 544(b)(1).

As explained below:  (i) the repayment of the loan constituted an act of setoff rather than a "transfer" subject to avoidance; (ii) the repayment of a secured loan is not avoidable; and (iii) under the Second Circuit's decision in *Sharp International*, the repayment of any loan is not avoidable absent participation by the creditor in the debtor's fraud.

### 1.     As acts of setoff, the loan repayments are not avoidable.

The Amended Complaint alleges that "Madoff sent a letter to JPMC requesting a decrease in BLMIS's loan amount to zero, and authorizing JPMC to debit the $145 million principal amount of the loan from the 703 Account.  JPMC did as Madoff requested, and debited $145 million from the 703 Account that same day."  Am. Compl. ¶ 266.

These allegations present a textbook example of a *setoff*.  "Ordinarily, funds in a general deposit account can be used to setoff debts owed to the bank because when a depositor deposits funds into a general account he parts with title to the funds in exchange for a debt owed to him by the bank, thereby establishing a standard debtor-creditor relationship."  *In re Bennett Funding Grp.*, 146 F.3d 136, 139 (2d Cir. 1998); *accord, e.g.*, 9 N.Y. Jur. 2d (Banks) § 303. Here, as alleged, JPMorgan debited the 703 Account at JPMorgan to satisfy JPMorgan's loan to BMIS, using "the funds in a general account to set off debts owed to it by a depositor."  *Swan Brewery Co.* v. *U.S. Trust Co.*, 832 F. Supp. 714, 718 (S.D.N.Y. 1993).

Section 544(b) of the Bankruptcy Code authorizes the avoidance of "obligations" and "transfers."  11 U.S.C. § 544(b)(1).  A setoff is neither.  Indeed, the definition of "transfer" in the Code omits any mention of "setoff."  11 U.S.C. § 101(54).  Accordingly, "it is clear that valid setoffs are not avoidable as preferential or fraudulent transfers for the simple reason that setoffs are not transfers of property of the estate."  *In re Am. Remanufacturers, Inc.*, 2008 WL 2909871, at *2 (Bankr. D. Del. July 25, 2008); *accord, e.g.*, *Belford* v. *Union Trust. Co. (In re Wild Bills, Inc.)*, 206 B.R. 8, 12-13 (Bankr. D. Conn. 1997).

In the Amended Complaint, the Trustee asserts for the first time that the debiting of the 703 Account "was not a proper setoff," because the money deposited into the 703 Account was "held in a fiduciary capacity" for BMIS's customers.  Am. Compl. ¶ 311.  Under settled law, however, "funds in a general deposit account can be used to setoff debts owed to the bank."  *In re Bennett Funding Grp.*, 146 F.3d at 139-40.  Moreover, the law presumes that a bank account is a "general" account, which can be overcome only by "showing an intent to have the funds 'kept separate from the general funds of the bank.'"  *Id.* at 140.  The Amended Complaint alleges absolutely no facts showing that anyone intended that funds in the 703 Account be segregated from other deposits at JPMorgan.  *See* Point III.C, *supra*.

**2.     The loan repayments are not avoidable because they discharged secured debts.**

The Amended Complaint alleges that the $145 million loan debt was fully secured by collateral separate from the 703 Account balance.  *See* Compl. ¶¶ 229, 279 (alleging that JPMorgan's $95 million loan was secured by a $100 million bond); *id.* ¶¶ 285-86 (alleging that JPMorgan's $50 million loan was secured by $54 million in bonds); *id.* ¶¶ 279, 290 (alleging that loan was "fully collateralized").

Consequently, even if viewed not as setoffs but as transfers, the loan repayments are not avoidable.  As explained by Judge Chin, "it is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if . . . [it] does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors.'"  *Lippe* v. *Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274, 281 (2d Cir. 2004); *accord Bear, Stearns Sec. Corp.* v. *Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (concluding that "only asset transfers that may have actually harmed creditors may be avoided" as fraudulent).  By definition, the repayment of a *fully secured* debt does not prejudice other creditors of the debtor, because such a repayment does not "put assets otherwise available in a bankruptcy distribution out of the reach" of creditors.  *Henry* v. *Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1008 (9th Cir. 2006).[16]

Here, therefore, because JPMorgan's loans to BMIS were fully secured, the property and value transferred to JPMorgan in repayment of the loans would not have been available to unsecured creditors even if the transfers had not taken place.  As a result, there is no basis to avoid the challenged loan repayments as fraudulent transfers.

---

[16] *See also Melamed* v. *Lake County Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (secured loan repayment did not "diminish the assets of the debtor which were available to its creditors" and thus was not avoidable as a fraudulent transfer); *In re Nat'l Century Fin. Enters., Inc.*, 2011 WL 1397813, at *23 (S.D. Ohio Apr. 12, 2011) (secured loan repayment by Ponzi scheme operator was not avoidable because "a payment does not harm other creditors when it results in a dollar-for-dollar reduction in secured, antecedent debt"); *Miller* v. *Forge Mench P'ship Ltd.*, 2005 WL 267551, at *4-5 (S.D.N.Y. Feb. 2, 2005) (fraudulent conveyance plaintiff not entitled to avoid debtor's transfer of property pledged as collateral).

