**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

               Plaintiff-Applicant,

        v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

             Defendant.

                Adv. Pro. No. 08-01789 (BRL)
                SIPA LIQUIDATION
                (Substantively Consolidated)

---------------------------------------------------

In re:
      BERNARD L. MADOFF,

             Debtor.

---------------------------------------------------

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

            Plaintiff,

        v.

JPMORGAN CHASE & CO., *et al.*,

             Defendants.

                Adv. Pro. No. 10-4932 (BRL)

                No. 1:11-cv-913 (CM) (MHD)

---------------------------------------------------

## MEMORANDUM OF LAW OF THE
## SECURITIES INVESTOR PROTECTION CORPORATION
## IN OPPOSITION TO MOTION TO DISMISS

SECURITIES INVESTOR PROTECTION CORPORATION
805 15th Street N.W., Suite 800
Washington, D.C. 20005
Telephone:  (202) 371-8300
JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution
CHRISTOPHER H. LAROSA
Associate General Counsel
LAUREN T. ATTARD
Staff Attorney

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF THE ISSUES .................................................................................. 1

STATEMENT OF THE FACTS .................................................................................. 2

SUMMARY OF THE ARGUMENT ........................................................................... 4

ARGUMENT ............................................................................................................... 8

I.   THE TRUSTEE HAS STANDING TO BRING HIS COMMON LAW
     CLAIMS AS THE BAILEE OF CUSTOMER PROPERTY ................................. 8

     A.   Redington Remains Controlling Law ......................................................... 9

          1.   Redington And Its History .................................................................. 9

          2.   Post-Redington Decisions ................................................................. 10

          3.   Movants' Attack on Redington ......................................................... 11

     B.   Redington Was Properly Decided ............................................................ 13

          1.   The Trustee Is The Bailee of Customer Property .......................... 13

               (a)   Segregation Requirements Of Rule 15c3-3 ....................... 13

               (b)   Origins of Rule 15c3-3 And Relationship to SIPA ........... 15

               (c)   Applicability Of Federal Common Law ............................ 17

               (d)   The Trustee As Bailee Under Federal Common Law ....... 19

               (e)   The Trustee As Bailee Under New York Law ................. 21

               (f)   Movants' Objections ......................................................... 21

          2.   As Bailee, The Trustee Has A Possessory Interest In
               Customer Property ........................................................................... 23

          3.   Wagoner And Caplin Do Not Bar The Trustee's Suit To
               Vindicate  His Possessory Interest In Customer Property ............. 24

(a)    *Wagoner* And *Caplin* ........................................................24

(b)    *InPari Delicto* Does Not Bar A Suit By A Bailee
        Against A Third Party ..........................................................25

(c)    Application of *In Pari Delicto* Is Inappropriate
        At the Pleading Stage ........................................................27

4.    The Trustee's Standing To Sue Is Not Limited By SIPA..............29

5.    The Trustee Has Standing To Bring Common Law Claims..........30

II.    THE TRUSTEE HAS STANDING TO BRING HIS COMMON LAW CLAIMS
        AS THE ENFORCER OF SIPC'S SUBROGATION RIGHTS, AND WOULD
        HAVE STANDING AS THE ASSIGNEE OF CUSTOMERS ...........................32

        A.    The Trustee's Standing To Enforce SIPC's Subrogation Rights  ............33

        B.    The Trustee's Standing To Sue As The Assignee of Customers...............35

III.    HSBC WAS WRONGLY DECIDED ..................................................36

IV.    SLUSA DOES NOT PREEMPT THE TRUSTEE'S COMMON LAW
        CLAIMS ...............................................................................40

        A.    The Trustee's Amended Complaint Is Not a
                "Covered Class Action"......................................................40

        B.    The Trustee Has Not Alleged Securities Fraud .........................46

CONCLUSION ..............................................................................48

# TABLE OF AUTHORITIES

**CASES:**                                                                                     **PAGE**

*Ace American Ins. Co. v. First Choice Marine, Inc.*,
    2010 WL 3125945 (M.D. Fla. July 29, 2010) ................................................................20

*Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372 (S.D.N.Y. 2010) ........................40, 46, 47

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995) .........................................33-35

*In re A.R. Baron & Co.*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002) .............................8, 10, 27, 31, 34

*In re Argo Communications Corp.*, 134 B.R. 776 (Bankr. S.D.N.Y. 1991) ..................................31

*Matter of Atkeison*, 446 F.Supp. 844 (M. D. Tenn. 1977) ..........................................................21

*Baldwin v. Hill*, 315 F.2d 738 (6th Cir. 1963) ...........................................................................23

*In re Baldwin-United Corp. Litig.*, 765 F.2d 343 (2d Cir. 1985) ...............................................12

*In re Banco Santander Secs .- Optimal Litig.* 732 F.Supp.2d 1305 (S.D. Fla. 2010) ..................46

*Bank of New York v. Amoco Oil Co.*, 35 F.3d 643 (2d Cir. 1994) .............................................21

*In re Bell & Beckwith*, Case No. 83-1071 (June 26, 1984) ........................................................11

*In re Bell & Beckwith*, 821 F.2d 333 (6th Cir. 1987) ................................................................27

*In re Bell & Beckwith*, 937 F.2d 1104 (6th Cir. 1991) ..............................................................35

*In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003) ................................................28

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2011) ............................................................12

*Calumet Paper Co. v. Haskell Show-Printing Co.*, 45 S.W. 1115 (Mo. 1898) ...........................22

*Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) ...............12, 24-25

*Carver v. City of New York*, 621 F.3d 221 (2d Cir. 2010) ........................................................12

*In re CBI Holding*, 529 F.3d 432 (2d Cir. 2008) .....................................................................28

*Demers v. Target Corp.*, 2010 WL 2667438 (D. Conn. June 30, 2010) ......................................12

*Donk Bros. Coal & Coke Co. v. Kinealy*, 83 Mo. App. 40 (Mo. Ct. App. 1900) .........................22

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

*Fischer v. Int'l Ry. Co.*, 182 N.Y.S. 313 (N.Y.Sup.Ct. 1920) ...................................................25-26

*Fireman's Fund Ins. Co. v. Panalpina, Inc.*, 153 F.Supp.2d 1339 (S.D. Fla. 2001) ....................20

*Global Crossing Estate Representative v. Winnick*,
    2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ................................................................29

*Gold v. Hyman*, [1974-75 Transfer Binder] Fed. Sec. L. Rep.
    (CCH) ¶ 95,043 (S.D.N.Y. 1975) ..............................................................................17

*In re Hampton Hotel Investors, L.P.*, 289 B.R. 563 (Bankr. S.D.N.Y. 2003) .............................31

*Herrington v. Verrilli*, 151 F.Supp.2d 449 (S.D.N.Y. 2001) ........................................................21

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ...................................................28

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) ...............................................................17

*King Grain Co. v. Caldwell Mfg. Co.*, 820 F.Supp. 569 (D. Kans. 1993) .....................................23

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 938 N.E.2d 941 (N.Y. 2010) .....................................28

*LaSala v. Bank of Cypress Public Co.*,
    510 F.Supp.2d 246 (S.D.N.Y. 2007) ...................................................................42, 43

*LaSala v. Bordier Et Cie*, 519 F.3d 121 (3d Cir.),
    *cert. dismissed*, 129 S.Ct. 593 (2008) ............................................................42, 43, 44-46

*LaSala v. Lloyd's TSB Bank, PLC*, 514 F.Supp.2d 447 (S.D.N.Y. 2007) ..............................42, 43

*LaSala v. UBS AG*, 510 F.Supp.2d 213 (S.D.N.Y. 2007) ........................................42, 43, 46-47

*Lee v. Marsh & McClennan*, 2007 WL 704033 (S.D.N.Y. Mar. 7, 2007) ..............................42, 43

*Lutz v. Chitwood*, 337 B.R. 160 (S.D. Ohio 2005) .......................................................................11

*Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) .....................................................................17

*McCutcheon v. Charleston Boatworks, Inc.*, 2010 WL 2431017
    (D.S.C. June 14, 2010) ..............................................................................................20

*In re the Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) .................................................................28

iv

# TABLE OF AUTHORITIES

**CASES:**                                                                **PAGE**

*In re Meridian Asset Management, Inc.*, 296 B.R. 243 (Bankr. N.D. Fla. 2003)..........................11

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006).....................................40

*Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531 (S.D.N.Y. 1990)................33, 38-39

*In re Neri Bros. Constr. Co.*, 323 B.R. 540 (Bankr. D. Conn. 2005)...........................................28

*Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*,
    437 F.3d 1145 (11th Cir.), *cert. denied sub nom.*,
    *Laddin v. Reliance Trust Co.*, 549 U.S. 811 (2006) .........................................................28

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) .........................................................................................28

*Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169 (2d Cir. 1962),
    *cert. den. sub nom. Yacimientos Petro. Fisc. v. Paragon Oil Co.*, 372 U.S. 967 (1963) ...23

*In re Payroll Express Corp.*, 2005 WL 2438444 (Bankr. S.D.N.Y. Mar. 30, 2005) ...................31

*Pension Committee of the University of Montreal Pension Plan v.*
    *Banc of America Secs., LLC*, 750 F.Supp.2d 450 (S.D.N.Y. 2010) .................................46

*Picard v. Taylor (In re Park South Secs., LLC)*
    326 B.R. 505 (Bankr. S.D.N.Y 2005)...........................................................8, 10, 27, 31

*Picard v. HSBC*, 2011 WL 32002988 (S.D.N.Y. July 28, 2011) ......................................36-40

*Pinter v. Dahl*, 486 U.S. 622 (1988)........................................................................................27

*Rahilly v. Wilson*, 20 F. Cas. 176 (D. Minn. 1872), *aff'd in part*,
    20 F. Cas. 179 (C.C.D. Minn. 1873) .............................................................................22

*Redington v. Touche Ross & Co.*, 428 F.Supp. 483 (S.D.N.Y. 1977), *rev'd*,
    592 F. 2d 617 (2d Cir. 1978), *rev'd*, 442 U.S. 560 (1979)...............................................9

*Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978),
    *rev'd on other grounds*, 442 U.S. 560 (1979) ..............10, 12-13, 17, 19, 30-31, 33-34, 39

*Redington v. Touche Ross & Co.*, 612 F.2d 68 (2d Cir. 1979).....................................................10

# TABLE OF AUTHORITIES

**CASES:**                              **PAGE**

*RGH Liquidating Trust v. Deloitte & Touche LLP*, ___N.E.2d___, 2011 WL 2471542 (N.Y. June 23, 2011) ...... 43

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010) ...... 40

*Rosado v. Wyman*, 397 U.S. 397 (1970) ...... 12

*Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990) ...... 26

*SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569 (3d Cir. 1977) ...... 16-17

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ...... 6, 12, 24-25, 27, 28, 33

*SIPC v. BDO Seidman, LLP*, 49 F.Supp.2d 644 (Bankr. S.D.N.Y. 1999), *aff'd in part, question certified*, 222 F.3d 63 (2d Cir. 2000), *aff'd*, 245 F.3d 174 (2d Cir. 2001) ...... 8, 10, 27, 33

*SIPC v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000) ...... 10, 11, 33

*SIPC v. Poirier*, 653 F.Supp. 63 (D. Or. 1986) ...... 17

*SIPC v. Vigman*, 803 F.2d 1513 (9th Cir. 1986) ...... 11, 34

*Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005) ...... 42

*In re Sokolowski*, 205 F.3d 532 (2d Cir. 2000) ...... 11

*In re Sunpoint Secs., Inc.*, 377 B.R. 513 (Bankr. E.D. Tex. 2007), *aff'd sub nom. Richardson v. Cheshier & Fuller*, 2008 WL 5122122 (E.D. Tex. Dec. 3, 2008) ...... 11

*Tepper v. Chicester*, 285 F.2d 309 (9th Cir. 1960) ...... 27

*Thyssen Steel Co. v. M/V Kavo Yerakas*, 50 F.3d 1349 (5th Cir. 1995) ...... 20

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) ...... 10, 32

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105 (2d Cir. 1997) ...... 12

# TABLE OF AUTHORITIES

**CASES:**                                                                                         **PAGE**

*United States v. Currency $716,502.44*, 2008 WL 5158291
    (E. D. Mich. Dec. 5, 2008) ...................................................................................23

*United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) .........................................18

*United States v. Perea*, 986 F.2d 633 (2d Cir. 1993) ...................................................23