**3.      The Trustee's claims to avoid the loan repayments are
barred by *Sharp International*.**

Even if the challenged payments to JPMorgan did not amount to setoffs or

repayments of secured debts, the Trustee's claims to recover those payments would still have to

be dismissed.  The Second Circuit's decision in *Sharp International* holds specifically that the

repayment of a loan, absent insider dealing or knowing participation in fraud by the creditor, is

not a fraudulent transfer.  *Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l*

*Corp.)*, 403 F.3d 43, 53-57 (2d Cir. 2005).

*Sharp International* involved a massive fraud perpetrated by Sharp's principals on

Sharp's creditors.  State Street, which was Sharp's largest creditor, realized that Sharp was

engaged in fraud and demanded that Sharp repay its debt, which was accomplished through a

fraud on new lenders.  *Id*. at 51-52.  Despite these facts, the Second Circuit concluded that

Sharp's payment to State Street was not a fraudulent conveyance.  In rejecting the debtor's

constructive fraudulent conveyance claims, the Court concluded that "the satisfaction of a

preexisting debt qualifies as fair consideration for a transfer of property."  *Id*. at 54 (dismissing

claims under N.Y. Debt. & Cred. Law §§ 273-275).  In rejecting the intentional fraudulent

conveyance claims, the Court likewise concluded that, because the payment at issue was "at most

a preference between creditors," it could not have "hinder[ed], delay[ed], or defraud[ed]"

creditors.  *Id*. at 56 (dismissing claim under N.Y. Debt. & Cred. Law § 276).

Although the Second Circuit recognized a potential exception for situations in

which a creditor actively participates in a debtor's fraud, 403 F.3d at 55, as explained at length

above, the Trustee has not alleged facts showing that JPMorgan knowingly participated in

Madoff's Ponzi scheme.  Under *Sharp International*, therefore, the Trustee has not stated a claim

to recover BMIS's loan repayment.  Nor has the Trustee stated a claim to recover contractual

interest earned on those loans. *In re Unified Commercial Capital*, 2002 WL 32500567, at *8-9 (W.D.N.Y. June 21, 2002) (rejecting fraudulent transfer claim to recover a "contractually provided-for, commercially reasonable rate of interest on what amounted to a loan"); *Daly* v. *Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002) (same).

## B.   The Trustee cannot avoid BMIS's obligations to repay loans from JPMorgan.

In response to JPMorgan's clear showing in its June 3 brief that BMIS's repayments of principal and interest are not subject to avoidance, the Trustee has amended his complaint in an effort to accomplish indirectly what he cannot accomplish directly. The Amended Complaint thus alleges that, despite BMIS having received $145 million in loan proceeds from JPMorgan, BMIS's *obligation* to repay that loan is avoidable under New York law and, as a result, the repayment of the loan is likewise subject to avoidance. *See* Am. Compl. ¶¶ 309-10. At bottom, the Trustee's allegations add up to the assertion that JPMorgan chose to lend $145 million into what it knew was a fraud — a patently absurd contention.

The Trustee's new theory is as much at odds with the purpose of fraudulent transfer law as his earlier attempt to avoid BMIS's repayment of a secured debt. Just as the repayment of a secured debt does not "deplete or otherwise diminish the value of the assets of the debtor's estate," *Lippe*, 249 F. Supp. 2d at 375, the incurrence of a repayment obligation in exchange for an equivalent amout of cash in no way diminishes (in fact, it increases) the pool of assets available to creditors. As demonstrated below, New York law does not permit avoidance of an obligation for which the creditor provided full value outside the narrow circumstance in which the creditor has fraudulent intent, which is not adequately alleged here.

1.    **BMIS's obligations are not avoidable as intentional fraudulent conveyances.**

Section 276 of the Debtor and Creditor Law states that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud" creditors is fraudulent.  N.Y. Debt. & Cred. Law § 276.  Numerous courts have held that this provision requires a plaintiff to "establish the actual fraudulent intent of both the transferor and the transferee."  *Nisselson* v. *Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007); *accord Gredd* v. *Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002).[17]

Beyond this, section 278(2) of the Debtor and Creditor Law provides that "[a] purchaser who *without actual fraudulent intent* has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."  N.Y. Debt. & Cred. Law § 278(2) (emphasis added).  Under section 278(2), a defendant that provides full value for an obligation without fraudulent intent does "not have liability as the transferee of a fraudulent conveyance, notwithstanding any arguments as to [the transferee's purported] lack of good faith."  *CNB Int'l, Inc. Litig. Trust* v. *Lloyds TSB Bank plc (In re CNB Int'l, Inc.)*, 440 B.R. 31, 44 & n.8 (W.D.N.Y. 2010); *accord* 30 N.Y. Jur. 2d (Creditors' Rights) § 403 (under section 278(2), a "transferee is entitled to protection to the extent of the consideration he or she paid if the transferee is *not guilty of actual fraud* but is merely chargeable with knowledge of such facts" (emphasis added)).