*Univ. of South Alabama v. American Tobacco Co.*, 168 F.3d 405 (11th Cir. 1999).....................12

*Wallis v. Pan. Am. Petroleum Corp.*, 384 U.S. 63 (1966)...........................................17

*Warth v. Seldin*, 422 U.S. 490 (1975)........................................................................12

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000)..........................................28

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
    341 F.Supp.2d 258 (S.D.N.Y. 2004) ....................................................................46

*Zaleski v. Burns*, 606 F.3d 51 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 805 (2010).....................12

**STATUTES AND RULES:**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78fff(b) ...........................................................................................................16, 35
78fff-1(a) ............................................................................16, 24, 29, 30, 36, 43
78fff-1(b) .....................................................................................................16, 43
78fff-2(b) .................................................................................................35, 36, 39
78fff-2(c)(1) ................................................................................................13, 35
78fff-3(a) ...........................................................................................................38
78fff-3(a)(5) ......................................................................................................39
78fff-4(a)4 .........................................................................................................38
78fff-4(c) .....................................................................................................37, 38
78kkk(g) ............................................................................................................15
78*lll*(2) ..............................................................................................................21
78*lll*(4) .........................................................................................................22, 27

Securities Exchange Act of 1934, 15 U.S.C. §

78q ........................................................................................................................9

# TABLE OF AUTHORITIES

**STATUTES AND RULES:**                                                     **PAGE**

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §

77p(b)(1).................................................................................................4
77p(f)(2)(A)(i)(I) ....................................................................................44
77p(f)(2)(C) ....................................................................................41, 43
78bb(f) ....................................................................................................4

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §

78bb(f)(5)(B)(i)(I) ................................................................................40
78bb(f)(5)(D)....................................................................................41, 43

United States Bankruptcy Code, 11 U.S.C. §

362(a)....................................................................................................35
362(a)(3)...............................................................................................38
541(a)....................................................................................................35
542........................................................................................................35
542(a)....................................................................................................38
544....................................................................................................7, 29
547........................................................................................................29
548........................................................................................................29
704........................................................................................................43
704(a)(1)...............................................................................................16

Bankruptcy Act, 11 U.S.C. §

60e..................................................................................................18, 27

17 C.F.R. §

240.15c3-3 ...........................................1, 5, 13-17, 18, 19, 20, 22, 27, 32, 36, 37
240.15c3-3a ..........................................................................................14
240.15c3-3(b) ........................................................................................13
240.15c3-3(c)..........................................................................................13
240.15c3-3(c)(1).....................................................................................14
240.15c3-3(c)(3).....................................................................................14
240.15c3-3(d) ........................................................................................13
240.15c3-3(e)(1).....................................................................................14
240.17a-59

Federal Register, 72  Fed. Reg. 12862 (March 19, 2007) ...........................15

# TABLE OF AUTHORITIES

**LEGISLATIVE MATERIALS:**                                                      **PAGE**

H.R. Rep. No. 91-1613 (1970) ............................................................................15

S. Rep. 105-182 (1998)......................................................................................41


**PUBLICATIONS AND TREATISES:**

Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the
   Securities Investor Protection Act and Their Impact on Securities Transfers*,
   12 Cardozo L. Rev. 508 (1990) ..........................................................14, 15, 18

Steven D. Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* (3d ed. 2005)........................14

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002)..............14, 15, 16

Norman J. Singer, J.D. Shambie Singer, 2A *Statutes and Statutory
   Construction* (7th ed. 2007)............................................................................29-30

Richard A. Lord, 19 *Williston on Contracts* (4th ed. 2011) .......................................20

Michael D. Bolton, *Repurchase Agreement Transactions in Securities Investor
   Protection Act Proceedings*, 15 Fordham Urb. L.J. 359 (1986)....................................17

8A Am. Jur. 2d Bailments § 165 .........................................................................25

8 C.J.S. *Bailments* § 100 (2005) ......................................................................21

8 C.J.S. *Bailments* § 156 (2005) ......................................................................23

9 N.Y. Jur. *2d Bailments and Chattel Leases* § 91   ............................................. 23, 24

The Securities Investor Protection Corporation ("SIPC") submits this memorandum of law in opposition to the motion to dismiss of JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Ltd. (collectively "JPMC" or "Movants"). The instant action was filed by Irving H. Picard ("Trustee"), trustee for the substantively consolidated proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA"), and the estate of Bernard L. Madoff.

## STATEMENT OF THE ISSUES

The instant motion presents the following issues:

1. Whether the Trustee has standing to bring his common-law claims as the bailee of customer property where:

   a. The Second Circuit's decision in Redington v. Touche Ross & Co., 592 F.2d 617 (2d Cir. 1978), rev'd on other grounds, 442 U.S. 560 (1979) ("Redington"), which recognized that a SIPA trustee has standing in that capacity, remains controlling law; and

   b. Redington was properly decided, because Securities and Exchange Commission ("SEC" or "Commission") Rule 15c3-3, SIPA, and the contracts between a broker-dealer and its customers create a bailment relationship under applicable law and because, as the successor bailee in that relationship, the Trustee has standing to sue third parties for recovery of the bailed customer property and for consequential damages flowing from the disturbance of the Trustee's possessory interest in that property.

2. Whether the Trustee has standing to bring his common-law claims as the enforcer of SIPC's subrogation rights where a purpose of a SIPA proceeding is to enforce rights of subrogation as provided in SIPA, SIPC has subrogation rights based upon its advances of funds for customers, and SIPC has assigned to the Trustee enforcement of its rights.

3. Whether the Trustee has standing to bring his common-law claims as the assignee of customers.

4. Whether the Securities Litigation Reform Act ("SLUSA") is inapplicable here because these cases do not qualify as "covered class actions" within the meaning of the statute and do not allege, or depend upon allegations of, securities fraud, as required by the statute.

SIPC respectfully submits that the Trustee has standing to bring all of the aforementioned claims and SLUSA does not apply under the facts of this case.

## STATEMENT OF THE FACTS

This is a suit by the Trustee, among other things, to 1) recover stolen BLMIS customer funds transferred to JPMC; 2) recover amounts by which JPMC profited from the BLMIS fraud; and 3) for other relief. The facts relevant to the Motion and to this opposition are set forth in detail in the Trustee's memorandum, and are briefly summarized below.

JPMC was the primary banker for Bernard L. Madoff ("Madoff") and BLMIS for over twenty years. (Amended Complaint ("Am. Cmpt.") ¶ 2, Dkt. No. 50.) From 1986 forward, all of the funds that BLMIS received from customers passed through BLMIS's primary account at JPMC – the "703 Account" – where those funds were commingled. (Id.) Likewise, all, or nearly all, payments made by BLMIS in furtherance of Madoff's now infamous Ponzi scheme were with funds deposited initially in the 703 Account. (See id.) JPMC received fees for processing transactions in the 703 Account, and also made loans to BLMIS. (See id. at ¶ 4.) BLMIS paid these fees, and repaid these loans, with stolen customer funds held in the 703 Account. (Id.)

In addition to serving as the banker for Madoff and BLMIS, JPMC also profited handsomely from the Ponzi scheme by selling to its clients structured products related to BLMIs feeder funds. (Am. Cmpt. ¶¶ 6, 99-102.) The majority of these products were structured to allow investors to collect returns tied to the returns of hedge funds invested wholly, or primarily, through BLMIS. (See id. at ¶ 100.) Moreover, investors typically borrowed heavily in order to make these

2

investments in order to magnify their gains relative the small amounts invested by them, net of the borrowed funds invested. (Id.)

JPMC received significant benefits from its role in perpetuating Madoff's Ponzi scheme. According to the Trustee, JPMC received "well in excess" of $400 million in direct, fraudulent transfers of stolen customer funds, and made at least $500 million in additional revenue through its BLMIS-related product sales and related activities. (Am. Cmpt. ¶ 12.) Further, JPMC's assistance and participation enabled Madoff to continue operating his Ponzi scheme for years past the time when that scheme otherwise would have collapsed, and caused at least $19 billion in damages. (Id.)

And JPMC could have, and should have, put a stop to the Ponzi scheme, but elected not to do so in order to continue profiting from it. In fact, JPMC had every reason to know – and, according to the Trustee, did know - that Madoff was operating a Ponzi scheme, but chose to participate in it. For example, although JPMC knew that BLMIS was a securities broker-dealer purportedly in the business of buying and selling securities, and that BLMIS used the 703 Account as its primary transactional account, it allowed BLMIS to process billions of dollars in transactions through that account unrelated to securities trading. (See Am. Cmpt. ¶ 3.) In processing these transactions without inquiry, JPMC violated its own anti-money laundering policies. (Id. at ¶ 3.)

JPMC also received and reviewed BLMIS's Financial Operations and Combined Uniform Single Reports – which BLMIS submitted to the Financial Industry Regulatory Authority (or its predecessor), as required by law – but ignored numerous material omissions in these reports, including the omission of any reference to JPMC's loans to BLMIS or to any commission revenue earned by BLMIS. (Id. at 4.) Finally, the due diligence conducted by JPMC in

connection with its sale of structured products repeatedly revealed additional red flags and warnings concerning the legitimacy of BLMIS operations, causing JPMC to admit, at one point, that it knew that BLMIS's reported returns were "too good to be true," and were likely the product of fraud.  (See id. at ¶¶ 7-12.)  Despite this admission, JPMC continued to participate in the fraud at BLMIS, resulting in billions of dollars in damages, and, ultimately, prompting this lawsuit.  (Id. at ¶ 12.)

## SUMMARY OF THE ARGUMENT

Movants' motions represents an attempt to avoid responsibility for their role in perpetuating the largest, longest financial fraud in history, and the improper diversion of customer funds to their own use and benefit.  As the Trustee has explained in detail in his Complaint, JPM acted as the banker for BLMIS and, in that capacity, enabled BLMIS to funnel billions of dollars in fresh investments into the Ponzi scheme orchestrated by Bernard Madoff and operated through BLMIS, substantially prolonging the life of that scheme and greatly multiplying both the number of investors harmed and the extent of their injuries.  In the process, having profited handsomely in various ways from their role in perpetuating that scheme, Movants now seek to walk away from the staggering damage they caused on the ground that they cannot be sued under the common law.

As demonstrated below, Movants cannot walk away.  There is no legal barrier to the Trustee's pursuit of his common law claims.  On the contrary, Movants' contention that the Trustee lacks standing to bring those claims, and the contention that his claims are preempted by the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 77p(b)(1) and 78bb(f) ("SLUSA"), are inconsistent with long-standing precedent in this jurisdiction and with the plain language and purposes of both SIPA and SLUSA.

The Trustee brings his common law claims as the bailee of customer property, and as the enforcer of SIPC's statutory and equitable rights as subrogee of customers holding claims satisfied, in whole or in part, through advances from SIPC. While the Trustee has not asserted standing as the assignee of customers whose claims he has satisfied, there is no legal barrier to such an assertion.

The Trustee's standing to sue as the bailee of customer property is well-established and has been recognized in this jurisdiction since 1978, when the Second Circuit decided <u>Redington v. Touche Ross & Co.</u>, 592 F.2d 617 (2d Cir.). Although the Second Circuit's decision in <u>Redington</u> was subsequently overturned on other grounds, the court's holding regarding standing was left undisturbed, and, as a jurisdictional ruling, was unaffected by the disposition of the remainder of the case. As shown below, that holding remains good law today, and, with two exceptions – including Judge Rakoff's recent, and erroneous, decision in the Trustee's suit against HSBC - has been recognized as such by every court that has addressed it since <u>Redington</u> was decided, including courts at every level in this jurisdiction.

Moreover, <u>Redington</u> was correctly decided. The contracts between brokerage customers and their broker-dealers and Commission Rule 15c3-3 conjoin to create a bailment relationship between customer and broker under applicable law. In fact, as discussed in detail below, Rule 15c3-3 represents an adaptation of traditional bailment law concepts to custodial practices in the securities industry, and was adopted, in part, to ensure that a bailment relationship would continue to exist between customer and broker notwithstanding changes in those practices to accommodate the growth of the industry and a significant rise in transactional volume.

Under Commission Rule 15c3-3, and SIPA, a SIPA trustee assumes the broker-dealer's position as bailee with respect to customer property. With certain modifications, the trustee

enjoys all of the broker's former rights and duties as bailee, including the bailee's universally-recognized right to sue third parties for the recovery of bailed property and for consequential damages caused by the disturbance of the bailee's possessory interest in that property.