---

[17]  Other courts have interpreted section 276 to require fraudulent intent only on the part of the transferor.  *See Gowan* v. *The Patriot Group, LLC (In re Dreier LLP)*, 2011 WL 2412581, at *29-30 (Bankr. S.D.N.Y. June 16, 2011).  Even if those courts were correct, section 278(2) of the Debtor and Creditor Law still protects transferees from liability absent fraudulent intent.

Since JPMorgan provided dollar-for-dollar value in exchange for BMIS's obligation to repay JPMorgan's loan, the critical question here is whether JPMorgan acted with "fraudulent intent."  For all the reasons set forth in this brief, there is no plausible basis to draw any such inference.  To the contrary, in connection with JPMorgan's $145 million loan, the Trustee simply alleges that JPMorgan "conducted an inadequate credit review," a fact that is entirely inconsistent with knowing participation in fraud.  Am. Compl. ¶ 278.  Moreover, the Amended Complaint acknowledges that JPMorgan loaned $145 million to BMIS in return for $3.4 million in interest over six-and-a-half months.  *Id*. ¶ 287.  The notion that JPMorgan knowingly facilitated Madoff's Ponzi scheme, in exchange for a modest interest rate, defies "economic reason" — precluding any inference of fraudulent intent.  *Kalnit*, 264 F.3d at 140-41.

### 2.       BMIS's obligations are not avoidable as constructive fraudulent conveyances.

The Debtor and Creditor Law permits avoidance of conveyances made or obligations incurred by an insolvent debtor without "fair consideration."  N.Y. Debt. & Cred. Law §§ 273, 275.[18]  "Fair consideration" is given for property or an obligation when "in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."  N.Y. Debt. & Cred. Law § 272(a).  Since JPMorgan provided cash to BMIS equal to the full amount of BMIS's obligation, there is no question that JPMorgan provided "fair equivalent" for the obligation.  The only question is whether JPMorgan made the loan to BMIS in "good faith."

---

[18]  The Trustee's third cause of action invokes section 274 of the Debtor and Creditor Law.  That provision permits avoidance of "conveyances" made by an undercapitalized debtor without "fair consideration," but it does *not* permit avoidance of "obligations."  N.Y. Debt. & Cred. Law § 274.  For that reason alone, the claim should thus be dismissed.

The Second Circuit has recently observed that, for purposes of New York's fraudulent conveyance statute, "New York law holds that the focus of the good faith inquiry is on *the subjective intent of the transferee*." *CFTC* v. *Walsh*, 618 F.3d 218, 230 (2d Cir. 2010) (emphasis added).  Likewise, in *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 637 (2d Cir. 1995), the Second Circuit, addressing New York's fraudulent conveyance statute, focused on whether the defendant's conduct constituted "a conscious turning away from the subject," a test that has been described as requiring a "culpable state of mind" akin to "actual knowledge."  *Agape*, 2011 WL 1136173, at *8, *20; *see also In re Teleservices Grp., Inc.*, 444 B.R. 767, 815 (Bankr. W.D. Mich. 2011) (rejecting negligence-based "good faith" test and concluding that good faith "is to be tested based upon [the defendant's] own honesty and integrity").

The Amended Complaint does not allege facts to support a claim of bad faith. The Amended Complaint does not allege that JPMorgan had knowledge of Madoff's fraud when it loaned $145 million to BMIS.  Nor does the pleading allege that JPMorgan "'suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'"  *Agape*, 2011 WL 1136173.  Rather, the Amended Complaint alleges that JPMorgan "conducted an inadequate credit review" and overlooked supposed "red flags."  Am. Compl. ¶¶ 278, 303.  None of these allegations demonstrates that JPMorgan had a culpable "subjective intent."  *Walsh*, 618 F.3d at 230.[19]

---

[19] The Trustee's claims to recover some $590,000 in fees paid to JPMorgan should be dismissed as well.  To the extent the fees are being attacked under New York law, they are protected from avoidance on the same grounds as the loan repayments.  To the extent the fees are being attacked under the Bankruptcy Code, they are also protected.  The Bankruptcy Code permits avoidance of "transfer[s] of an interest of the debtor in property."  11 U.S.C. §§ 547(b), 548(a)(1).  As discussed above, debits from a bank account to satisfy debts owed to the depository bank are setoffs rather than transfers and are not subject to avoidance.

## CONCLUSION

Despite amending his complaint in response to JPMorgan's June 3 motion to dismiss, the Trustee has failed, for the reasons set forth above, to state valid common law claims against JPMorgan or claims to recover BMIS's loan repayment.  Accordingly, causes of action 21-28 and 1-12 of the Amended Complaint should be dismissed with prejudice and without leave to amend.

Dated:  New York, New York
        August 1, 2011

Respectfully submitted,

*Of counsel:*

WACHTELL, LIPTON, ROSEN & KATZ

Amy R. Wolf
Douglas K. Mayer
Stephen R. DiPrima
Emil A. Kleinhaus
Meredith L. Turner
Jonathon R. La Chapelle
Lauren M. Kofke

By: /s/ John F. Savarese
    John F. Savarese

51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., J.P. Morgan Securities
LLC and J.P. Morgan Securities Ltd.*