Under applicable law, that right is <u>not</u> subject to the defense of *in pari delicto* and is <u>not</u> limited by the Second Circuit's decision in <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114 (2d Cir. 1991) ("<u>Wagoner</u>"). Under SIPA, customers share ratably in customer property until their claims are fully satisfied. Recovery of such property by certain customers, as bailors, outside the context of the SIPA liquidation, would preclude non-recovering customers from receiving their ratable share of the recovered property, and thus would utterly frustrate SIPA's scheme of ratable distribution. As a result, the SIPA trustee, as bailee, not the customer/bailors, must be the party to sue for the recovery of customer property. In doing so, the trustee cannot be barred by the doctrine of *in pari delicto*. Application of that bar against the only party able to sue culpable third parties would excuse those parties of responsibility for their conduct, at the expense of innocent customer/bailors. Such an outcome would severely compromise SIPA's principal purpose, the protection of customers.

The Trustee also has standing as the enforcer of SIPC's subrogation rights, which arise both under SIPA and the common law. Movants' objection to the Trustee's standing in that capacity rests heavily on their contention that allowing SIPC to sue third parties based upon its subrogation rights would upset SIPA's scheme for the allocation of customer property, improperly placing SIPC ahead of customers. But Movants are mistaken, and read SIPA's allocation provision in isolation from the remainder of the statute. In fact, any recovery by SIPC, as subrogee, would constitute customer property, and therefore would have to be turned over to the SIPA trustee. Where, as here, SIPC has assigned its subrogation rights to the Trustee, there

6

is no need for such a turn over, as any recovery by the Trustee will automatically augment the fund of customer property.

Movants' objection to the Trustee's standing as the assignee of customers suffers from a similar flaw. Movants read the language of the provision in SIPA authorizing such assignments as limiting those assignments to the assignors/customers' rights against the fund of customer property. But that provision says no such thing, and reading it that way is inconsistent with the rest of the statute and with the statutory purpose. Congress enacted SIPA, first and foremost, to protect customers. In light of this purpose, it hardly makes sense that Congress would tightly restrict the SIPA trustee's power to bring suits designed to recover customer property. On the contrary, read correctly, SIPA's assignment provision merely confirms that the Trustee has the power to insist that a claimant seeking "customer" status provide the Trustee with an appropriate assignment as a condition of satisfying that customer's claim. The provision does not limit the scope or extent of the assignment in any way. Finally, for the reasons stated in the Trustee's memorandum, the Trustee also has standing under Section 544 of the Bankruptcy Code.

Movants' contention that SLUSA preempts the Trustee's common-law claims also misses the mark. Congress enacted SLUSA to prevent class-action plaintiffs from bringing state-law securities claims in order to avoid the stringent pleading requirements applicable to claims brought under the federal securities laws. The statute applies only to "covered class actions" – those brought "on behalf of" 50 or more persons – and only to claims necessarily based upon securities fraud.

Neither of those requirements is met here. "Covered class actions" do not include those, like the instant action, brought by an entity (including a bankruptcy trustee) not established for the primary purpose of bringing litigation, and also do not include actions lacking questions of

law or fact common to the putative class members. Without question, the Trustee was not appointed for the primary purpose of bringing litigation. Indeed, he is charged with a host of unrelated duties, including, for example, administering the claims process in the BLMIS liquidation, allocating and distributing customer and estate property, investigating the reasons for BLMIS's failure, and so forth. In addition, there are no contested questions of law or fact pertaining to the customers in these cases. On the contrary, the contested issues relate only to Movants. They include, e.g., what Movants knew about the BLMIS fraud; when they acquired their knowledge; what actions, if any, they took upon learning of the fraud; what role they had in perpetuating that fraud.

Finally, SLUSA is not applicable to the Trustee's actions because the Trustee has not alleged securities fraud and his claims do not depend upon such allegations. As a result, SLUSA's primary purpose – to preclude the use of state law to avoid federal pleading requirements in securities class actions – is not implicated, and application of the statute here would be both unnecessary and inappropriate.

## ARGUMENT

### I. THE TRUSTEE HAS STANDING TO BRING HIS COMMON LAW CLAIMS AS THE BAILEE OF CUSTOMER PROPERTY

Since 1978, with one exception, the courts in this jurisdiction uniformly have held that a SIPA trustee has standing to sue a third party based on his rights as the bailee of customer property. See Redington v. Touche Ross & Co., 592 F.2d 617, 625 (2d Cir. 1978), rev'd on other grounds, 442 U.S. 560 (1979); SIPC v. BDO Seidman, LLC, 49 F.Supp.2d 644, 654 (S.D.N.Y. 1999), aff'd in part, question certified, 222 F.3d 63 (2d Cir. 2000), aff'd, 245 F.3d 174 (2d Cir. 2001); Picard v. Taylor (In re Park South Secs., LLC), 326 B.R. 505, 517 (Bankr. S.D.N.Y 2005) ("Park South"); In re A.R. Baron & Co., 280 B.R. 794, 805 (Bankr. S.D.N.Y.

2002) ("A. R. Baron"). In Redington v. Touche Ross & Co., the Second Circuit stated explicitly that a SIPA trustee "is responsible for marshalling and returning [customer] property; to the extent that he is unable to do so . . . he may sue on behalf of the customer/bailors any wrongdoer whom they could sue themselves." 592 F.2d at 625. For the reasons discussed in detail below, Redington was correctly decided and remains controlling law in this jurisdiction.

### A. **Redington Remains Controlling Law**

#### 1. **Redington And Its History**

Redington arose in the liquidation under SIPA of former SIPC-member Weis Securities, Inc. ("Weis"). The trustee for the liquidation and SIPC jointly commenced simultaneous actions against Touche Ross & Co. ("Touche Ross"), Weis's former auditor, in both the New York Supreme Court and in this Court. See Redington v. Touche Ross & Co., 428 F.Supp. 483, 486-88 (S.D.N.Y. 1977). In both actions, the trustee and SIPC asserted claims for negligence, malpractice, and breach of contract. Id. In their action in this Court, the trustee and SIPC also asserted claims for violations of Section 17 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78q, and Commission Rule 17a-5, 17 C.F.R. § 240.17a-5. Id. Touche Ross moved to dismiss the complaint filed in this Court for lack of subject matter jurisdiction and for failure to state a claim, on the grounds, inter alia, that no private right of action existed under Section 17 of the 1934 Act and SEC Rule 17a-5, and that the Court had no other basis for jurisdiction over the case. Id. at 488. This Court granted that motion, holding that no private right of action existed under Section 17 of the 1934 Act and that it lacked "diversity" jurisdiction over the remaining common law claims brought by the trustee and SIPC. Id. at 491-93.

The trustee and SIPC appealed to the Second Circuit, which reversed the District Court decision. See Redington, 592 F.2d at 619, 625. The Second Circuit found that Weis's customers

had a private right of action under Section 17 of the 1934 Act, that SIPC had standing to bring a claim under that section as "subrogee of the customers whose claims it has paid," and that the trustee had standing as the bailee of customer property. Id. at 623-24. By acknowledging that the trustee and SIPC had standing to pursue the action, it also acknowledged implicitly that they had standing to do so with respect to both their 1934 Act claims and their common law claims.

Touche Ross appealed the Second Circuit's decision to the Supreme Court. The Supreme Court reversed that part of the Second Circuit's determination that Section 17 created a private right of action, but left undisturbed the Second Circuit's holdings that SIPC had standing as the customers' subrogee to pursue claims against third parties and that the SIPA trustee had standing as the bailee of customer property. The case was then remanded to the Second Circuit for further proceedings consistent with the Supreme Court's decision. Touche Ross & Co. v. Redington, 442 U.S. 560 (1979).

On remand, the Second Circuit affirmed this Court's dismissal of the case for lack of subject matter jurisdiction, finding that: (i) it could not exercise "diversity" jurisdiction as the parties were not of diverse citizenship, and (ii) in the absence of a claim arising under federal law, no alternative basis for jurisdiction existed. Redington v. Touche Ross & Co., 612 F.2d 68 (2d Cir. 1979). The Second Circuit did nothing to disturb its earlier ruling regarding standing. Id.

### 2. Post-Redington Decisions

Federal courts at every level have repeatedly acknowledged that the Second Circuit's standing ruling in Redington remains good law. See BDO Seidman, LLP, 222 F.3d at 69; BDO Seidman, 49 F.Supp.2d at 654; Picard v. Taylor (In re Park South Secs., LLC), 326 B.R. 505, 517 (Bankr. S.D.N.Y 2005); In re A.R. Baron & Co., 280 B.R. 794, 805 (Bankr. S.D.N.Y. 2002);

Lutz v. Chitwood, 337 B.R. 160, 162 (S.D. Ohio 2005); In re Sunpoint Secs., Inc., 377 B.R. 513,

550 (Bankr. E.D. Tex. 2007), aff'd sub nom. Richardson v. Chesier & Fuller, 2008 WL 5122122

(E.D. Tex. Dec. 3, 2008); In re Meridian Asset Management, Inc., 296 B.R. 243, 258 (Bankr.

N.D. Fla. 2003); In re Bell & Beckwith, Case No. 83-1071 (memorandum and opinion at 6)

(June 26, 1984) (See Ex. A to Declaration of Christopher H. LaRosa In Support of Response of

Securities and Investor Protection Corporation to Motion to Dismiss ("Bell Decl.")). Cf., SIPC

v. Vigman, 803 F.2d 1513, 1519-20 n. 2 (9th Cir. 1986) ("Vigman") (acknowledging that

operating broker-dealer is the bailee of customer cash and securities). In BDO Seidman, for

example, Judge (now Justice) Sotomayor, writing for the court, explained that, had the Second

Circuit needed to address the issue of the trustee's standing as the bailee of customer property, it

would have been bound to follow its prior decision in Redington. See 222 F.3d at 69. Then

Judge Sotomayor left no doubt that the rationale of Redington remains controlling law in the

Second Circuit, citing that court's earlier decision in In re Sokolowski, 205 F.3d 532, 534-35 (2d

Cir. 2000), for the proposition that "[t]his court is bound by a decision of a prior panel unless and

until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court en

banc." Id. (emphasis added).

### 3. Movants' Attack On Redington

Movants mistakenly contend both that Redington is no longer good law and that it was

wrongly decided. First, Movants argue that because, on remand, the Second Circuit ultimately

found that it lacked subject matter jurisdiction, the court's earlier ruling on standing was made in

the absence of jurisdiction and is therefore null and void. Second, they point out that Redington

was decided prior to the enactment of the 1978 amendments to SIPA, and suggest that this

somehow invalidates the Redington court's standing ruling. Finally, they assert that Redington

is in conflict with the Supreme Court's decision in <u>Caplin v. Marine Midland Grace Trust Co. of New York</u>, 406 U.S. 416 (1972) ("<u>Caplin</u>"), and that it did not survive the Second Circuit's decision in <u>Wagoner</u>.  Movants' final argument is addressed <u>infra</u>.  Their first and second arguments are discussed below.

Movants' first contention – that the court's standing ruling in <u>Redington</u> is void because the court lacked subject matter jurisdiction – ignores the nature of standing.  As the courts have long recognized, "standing is a federal jurisdictional question determining the power of the court to entertain the suit." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975); <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011); <u>Carver v. City of New York</u>, 621 F.3d 221, 225 (2d Cir. 2010); <u>Zaleski v. Burns</u>, 606 F.3d 51, 52 (2d Cir. 2010), <u>cert. den.</u>, 131 S.Ct. 805 (2010).  It is equally well-established that a court always has jurisdiction to determine whether it has jurisdiction. <u>See, e.g.</u>, <u>Rosado v. Wyman</u>, 397 U.S. 397 (1970); <u>In re Baldwin-United Corp. Litig.</u>, 765 F.2d 343 (2d Cir. 1985).   Indeed, a court has not only a right, but a duty, to determine whether it has subject matter jurisdiction over a case, and may do so, either pursuant to motion or <u>sua</u> <u>sponte</u>, at any time.  <u>See</u>, <u>e.g.</u>, <u>Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.</u>, 109 F.3d 105, 107-08 (2d Cir. 1997); <u>Demers v. Target Corp.</u>, 2010 WL 2667438, at ** 1-2 (D. Conn. June 30, 2010).  <u>See also</u> <u>Univ. of South Alabama v. American Tobacco Co.</u>, 168 F.3d 405, 410 (11th Cir. 1999) ("[I]t is well settled that a federal court is obligated to inquire into subject matter jurisdiction <u>sua</u> <u>sponte</u> whenever it may be lacking").  As a result, the Second Circuit had jurisdiction to address standing in <u>Redington</u>, and its ruling that the trustee had standing as the bailee of customer property therefore is not void for want of jurisdiction.

Movants' second contention – that <u>Redington</u> is no longer good law because SIPA was amended in 1978 shortly after the case was decided – is baseless.  The only revised provision of

SIPA on which Movants rely as the basis for their argument that <u>Redington</u> is no longer valid is Section 78fff-2(c)(1).   That section provides a priority scheme governing the allocation of customer property, and places customers ahead of SIPC, as subrogee, as part of that scheme.   <u>See</u> SIPA § 78fff-2(c)(1).   As shown below, Movants wrongly contend that this priority scheme would be subverted if the trustee had standing to sue third parties as the enforcer of SIPC's subrogation rights.   More important for present purposes, it has nothing to do with bailment, and has no relevance here.

### B.   <u>Redington Was Properly Decided</u>

<u>Redington</u> is correct, as well as controlling.   Specifically, the <u>Redington</u> court's findings that a SIPA trustee is the bailee of the customer property entrusted to the liquidating firm, and that the trustee has standing to sue third parties as bailee, were both correct statements of the law at the time <u>Redington</u> was decided, and remain correct today.

### 1.   <u>The Trustee Is The Bailee Of Customer Property</u>

A SIPA Trustee has the powers of a bailee of the Fund of Customer Property by virtue of: (1) SIPA; (2) Commission Rule 15c3-3, 17 C.F.R. § 240.15c3-3 – known as the "customer protection rule"- as well as the agreements between the broker dealer and its customers; and (3) applicable bailment law.   As discussed in detail below, Rule 15c3-3 represents an adaptation of traditional bailment law to the exigencies of cash and securities custodianship in the modern age.

### (a)   <u>Segregation Requirements Of Rule 15c3-3</u>

Rule 15c3-3 requires that a broker-dealer promptly obtain possession, and thereafter maintain physical possession or "control" of all "fully-paid" and "excess margin" securities held by the firm for customers.   <u>See</u> 17 C.F.R. §§ 240.15c3-3(b)-(d).   For this purpose, securities are deemed to be in the firm's "control" when held in the firm's name at a clearing corporation or

other approved "control location" and allocated to the firm's customers on its books and records – a form of "bookkeeping segregation." See 17 C.F.R. § 240.15c3-3(c)(1) and (3). See also, Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev. 508, 529-31 (1990) ("Don & Wang"). Most important, the firm cannot use such securities in any aspect of its business, and thus cannot sell them without customer authorization, lend them to others, use them to deliver against short sales, or use them as collateral for a loan. See Steven D. Lofchie, Lofchie's Guide to Broker-Dealer Regulation 481 (3d ed. 2005) ("Lofchie").

Rule 15c3-3 treats customer cash slightly differently. Under the rule, and pursuant to a formula specified in Rule 15c3-3a, a broker-dealer must make a weekly calculation of an amount designed to reflect its net cash obligations to customers. See 17 C.F.R. §§ 240.15c3-3(e)(1), 240.15c3-3a. See also Michael P. Jamroz, The Customer Protection Rule, 57 Bus. Law. 1069, 1095-96 (2002) ("Jamroz"). The firm must then maintain in a "special reserve bank account for the exclusive benefit of customers" a deposit equal to the amount yielded by the Rule 15c3-3a calculation. See 17 C.F.R. § 240.15c3-3(e)(1). The firm at all times must keep this reserve account "separate from any other bank account of the broker or dealer" and must maintain a deposit in the account in the amount required by Rules 15c3-3 and 15c3-3a. See id.

The purpose of the reserve account requirement "is to ensure that funds a broker-dealer holds as a result of its customer business are used only to finance customer liabilities, and not to finance the broker's proprietary positions." Lofchie at 489. See also Jamroz at 1095-97. Thus, while Rule 15c3-3 recognizes that cash is fungible, and therefore does not require a broker-dealer to segregate the specific cash deposited by its customers, it does require the broker-dealer to segregate cash in an amount equal to its current, net cash obligations to all customers. As in

the case of securities, the rule thus requires the physical segregation of customer property on an aggregate basis. Should the firm have to liquidate, this cash is then available for delivery to individual customers in accordance with the firm's cash obligations to them, as established, through the firm's books and records — another instance of "bookkeeping segregation" comparable to the one applicable to customer securities. Cf., Jamroz at 1095-97.

### (b) Origins of Rule 15c3-3 and Relationship to SIPA

Rule 15c3-3 arose as part of a continuing effort to ensure protection of customer assets entrusted to securities broker-dealers, thereby adapting bailment concepts to the custodial needs and practices in the securities industry. See Don & Wang at 520-40 (summarizing history of SIPA and Rule 15c3-3). See also, Amendments to Financial Responsibility Rules for Broker-Dealers, Exchange Act Rel. No. 55431 (Mar. 19, 2007), 72 Fed. Reg. 12862 (March 19, 2007) ("The intent of [Rule 15c3-3] is to require a broker-dealer to hold customer assets in a manner that enables their prompt return in the event of an insolvency...."). The rule was adopted pursuant to a mandate under SIPA section 78kkk(g) that required the Commission to make recommendations concerning additional legislation that was needed to eliminate unsafe or unsound practices in the securities industry. See H. R. Rep. No. 91-1613, at 13-14 (1970) (SIPA makes "clear that the Commission has authority to promulgate rules with respect to the financial responsibility and related business practices of broker-dealers including, but not limited to, the acceptance of custody and use of customers' securities, and the carrying and use of customers' deposits or credit balances.")

Rule 15c3-3 and SIPA fit hand in glove. The "bookkeeping segregation" requirements in Rule 15c3-3, for example, are designed to ensure that, in the event of a broker-dealer failure, all cash and securities owed by a broker-dealer to its customers on a net basis are available for

15

return to them. <u>See</u> Jamroz at 1071-74. Even partial compliance with the rule by a broker-dealer ensures that some customer property will be available for return to customers in a liquidation under SIPA. <u>Id.</u> As one commentator has explained:

> [T]he primary purpose of the Customer Protection Rule is to ensure that customer property in a failed brokerage firm is available to satisfy the claims of customers. The rule was adopted by the Commission in response to a mandate by Congress when it adopted section 7(d) of the Securities Investor Protection Act (SIPA)…
>
> The Customer Protection Rule plays an integral role in assuring that customer property held by failed securities firms will be sufficient to satisfy customer claims in a self-liquidation or a proceeding under SIPA.

<u>See</u> Jamroz at 1071, 1073.

Moreover, when a SIPA liquidation begins, the SIPA trustee assumes all the same powers that the broker-dealer had under Rule 15c3-3 as the custodian of customer property prior to the commencement of the liquidation. In this regard, the Second Circuit noted in <u>Redington</u>, the trustee is obligated to marshal customer property and hold it in trust for customers. <u>See</u> <u>Redington</u>, 592 F.2d at 625. <u>See also</u> SIPA § 78fff(b) (providing for the application in SIPA liquidations of certain sections of the Bankruptcy Code, to the extent consistent with SIPA); SIPA § 78fff-1(a) and (b) (providing that a SIPA trustee generally has the powers and duties of a Chapter 7 trustee, but obligating the trustee to deliver securities "to the maximum extent practicable in satisfaction of customer claims"); 11 U.S.C. §§ 704(a)(1) (requiring trustee to collect property of the estate). To enable the trustee to fulfill these obligations, the trustee possesses powers beyond those available to an ordinary bankruptcy trustee; additional powers that include those available to a federal equity receiver. <u>See, e.g.,</u> <u>SEC v. Albert & Maguire Sec.</u> <u>Co., Inc.,</u> 560 F.2d 569, 574 (3d Cir. 1977) ("Thus, the SIPA trustee, upon order of the court,

will have the combined powers of a trustee in ordinary bankruptcy, a Chapter X trustee and a federal equity receiver"); SIPC v. Poirier, 653 F.Supp. 63, 66 (D. Or. 1986); Gold v. Hyman, Fed. Sec. L. Rep. ¶95,043 at pp. 97-657 – 97,658 (S.D.N.Y. 1975) (SIPA trustee has "even more powers in some circumstances than a trustee in bankruptcy"). See also Michael D. Bolton, Repurchase Agreement Transactions in Securities Investor Protection Act Proceedings, 15 Fordham Urb. L.J. 359, 375-86 (1986).

### (c)    Applicability of Federal Common Law

Movants mistakenly assume that the question of whether a bailment relationship exists between the Trustee and BLMIS's customers turns solely on certain particulars of New York bailment law.   In fact, federal law governs the relationship between both BLMIS and its customers, and the relationship between those customers and the Trustee.

The Redington decision hints at the applicability of federal common law, and its application is warranted here.  Under prevailing Supreme Court precedent, the application of federal common law is appropriate where there is a significant conflict between some federal policy or interest and the use of state law.  See, e.g., Wallis v. Pan. Am. Petroleum Corp., 384 U.S. 63, 68 (1966).  While the courts presume that state law is determinative where private parties have entered legal relationships with the expectation that their rights and obligations will be governed by state law standards, no such presumption exists where the rights of the parties are governed by federal law.  Cf., Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991); Marsh v. Rosenbloom, 499 F.3d 165, 181 (2d Cir. 2007).  In determining whether to apply federal common law, the courts consider whether: (1) there is a "need for a nationally uniform body of law;" (2) application of state law would frustrate specific objectives of a federal program; and (3)

"the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." United States v. Kimbell Foods, Inc., 440 U.S. 715, 728-29 (1979).

Under these standards, it is clear that the federal common law of bailment governs the relationship between securities broker-dealers and their customers.  Through Rule 15c3-3 and SIPA (and Section 60e of the Bankruptcy Act of 1898, SIPA's predecessor), Congress and the Commission federalized that relationship.  They did so in order to override inconsistencies in state law - e.g., a conflict between New York and Massachusetts law regarding the legal character to the customer/broker relationship – and to ensure national uniformity in the treatment of brokerage customers and the custody of their investment assets.  See Don & Wang at 520-27. Allowing state law to assign a different character to that relationship would undercut the principal purpose of Rule 15c3-3 and one of the key objectives of SIPA and its predecessor statute.

Moreover, through Rule 15c3-3 and SIPA (and its predecessor, section 60e), and their emphasis on "bookkeeping segregation," the Commission and Congress consciously adapted general principles of bailment law to custodial practices in the securities industry; practices that were driven by the expansion of that industry and rising transactional volume over time.  In so doing, they attempted to preserve the traditional character of the relationship between brokers and their customers – that of bailment - without imposing custodial requirements that would interfere with efficiency in securities trading and impede the further growth of the industry.  See Don & Wang at 520-40.  Reverting to state bailment laws to define the relationship of the trustee and the customers is incompatible with that intent.

It also would undercut another of SIPA's key purposes – facilitating the recovery and distribution of customer property by the trustee.  As noted, one of Congress's principal aims in

enacting SIPA was to restore customers as quickly as possible to the status they would have occupied had the liquidating broker-dealer not failed. Toward that end, SIPA empowers trustees to marshal customer property for distribution to customers, as the Second Circuit noted in Redington. Allowing state law to re-characterize the relationship between a broker-dealer and its customers would produce inconsistencies in the power of the trustee to recover customer property as the bailee thereof. It would eliminate that power where, as Movants contend is the case here, the custodial requirements imposed by Rule 15c3-3 are insufficient to create a bailment relationship under applicable state law. That is the opposite of what Congress intended when it enacted SIPA.

Finally, as the foregoing suggests, application of federal common law here would not disrupt any commercial relationship predicated on state law. As discussed, the custodial relationship between a brokerage customer and a securities broker-dealer is governed by federal law – specifically Commission Rule 15c3-3. As a result, the parties to the brokerage contracts relevant here had no reason to expect that state law would govern that relationship under the circumstances presented, and there is no state law that would be displaced by the application of federal common law.

The bailment relationship between the Trustee and the customers derives from SEC Rule 15c3-3 and SIPA. Application of either federal common law or New York law results in the same standing of the Trustee as a bailee and the same power of the Trustee to sue to recover customer property.

### (d)    **The Trustee As Bailee Under Federal Common Law**

Under federal common law, a bailment is created by the delivery of goods or personal property to the bailee in trust, under an express or implied contract, which requires the bailee to

perform the trust and either to redeliver the bailed property or to dispose of it in accordance with the purpose of the trust. See, e.g., Thyssen Steel Co. v. M/V Kavo Yerakas, 50 F.3d 1349, 1354-55 (5th Cir. 1995); Ace American Ins. Co. v. First Choice Marine, Inc., 2010 WL 3125945, at ** 3-4 (M.D. Fla. July 29, 2010); McCutcheon v. Charleston Boatworks, Inc., 2010 WL 2431017, at * 4 (D.S.C. June 14, 2010) (where there is no federal common law addressing a particular issue, the court may look to general bailment law principles); Fireman's Fund Ins. Co. v. Panalpina, Inc., 153 F.Supp.2d 1339, 1343 (S.D. Fla. 2001). Importantly, and consistent with general principles of bailment, this test does not incorporate any requirement that the bailee's possession have come about lawfully, or without "present intent to appropriate" the bailed property by the bailee. See supra. See also Richard A. Lord, 19 Williston on Contracts § 53:2 (4th ed. 2011) ("Williston"). Further, where a bailment involves fungible property, like cash or securities, the bailee is not obligated to return the specific property received from the bailor, and may instead return an equivalent quantity of property of the same type. See, e.g., 19 Williston § 53:6.

Under these standards, there is no doubt that a bailment existed between BLMIS and its customers. Pursuant to account agreements entered into with BLMIS, innocent customers entrusted cash to BLMIS for the purpose of purchasing and holding securities for them, and believed that BLMIS had done so. The contracts, and Rule 15c3-3, required that BLMIS hold such cash and/or securities in "bookkeeping segregation" for the customers in the manner described, and that BLMIS return that property, or its equivalent, to the customers upon demand. Custody of this kind satisfies all of the criteria necessary to create a bailment relationship under federal common law. Prior to the commencement of the BLMIS liquidation, BLMIS therefore was the bailee of the property of its customers, and the Trustee succeeded to that role.

(e)     **The Trustee As Bailee Under New York Law**

Under the common law of New York, as under federal common law, a bailment is created by the "delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be." Herrington v. Verrilli, 151 F.Supp.2d 449, 457 (S.D.N.Y. 2001). In the case of fungible property, New York generally permits the substitution of equivalent property in place of the property originally bailed. See, e.g., id. at 457. See also, 8 C.J.S. *Bailments* § 100 (2005) ("C.J.S."). Cf., Bank of New York v. Amoco Oil Co., 35 F.3d 643, 655 (2d Cir. 1994) (under New York's U.C.C., identification of goods as part of fungible mass sufficient to create bailment). Thus, the relationship between BLMIS and its customers was one of bailment.

(f)     **Movants' Objections**

Movants contest the existence of the bailment relationship on several grounds. For instance, Movants contend that SIPA's distribution scheme is inconsistent with bailment law. They also suggest that BLMIS intended to appropriate the customer property in question when received, and that no bailment relationship could have been formed under New York law.

SIPA is perfectly consistent with bailment law, however. In a SIPA proceeding, the customer is owed all cash and securities held in custody for the customer by the broker. See SIPA §78*lll*(2). See also Matter of Atkeison, 446 F.Supp. 844, 847 (M. D. Tenn. 1977) (SIPA protects customers "who have either cash or securities ... in the custody of broker-dealer firms"). The fact that SIPA permits interim pro rata distributions of customer property, as such property is amassed by the trustee, does not alter what the customer ultimately is owed, and certainly does

not prevent the formation of a bailment relationship when the property in question is initially bailed.

Moreover, while SIPA allows pro rata distributions of customer property to customers, that distribution scheme is entirely consistent with the manner in which bailment law has been applied where multiple bailors have bailed fungible property held in a common pool by a bailee, who then becomes insolvent. See, e. g., Rahilly v. Wilson, 20 F. Cas. 176, 176-77 (D. Minn. 1872), aff'd in part, 20 F.Cas. 179 (C.C.D. Minn. 1873) (bailment created where multiple producers of wheat stored the commingled product in warehouse, entitling the producer/bailors to pro rata share of wheat remaining in warehouse's custody upon its failure). See also Calumet Paper Co. v. Haskell Show-Printing Co., 45 S.W. 1115, 1116-17 (Mo. 1898) (assignee of property of insolvent corporation held property in bailment for corporation's creditors and was obligated to allocate it to those creditors on a pro rata basis); Donk Bros. Coal & Coke Co. v. Kinealy, 83 Mo. App. 40 (Mo. Ct. App. 1900) (same).

Movants' contention that no bailment relationship was formed because BLMIS was a thief, i.e., because it intended to appropriate the bailed property at the time of receipt, is based upon a state law principle that is overridden by operation of Rule 15c3-3 and SIPA. Rule 15c3-3 imposes the obligations of a bailee upon a broker-dealer who accepts custody of investor cash or securities irrespective of the broker's intent with respect to that property. Likewise, and in keeping with Rule 15c3-3, SIPA's definition of "customer property" encompasses cash or securities "unlawfully converted" by the broker-dealer, including such property converted at the inception of the customer-broker relationship. See SIPA § 78_lll_(4). Of course, requiring innocent intent on the part of the bailee as pre-requisite to the formation of a bailment relationship would utterly frustrate the primary objective of both Rule 15c3-3 and SIPA --

namely, customer protection.   Both the rule and the statute thus override any state-law requirement regarding the bailee's intent that Movants argue would apply.

2.     **As Bailee, The Trustee Has A Possessory Interest In Customer Property**

As the Second Circuit recognized in Redington, as the bailee of customer property, a SIPA trustee has a possessory interest in that property.  See, e.g., Redington, 592 F.2d at 625. That principle is as firmly established in New York law as it is in the law of bailment generally. See, e.g., United States v. Perea, 986 F.2d 633, 640 (2d Cir. 1993) ("Perea").  See also, 8 C.J.S. Bailments § 156 ("While the bailee does not own the bailed property, his or her possessory interest is sufficient to maintain an action for damages").

Moreover, as the Second Circuit also recognized in Redington, in exercising his or her possessory rights to recover bailed property from a third party, or related damages, a SIPA trustee, as bailee, stands in the shoes of the customer/bailors.  Redington, 592 F.2d at 625.  And again, that principle is grounded in long-established bailment law, both in New York and elsewhere.  See, e.g., Perea, 986 F.2d at 640 (under New York law, bailee has the "right of the owner" to recover bailed property and consequential damages from misuse of that property); Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, 175 (2d Cir. 1962), cert. den. sub nom. Yacimientos Petro. Fisc. V. Paragon Oil Co., 372 U.S. 967 (1963) (noting that "the bailee is entitled to recover the full value of the [bailed] goods or the full value of the damage inflicted"); 9 N.Y. Jur. 2d Bailments and Chattel Leases § 91 ("N.Y. Jur.").  See also Baldwin v. Hill, 315 F.2d 738, 742 (6th Cir. 1963); United States v. Currency $716,502.44, 2008 WL 5158291, at * 4 (E. D. Mich. Dec. 5, 2008) ("[A] bailee has agreed to hold the bailor's property according to certain terms and obligations, and then stands in the place of the owner in his ability to assert claims against third parties"); King Grain Co. v. Caldwell Mfg. Co., 820 F.Supp. 569, 572 (D.

Kans. 1993) ("King Grain").  The bailee holds any recovery from a third party in trust for the bailor.  See, e.g., N.Y. Jur. at § 91.

Movants object to the Trustee's assertion of standing as the bailee of customer property on a number of grounds, including that: (1) the Wagoner and Caplin decisions preclude standing; (2) Section 78fff-1(a) of SIPA limits the Trustee's standing to claims brought pursuant to the avoidance powers conferred by the Bankruptcy Code; and (3) the standing recognized in Redington cannot be extended to common law causes of action and, in any event, was implicitly overruled by the Supreme Court.  For the reasons discussed, none of these objections hits the mark.

### 3.    Wagoner and Caplin Do Not Bar The Trustee's Suit to Vindicate His Possessory Interest in Customer Property

#### (a)    Wagoner and Caplin

In Caplin, the Supreme Court held that a bankruptcy trustee has no standing to sue third parties on behalf of the creditors of the bankruptcy estate, but may only assert claims held by the debtor itself.  See Caplin, 406 U.S. at 434.  In reliance on Caplin, the Second Circuit in Wagoner held that, where the insiders of a corporate debtor participated with third parties in defrauding the corporation, a bankruptcy trustee for the debtor corporation lacks standing to sue those third parties on causes of action held by creditors of the bankruptcy estate.  See Wagoner, 944 F.2d at 119-20.  The court then further held that, because the debtor's "sole stockholder and decisionmaker" knew of, and participated in, the fraud on the debtor, the trustee for the debtor was barred from suing the complicit third parties under New York's doctrine of *in pari delicto*. Id. at 120.  The court did not state clearly whether this latter holding formed part of its standing decision or arose as an affirmative defense, but did note that the facts that the insider/wrongdoer

was in sole control of the debtor, and that the insider was complicit in the fraud on the debtor, were uncontested. Id. at 120.

For the reasons stated, however, the *in pari delicto* doctrine upon which the Second Circuit relied in Wagoner does not apply to a bailee's suit against a third party and, even assuming, arguendo, that it did, the question of its applicability cannot be resolved on a motion to dismiss.

### (b) *In Pari Delicto* Does Not Bar A Suit By A Bailee Against A Third Party

Movants assume, without analysis, that New York's doctrine of *in pari delicto* could act as a bar to a suit by a bailee against a third party for torts connected with the bailment. For the reasons stated, however, the Trustee's status as bailee is part of a federal scheme inconsistent with the application *in pari delicto*. In any event, such an application would contravene basic principles of bailment law.

While some authorities hold that certain equitable defenses may be available in a suit by a bailee against a third party, the defenses available are limited to those based upon the comparative fault of the two parties. Thus, for example, some courts hold that a third party sued by a bailee for negligence in the handling of bailed property may assert the bailee's contributory negligence as a defense. See, e.g., 8A Am. Jur. 2d Bailments § 165; Fischer v. Int'l Ry. Co., 182 N.Y.S. 313, 313-15 (N.Y.Sup.Ct. 1920). Consistent with the principle that the bailee is deemed to stand in the shoes of the bailor for purposes of suits against third parties, however, they do not recognize equitable defenses barring liability against a joint tortfeasor. Rather, the recognized defenses allow the bailee to recover from a third party that portion of the joint liability allocable to the third party, leaving the bailee responsible for any remaining portion of its liability to the bailor. Cf., Fischer, 182 N.Y.S.2d at 314 ("To say that, where an injury is occasioned by the

25

joint negligence of the bailee and a third party the bailor must look to the bailee alone is to ignore the well-recognized rule that joint tort-feasors are jointly and severally liable for the consequences of their torts. The injured party may sue both jointly, or each separately").

In bringing a suit, the bailee is deemed to stand in the shoes of the bailor. Accordingly, any limitation on the bailee's ability to sue normally also binds the bailor. Yet *in pari delicto* would serve as a complete bar to recovery which would bind the bailor. Cf, e.g., Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990) ("Where both parties are *in delicto*, but not *in pari delicto*, a trial court should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less"). Under the doctrine, if the bailee is completely barred from recovery against a third party, and the bailor is bound by that bar, an innocent bailor would then be precluded from realizing any recovery against a culpable third party solely because of the misconduct of the bailee or its successor. In that vein, if the bailee were insolvent or otherwise judgment proof, the bailor would realize <u>no</u> recovery, while both the bailee and the culpable party escape liability for their misconduct.

This concern is particularly acute in the context of a SIPA liquidation. As noted, SIPA requires that customer property be allocated and distributed to customers on a ratable basis. Accordingly, the customer/bailors cannot sue at present because any recovery by them outside of the BLMIS liquidation would disrupt SIPA's scheme for the allocation and distribution of customer property. Instead, the Trustee, as bailee, must bring suit. If, however, the Trustee is barred from bringing suit by the doctrine of *in pari delicto*, then the customer/bailors effectively have no remedy against third parties that played an active and indispensable role in enabling BLMIS to victimize them.

That is not, and cannot be, the law, particularly in the context of a SIPA liquidation, which is concerned primarily with the protection of customers whose recovery would be significantly limited by application of the principle. *See, e.g.,* Pinter v. Dahl, 486 U.S. 622, 632-33 (1988) (application of *in pari delicto* to causes of action created by federal statutes depends, in part, on the policy goals of the federal statute). In fact, consistent with the foregoing analysis, every case in this jurisdiction decided since Wagoner that has addressed the standing of a SIPA trustee to sue third parties as the bailee of customer property has recognized that the trustee has such standing, notwithstanding Wagoner. See BDO Seidman, 49 F.Supp.2d at 654; Park South, 326 B.R. at 517; A.R. Baron., 280 B.R. at 805. The same outcome is required here. *See* In re Bell & Beckwith, 821 F.2d 333, 337-38 (6th Cir. 1987) (U.C.C. is the law of Ohio "except insofar as federal bankruptcy or securities law preempts it...*SIPA alters the rights of the parties in a way not contemplated by the U.C.C.*" (emphasis added)); Tepper v. Chicester, 285 F.2d 309, 312 (9th Cir. 1960) (Section 60e, SIPA's precursor, displaced state law of agency because "[t]he provisions of the Federal Bankruptcy Act are superior to all state laws upon the subject and suspend those laws insofar as they are in conflict with the Act...").

Finally, application of *in pari delicto* to a SIPA trustee suing as the bailee of customer property, standing in the shoes of the bailor, would be inconsistent with the customer protection purpose of both Rule 15c3-3 and SIPA, which specifically defines "customer property" to include converted property. See SIPA § 78*lll*(4). The bailment law applicable to the Trustee must be read in light of that purpose, and *in pari delicto* therefore cannot bar his suit.

    **(c)**    <u>**Application Of *In Pari Delicto* Is Inappropriate At the Pleading Stage**</u>

In any event, assuming, arguendo, that the doctrine of *in pari delicto* could be applied to the claims brought by the Trustee as the bailee of customer property, the applicability of the

doctrine cannot be decided on a motion to dismiss. As noted, federal common law governs the Trustee's claims as bailee, and under federal common law, *in pari delicto* is an affirmative defense, not a barrier to standing. See, e.g., Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1149 (11th Cir. 2006), cert. den. sub nom. Laddin v. Reliance Trust Co., 549 U.S. 811 (2006) (under federal common law, "[a]n analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*" (quoting Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (3d Cir. 2001)).

The same is generally true under Wagoner. Although the Second Circuit's application of *in pari delicto* in Wagoner has been interpreted as a decision regarding standing, the doctrine is grounded in New York law, which treats *in pari delicto* as a defense. See, e.g., Kirschner v. KPMG LLP, 15 N.Y.3d 446, 484 n. 3, 938 N.E.2d 941 (N.Y. 2010). Further, with good reason, the Second Circuit generally has addressed the applicability of the *in pari delicto* doctrine at the pleading stage only where there was no dispute that the debtor corporation was wholly owned and controlled by the principal wrongdoers. See, e.g., In re Bennett Funding Group, Inc., 336 F.3d 94, 100-01 (2d Cir. 2003) (two shareholder/wrongdoers controlled innocent directors); Wight v. BankAmerica Corp., 219 F.3d 79, 81-83 (2d Cir. 2000) (undisputed allegations of dominance and control by two insiders); In re the Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) (sole shareholder); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1095-96 (2d Cir. 1995); Wagoner, 944 F.2d at 120 (sole shareholder). See also In re Neri Bros. Constr. Co., 323 B.R. 540, 543 (Bankr. D. Conn. 2005). Where the key facts are either contested and/or more complicated, the Second Circuit and the lower courts in the jurisdiction generally have deferred ruling until after trial. See, e.g., In re CBI Holding, 529 F.3d 432, 447-53 (2d Cir. 2008); Global

Crossing Estate Representative v. Winnick, 2006 WL 2212776, at * 15 (S.D.N.Y. Aug. 3, 2006) ("Global Crossing").

That caution is appropriate, as the applicability of the *in pari delicto* doctrine frequently turns on contested issues of fact, including degrees of culpability between and among the debtor corporation and the defendants. See, e.g., Global Crossing, 2006 WL 2212776, at * 15. For this reason, application of the doctrine to claims for aiding and abetting a breach of fiduciary duty, for example, are particularly inappropriate for resolution at the pleading stage. Id.

The same logic precludes dismissal here. There is no question that the parties will dispute their relative degrees of culpability. Inevitably, resolution of that dispute will require the Court – or a jury - to make extensive factual findings, an exercise that cannot occur until after the presentation of evidence at trial.

### 4. The Trustee's Standing To Sue Is Not Limited By SIPA

Movants assert that Section 78fff-1(a) of SIPA limits a SIPA trustee's standing to claims brought under the avoidance provisions of the Bankruptcy Code. See 11 U.S.C. §§ 544, 547-48. Nothing in either provision supports this assertion.

Section 78fff-1(a) vests a SIPA trustee with "[t]he same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11." See SIPA § 78fff-1(a). Nothing in the section indicates that the trustee is limited to the powers of a Chapter 7 trustee, however, and to so read the statute would ignore the larger statutory context in which the section appears, in violation of the most elementary principles of statutory construction. See, e.g., Norman J. Singer, J.D. Shambie Singer, 2A Statutes and Statutory Construction § 47:6 (7th ed. 2007) (to the extent possible, all parts of a statute must be construed to harmonize with one another and with the purposes and

29

objectives of the legislation). As noted, SIPA requires a SIPA trustee to determine claims for "customer property," and to marshal, allocate, and distribute such property in satisfaction of allowed claims. It strains credulity to suppose that Congress would impose such a duty on a SIPA trustee, while simultaneously withdrawing or restricting the trustee's means for doing so. In fact, as discussed above, Congress intended the opposite. Thus, read properly and in context, Section 78fff-1(a) of SIPA merely confirms that, in addition to the other unique powers that the trustee has under SIPA, he or she also has those powers available to a bankruptcy trustee.

In any event, even if a SIPA trustee were limited to the powers available to a Title 11 trustee, the Trustee here would still have standing as bailee. Unlike securities broker-dealers, most businesses do not hold bailed property, and most debtors therefore do not qualify as bailees. In the rare case where a debtor is a bailee of property, however, the law of bailment would apply to the trustee for the debtor's bankruptcy in exactly the same way that it applies to other bailees. In short, for the same reasons discussed above, the bankruptcy trustee, as bailee, would have standing to sue third parties for recovery of bailed property and disturbance of the debtor's possessory interest in the property, and would not be limited by the doctrine of *in pari delicto* as part of any such suit. See supra.

5.    **The Trustee Has Standing To Bring Common Law Claims**

Movants argue that even if Redington remains good law, its holding cannot be extended to common law claims because: (1) the Trustee lacks standing to "assert rights belonging to others;" and (2) the Supreme Court's logic in Redington in rejecting a private cause of action under Section 17 of the Exchange Act applies with equal force to the common law claims asserted by the Trustee.

As discussed above, the Trustee, as the bailee of customer property, is not asserting "rights belonging to others," but rather his own "possessory interest" in customer property as the successor of BLMIS. The fact that, under applicable bailment law, the Trustee is deemed to stand in the shoes of the customer/bailors does nothing to alter the basis of the Trustee's claims.

Moreover, action by the Trustee is necessary in order to ensure the trustee's collection of customer property required by SIPA. Recovery by individual customers outside the context of the liquidation, and without any requirement that such recovery be distributed through the BLMIS estate in accordance with SIPA, would deprive non-recovering customers of their ratable share of any recovery. As equality in the treatment of customers was one of Congress's primary objectives in enacting SIPA, action by individual customers thus would badly frustrate the Congressional purpose.

The suggestion that, due to the individualized nature of customers' reliance and damages, the Trustee's standing as bailee should not include the power to bring common law claims is baseless. Nothing in Redington suggests that its holding is so limited, and trustees under both SIPA and the Bankruptcy Code have been permitted to bring, and have brought, common law claims in numerous cases in the past. See, e.g., Park South, 326 B.R. at 517; A.R. Baron, 280 B.R. at 805. See also In re Payroll Express Corp., 2005 WL 2438444 (Bankr. S.D.N.Y. Mar. 30, 2005) (trustee had standing to bring claims for negligence, misrepresentation, unjust enrichment, and accounting); In re Hampton Hotel Investors, L.P., 289 B.R. 563 (Bankr. S.D.N.Y. 2003) (claims for aiding and abetting breach of fiduciary duty); In re Argo Communications Corp., 134 B.R. 776 (Bankr. S.D.N.Y. 1991) (claim for fraud). There is no reason why any different result should obtain here.

The idea that the Supreme Court's decision in <u>Redington</u> bars the Trustee's claims here is also mistaken.  In <u>Redington,</u> the Supreme Court held that Section 17(a) of the Exchange Act did not <u>create</u> a cause of action, and concluded that the SIPA trustee in the case therefore could not assert such a claim.  See <u>Redington</u>, 442 U.S. at 570.  The Court's decision thus had nothing to do with standing to bring a cause of action, but rather dealt with whether a cause of action of the kind asserted existed at all.  <u>Id.</u>  Certainly, the Court did not address what effect, if any, federal securities law might have on pre-existing state-law causes of action.

In contrast, this case concerns both standing and the impact of federal law on pre-existing state law rights.  For the reasons discussed above, there is no doubt that, under state law, Rule 15c3-3 creates a bailment relationship between a securities broker-dealer and its customers.  Thus, even in the absence of federal common law, the Trustee, as successor to the liquidating broker-dealer, would have standing under state law to bring suit as the bailee of customer property.  But, as explained, application of federal common law is necessary to ensure national uniformity in the administration of liquidations under SIPA.

## II.    THE TRUSTEE HAS STANDING TO BRING HIS COMMON LAW CLAIMS AS THE ENFORCER OF SIPC'S SUBROGATION RIGHTS, AND WOULD HAVE STANDING AS THE ASSIGNEE OF CUSTOMERS

Beyond his standing as the bailee of customer property, the Trustee also has standing to bring his common-law claims as the enforcer of SIPC's subrogation rights and, through the debtor, as a joint tortfeasor seeking contribution.  In addition, although the Trustee has not asserted standing to bring those claims as the assignee of customers whose claims he has satisfied in the BLMIS liquidation, there is no legal barrier to his doing so.

## A.   The Trustee's Standing To Enforce SIPC's Subrogation Rights

The Trustee has explained in detail in his opposition to the Motions the basis for his standing as the representative of an estate seeking contribution as a joint tortfeasor. SIPC concurs in the Trustee's position. With regard to subrogation, Movants contend that allowing the Trustee to recover as the enforcer of SIPC's subrogation rights would somehow contravene SIPA's plain language and would upset the SIPA scheme for the allocation of customer property by placing SIPC above customers, instead of beneath them, in the order of priority. They also contend that, in Redington, the Second Circuit held that SIPA itself does not create subrogation rights, but merely allows SIPC to assert such subrogation rights as it may have under state law. According to Movants, SIPC has no subrogation rights under New York law because it makes advances to the Trustee, not customers, and therefore, as subrogee, it stands in the shoes of the estate, not the customers. In Movants' view, the Trustee is barred by Wagoner from suing third parties in that capacity.

As an initial matter, Movants mistakenly place great reliance on this Court's decision in Mishkin v. Peat, Marwick, Mitchell & Co., 744 F.Supp. 531 (S.D.N.Y. 1990). In Mishkin, former Judge Pollack elected not to follow Redington's dictate, in contravention of long-established rules of stare decisis. The case is thus not good law in this jurisdiction, and should not serve as any guide here. See Appleton v. First Nat. Bank, 62 F.3d 791, 799 (6th Cir. 1995) ("Appleton") (rejecting Mishkin because the case "departed from the precedent of its circuit"). In contrast, in BDO Seidman, Chief Judge Preska, while critical of Redington, recognized that the Court was bound by it. BDO Seidman, 49 F.Supp.2d at 654. On appeal, the Second Circuit confirmed the wisdom of Judge Preska's decision, noting that Redington remains good law. See BDO Seidman, 222 F.3d at 69.

33

In any event, the Second Circuit did not suggest in Redington that SIPC's subrogation rights are limited to those available under state law.  On the contrary, the Second Circuit merely stated that SIPA does not displace SIPC's state-law subrogation rights against third parties. Thus, the Court did not reach the issue whether the statute itself creates such rights independently.  See Redington, 592 F.2d at 624.  Numerous other courts have reached that issue, however, including several in this jurisdiction, and nearly all have concluded that SIPA does create subrogation rights in SIPC independent of the common law.  See, e.g., Appleton, 62 F.3d at 799-800; Vigman, 803 F.2d at 1516; A.R. Baron, 280 B.R. at 804 ("SIPA expressly provides that SIPC has the statutory right of subrogation").

It is now even clearer, post-Redington, that SIPC's subrogation rights extend to suits against third parties.  In 1978, Congress amended SIPA's subrogation provision to emphasize that the subrogation rights conferred upon SIPC are "in addition to all other rights it may have at law or in equity."  See Appleton, 62 F.3d at 799.  That addition confirms without doubt that SIPC enjoys common-law subrogation rights against third parties under applicable state law.  Id. Movants' attempt to dismiss this amendment as merely "technical" misses the point.  The amendment was "technical" only because SIPC's subrogation rights against third parties were already well-established in 1978 when the amendment was enacted.

Finally, Movants' contention that allowing the Trustee to enforce SIPC's subrogation rights against third parties would upset SIPA's scheme for the allocation of customer property is also wrong.  Again, Movants mistakenly read SIPC's subrogation provision in isolation from the remainder of the statute and from the underlying Congressional purpose.

As "customer property" constitutes property of the estate, SIPC is barred by the automatic stay from bringing an action to recover such property and, even in the absence of the

34

stay, would be obliged to turn any recovery of such property over to the SIPA trustee.  See SIPA § 78fff(b); 11 U.S.C. §§ 362(a), 541(a), 542.  Where, as here, SIPC has assigned its subrogation rights to the Trustee, any customer property recovered by the Trustee through the exercise of those rights will automatically be included in the fund of property available for distribution to all customers.  See SIPA § 78fff-2(c)(1).  See Appleton, 62 F.3d at 800.

Furthermore, as the Sixth Circuit recognized In re Bell & Beckwith, 937 F.2d 1104, 1108 (6th Cir. 1991), SIPA both allows and requires SIPC, to the extent of its advances for customers whose claims have been fully satisfied, to share with other customers in the allocation and distribution of customer property.  Such participation by SIPC is completely consistent with SIPA's allocation scheme.

**B.** **The Trustee's Standing To Sue As The Assignee of Customers**

With regard to the Trustee's capacity to assert standing as the assignee of customers, Movants suggest that Section 78fff-2(b), the provision of SIPA authorizing such assignments, precludes a SIPA trustee from accepting assignments of customer claims against third parties, and instead limits the trustee to accepting the assignment of customer claims against the fund of customer property.  In their view, such a reading would enable customers to pursue customer property through their own suits against third parties, and to retain in full any customer property so recovered.  But allowing them to do so would deprive other customers of their ratable share of customer property so recovered and thus would utterly frustrate Congress's effort to ensure equal treatment of customers through SIPA.

Further, Section 78fff-2(b) merely provides that a SIPA trustee may condition the satisfaction of a customer's claim upon the delivery of an appropriate assignment; it says nothing about the scope of the rights that the Trustee may accept as part of such an assignment.  In other

35

words, even if Movants' reading of Section 78fff-2(b) were correct – and it is not – and a SIPA trustee could not condition customer satisfaction upon the delivery of an assignment of customer rights against third parties, there is nothing in the language of the statute that would preclude a trustee from accepting a voluntary assignment by a customer of such rights.   Indeed, for the reasons stated, such an assignment would best serve SIPA's goal of equal treatment of customers.   As the Third Circuit explained in Albert & Maguire:

> The [Securities Investor Protection] Act authorizes the trustee to receive affidavits and assignments from customers in such form as he determines.  Nothing in the statutory language restricts the form or purpose of the assignments to use against the debtor.  Proper application of the statute requires that this provision be construed liberally in order to provide adequate reimbursement for customers.  If the trustee recovers on customers' claims against third parties, the single and separate fund [now customer fund] is augmented and additional money becomes available to satisfy claims of all customers.

Albert & Maguire, 560 F.2d at 573.

Finally, Movants suggest that, even if the Trustee could require and/or accept an assignment of a customer's rights against third parties, the Trustee has failed to allege proximate causation sufficiently to sustain his common-law claims.  For the reasons stated above, however, causation is not relevant to standing and, in any event, was more than adequately pled by the Trustee.

## III.   HSBC WAS WRONGLY DECIDED

In its opinion and order entered on July 28, 2011 in Irving H. Picard v. HSBC Bank, LLC, et al., Case Nos. 11 Civ. 763 and 11 Civ. 836, 2011 WL 32002988 (S.D.N.Y.) ("HSBC Order"), Judge Rakoff erred in dismissing the Trustee's common law claims for lack of standing. In the first instance, the Court erred in finding that Section 78fff-1(a) limits the Trustee to the powers available to a bankruptcy trustee.  Even if correct, however, that finding would have no

impact on the Trustee's standing as bailee. As discussed, a SIPA trustee succeeds to a bailment relationship between a securities customer and a liquidating broker-dealer that is imposed by Rule 15c3-3. That relationship arises at the time the customer entrusts cash or securities to the broker-dealer, i.e., before the liquidation commences. Thus, contrary to Judge Rakoff's finding in the HSBC Order, the misconduct alleged by the Trustee here – which caused a breach of bailment - occurred after, not before, the bailment arose. Further, BLMIS's intent when it received customer property – whether nefarious or noble – cannot have prevented the formation of a bailment relationship, since Rule 15c3-3 imposed the obligations of a bailee upon BLMIS irrespective of its intent. Likewise, the Trustee's obligation under SIPA to distribute recovered property ratably is identical to the common law of bailment as applied to the restitution to similarly-situated bailors of bailed property that has been consensually commingled.

Judge Rakoff's suggestion that the Trustee, as bailee, suffered no damages because the bailed property experienced a gain, not a loss, due to the HSBC defendants' actions reflects a misunderstanding of which property was bailed. The bailed property consists of the cash entrusted by the customer/bailors to BLMIS, not the fictional cash and securities positions fraudulently reported to the customers by BLMIS. The bailed customer cash did not change in value as consequence of the HSBC defendants' action, or those of Movants here. BLMIS's misappropriation of that bailed cash, however - which both the HSBC defendants, and Movants, aided and abetted – did cause substantial consequential damages, for which the Trustee now sues, along with restitution of the bailed cash received by the Defendants (or its equivalent).

In rejecting SIPC's subrogation rights as a source of standing, the Court cited Section 78fff-4(c) of SIPA. But that provision applies only in a "Direct Payment Procedure," an extra-judicial procedure that may be used as a substitute for a court-administered liquidation only in cases

where customer claims aggregate less than $250,000. See SIPA § 78fff-4(a)(4). Moreover, the language in Section 78fff-4(c) limiting SIPC's subrogation rights to claims against the liquidating SIPC member is absent from Section 78fff-3(a), the subrogation provision applicable to proceedings like the BLMIS liquidation, suggesting that Congress intended that no such limitation apply in the context of such a proceeding.

Further, as discussed, the use of SIPC's subrogation rights as the basis for suit against third parties could not subvert SIPA's order of priority for the allocation of "customer property" because SIPC could not assert those rights to seek recovery of customer property to the exclusion of a debtor's estate. Any attempt to do so would violate the automatic stay imposed by Bankruptcy Code Section 362(a)(3), and, even in the absence of such a stay, SIPC would have to turnover any recovery to the Trustee under Code Section 542(a). In this light, the fact that Section 78fff-3(a) precludes SIPC's recovery against the fund of "customer property" until after the allocation of that property to customers is perfectly consistent with SIPC's right to sue third parties. After all, any recovery by SIPC pursuant to its subrogation rights would be a recovery of customer property, and would thus be allocable to customers on a ratable basis. Section 78fff-3(a) thus merely confirms that SIPC has no claim to customer property recovered through the exercise of its subrogation rights until that property has first been allocated to customers.

The Trustee is not presently pursuing his common law claims here as the assignee of customers, and Judge Rakoff's discussion in the HSBC Order of the Trustee's standing as assignee is therefore dicta. Nevertheless, Judge Rakoff's reliance in that discussion on Mishkin v. Peat, Marwick, Mitchell & Co., 744 F.Supp. 531, 554 (S.D.N.Y. 1990), and several subsequent cases citing it, is mistaken, as Mishkin is riddled with errors. In Mishkin, former Judge Pollack held that a SIPA trustee who received assignments from several banks was barred

38

from pursuing claims against third parties as assignee.  Judge Pollack based this holding on a mistaken premise – his belief that, under SIPA, a SIPA Trustee "may not make customer net equity payments to banks," and therefore could not have made a payment to the bank/assignors for which an assignment under SIPA Section 78fff-2(b) might have been given.  Id.  But the section on which Judge Pollak relied for this premise – SIPA Section 78fff-3(a)(5) -- merely provides that a bank is barred from receiving a SIPC advance, not from qualifying as a "customer" eligible to receive a "net equity" payment.  In any event, with few exceptions, the BLMIS customers to whom the Trustee has made "net equity" payments are not banks, and thus would not have been barred from the receipt of such payments even if Judge Pollack had been correct.  Finally, the fact that Section 78fff-2(b) is styled "Payments to Customers," has no bearing on the scope of the assignment that made be requested, and given, in exchange for such a payment, and certainly does not bar the assignment to the Trustee of claims against third parties.  See supra.

Judge Rakoff's rejection of the Second Circuit's decision in Redington in the HSBC Order on the ground that the case was ultimately dismissed for lack of subject matter jurisdiction misses a key point.  Because standing is a jurisdictional prerequisite to adjudication, the Second Circuit's standing decision in Redington was a jurisdictional determination.  As noted, a court always has jurisdiction to decide whether it has jurisdiction, and the Second Circuit thus had jurisdiction to issue its standing decision.  The principle that a decision entered without jurisdiction has no precedential value thus has no application to Redington, which remains good law.

Finally, Judge Rakoff's application of the defense of *in pari delicto* to the Trustee in the HSBC Order was a mistake.  For the reasons discussed above, the defense does not apply where

the plaintiff is a bailee seeking to recover bailed property, and damages stemming from the misuse of that property, and therefore cannot apply to a SIPA trustee seeking the recovery of customer property as the bailee thereof. *In pari delicto* also has no application where a SIPA trustee sues as the enforcer of SIPC's subrogation or as the assignee of customer, as neither SIPC nor the customers (absent unusual circumstances) were party to the debtor's misconduct.

## IV.   SLUSA DOES NOT PREEMPT THE TRUSTEE'S COMMON LAW CLAIMS

Having failed to demonstrate that the Trustee lacks standing to bring his common-law claims, Movants distort SLUSA in an attempt to secure dismissal of those claims through preemption. Congress enacted SLUSA as part of the Private Securities Litigation Reform Act of 1995 in order to prevent securities class action plaintiffs from suing under state law so as to circumvent the stringent pleading requirements imposed on claims brought under the federal securities laws. See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82 (2006); Anwar v. Fairfield Greenwich Ltd., 728 F.Supp.2d 372, 398 (S.D.N.Y. 2010).

Under SLUSA, claims that: (1) are brought by a private party in a "covered class action;" (2) are based upon state or local law; (3) allege the misrepresentation or omission of a material fact "in connection with" the purchase or sale of (4) a "covered security," are preempted by SLUSA and subject to dismissal. See, e.g., Romano v. Kazacos, 609 F.3d 512, 517-18 (2d Cir. 2010); Anwar, 728 F.Supp.2d at 398. For the reasons discussed below, the instant cases do not constitute "covered class actions" and do not allege fraud "in connection with" the purchase or sale of a "covered security."

### A.   The Trustee's Amended Complaint Is Not A "Covered Class Action"

SLUSA defines a "covered class action" to include a single lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members..." and in which

40

"questions of law or fact common to those persons...predominate." <u>See</u> 15 U.S.C. §§77p(f)(2)(A)(i)(I); 78bb(f)(5)(B)(i)(I). SLUSA further provides that, in counting putative class members, an entity "shall be treated as one person or prospective class member, but only if the entity is not established for participating in the action." <u>See</u> 15 U.S.C. §§77p(f)(2)(C); 78bb(f)(5)(D). As this language indicates, unless an entity, including a trusteeship, is established for the purpose of bringing the claims in question, the Court cannot "look through" that entity to those who might benefit from its action, and instead must treat the entity as a single person in counting putative class members for purposes of the "covered class action" provisions. <u>Id.</u>

As the legislative history to SLUSA makes clear, Congress enacted this "entity exception," <u>inter</u> <u>alia</u>, to ensure that a trustee, among others, would be able to bring suit against third parties to recover property of the estate. <u>See</u>, <u>e.g.</u>, S. Rep. 105-182, at 8 (1998). In the regard, the Senate Report on SLUSA explains that:

> The class action definition has been changed from the original text of S. 1260 to ensure that the legislation does not cover instances in which a person or entity is duly authorized by law, other than a provision of state or federal law governing class action procedures, to seek damages on behalf of another person or entity. Thus, a trustee in bankruptcy, a guardian, a receiver, and other persons or entities duly authorized by law (other than by a provision of state or federal law governing class action procedures) to seek damages on behalf of another person or entity would not be covered by this provision.

<u>Id.</u>

In accord with the plain language of SLUSA's entity exception, it is well established in this jurisdiction and elsewhere that the "primary purpose" for which an entity was created controls how it is treated. If that "primary purpose" was to bring the claims in question, then the courts apply a "look through" rule and consider the number of entity beneficiaries in counting the number of putative class members for purposes of the "covered class action" provisions.

See, e.g., LaSala v. Lloyd's TSB Bank, PLC, 514 F.Supp.2d 447, 470-71 (S.D.N.Y. 2007) ("TSB Bank"); LaSala v. UBS AG, 510 F.Supp.2d 213, 236-37 (S.D.N.Y. 2007); LaSala v. Bank of Cypress Public Co. Limited, 510 F.Supp.2d 246, 269-70 (S.D.N.Y. 2007) ("Bank of Cypress"); Lee v. Marsh & McClennan Companies, 2007 WL 704033, at * 4 (S.D.N.Y. Mar. 7, 2007) ("Lee").  See also LaSala v. Bordier Et Cie, 519 F.3d 121, 132-33 (3d Cir. 2008), cert. dismissed, 129 S.Ct. 593 (2008) ("Bordier") (the plain language of SLUSA requires the court "to follow the usual rule of not looking through an entity to its constituents unless the entity was established for the purpose of bringing the action, i.e., to circumvent SLUSA"); Smith v. Arthur Andersen LLP, 421 F.3d 989, 1007-08 (9th Cir. 2005).

In contrast, however, where the entity was not primarily for the purpose of pursuing the challenged litigation, the "look through" rule is not applied, the entity is treated as a single person, and the number of ultimate beneficiaries is of no import.  In applying this rule to trusts, for example, this Court has explained that:

> Under the plain language of SLUSA, the propriety of granting entity treatment to a given trust turns on the purpose for which the trust was created.  A trust whose primary purpose is to pursue causes of action on behalf of its beneficiaries is not entitled to entity treatment, whether or not the trust was formed with particular litigation in mind.  Conversely, a typical Chapter 11 trust established to represent a bankruptcy estate for all purposes, including the litigation of outstanding causes of action, is entitled to entity treatment.

Lee, 2007 WL 704033, at * 4.

Application of these principles to the instant matter is straightforward.  The Trustee was not appointed for the primary purpose of bringing and prosecuting his claims in this proceeding.  Instead, as a matter of law, he has a host of duties associated with the administration of the BLMIS estate, including, inter alia, administering all aspects of the claims process in the BLMIS liquidation, serving as bailee of customer property of the debtor, marshalling and distributing

42

such property and other property of the debtor's estate, and investigating the failure of BLMIS. See SIPA §78fff-1(a) and (b); 11 U.S.C. § 704. Specifically, he generally has the same powers and duties as a Chapter 7 trustee, with limited modifications specified in SIPA. See SIPA §78fff-1(a) and (b). Accordingly, under the plain language of SLUSA, and the case law in this jurisdiction and elsewhere, the Trustee is a single person for purposes of counting putative class members and no "look-through" provision should be applied in making that computation. See 15 U.S.C. §§ 77p(f)(2)(C); 78bb(f)(5)(D); TSB Bank, 514 F.Supp.2d at 470-71; UBS AG, 510 F.Supp.2d at 236-37; Bank of Cypress, 510 F.Supp.2d at 269-70; Lee, 2007 WL 704033, at * 4; RGH Liquidating Trust v. Deloitte & Touche LLP, -- N.E.2d --, 2011 WL 2471542 (N.Y. June 23, 2011). See also Bordier, 519 F.3d at 132-33. The number of customers and/or other estate creditors who may benefit from a recovery by the Trustee thus is not pertinent here, and the Trustee's claims in this proceeding therefore cannot form part of a "covered class action."

The related limitation on the scope of the term "covered class action" noted above – the requirement that questions of law or fact common to putative class members predominate – is also relevant here. As the plain language of this limitation suggests, where suit is brought by a trustee or other trust or estate representative, questions of law or fact must be common to more than 50 of the trust or estate beneficiaries in order to satisfy the numerical requirement imposed in the definition of the term. See Bordier, 519 F.3d at 133 ("The definition [of 'covered class action'] is two-pronged: to be a covered class action, (1) the claim must be brought 'on behalf of 50 or more persons,' and (2) questions of law or fact common to 'those persons' must predominate" (emphasis in original)).

In this case, the only facts in dispute concern the knowledge and actions of Movants and the other Non-Fund Defendants, including whether those parties knew or should have known

about the fraud at BLMIS, what actions they took, if any, that assisted the fraud. These are not questions of fact that relate to the affected BLMIS customers. As a result, under SLUSA's plain language, even if the customers somehow constitute putative class members, the number of customers affected by the conduct of Movants and the other Non-Fund Defendants is irrelevant, and, again, the Trustee's claims in this proceeding cannot qualify as a "covered class action." See 15 U.S.C. §§ 77p(f)(2)(A)(i)(I); 78bb(f)(5)(B)(i)(I); Bordier, 519 F.3d at 132-33.

In attempting to overcome SLUSA's plain language, Movants rely heavily on the Third Circuit's decision in Bordier. In that case, two insiders in a corporation manipulated the corporation's stock through a "pump and dump scheme," in which they bid up the stock price through manipulated trading, and then "dumped" the stock on the market by selling it to unsuspecting investors. Id. at 126. Purchasers of the stock subsequently sued the corporation. After the corporation filed a Chapter 11 petition, the parties settled the suit. Under the terms of the settlement, the corporation assigned all of its causes of action to a litigation trust. Similarly, to facilitate efficient prosecution of the purchasers' claims, the purchasers also assigned their individual causes of action to the litigation trust. The trust thus held two types of claims: (1) those originally held by the corporation prior to assignment to the trust; and (2) those originally held by the purchasers prior to such assignment. See id. at 126-27.

In considering the applicability of SLUSA to these causes of action, the Third Circuit held that those in the first category -- claims originally held by the corporation -- did not qualify as "covered class actions." Id. at 132-37. The court reasoned that the corporation was the entity on whose behalf those claims were brought and, as a single entity, did not satisfy SLUSA's requirement that the subject suit be brought "on behalf of 50 or more persons." See id. at 134. The court explained that "[t]he Trust is not bringing the claims 'on behalf' of the Purchasers, as

44

SLUSA uses the term, because the Purchasers are not the injured parties; rather the Trust is bringing the claims 'on behalf of...' the corporation. Id.

Bordier is of no help to Movants in this case. In the first place, Bordier did not involve claims brought by a bankruptcy trustee, and the Third Circuit made crystal clear that SLUSA does not preempt such claims. See id. at 135-37. Further, the Trustee's common-law claims, which he brings as the bailee of customer property and the enforcer of SIPC's subrogation rights, are derived from single corporate entities – BLMIS in the case of the Trustee's claims as bailee and SIPC in his claims as the enforcer of SIPC's subrogation rights.

Just as in the case of the corporation in Bordier, there is no basis here for "looking through" the entity from whom the Trustee acquired the relevant claim. Thus, in Bordier, the court refused to "look through" the assignor corporation to its shareholders or to the victimized securities purchasers - the beneficiaries of the corporation's claims following the assignment of those claims to them as the result of a settlement – in evaluating whether SLUSA's class size requirement was met. See Bordier, 519 F.3d at 134. In the same way, and for the same reasons, this Court should not "look through" BLMIS or SIPC to, respectively, the customer/bailors and/or the customers whose claims SIPC made advances to satisfy, in applying that requirement. Rather, the Court should look no further than the single entities that suffered the injuries for which the Trustee now sues – BLMIS and SIPC.

In any event, even if this Court views BLMIS's customers as putative class members, application of SLUSA to the Trustee's claims is still barred by the entity exception, and the same would be true if the Trustee were also suing as assignee of the claims of customers. Movants' assertion that Bordier compels the contrary conclusion is flatly wrong. In Bordier, the Third Circuit had little to say about the entity exception in light of its conclusion that the original

holder of the claims in question was a single corporate entity. See Bordier, 519 F.3d at 134-35 ("[E]ven if the Trust can be deemed to have been established for the purpose of litigation, *a question we need not address*, looking through it would only get the court to ArtemisSoft [the corporation], the injured party, not to the Purchasers" (emphasis added)). The case certainly provides no support for the proposition that the entity exception is inapplicable here.

### B.    The Trustee Has Not Alleged Securities Fraud

Finally, SLUSA does not apply here because the Trustee has not alleged fraud "in connection with" the purchase or sale of a "covered security" within the meaning of SLUSA. The statute preempts only those claims for which allegations of "material misstatements or omissions" with respect to a "covered security" are necessary. See, e.g., Anwar v. Fairfield Greenwich, Ltd., 728 F.Supp.2d 372, 399 n.7 (S.D.N.Y. 2010); Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F.Supp.2d 258, 266-70 (S.D.N.Y. 2004). Moreover, the alleged misstatements or omissions must be the focus of the plaintiff's claim in order to trigger preemption. See, e.g., Pension Committee of the University of Montreal Pension Plan v. Banc of America Secs., LLC, 750 F.Supp.2d 450, 453-56 (S.D.N.Y. 2010) (investment in hedge fund shares does not trigger SLUSA preemption, even when the funds themselves invest in covered securities); In re Banco Santander Secs. - Optimal Litig., 732 F.Supp.2d 1305, 1317-18, 1341 (S.D. Fla. 2010) (finding no SLUSA preemption where Madoff's fraud was not "the crux of this litigation"); Anwar, 728 F.Supp.2d at 399; UBS AG, 510 F.Supp.2d at 240 ("If merely making allegations of fraud somewhere in the complaint were sufficient to bring the case within the reach of SLUSA, a class action complaint for commission of an environmental tort, that also alleged that the company fraudulently altered its books and thereby deceived shareholders,

would be preempted, even if the claim against the defendant had nothing to do with securities fraud").

In this light, there is no doubt that the Trustee's claims fall outside the scope of SLUSA. The Trustee has made no allegations of material misstatements or omissions in connection with the purchase or sales of covered securities, and need not do so in order to sustain his claims. Further, the crux of his claims does not concern any such misstatements or omissions. Rather, the Trustee alleges, at most, that Movants perpetuated the BLMIS fraud, inter alia, by helping to funnel additional investor cash into the BLMIS Ponzi scheme. The focus of the Trustee's claims thus lies several steps removed from Madoff's securities fraud, which is merely background to the Amended Complaint. See Anwar, 728 F.Supp.2d at 399 ("Though the Court must broadly construe SLUSA's 'in connection with' phrasing, stretching SLUSA to cover this chain of investment – from…[the] initial investment in the [Feeder] Funds, the Funds' reinvestment with Madoff, Madoff's supposed purchases of covered securities, to Madoff's sales of those securities and purchases of Treasury bills – snaps even the most flexible rubber band").

## CONCLUSION

For all of the aforementioned reasons, the Motions should be denied in all respects.

Dated: August 31, 2011
Washington, D.C.

Respectfully submitted,


JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior   Associate   General   Counsel   for
Dispute Resolution

/s/ Christopher H. LaRosa
CHRISTOPHER H. LAROSA
Associate General Counsel

LAUREN T. ATTARD
Staff Attorney

SECURITIES INVESTOR
   PROTECTION CORPORATION
805 15th Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
Email: jwang@sipc.org
Email: kbell@sipc.org
Email: clarosa@sipc.org
Email: lattard@sipc.org